The decision below is hereby signed. Dated:
December 6, 2006.

_S. Martin Teel Jr._ _____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| GREATER SOUTHEAST COMMUNITY | ) | Case No. 02-02250 |
| HOSPITAL CORP. I, *et al.*, | ) | (Chapter 11) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| ―――――――――――――――――― | ) | |
| | ) | |
| SAM J. ALBERTS, TRUSTEE FOR | ) | |
| THE DCHC LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding No. |
| v. | ) | 04-10366 |
| | ) | |
| HCA INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM DECISION REGARDING MOTION FOR PARTIAL
SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

Sam J. Alberts, trustee for the DCHC Liquidating Trust (the

"Trust") and plaintiff in this adversary proceeding, seeks to

avoid and recover certain allegedly fraudulent transfers (the

"Michael Reese Transfers") from Michael Reese Medical Center

Corporation ("Michael Reese"), as well as other debtors in this

jointly administered bankruptcy case (collectively the

"Debtors"), to defendants HCA, Inc. ("HCA"), Galen Hospital

Illinois, Inc. ("GHI"), and Western Plains Capital, Inc.

("Western") under the Illinois Uniform Fraudulent Transfer Act,

740 Ill. Comp. Stat. 160/1 et seq. (1990) (the "IUFTA"), pursuant

to 11 U.S.C. § 544.  Alberts has moved for partial summary

judgment with respect to Count III of his second amended

complaint (D.E. No. 56, filed July 21, 2005) (the "Complaint").[1]

HCA and GHI (collectively the "Defendants") oppose this motion

and have cross-moved for summary judgment on all counts in the

Complaint.[2]

The Complaint lists six counts: two causes of action

premised on § 5(a)(1) of the IUFTA (Counts I and II), see 740

Ill. Comp. Stat. 160/5(a)(1), two causes of action under

§ 5(a)(2) of the IUFTA (Counts III and IV), see id. at

160/5(a)(2), and two causes of action under § 6(a) of the IUFTA

---

[1] Subsequent to the filing of his motion for partial
summary judgment, Alberts requested leave to file a third amended
complaint adding Western as a defendant and adding language
regarding certain "Obligations" incurred by Michael Reese in
connection with its allegedly fraudulent transfers (D.E. No. 208,
filed August 29, 2006).  The court granted this request in part
by permitting Alberts to add Western as a defendant in a decision
and accompanying order entered on October 12, 2006 (D.E. Nos.
247-48).  The balance of Alberts's request was resolved by a
stipulation entered into between the parties on October 18, 2006
(D.E. No. 254).

[2] Because Western was not yet a party to this proceeding
when Alberts filed his motion for partial summary judgment, HCA
and GHI were the only two defendants in a position to respond to
the motion.

(Counts V and VI).  See id. at 160/6(a).  Alberts seeks partial

summary judgment with respect to Count III on a single issue:

whether the count is barred by the statute of repose set forth in

the IUFTA.  The Defendants seek summary judgment on this issue

and several others.  For the reasons that follow, the court will

deny Alberts's motion in part, grant in part and deny in part the

cross-motion filed by the Defendants, and defer consideration of

one issue at this time.

I

The following facts are undisputed.[3]  Michael Reese was

formed as a wholly-owned subsidiary of Doctors Community Hospital

Corporation ("DCHC"), a privately-held healthcare management

company organized under the laws of Delaware.  (Pl. Statement of

Material Undisputed Facts ¶ 15 (D.E. No. 104, filed March 9,

2006).[4]  On July 8, 1998, Michael Reese entered into an asset

purchase agreement (the "APA") with GHI, a corporate subsidiary

of fellow defendant HCA, for the purchase of Columbia Michael

---

[3]  Unless indicated otherwise, all factual conclusions drawn
from the parties' statements of material undisputed facts refer
to facts not disputed in the parties' responsive statements,
which are therefore deemed as having been admitted pursuant to
Local Bankr. R. 7056-1, and all factual conclusions drawn from
the Complaint refer to allegations in the Complaint that are
admitted by the Defendants.

[4]  The citation above is to a statement of material
undisputed facts filed by Alberts in connection with his prior
motion for partial summary judgment, which remains a part of the
record in this proceeding.

Reese Hospital and Medical Center ("Michael Reese Hospital").

(Compl. ¶ 15).  Michael Reese and GHI entered into a series of

amendments to the APA throughout the fall of 1998.  (Compl.

¶¶ 17-21).  On November 9, 1998, the parties signed the "Sixth

Amendment" to the APA--the last such document signed prior to the

purchase of the hospital.  (Compl. ¶ 21).  The purchase of

Michael Reese Hospital closed on November 12, 1998.  (Def.

Statement of Undisputed Material Facts ¶ 4 (D.E. No. 198, filed

August 28, 2006)).[5]

Michael Reese and its affiliated Debtors filed for chapter

11 relief on November 20, 2002.  After protracted proceedings

lasting almost 18 months, the Debtors achieved confirmation of

their second amended plan of reorganization (the "Plan") on April

---

[5]  Alberts filed a counter-statement of material undisputed
facts to the Defendants' cross-motion (D.E. No. 240, filed
September 28, 2006), but he neglected to file a statement of
disputed facts contradicting the assertions made by the
Defendants in their initial statement.  Pursuant to Local Bankr.
R. 7056-1, the court will deem the facts stated in the
Defendants' statement as having been admitted by Alberts insofar
as those facts do not contradict the facts laid out by Alberts in
his counter-statement.  Alberts did not address the timing of the
Michael Reese Transfers in his counter-statement; accordingly,
the Defendants' statement that the transfers closed on November
12, 1998, is binding.
    Also as set forth in the Defendants' statement of undisputed
material facts, DCHC subsidiary Grant Hospital Corporation signed
an asset purchase agreement with Columbia Grant Hospital Inc.,
for the purchase of Grant Hospital on the same date that Michael
Reese entered into the APA with GHI.  (Def. Statement of Material
Undisputed Facts ¶ 2).  Although this transaction has some
bearing on the overall dispute between the parties, it is
irrelevant with respect to the issues raised in the motions
considered in this memorandum decision.

5, 2004, and their operations were taken over by entities known as the "Reorganized Debtors."  Section 6.6 of the Plan provides for the creation of the Trust, which is charged with liquidating certain assets of the Debtors and distributing the proceeds to certain classes of creditors (including certain unsecured creditors).[6]  Among the assets transferred to the Trust were fraudulent conveyance and other actions authorized under chapter 5 of the Bankruptcy Code.  (Plan §§ 4.10, 6.6(f)).

Alberts initiated the instant adversary proceeding on November 18, 2004.  After filing an amended complaint (while at the same time opposing the Defendants' motion to dismiss the original complaint),[7] the Defendants filed a second motion to dismiss.  The court denied the second motion to dismiss, but ordered Alberts to file a second amended complaint alleging facts that would justify his "lumping" together of the debtors in his complaint or specify which of the debtors consummated the allegedly fraudulent conveyance.

Alberts amended his complaint again on July 21, 2005, and

---

[6] Section 6.6(a) of the Plan specifies that the Trust "shall be for the benefit of the holders of the NCFE Claim, Allowed General Unsecured Claims and Allowed Patient Refund Claims." Other creditors' claims were discharged by the Plan (e.g., if no timely claim was filed) or assumed by the Reorganized Debtors (as in the case of allowed medical malpractice claims).  (See generally Plan Art. IV).

[7]  The Defendants' motion to dismiss the original complaint was denied without prejudice in an order entered March 31, 2005.

moved for partial summary judgment on March 9, 2006.  The
Defendants filed an initial opposition to this motion under Fed.
R. Civ. P. 56(f) and then filed a supplemental opposition, which
Alberts moved to strike.[8]

The parties appeared before the court on April 4, 2006, for
a hearing on Alberts's motion for partial summary judgment, at
which time the court ruled from the bench that the motion should
be granted in part and denied in part.  The court subsequently
entered an order reciting that Michael Reese transferred
$66,048,840.00 towards the purchase of Michael Reese Hospital.[9]

Alberts filed the instant motion on July 27, 2006.  The
Defendants responded to this latest motion by filing both an
opposition and a cross-motion for summary judgment.  The
Defendants filed a separate motion for summary judgment on
November 6, 2006, which the court has not yet considered.

II

Pursuant to Fed. R. Civ. P. 56 (as incorporated by Fed. R.
Bankr. P. 7056), summary judgment will be granted where "there is
no genuine issue as to the material fact and the . . . moving
party is entitled to judgment as a matter of law."  Fed. R. Civ.

_____

[8] The court ultimately denied Alberts's motion to strike,
but did award him attorneys' fees and costs for expenses incurred
in drafting and prosecuting the motion.

[9] The court has not yet determined whether additional
transfers totaling $5,571,381.00 were made as alleged by Alberts.
(Summ. J. Order at 2 (D.E. No. 155, entered June 2, 2006)).

P. 56(c).  The court must deny summary judgment where there is a genuine issue as to any material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  If the movant makes a properly supported motion, the burden shifts to the opposing party to demonstrate specific facts showing that there is a genuine issue for trial.  Id.

If the moving party does not bear the burden of proof at trial on an issue, summary judgment may be granted if the moving party shows "that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant alleges that the opposing party lacks proof to establish requisite elements of its case, the movant must show the absence of such facts.  Id.  The court must view the opposing party's evidence in the light most favorable to non-movant's position and draw inferences in favor of that party, provided such inferences are justifiable or reasonable. Matsushita Elec. Indus. Co., Inc. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

A.  Statute of Limitations

The only issue presented by Alberts's motion is whether Alberts is time-barred from pursuing Count III of his Complaint by § 10 of the IUFTA, which provides that a cause of action under the act "is extinguished" unless brought "within four years after the transfer was made or the obligation incurred."  740 Ill.

7

Comp. Stat. 160/10(a).  Alberts does not dispute that his complaint was filed more than four years after the purchase of Michael Reese Hospital, but argues that he is entitled to invoke the statute of limitations available to any unsecured creditor of the estate at the time that Michael Reese filed its petition.

Alberts identifies two such creditors: the United States Department of Health and Human Services ("HHS") and the Internal Revenue Service ("IRS").  According to Alberts, HHS held a claim for Medicare overpayments pursuant to 28 U.S.C. § 1345, while the IRS held separate claims for taxes owed under the Federal Unemployment Tax Act, 11 U.S.C. § 3301 <u>et</u> <u>seq.</u> ("FUTA"), and for employment taxes owed pursuant to § 3111 of the Internal Revenue Code.  26 U.S.C. § 3111(a).  He argues that the existence of these three claims allows him to access either the six-year statute of limitations provided by 28 U.S.C. § 2415 for actions brought by the United States government (for the HHS claim) or the ten-year statute of limitations provided by 26 U.S.C.

§ 6502[10] for tax claims brought by the IRS (for the two IRS claims).

The Defendants argue in response that (1) Alberts lacks standing to assert any claims held by HHS or the IRS, or, alternatively, should be equitably estopped from doing so, (2) Alberts cannot invoke any statute of limitations other than § 10 of the IUFTA as a matter of law, and (3) there is no evidence in the record that either HHS or the IRS were unsecured creditors of Michael Reese as of the petition date.[11]  The court considers each category of documents in turn.

---

[10]  Section 6502 of the Internal Revenue Code provides that "[w]here the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun . . . within 10 years after the assessment of the tax . . . ."  26 U.S.C. § 6502(a)(1).  Section 6501 of the Internal Revenue Code specifies that "the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed . . . ."  Id. at § 6501(a).  Thus, the IRS has three years from the filing of a tax return to render an assessment of the taxes owed and another ten years from the date of assessment to pursue its claims in court.

[11]  Because the avoidance powers conferred upon the estate representative by § 544(b) cannot be altered by the subsequent conduct of a single creditor, the key question is whether an unsecured creditor existed as of the petition date, not whether such a creditor exists now.  Marquette Bank Ill. v. Covey (In re Classic Coach Interiors, Inc.), 290 B.R. 631, 640 (Bankr. C.D. Ill. 2002); accord Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 807 (9th Cir. 1994); Sheffield Steel Corp. v. HMK Enterprises, Inc. (In re Sheffield Steel Corp.), 320 B.R. 423, 446 (Bankr. N.D. Okla. 2004).

1.   <u>Standing & Equitable Estoppel</u>

As a threshold issue (although it is actually one of the last arguments that they make), the Defendants argue that Alberts lacks standing to assert causes of action held by the IRS or HHS. (Def. Opp'n at 83-93 (D.E. No. 195, filed August 28, 2006)). Alternatively, they request that the court bar Alberts from pursuing the instant action under traditional principles of equity.  (Def. Opp'n at 93-96).  Both arguments derive from the provisions of the Plan, which vest the § 544(b) claims formerly held by the Debtors in the Trust but leaves the claims against the former estate held by the IRS and HHS with the Reorganized Debtors. (Plan §§ 1.29, 6.3(e)).

The standing argument requires little effort to refute. Section 6.6 of the Plan provides for the transfer of the "Liquidating Trust Assets" to the Trust.  The Liquidating Trust Assets include "Litigation Claims" (Plan § 1.50), which the Plan defines as meaning, <u>inter</u> <u>alia</u>, "all remaining causes of action of the Debtors as of the Effective Date, including but not limited to claims or causes of action under sections 542 through

10

553 of the Bankruptcy Code . . . ." (Plan § 1.53).[12]

This court has already concluded that Alberts can invoke the same powers that a chapter 11 trustee or debtor-in-possession would possess because he is a "representative of the estate" as defined by 11 U.S.C. § 1123. <u>Alberts v. Tuft (In re Greater Southeast Cmty. Hosp. Corp. I)</u>, 333 B.R. 506, 537-38 (Bankr. D.D.C. 2005) ("<u>Tuft</u>"). Alberts works on behalf of the estate, and it is that interest, not the interests of specific creditors, that matters in determining whether a person can invoke § 544(b).[13] His standing is not in doubt.

The court is equally unpersuaded by the Defendants' equitable estoppel argument. The argument assumes that HHS and the IRS will receive no benefit from any recoveries made by Alberts because the Plan bifurcated the former Debtors into the

---

[12] The Defendants state correctly that the Plan transferred responsibility for payment of claims held by HHS and the IRS against the estate to the Reorganized Debtors, but the claims at issue here never belonged to those creditors. Rather, the claims asserted by Alberts pursuant to § 544(b) belonged to the estate in the first instance. <u>See</u> <u>AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.)</u>, 117 B.R. 789, 799-800 (Bankr. S.D.N.Y. 1990) ("Sections 544(b) and 548 of the [Bankruptcy] Code expressly vest in the trustee or debtor-in-possession the right to assert a claim for fraudulent conveyance under state or federal law."); <u>see also</u> <u>Bank of Cal. v. LMJ, Inc. (In re LMJ, Inc.)</u>, 159 B.R. 926, 928 (D. Nev. 1993) ("The Code section does not give avoidance powers to creditors, nor have the courts generally allowed creditors to invoke such power.").

[13] Individual creditors can pursue their own state-law fraudulent conveyance claims once the bankruptcy case is closed and the automatic stay imposed by 11 U.S.C. § 362 expires. <u>Klingman v. Levinson</u>, 158 B.R. 109, 113 (N.D. Ill. 1993).

Trust, which holds and prosecutes the litigation claims formerly held by the Debtors for the benefit of certain creditors, and the Reorganized Debtors, who retain the former Debtors' liabilities to HHS and the IRS.  However, as the court explained in a recent decision involving a different liquidating trust, even creditors who hold no interests in a trust benefit from the creation of the trust because they receive a greater <u>pro rata</u> distribution under the debtor's plan of reorganization than they would have received had other creditors not exchanged their claims for shares in the trust.  <u>Premium of America, LLC v. Sanchez (In re Premium Escrow Services, Inc.)</u>, 342 B.R. 390, 401 & n.5 (Bankr. D.D.C. 2006).

In short, it does not matter whether the IRS or HHS would benefit <u>now</u> from any recovery made by Alberts in this proceeding because, starting from the petition date, they <u>already</u> benefitted from the mere possibility of recovery, which could have only increase the possibility that the Debtors would pay the IRS and HHS claims in a manner satisfactory to those creditors.[14]  In any event, § 544(b) simply does not require an estate representative to demonstrate that the debtor into whose shoes she steps as of

---

[14]  <u>Cf.</u> <u>In re Acequia, Inc.</u>, 34 F.3d at 807-08 (holding that preference actions maintained by estate representatives post-confirmation benefit the estate within the meaning of 11 U.S.C. § 550 in part because "if confirmation and payment precluded application of section 544(b), debtors undoubtedly would delay filing plans of reorganization until completing all potential litigation, a result that would contravene the Bankruptcy Code's goal of quick and equitable reorganization").

the petition date will benefit from the recovery, nor does it recognize an equitable defense on those grounds to recovery of otherwise avoidable transfers of assets.  Even if the IRS and HHS claims had been paid in full mere hours after commencement of the case, that would not alter the estate representative's ability to invoke § 544(b).  <u>See</u> n.11, <u>supra</u>.

Alberts has standing to pursue this lawsuit, and there is nothing inequitable in permitting him to do so.  The Defendants' arguments to the contrary are denied.

2.   <u>Sovereign immunity</u>

Section 544(b) of the Bankruptcy Code permits a trustee (or other representative of the estate) to "use [the] statutes of limitations available to any creditor in whose shoes he stands in bringing the action."  <u>Osherow v. Porras (In re Porras)</u>, 312 B.R. 81, 97 (Bankr. W.D. Tex. 2004); <u>accord</u> <u>G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)</u>, 313 B.R. 612, 636 (Bankr. D.N.J. 2004) ("<u>G-I Holdings I</u>"), <u>rev'd in part on other grounds by</u> <u>Official Comm. of Asbestos Claimants v. Bank of N.Y.</u>, Civil No. 04-3423 (D.N.J. June 21, 2006) ("<u>G-I</u>

13

Holdings II").[15]  In the case of government creditors, the

statute of limitations provided by federal law to the specific

creditor in question trumps any statute of limitations set forth

in the applicable state fraudulent transfer law under the Supreme

Court's ruling in United States v. Summerlin, 310 U.S. 414

(1940).  In re Porras, 312 B.R. at 97; accord Shearer v. Tepsic

(In re Emergency Monitoring Technologies, Inc.), 347 B.R. 17, 18-

19 (Bankr. W.D. Pa. 2006).

     In Summerlin, the Supreme Court expounded upon the "well

settled" rule "that the United States is not bound by state

statutes of limitation or subject to the defense of laches in

enforcing its rights."  Summerlin, 310 U.S. at 416.  Writing for

the majority, Chief Justice Hughes stated unequivocally:

> When the United States becomes entitled to a
> claim, acting in its governmental capacity and
> asserts its claim in that right, it cannot be
> deemed to have abdicated its governmental
> authority so as to become subject to a state
> statute putting a time limit upon enforcement.

Id. at 417.  As the Ninth Circuit explained in Bresson v. Comm'r

of Internal Revenue, 213 F.3d 1173 (9th Cir. 2000), "if the

---

[15]  In G-I Holdings II, the district court held that the
doctrine of equitable tolling did not apply to New Jersey's
version of the Uniform Fraudulent Transfer Act (the "UFTA")
because that statute contained a statute of repose rather than a
statute of limitations.  G-I Holdings II, slip op. at 20-22.  The
decision is not relevant to the instant dispute because the
doctrine under which the IRS and HHS could extend the limitations
period set forth in the IUFTA is federal sovereign immunity, not
equitable tolling.  See discussion, infra.

14

United States comes into possession of a valid claim, that claim cannot be 'cut off' later by a state statute of limitations." Id. at 1176.

Numerous courts have held that the Summerlin rule applies to fraudulent transfer actions brought by an unsecured governmental creditor. See, e.g., Bresson, 213 F.3d at 1177-79; United States v. Moore, 968 F.2d 1099, 1100-01 (11th Cir. 1992); United States v. Jepsen, 131 F. Supp. 2d 1076, 1087-88 (W.D. Ark. 2000); United States v. Nemecek, 79 F. Supp. 2d 821, 824-27 (N.D. Ohio 1999); United States v. Cody, 961 F. Supp. 220, 221 (S.D. Ind. 1997); United States v. Smith, 950 F. Supp. 1394, 1402-04 (N.D. Ind. 1996); United States v. Bantau, 907 F. Supp. 988, 991 (N.D. Tex. 1995).[16]  Many of these same courts have rejected expressly the position (previously espoused by the Defendants) that Summerlin does not apply because the UFTA contains a "statute of repose" rather than a "statute of limitations."  See, e.g., Bresson, 213 F.3d at 1177-79; Nemecek, 79 F. Supp. 2d at 825-27; Cody, 961 F.

---

[16]  See also, e.g., United States v. Spence, 242 F.3d 392, available at 2000 WL 1715216, *3 (10th Cir. 2000) (unpublished op.); United States v. Gaona, 2004 WL 3186398, **2-3 (W.D. Tex. Dec. 22, 2004); United States v. Stavros, 2002 WL 31545918, **3-4 (N.D. Ill. Nov. 13, 2002); United States v. Smith, 2002 WL 31174188, **4-5 (S.D. Ohio Aug. 23, 2002); United States v. Kattar, 1996 WL 784587, **4-5 (D.N.H. Dec. 31, 1996); United States v. Zahone, 1996 WL 437509, **2-4 (C.D. Ill. May 29, 1996); Flake v. United States, 1995 WL 735740, **2-4 (D. Az. Sept. 29, 1995); Snyder v. United States, 1995 WL 724529, *12 (E.D.N.Y. July 26, 1995); Stoecklin v. United States, 858 F. Supp. 167, 167-68 (M.D. Fla. 1994).

15

Supp. at 220.[17]

Notwithstanding these settled principles of law, the
Defendants argue that the four-year statute of limitations set
forth in § 10 of the IUFTA is the governing statute of
limitations even if unsecured governmental creditors with longer
statute of limitations were in existence as of the petition date.
They argue that Summerlin does not apply in this case because (1)
the IRS and HHS have other ways of enforcing any claims they
might have against Michael Reese Corp., (2) Alberts is not acting
in a governmental capacity, and (3) Summerlin does not apply to
future governmental creditors (i.e., governmental creditors not
in existence at the time of the challenged transfer).  Each of
these arguments contradicts settled law and sound reason;
accordingly, each argument must be rejected as a matter of law.

(a)  Alternative means of enforcement

The Defendants quote selectively--very selectively--from the
Summerlin decision to support the novel proposition that "a state
statute of limitations will remain effective and applicable

_____

[17]  This court could locate only one decision in which a
court held that Summerlin did not apply to fraudulent conveyance
actions brought by a governmental creditor.  In United States v.
Vellalos, 780 F. Supp. 705 (D. Haw. 1992), the district court
held that Summerlin did not apply to a fraudulent transfer action
brought by the IRS under Hawaii's version of the UFTA because, in
its opinion, Summerlin applied only to common law causes of
action, whereas the UFTA created statutory causes of action.
Vellalos, 780 F. Supp. at 707-08.  This holding was rejected
explicitly by the Ninth Circuit in Bresson.  213 F.3d at 1178.

against a federal entity as long as there is 'an opportunity

[for] the United States otherwise to enforce its claim.'"  (Def.

Opp'n at 15 (quoting Summerlin, 310 U.S. at 417)).  This is a

gross distortion of the Supreme Court's actual sentiment.  The

language surrounding the Defenants' quote clarifies the meaning

of the excerpted language:

> If this were a statute merely determining the
> limits of the jurisdiction of a probate court
> and thus providing that the County Judge
> should have no jurisdiction to receive or pass
> upon claims not filed within the eight months,
> while leaving an opportunity to the United
> States otherwise to enforce its claim, the
> authority of the State to impose such a
> limitation upon its probate court might be
> conceded.  But if the statute, as sustained by
> the state court, undertakes to invalidate the
> claim of the United States, so that it cannot
> be enforced at all, because not filed within
> eight months, we think the statute in that
> sense transgressed the limits of state power.

Summerlin, 310 U.S. at 417 (emphasis added).

In other words, the Court merely distinguished a statute

that eliminated a claim, which the Court held to be

impermissible, from a statute that barred a particular court from

hearing a claim, which the Court considered permissible.  Nothing

in the passage quoted above suggests that the Supreme Court

intended for Summerlin to apply only when a governmental creditor

possesses a single cause of action.

The court cannot conceive of a reason why the Supreme Court

would have engrafted the kind of limitation on the federal

government's sovereign immunity that the Defendants propose.  As
the Court made clear two years prior to the Summerlin decision in
Guaranty Trust Co. of N.Y. v. United States, 304 U.S. 126 (1938)
("Guaranty Trust"), the "true reason" for the federal
government's immunity from laches or state statutes of
limitations "is to be found in the great public policy of
preserving the public rights, revenues, and property from injury
and loss[] by the negligence of public officers."  Id. at 132
(quotation omitted).

It can hardly be argued that the Summerlin rule "preserv[es]
the public rights" if it only applies whenever the government has
no other rights to assert in a particular dispute.  To the
contrary, both Guaranty Trust and Summerlin stand for the
proposition that governmental error should never compromise the
national public interest except insofar as the people limit their
own rights through the passage of federal statutes of
limitations.  See E.I. Dupont De Nemours & Co. v. Davis, 264 U.S.
456, 462 (1924) ("an action on behalf of the United States in its
governmental capacity . . . is subject to no time limitation, in
the absence of congressional enactment clearly imposing it")
("E.I. Dupont").

(b)  Governmental capacity

The Defendants suggest that the putative claims held by HHS
and the IRS are not claims held in a "governmental capacity"

18

because these creditors will not benefit from the instant
lawsuit.  See United States v. Banks, 115 F.3d 916, 919 (11th
Cir. 1997) (state statute of limitations applies "when the
government is acting to vindicate private interests, not a
sovereign or public interest" (emphasis in original)).  As the
court explained in discussing Alberts's standing to bring this
suit, this theory rests on the flawed premise that the IRS and
HHS must receive a present benefit from Alberts's lawsuit for
their interests to be served when they have already benefitted
insofar as the right to bring the lawsuit could only have a
positive impact on the payment of their claims.  See part II.A.1,
supra.

There is another, more fundamental flaw in the Defendants'
argument.  It assumes that Alberts is asserting the claims
actually held by the IRS and HHS, as though these claims were
assigned to him by the creditors.  They were not.  The claims
assigned to Alberts were separate claims held by the Debtors as
debtors-in-possession that arose under § 544(b).  See nn.12-13,
supra.

Congress crafted § 544(b) to give the representative of the
estate the ability to avoid any transaction that any unsecured
creditor of the estate could have avoided as of the petition

date.[18]  The estate representative steps into the shoes of each

such unsecured creditor and is cloaked with the rights of that

creditor.  If an unsecured creditor of the estate could have

avoided a transaction under state law despite the existence of a

state statute of limitations on that claim because the creditor

was acting in a "governmental capacity," so too can the estate

representative avoid the transfer under § 544(b).  The unsecured

creditor's ability to trump the applicable state statute of

limitations might derive from its sovereign immunity, but the

estate representative's ability to override that same limitation

derives from § 544(b).[19]  The focus of the court in determining

who is acting in a "governmental capacity" is the unsecured

creditor, not the estate representative.

The basis for the claims allegedly held by the IRS derives

from Subtitle C of the Internal Revenue Code, which effectuates

the authority given to Congress to "collect Taxes" pursuant to

Article I, § 8 of the Constitution.  The basis for the claim

allegedly held by HHS is the government's common law right to

---

[18]  See S. Rep. No. 95-989 at 85 (1978), as reprinted in
1978 U.S.C.C.A.N. 5787, 5871 (section 544(b) "gives the trustee
the rights of actual unsecured creditors under applicable law to
void transfers"); see also H.R. Rep. No. 95-595 at 370 (1977), as
reprinted in 1978 U.S.C.C.A.N. 5963, 6326 (same).

[19]  To the extent that § 544(b) conflicts with § 10 of the
IUFTA, the Bankruptcy Code provision controls under normal
principles of federal preemption.  The Plan Committee v.
Pricewaterhousecoopers, LLP, 335 B.R. 234, 244 (D.D.C. 2005).

recovery of funds paid in error to Michael Reese Hospital.  <u>See</u>

<u>United States v. Lahey</u>, 399 F.3d 1, 5 (1st Cir. 2004) (describing

common law causes of action under which HHS can pursue Medicare

overpayments).  Both types of claims fall squarely within the

rubric of the agencies' "governmental capacit[ies]".[20]

          (c)   <u>Future creditors</u>

Finally, the Defendants argue that the <u>Summerlin</u> rule cannot

protect the claims held by the IRS and HHS because those alleged

claims arose after the Michael Reese Transfers.  According to the

Defendants, application of the <u>Summerlin</u> rule under such

circumstances would "violate[] the parties' state-created,

substantive right to protection from liability because the

parties have no way of knowing when, if ever, their liability

associated with the transfer will be extinguished."  (Def. Opp'n

at 22).  It would also supposedly "rewrite [§] 544(b) and extend

---

    [20]   <u>See</u> <u>United States v. Peoples Household Furnishings,</u>
<u>Inc.</u>, 75 F.3d 252, 254-56 (6th Cir. 1996) (claim assigned to
Small Business Association by virtue of the Small Business Act of
1953 had "governmental" purpose because the underlying law "was
designed to enhance the security and economic well-being of the
nation"); <u>United States v. West</u>, 299 F. Supp. 661,664 (D. Del.
1969) (government was "acting in its governmental capacity" by
"striving to protect 'public money'" from delinquent debtor
(internal quotation omitted)).

its reach beyond comprehension . . . .” (Def. Opp’n at 13).[21]

This argument holds little water.[22]  The IUFTA allows future creditors to utilize its remedies.  740 Ill. Comp. Stat. 160/5. There is no great injustice in allowing HHS or the IRS to have a fraudulent transfer claim under the IUFTA without a set statute of limitations.  The Defendants’ argument would apply as well to a claim in existence prior to the fraudulent transfer whose existence remained undisclosed.  Consider a debtor who conceals her tax debt by failing to file a tax return.[23]  Such a debtor should not profit from her own deceit any more than a tortfeasor

---

[21]  The tone of the Defendants’ prose would lead one to think that Alberts is somehow to blame for creating this supposed “violat[ion]” of the (heretofore unknown) “right to protection from liability,” when in fact it is the IUFTA which has created this conundrum by permitting future creditors to avoid transfers that took place before those creditors were owed any money. Presumably, the Illinois legislature will amend the statute to eliminate this provision if the economic catastrophe predicted by the Defendants comes to pass.

[22]  The Defendants cite no precedent that remotely suggests anything like the proposition they advance.  They point to Landgraf v. USI Film Products, 511 U.S. 244 (1994), where the Supreme Court held that certain provisions of the Civil Rights Act of 1991 did not apply to Title VII cases pending on appeal when the statute was enacted under traditional principles of statutory retroactivity.  Id. at 247-86.  Given that both the IUFTA and § 544(b) were already in effect at the time of the Michael Reese Transfers, the court fails to see how that case has any bearing on the instant dispute.

[23]  The reader will recall that deadline for the IRS to render an assessment is three years from the filing of a tax return.  See n.10, supra.  The assessment, in turn, serves as the starting point for the ten-year statute of limitations in which the IRS may pursue its claims in court.  Id.

who conceals her tort is allowed to profit from that dishonesty
by invoking the statute of limitations.[24]

Moreover, it is far from clear that applying the <u>Summerlin</u>
rule in cases like this would "provid[e] a trustee with avoidance
powers that have no temporal limitations whatsoever" as the
Defendants intimate.  (Def. Opp'n at 13).  In <u>Guaranty Trust</u>, the
Supreme Court refined its sovereign immunity jurisprudence by
holding that a claim assigned to the United States government
that had already lapsed under the applicable state statute of
limitations was not "revived" by its assignment to the United
States.  304 U.S. at 141-42.  In the Court's view, because there
had "been no neglect or delay by the United States or its
agents," the government had "lost no rights by any lapse of time
after the assignment," <u>id.</u> at 141, and "the United States never
acquired a right free of a pre-existing infirmity, . . . which

_____

[24]    The court recognizes that the doctrine of equitable
tolling does not apply to actions brought under the IUFTA because
that statute contains a statute of repose, <u>see</u> n.15, <u>supra</u>, but
the statute in question here is § 2602 of the Internal Revenue
Code, not § 10 of the IUFTA.

public policy does not forbid." _Id._ at 141-42.[25]

_Guaranty Trust_ involved the assignment of a claim, whereas the hypothetical claim at issue here arose by operation of § 544(b). Nevertheless, a persuasive case could be made that _Guaranty Trust_ would prevent a governmental creditor from bringing an action under the IUFTA if its claim did not arise until after the four-year statute of repose had passed. Such a rule would render the Defendants' "Chicken Little" argument moot.

Finally, the whole point of the _Summerlin_ rule and the doctrine of federal sovereign immunity in general is that the "right to protection from liability" (_i.e._, statutes of limitations or repose) created by an individual State can be "violate[d]" by the federal government whenever it is in the public interest to do so. Indeed, where Congress does not pass a statute of limitations specifically limiting a claim held by the

---

[25] The Ninth Circuit summarized the effect of the _Guaranty Trust_ holding on the _Summerlin_ rule as follows:

> Taken together, _Summerlin_ and _Guaranty Trust_ suggest two countervailing principles. On the one hand, if the United States comes into possession of a valid claim, that claim cannot be "cut off" later by a statute of limitations. On the other hand, if a claim already has become infirm (for example, when a limitations period expires) by the time the United States acquires the purported right, the rule of _Summerlin_ will not operate to revive the claim.

_Bresson_, 213 F.3d at 1176 (emphasis in original).

government, that claim is inexhaustible.  E.I. Dupont, 264 U.S.
at 462.

For all these reasons, the court concludes that Alberts can
utilize the extended statute of limitations available to
unsecured governmental creditors assuming that such creditors
existed as of the petition date.

3.   Existence of unsecured governmental creditors

Having determined the availability of a statute of
limitations longer than that provided by § 10 of the IUFTA as a
matter of law, the court now considers whether there is any
genuine dispute as to whether creditors capable of invoking such
statutes existed on the petition date as a factual matter.  As
the court noted previously, Alberts hangs his hat on three
alleged claims: one purportedly held by HHS due to Medicare
overpayments made to Michael Reese throughout 2002, and two
purportedly held by the IRS for FUTA and employment taxes.  In
all three cases, Alberts relies at least in part on the proofs of
claim filed by HHS and the IRS in the Debtors' main case as proof
of the claims' existence.

"Proofs of claim are more than mere pleadings or
allegations--they are some evidence."  In re Cluff, 313 B.R. 323,
340 (Bankr. D. Utah 2004); accord In re Dove-Nation, 318 B.R.
147, 152 (B.A.P. 8th Cir. 2004); see also In re McGee, 258 B.R.
139, 147 (Bankr. D. Md. 2001) (noting that even rebutted proof of

25

claim "retains some weight as evidence").[26]  Thus, Alberts need

only show that the proofs of claim filed by HHS and the IRS

establish at least one of these creditors as holding an allowable

unsecured claim on the Debtors' petition date to survive the

Defendants' cross-motion.[27]  If Alberts can clear that hurdle,

the burden will fall on the Defendants to present some evidence

contradicting any such proofs of claim if they are to defeat

Alberts's summary judgment motion.

     (a)  <u>HHS claim</u>

HHS filed Proof of Claim No. 01883 on November 3, 2003.

(Pl. Mem. at Ex. 1 (D.E. No. 177, filed July 27, 2006)).  In its

proof of claim, HHS asserted an "[u]nsecured [n]on[-p]riority

[c]laim" totaling $176,400.00 for Medicare overpayments made over

the course of 2002.  In a subsequent letter sent to former DCHC

---

[26]  The notion that a proof of claim has intrinsic
evidentiary value dates back to the Supreme Court's ruling in
<u>Whitney v. Dresser</u>, 200 U.S. 532 (1906), where Justice Holmes,
writing for the court, concluded that the structure of the claims
allowance process and the requirement that a creditor file a
"proof" of her claim "indicates that the claim is regarded as
having a certain standing already established by the oath" taken
by the creditor when filing the proof of claim.  <u>Id.</u> at 535.

[27]  The court does not mean to suggest that Alberts will
prevail at trial if the only evidence adduced in support of his
assertion that HHS and the IRS were pre-petition creditors of
Michael Reese is the proofs of claim filed by those agencies.  At
that point, Alberts would need to satisfy his evidentiary burden
of demonstrating the existence of these creditors by a
preponderance of the evidence, whereas for purposes of the
instant motions he need only show some evidence of their
existence in the record.

Vice-President Donna Talbot on November 15, 2005, Mutual of Omaha
Insurance Company ("Mutual of Omaha"), the insurance provider
acting as an intermediary between HHS and Michael Reese,
calculated that Michael Reese owed HHS $53,186.00 for
overpayments made in 2002. (Demchick Decl. at Ex. C).[28]   The HHS
proof of claim and Mutual of Omaha letter are the only exhibits
proffered by Alberts in support of his allegation that HHS was an
unsecured creditor as of the petition date.

This meager evidence is not enough to withstand the
Defendants' cross-motion for summary judgment. As the court
explained at the hearing on the parties' last round of summary
judgment motions, the evidence produced by Alberts suggests that
Michael Reese was overpaid at some point in 2002, but it does not
show that the company was overpaid before the petition date.
(Apr. 4, 2006 Hr'g Tr. at 148:8-17 (D.E. No. 145, filed May 12,
2006)). Simply put, there is not even a scintilla of evidence
that HHS overpaid Michael Reese anytime before December 31, 2002.

Alberts might have avoided this result had he produced
evidence as to which costs reported by Michael Reese at the end
of 2002 fell short of the projected costs reported by Michael

---

[28]   Prior to its November 15, 2005, letter, Mutual of Omaha
had indicated that HHS actually owed Michael Reese $1,961,962.00
due to underpayments made in 2002. (Demchick Decl. at Ex. B).
The eye-catching discrepancy between these two figures (a
difference of $2,015,148.00) appears to be due to a revised
calculation by Mutual of Omaha as to the amounts paid to Medicare
by Michael Reese in 2002.

Reese throughout the year.  Such evidence would have allowed the court to determine when specific Medicare overpayments were made. But Alberts has given the court nothing of the sort.  Instead, he has submitted a draft settlement between a group of affiliated debtors and HHS in a different bankruptcy case in which the parties have agreed to pro-rate HHS's claim for Medicare overpayments as if the overpayments had been made uniformly throughout the course of the year.  (Pl. Mem. at Ex. 2).  This "evidence" suggests that the parties in that case found it more convenient to pro-rate HHS's claim than to litigate it, nothing more.

There is no evidence in the record from which a factfinder could reasonably infer that HHS was an unsecured creditor of Michael Reese on the Debtors' petition date.  For that reason, summary judgment must be granted to the Defendants with respect to Alberts's invocation of the six-year statute of limitations provided by 28 U.S.C. § 2415 based on the claim allegedly held by HHS.

(b)  Employment tax claim

In the alternative, Alberts asserts that the IRS was an unsecured creditor as of the Debtors' petition date because Michael Reese owed the IRS $87,067.67 in FICA and Medicare taxes for the pay period commencing on November 10, 2002, and ending on November 23, 2002.  The only evidence presented in support of

28

this allegation is the affidavit of current Michael Reese CFO

Phillip J. Robinson (with a series of unauthenticated exhibits

attached thereto)[29] and a series of documents filed in the

Debtors' main bankruptcy case.[30]

The Defendants contend that the IRS was not a creditor of

Michael Reese on the petition date because the employer taxes

serving as a basis for the claim did not attach until the wages

in question were paid by Michael Reese, which could not have

occurred pre-petition given that the pay period itself extended

three days past the petition date.  (Def. Opp'n at 40).  But the

IRS did not need to hold a matured claim against Michael Reese to

qualify as a creditor on the petition date.  Rather, the

Bankruptcy Code defines the term "creditor" to include any entity

---

[29]  Unauthenticated evidence is as inadmissible on a motion
for summary judgment as it would be at trial.  Dicello v.
Jenkins (In re Int'l Loan Network, Inc.), 160 B.R. 1, 6 (Bankr.
D.D.C. 1993).  But the Defendants have waived any objection to
the admissibility of the exhibits attached to Robinson's
affidavit by failing to raise the issue in their opposition to
Alberts's motion.  See Kattan v. District of Columbia, 995 F.2d
274, 277-78 (D.C. Cir. 1993) (holding that argument not raised in
opposition to motion was waived).  In any event, the
admissibility of the exhibits does not affect the outcome of the
court's decision one way or the other.

[30]  These documents are irrelevant in the context of the
instant dispute.  First, they are not admissible as evidence with
regards to the truth of the matters asserted therein, but only
insofar as they reflect certain positions taken by the parties
and actions taken by the court.  Tuft, 333 B.R. at 523 n.16.
Second, they do not address the concerns that the court expresses
below with regards to the sufficiency of the other evidence
presented by Alberts, making them superfluous at best.

29

holding a "claim" against the debtor arising pre-petition, 11 U.S.C. § 101(10)(A), and defines a "claim" as meaning any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, <u>contingent</u>, matured, <u>unmatured</u>, disputed undisupted, legal, equitable, secured, or unsecured." <u>Id.</u> at § 101(5)(A) (emphasis added).

In this case, the IRS held a contingent claim against Michael Reese as soon as its employees performed work for which they were entitled to a wage (the contingency being the payment of the wage for the work performed). <u>See</u> <u>Psychotherapy and Counseling Center, Inc. v. Shalala (In re Psychotherapy and Counseling Center, Inc.)</u>, 195 B.R. 536, 543 (Bankr. D.D.C. 1996) (citing <u>Lousberg, Kopp, Kutsunis, and Weng, P.C. (In re Bonnett)</u>, 158 B.R. 125 (Bankr. C.D. Ill. 1993), for the proposition that a "contingent claim is a claim that has not yet accrued and that is dependent upon some future event that may never happen"). To the extent that this claim arose pre-petition, the IRS was a pre-petition creditor of Michael Reese. The date upon which the

claim matured is irrelevant.[31]

The Defendants argue that the IRS was not a priority unsecured creditor for purposes of 11 U.S.C. § 507(a)(8) because the tax return relating to the employer taxes in question was not due in the three years preceding the petition date, and that therefore the IRS must have been an administrative (as opposed to an unsecured) creditor on the petition date.  (Def. Opp'n at 47-50).  This is pure hogwash.  "Taxes arising from conduct of the debtor, as opposed to the estate, are pre[-]petition taxes and should not be compensated as an administrative expense."  In re Garfinkels, 203 B.R. 814, 819 (Bankr. D.D.C. 1996).  "When employment taxes relate to wages or salaries earned pre[-]petition but not paid until after the filing in bankruptcy, they are specifically excluded from administrative status by virtue of sections 503(b)(1)(B)(i) and 507(a)(8)(D)."  4 Collier

---

[31] The IUFTA similarly defines a "creditor" as "a person who has a claim," 740 Ill. Comp. Stat. 160/2(d), and defines a "claim" as meaning "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  Id. at 160/2(c) (emphasis added).  Thus, the IRS was not only a creditor as of the petition date, but a creditor capable of invoking the provisions of the IUFTA as well.  See A.P. Properties, Inc. v. Goshinsky, 714 N.E.2d 519, 522 (Ill. 1999) ("To properly plead a claim under the [IUFTA], the creditor must demonstrate that the debtor owes or potentially owes a 'payment' to the creditor.").

on Bankruptcy ¶ 503.07[2][d] (15th ed. 2006).[32]

Section 507(a)(8)(D) provides for treatment of taxes owed on wages earned within ninety days of the petition date so long as the return on those taxes is due "after three years before the date of the filing of the petition . . . ."[33]  In other words, returns due longer than three years before the petition (e.g., in this case, a return due December 31, 1998) are not accorded priority status under the sub-section.  Nothing in the statute suggests that the return must be due pre-petition.

The Defendants suggest that because § 507(a)(8)(A)(iii) provides for priority treatment of certain kinds of taxes "not assessed before, but assessable, under applicable law or by agreement, after, the commencement of the case," and because no

---

[32]  The Defendants attempt to distinguish In re Garfinckels and Collier on the grounds that "the facts here demonstrate that the tax [sic] employment tax claim arose from the conduct of the estate, not the conduct of the debtor."  (Def. Reply at 23 (D.E. No. 249, filed October 12, 2006).  In truth, the contingent claim held by the IRS arose whenever Michael Reese's employers performed the work for which they were owed a wage, which makes the relevant conduct here (i.e., the incurrence of liability by Michael Reese to its employees) that of the debtor, not the estate.  Moreover, the quote from Collier recited above specifically contemplates post-petition payment of wages.  The Defendants may disagree with the treatise's description of the law, but they cannot distinguish it.

[33]  Congress amended § 507 of the Bankruptcy Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act, Pub. L. 109-8 (generally effective Oct. 17, 2005) ("BAPCPA"), but this proceeding predates the enactment of that statute.  Accordingly, all references to titles 28 and 11 of the U.S. Code are to the pre-BAPCPA version of those titles.

such language is present in § 507(a)(8)(D), the latter section
prevents employer taxes for pay periods straddling the petition
date from receiving priority treatment.  (Def. Reply at 21).[34]
They cite Paulson v. IRS (In re Paulson), 152 B.R. 46 (Bankr.
W.D. Pa. 1992), as having "explicitly stated that [an] employment
tax period that straddles the petition date did not have a return
that was due to be filed 'within three years prior to the filing
of the bankruptcy petition' per 11 U.S.C. § 507(a)(8)(D)."  (Def.
Reply. at 22).

   The Defendants' statutory construction argument presents a
classic comparison of apples to oranges.  Section 507(a)(8)(A)
addresses the priority of taxes "measured by income or gross
receipts" (i.e., income and sales taxes).  Sub-section (A)(i)
sets forth the general rule that such taxes be "for a taxable
year ending on or before the date of the filing of the petition
for which a return, if required, is last due . . . after three
years before the date of the filing of the petition."  In other
words, the sub-section permits priority unsecured treatment of
tax claims based on returns due within three years of the
petition date so long as the return is due "on or before" the

_____

   [34]  The Defendants contend that if the claims are not
priority claims under § 507(a)(8), the claims would be
administrative claims under 11 U.S.C. § 503(b)(1)(B)(i) that must
be treated as issuing after the commencement of the case.  The
court does not need to address that argument because the claims
are indeed § 507(a)(8) claims.

year in which the petition is filed.

Sub-sections (A)(ii) and (A)(iii) essentially operate as gap-fillers for the IRS where a return is due more than three years prior to the petition date but a late assessment (*i.e.*, an assessment made outside the ordinary three-year window set forth in 26 U.S.C. § 6501(a)) is made by the IRS for some legitimate reason (*e.g.*, litigation in the Tax Court regarding a notice of deficiency determined by the Commissioner).  Sub-section (A)(ii) treats tax claims under those circumstances as priority unsecured claims if the taxes are "assessed within 240 days . . . before the date of the filing of the petition . . . ."  Sub-section (A)(iii) covers taxes that are assessable before the petition date but not assessed until after the petition is filed regardless of how long ago the return corresponding to that assessment was filed.

Like sub-section (A), § 507(a)(8)(D) limits the scope of the priority treatment afforded by § 507(a) to claims based on returns due to be filed no earlier than three years before the debtor's petition for bankruptcy relief.  Unlike sub-section (A), sub-section (D) provides no exceptions for tax claims based on returns due more than three years prior to the petition date. That is because sub-section (D), unlike sub-section (A), is tied to wages earned by individuals within ninety days of the petition date (or the date of the cessation of the debtor's business,

34

whichever comes first).  11 U.S.C. § 507(a)(3).[35]

To summarize, the language regarding assessment found in § 507(a)(8)(A)(iii) extends the potential scope of priority <u>backwards</u> for the taxes listed in that sub-section.  Nothing in that sub-section or any other part of § 507(a)(8) suggests that Congress intended to allow the IRS to hold priority claims where the return is filed post-petition in sub-section (A) but not sub-section (D).  To the contrary, sub-section (A)(i) applies only to returns for a year ending "on or before" the petition date--a restriction not found in sub-section (D).[36]  "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  Rusello v. United States, 464 U.S. 16, 23 (1983) (internal quotation omitted).

As for the In re Paulson decision, that case concerned a

---

[35] This latter limitation explains why § 507(a)(8)(D) requires that the return relating to employer taxes be due to be filed no more than three years before the petition date; otherwise, the IRS could assert priority status for tax claims that it failed to pursue diligently so long as the cessation of the debtor's business occurred far enough in advance of the petition date.  There would be no need for this requirement if the language regarding "cessation of the debtor's business" found in § 507(a)(3) were eliminated: if that were the case, § 507(a)(3) would restrict the temporal scope of the IRS's claim by itself.

[36] Presumably, Congress recognized that employment taxes, unlike income taxes, are of a divisible character allocable to each day of employment.

dispute between the IRS and a debtor as to whether certain
penalties and post-petition interest on taxes and penalties were
immune from the debtor's discharge pursuant to 11 U.S.C.
§§ 727(b) and 523(a)(1)(A).  Id. at 47.[37]  As part of its
recitation of the facts underlying the dispute, the bankruptcy
court noted that the IRS had made assessments on employer taxes
for the first and <u>fourth</u> quarters of 1983, "which quarter was
partially pre-petition and partially post-petition," <u>id.</u>, and
that the debtor's tax liabilities for "the first and <u>second</u>
quarters of 1983 . . . were all due to be filed within three
years prior to the filing of the bankruptcy petition."  <u>Id.</u>
(emphasis added).  In the Defendants' view, the court's omission
of the fourth quarter of 1983 in the latter quote is tantamount
to a ruling that "the 'straddling' employment tax quarter was not
a priority claim."  (Def. Reply at 22).

The court finds it highly unlikely that the <u>Paulson</u> court
would make a ruling of the sort suggested by the Defendants <u>sub
silentio</u> and without solicitation from the parties.  It is far
more likely that the court's initial description of "a Form 941

---

[37]  Section 727(b) provides that a discharge under § 727(a)
discharges the debtor from all pre-petition debts "[e]xcept as
provided in section 523 of [title 11] . . . ."  Section
523(a)(1)(A), in turn, excepts from discharge "a tax . . . of the
kind and for the periods specified in section 507(a)(2) or
507(a)(8) of [title 11] . . . ."  Thus, any claims held by the
IRS afforded priority status by § 507(a)(8) are non-dischargeable
as well.

liability against the Debtor for the fourth quarter of 1983,"
id., was actually a typographical error given that (1) the
decision never mentions a "Form 941" for the fourth quarter of
1983 again, and (2) the decision mentions a "Form 941" for the
second quarter of 1983 everywhere else in the decision except in
that initial description. See id. at 47, 51. In any event, the
court can hardly be persuaded by a decision devoid of reasoning
with respect to the point at issue. In re Paulson is useless
insofar as the instant dispute is concerned.

There is, however, another problem with the evidence
produced by Alberts that the Defendants do not address. The
Robinson affidavit references a pay period running from November
10, 2002, to November 23, 2002, but it does not specify that
wages were earned on all or any specific days within that period.
The most that a factfinder could infer from his evidence is that
wages might have been earned prior to the petition date. As the
party with the burden of proof on this issue, Alberts must
establish that wages were earned prior to the petition date, not
that they could have been earned prior to the petition date.

There is one important difference between this gaffe by
Alberts and his similar mistake with respect to the alleged HHS
claim. Alberts was put on notice by the court at a prior hearing
that he needed to provide more than a range of dates straddling
the petition date to fulfill his evidentiary burden with respect

37

to the latter claim.  He was not given notice that he needed to
supply evidence that wages were earned prior to November 20,
2002.  The court did not raise the issue at the prior hearing,
and the Defendants failed to articulate the problem in their
lengthy opposition and cross-motion.

It would be unfair to hold Alberts's feet to the fire for
failing to supply evidence that no one thought to request.[38]  For
that reason, the court will give both Alberts and the Defendants
an opportunity to supplement the record with respect to whether
wages were earned by Michael Reese employees between November 10,
2002, and November 19, 2002.  Should Alberts fail to supply such
evidence, summary judgment will be granted to the Defendants on
this point.  But if Alberts is able to provide evidence that
would permit an inference that work was performed prior to the
petition date (e.g., by providing documentary or testimonial
evidence to the effect that Michael Reese employees worked on the
dates in question or usually worked on the days of the week that
fell within those dates), the court will grant summary judgment
in his favor on this point unless the Defendants can produce

---

[38]  The court can speculate that Michael Reese was an
operating hospital with employees performing work each day of
November of 2002, and for that reason the parties recognized that
taxes were incurred for each day of that month.  But
speculation--even well-reasoned speculation--is not the same as
evidence.

evidence to the contrary.[39]

(c)  FUTA claim

Finally, Alberts asserts that the IRS was a pre-petition unsecured creditor of Michael Reese based on FUTA taxes assessed on July 15, 2002.  The issue here is not whether evidence in support of this assertion exists, but whether such evidence is admissible.  The Defendants contend that it is not because (1) the evidence was produced after the close of discovery and (2) some of the evidence is unauthenticated.

The court agrees with the Defendants that Alberts should not receive summary judgment on this issue.  The only evidence that Alberts produces in support of his position is the proof of claim filed by the IRS against Greater Southeast Community Hospital in the Debtors' main bankruptcy case and an undated letter from the IRS that is misidentified as a copy of Michael Reese's 940EZ tax form for the period ending on December 31, 1999, in the affidavit

---

[39]  There is one complicating factor that warrants the parties' attention.  As the court mentioned previously, there is at least a legitimate question as to whether the IRS could have invoked the longer statute of limitations supplied by 26 U.S.C. § 6502 under the Summerlin rule if the November 12, 2002 deadline for filing a fraudulent transfer action imposed by § 10 of the IUFTA had passed before the IRS's claim arose.  See part II.A.2.c, supra.  Thus, to the extent that Alberts fails to show that wages were earned on November 10, 2002, November 11, 2002, or November 12, 2002, the Defendants could argue that the Summerlin rule does not apply to the IRS's employer tax claim and request summary judgment on that basis.  The court would then be put in the position of having to decide the difficult legal question set forth above.

that purports to authenticate it.    (Demchick Decl. ¶ 9).    Both documents were produced after the close of discovery, and the letter from the IRS is inadmissible because it was not properly authenticated.    Fed. R. Bankr. P. 7056 (incorporating Fed. R. Civ. P. 56(e)); Fed. R. Evid. 602.

At the same time, the proof of claim filed by the IRS would be enough by itself to defeat a motion for summary judgment, see In re Cluff, 313 B.R. at 340, and the court sees no justice in striking the proof of claim if it was seasonably produced, an issue in dispute.    Alberts represents that the evidence was disclosed within a reasonable time of its discovery.    (Pl. Reply ¶¶ 56-57).    The Defendants quarrel that Alberts was in a position to locate the proof of claim earlier.    The court views this as a material issue in genuine dispute that is better off left for resolution at a plenary hearing at the pre-trial conference scheduled in this adversary proceeding.

Both sides to this dispute have engaged in a "scorched earth" litigation strategy that has produced many needless delays and unseemly accusations throughout this proceeding.    If that is how the parties wish to conduct themselves, so be it, but they can hardly expect the court to resolve their disputes over unmet discovery deadlines based on the papers submitted in connection with cross-motions for summary judgment.    The court will tentatively deny summary judgment with respect to both sides of

this issue subject to renewal once the court resolves the messy issue regarding the delay in production of the IRS proof of claim.

B.   <u>Existence of an Unsecured Present Creditor</u>

In addition to their opposition to Alberts's motion for summary judgment, the Defendants seek summary judgment with respect to all of the counts in Alberts's Complaint.  The court has resolved that cross-motion insofar as Counts I-IV of the Complaint are concerned,[40] but Counts V and VI of the Complaint reference a different provision of the IUFTA that imposes additional evidentiary requirements on Alberts.  Specifically, they invoke § 6(a) of the IUFTA, which only provides relief for creditors of a debtor in existence at the time of the challenged transfer.  <u>Id.</u> at 160/6(a).

Alberts has demonstrated that at least two subsidiaries of

---

[40]   As noted below, <u>see</u> n.42, <u>infra</u>, Alberts has not put forth any evidence of actual fraud by Michael Reese, which is one of the elements of § 5(a)(1) of the IUFTA, the basis for Count I. 740 Ill. Comp. Stat. 160/5(a)(1).  In addition, Counts II, IV, and VI of the Complaint are directed toward the other Debtors in existence at the time of the Michael Reese Transfers, yet Alberts has produced no evidence of any involvement by other Debtors in the Michael Reese Transfers.  Nevertheless, the court will not grant summary judgment to the Defendants on these counts because the Defendants did not put Alberts on notice that he needed to address these issues.

41

National Century Financial Enterprises ("NCFE")[41]--NPF-CSL, Inc.
and NPF X, Inc.--were creditors of Michael Reese at the time of
the Michael Reese Transfers. (Lau Decl. at Exs. 2-3).[42] These
creditors were not, however, entitled to an extended statute of
limitations like HHS or the IRS. Their potential claims expired

---

[41] A third NCFE subsidiary, NPF VI, Inc., entered into a
sale and subservicing agreement with Michael Reese for the
accounts receivables of Michael Reese Hospital. Although this
agreement appears to pre-date the Michael Reese Transfer, it also
appears to convey a conditional security interest in the accounts
receivable to NPF VI, Inc., to the extent that the agreement
between the parties was deemed a loan agreement rather than a
sales agreement by a court of competent jurisdiction. (Lau Decl.
at Ex. 1 (D.E. No. 106, filed March 9, 2006)). Alberts has not
presented any evidence demonstrating that this contingent
arrangement did not come to pass.

[42] The Defendants argue that these creditors could not have
held claims against Michael Reese prior to the Michael Reese
Transfers because performance on the contracts was conditioned on
that very transfer. Once again, the Defendants construe the
definition of a "claim" too narrowly. As soon as the parties
entered into their respective contracts, the NCFE subsidiaries
held contingent claims against Michael Reese. See In re
Psychotherapy and Counseling Center, Inc., 195 B.R. at 543 ("a
claim arises for bankruptcy purposes when the contingent
liability is established"). The contracts precede the Michael
Reese Transfers; ergo, the NCFE subsidiaries held unsecured
claims against Michael Reese prior to the Michael Reese
Transfers.

on November 12, 2002, pursuant to § 10 of the IUFTA.[43]

Alternatively, Alberts argues that HHS was an unsecured creditor of Michael Reese at the time of the Michael Reese Transfers.[44]  The process by which he arrives at this conclusion is somewhat convoluted.  He argues that GHI owed HHS for Medicare overpayments prior to its sale of Michael Reese Hospital, and that those liabilities were assumed by Michael Reese as part of the APA.  Alberts then argues that because the closing statement of the APA was executed on November 11, 1998, and "the majority of the subject transfers were made at 12:57 and 12:59 on November 12, 1998," (Pl. Opp'n ¶ 7), Michael Reese became obligated on the debt owed to HHS for Medicare overpayments prior to "the majority of" its allegedly fraudulent transfers.

---

[43]  Alberts notes in a footnote that Michael Reese engaged in actual fraud in consummating the Michael Reese Transfers, which would "extend[] the four-year limitations period to 'one year after the transfer or obligation was or reasonably could have been discovered by the claimant.'" (Pl. Reply at 3 n.4 (D.E. No. 220, filed September 5, 2006)) (quoting 740 Ill. Comp. Stat. 160/10(a)).  The problem here is that he has not submitted any real evidence of intentional fraud on the part of Michael Reese. He cites his own interrogatory responses as proof of actual fraud, but those responses do not establish Michael Reese's intent in initiating the Michael Reese Transfers.  Instead, the responses indicate that actual fraud was perpetrated against Michael Reese's creditors because the Michael Reese Transfers resulted in constructive fraud.  (Pl. Opp'n at Ex. E (D.E. No. 221, filed September 6, 2006)).

[44]  Alberts also asserts that "DCHC was a co-obligor on the initial $1,000,000 purchase deposit of Michael Reese to [the] Defendants," (Pl. Opp'n ¶ 5; Pl. Counter-Statement of Undisputed Material Facts ¶ 39), but he provides no evidence in support of this bald assertion.

As a practical matter, Alberts's position--namely, that a
creditor of Michael Reese existed prior to the Michael Reese
Transfers because the exchange of consideration between the
parties to the purchase of Michael Reese Hospital did not occur
instantaneously--is too cute by half.  As a technical matter, it
is simply wrong.  The payments made to the Defendants on November
12, 1998, followed the incurrence of debt to GHI by Michael Reese
in exchange for the hospital, which occurred when the APA was
executed on November 11.  This incurrence of debt would itself be
avoidable pursuant to a timely complaint under the IUFTA if it
defrauded a creditor in existence at the time of the incurrence.
See 740 Ill. Comp. Stat. 160/6(a) (providing for avoidance of
"transfer[s] made" or "obligation[s] incurred").  There is
evidence that there were such creditors in existence, but HHS
itself was not an unsecured creditor of Michael Reese at the time
of the incurrence of debt to GHI; rather, it became a creditor of
Michael Reese upon the incurrence of the debt.

If the underlying incurrence of debt to GHI is not
avoidable, the subsequent payment of that debt on November 12,
1998, is similarly unavoidable because the only way that the
subsequent transfers made by Michael Reese could have been for
less than equivalent value (or actually fraudulent) would be if
the underlying incurrence of debt GHI is avoidable as fraudulent.
Singling out one creditor for payment may constitute a

44

preferential transfer under the right circumstances, see 11
U.S.C. § 547, but it is not a fraudulent one.  See In re
Liquidation of Medcare HMO, Inc., 689 N.E.2d 374 (Ill. Ct. App.
1997) ("Under Illinois law, . . . the mere preference of one or
more creditors over others does not constitute a fraudulent
transfer.").

Unless and until the initial incurrence of debt to GHI by
Michael Reese is avoided, Alberts has no right to recover the
funds paid in satisfaction of the debt created by that
incurrence.  Alberts has not demonstrated that there was an
unsecured creditor of Michael Reese whose claim existed at the
time of the incurrence of debt to GHI and who could have brought
a timely suit to avoid that incurrence on the petition date.
Therefore, the court will grant summary judgment in favor of the
Defendants on Counts V-VI with respect to both the obligation
incurred (the acquisition of debt by Michael Reese) and the
subsequent transfers (payments made on that debt).

III

For the reasons set forth above, and except with respect to
the factual issue of whether the IRS had a contingent unsecured
claim against Michael Reese for unpaid employment taxes based on
work performed by Michael Reese employees between November 10,
2002, and November 23, 2002, the court will deny Alberts's motion
for summary judgment, grant the Defendants' cross-motion for

45

summary judgment with respect to the factual issue of whether HHS
had an unsecured claim against Michael Reese on the petition date
and with respect to Counts V and VI, and deny the rest of the
cross-motion.  The court will enter a separate order to show
cause directing all parties to supplement the record in a manner
consistent with this decision.  Depending on the response of the
parties, the court will either grant or deny the balance of the
parties' motions at that time.[45]

An order follows.

[Signed and dated above.]

Copies to:

| | |
|---|---|
| Lucius B. Lau | Jeffrey W. Kilduff |
| Jeffrey E. Schmitt | Lani R. Miller |
| White & Case LLP | Stephen D. Brody |
| 701 Thirteenth Street, N.W. | O'Melveny & Myers LLP |
| Washington, DC 20005 | 1625 Eye Street, NW |
| | Washington, DC 20006 |

---

[45] The parties may renew their motions for summary judgment
with respect to whether the IRS held an unsecured pre-petition
claim against Michael Reese for unpaid FUTA taxes at the pre-
trial conference currently scheduled for January 4, 2006, unless
the issue is mooted by the court's determination of the parties'
motions with respect to whether the IRS held a contingent
unsecured pre-petition claim against Michael Reese for employment
taxes based on the parties' responses to the court's forthcoming
order to show cause.