The Decision and Order below is hereby signed.

Dated: January 2, 2007.

S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re )<br><br>GREATER SOUTHEAST COMMUNITY )<br>HOSPITAL CORP., I, *et al.*, )<br> )<br>　　　　　Debtors. )<br>───────────────────────── )<br> )<br>SAM J. ALBERTS, TRUSTEE FOR )<br>THE DCHC LIQUIDATING TRUST, )<br> )<br>　　　　　Plaintiff, )<br> )<br>　　　v. )<br> )<br>HCA INC., *et al.*, )<br> )<br>　　　　　Defendants. ) | Case No. 02-02250<br>(Chapter 11)<br>(Jointly Administered)<br><br><br><br><br><br><br><br><br>Adversary Proceeding No.<br>04-10366 |

DECISION AND ORDER REGARDING DEFENDANTS' MOTION IN LIMINE TO
PRECLUDE PLAINTIFF'S EXPERT NEIL H. DEMCHICK FROM TESTIFYING AT TRIAL

The defendants HCA Inc. ("HCA"), Western Plains Capital,

Inc. ("Western"),[1] and Galen Hospital Illinois, Inc. ("GHI," and

collectively the "defendants") seek to preclude the plaintiff's

expert, Neil H. Demchick, from testifying at trial pursuant to

─────────────

[1] Western's joinder in this motion is reflected in a
footnote to the defendants' reply brief.

Federal Rule of Evidence 702.  Specifically, the defendants
contend that Demchick's net asset valuation should be excluded as
unreliable because Demchick is not qualified to appraise the
value of real estate and equipment and he ignores principles
governing valuation of assumed liability.  Likewise, the
defendants contend that Demchick is biased, that the methodology
and analyses he employs in his income approach to valuation and
solvency analyses are unreliable, and that he lacks adequate
experience to render expert solvency opinions in this litigation.
Sam J. Alberts, Trustee for the DCHC Liquidating Trust (the
"Trust") and plaintiff in this adversary proceeding, opposes the
motion, contending that the defendants' arguments are without
merit, and at best, go to the weight and not admissibility of
Demchick's testimony.

I

     The trial court has a gatekeeping duty to determine whether
an expert's testimony satisfies the admissibility requirements of
Rule 702 and to ensure that the opinion offered by the expert is
reliable.  See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 157
(1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S.
579, 592-93 (1993); Burkhart v. WMATA, 112 F.3d 1207, 1211 (D.C.
Cir. 1997).  The court's gatekeeping role "applies not only to
'scientific' testimony but to 'technical' and 'other specialized'
knowledge as well."  Lippe v. Bairnco Corp., 288 B.R. 678, 685

2

(S.D.N.Y. 2003)(quoting Kumho Tire, 526 U.S. at 141).

Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

Although it is the Trust's burden to establish the reliability of Demchick's testimony by a preponderance of the evidence, Daubert, 509 U.S. at 592 n.10; Meister v. Med. Eng'q Corp., 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001), the "[r]ejection of expert testimony . . . is still the exception rather than the rule, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Lippe, 288 B.R. at 685-86 (internal quotations omitted)(citing and quoting Fed. R. Evid. 702 Advisory Committee Note (2000) and United States v. 14.38 Acres of Land, 80 F.3d 1074, 1078 (5th Cir. 1996)).

The court is necessarily guided by competing considerations when making admissibility determinations under Daubert.  On the one hand, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and

quite misleading . . . .' [and] given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." <u>Allapattah Services, Inc. v. Exxon Corp.</u>, 61 F. Supp.2d 1335, 1340 (S.D. Fla. 1999)(quoting <u>Daubert</u>, 509 U.S. at 595, and citing <u>United States v. Dorsey</u>, 45 F.3d 809, 815-16 (4th Cir. 1995)).  On the other hand, "Rule 702 was intended to liberalize the introduction of relevant expert evidence . . . and [a]s with all other admissible evidence, expert testimony is subject to being tested by 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" <u>Allapattah Services</u>, 61 F. Supp.2d at 1340 (quoting <u>Cavallo v. Starr Enter.</u>, 100 F.3d 1150 (4th Cir. 1996), and citing <u>Daubert</u>, 509 U.S. 579).

Where, as here, the judge serves as both gatekeeper and finder-of-fact, "the court's gatekeeping role is necessarily different" and there is a diminished need for the court to make reliability determinations before hearing the proffered testimony.  <u>In re Salem</u>, 465 F.3d 767, 777 (7th Cir. 2006). Accordingly, while not altering the standard for admissibility, a judge sitting as finder-of-fact in a bench trial "does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." <u>Id.</u>

4

As explained in more detail below, although the defendants raise potentially valid objections to the admissibility of Demchick's testimony, and notwithstanding that it is ultimately the Trust's burden to establish the reliability of Demchick's proffered testimony by a preponderance of the evidence, the court will deny the defendants' motion to preclude Demchick from testifying, reserving its final determination of admissibility for trial.  What follows are the court's preliminary conclusions regarding the admissibility of Demchick's proffered testimony.

A.

DEMCHICK'S QUALIFICATIONS

Rule 702 instructs that "a witness may be qualified as an expert based on 'knowledge, skill, experience, training, or education' in the relevant field."  See Burkhart, 112 F.3d at 1211.  Rule 702 does not require that the expert possess all of these qualifications, but merely one or some combination thereof, so long as the qualifications he does posses render him competent to testify on the matters he intends to address.  Exum v. General Elec. Co., 819 F.2d 1158, 1163-64 (D.C. Cir. 1987).  If the court determines that the witness qualifies as an expert under Rule 702, the relative strength or weakness of the expert's qualifications goes to the weight rather than admissibility of the evidence.  See In re Piece Goods Shops Co., 188 B.R. 778, 793 (Bankr. M.D.N.C. 1995).

Demchick's expert report reflects that Demchick has an extensive background in the field of business valuation. Demchick obtained his BS in 1977 from the Wharton School of the University of Pennsylvania, and received a master's degree in finance from New York University Graduate School of Business Administration in 1981. Demchick is also a certified public accountant, a certified business appraiser, a certified valuation analyst, and a certified insolvency restructuring analyst. Demchick is currently managing director at Invotex Group, where he "is directly responsible for performance and oversight of engagements in the areas of litigation services, forensic accounting, and restructuring and insolvency services [and] is also responsible for valuation and general business consulting services." (Demchick Report, Exh. A.) Demchick has over 20 years of professional experience in the field of business valuation, and prior to joining Invotex Group, held a number of senior positions at several different companies including that of Staff and Senior Auditor and Consultant at Price Waterhouse, Financial Analyst in Operations Planning Department at I.U. International, and Manager and Director in the Business Investigative Services Department at Coopers Lybrand. Before assuming the role of expert for the Trust in this adversary proceeding, Demchick served as a financial advisor first to the Official Committee of Unsecured Creditors in the underlying bankruptcy cases, and then,

6

after confirmation of the plan, as financial advisor to the Trust.[2]

Notwithstanding Demchick's extensive credentials relating to the field of business valuation, defendants object that Demchick is not qualified to serve as a valuation expert in this litigation.  The defendants' objections are addressed below.

    1.    The Trust has made a preliminary showing that Demchick is qualified to offer expert net asset valuation and solvency opinions.

    (a)  Demchick's Net Asset Valuation Opinion

The defendants contend that Demchick lacks the qualifications necessary to offer an expert opinion using the net asset approach to valuation.[3]  The defendants urge that, because Demchick is not qualified to conduct real estate or equipment appraisals, it follows that Demchick is not qualified to offer a net asset valuation opinion that is based, in large part, on an

---

[2]  The defendants complain that, because Demchick "has acted as a virtual member of plaintiff's legal team" by recommending that the Trust pursue this adversary proceeding, he is biased and cannot be trusted to offer an objective and reliable expert opinion in this litigation.  If Demchick is, in fact, biased, that goes to the weight of Demchick's testimony, not its admissibility.

[3]  Under the Net Asset Approach to valuation, Demchick purports to determine the Fair Market Value, at the time of the transfer, of the Net Assets of Michael Reese Hospital and Medical Center ("Reese Hospital") acquired by Michael Reese Hospital and Medical Center, Corp. ("Michael Reese") from GHI.  In conducting this analysis, Demchick considers the value of working capital, real estate and improvements, equipment, other assets, and assumed liabilities.

assessment of the value of the real estate and equipment that were included in the subject transfer.

Demchick concedes that he is not qualified to conduct his own real estate appraisal and that he has never conducted his own equipment appraisal; however, the reliability test set forth in <u>Daubert</u> is a flexible one, and trial courts have broad discretion to determine the qualification of expert witnesses and the admissibility of expert testimony.  <u>Ferrara & DiMercurio v. St. Paul Mercury Ins.</u>, 240 F.3d 1, 8 (1st Cir. 2001)(citing <u>Diefenbach v. Sheridan Transp.</u>, 229 F.3d 27, 30 (1st Cir. 2000)); <u>Kumho Tire</u>, 526 U.S. at 152.

As a preliminary matter, the court observes that it is permissible for Demchick to rely upon appraisals prepared by others so long as those appraisals are of the type experts in the field of business valuation would reasonably rely upon.  <u>See</u> Fed. R. Evid. 703; <u>Ferrara & DiMercurio</u>, 240 F.3d at 9 ("when an expert relies on the opinion of another, such reliance goes to the weight, not the admissibility of the expert's opinion.").[4] Likewise, there is nothing in the Rules requiring Demchick to establish that he is qualified to perform the types of real estate and equipment appraisals he relied upon.  <u>See McReynolds</u>

---

[4]  For purposes of addressing Demchick's qualifications, the court assumes, without deciding, that the sources Demchick relied upon are of the type reasonably relied upon by experts in the field of business valuation.

v. Sodexho Marriott Services, Inc., 349 F. Supp.2d 30, 36-37
(D.D.C. 2004) (statistical expert not required to personally
write computer code in order for resulting analysis to be
admissible).  Rather, to satisfy Rule 702, Demchick need only
demonstrate that he possesses the requisite knowledge, skill,
experience, training, or education to competently render a net
asset valuation opinion based upon an analysis of appraisals
prepared by others.[5]  See Sphere Drake Ins. PLC v. Trisko, 226
F.3d 951, 955 (8th Cir. 2000); Indian Coffee Corp. v. Proctor &
Gamble Co., 752 F.2d 891, 894-95 (3d Cir. 1985); Tunnel v. Ford
Motor Co., 330 F. Supp.2d 707 (W.D. Va. 2004).[6]  The court thinks
it likely that Demchick can make such a showing.

     (b)  Demchick's Solvency Analyses

The defendants also challenge Demchick's qualification to
offer expert solvency opinions because Demchick's only relevant
experience was gained while serving as an expert in litigation.
To qualify as an expert, however, Rule 702 does not require that
the witness possess non-litigation-related experience; rather, it
requires that the witness possess sufficient knowledge, skill,
experience, training or education to render him competent to

---

[5]  The appraisals of others must be reasonably relied upon
by experts in his field, but that is a separate inquiry under
Rule 703.

[6]  The same reasoning applies to defeat the defendants'
argument that Demchick is not qualified to render an opinion that
includes a valuation of excess land.

testify on the matters he intends to address.  <u>Bush v. Michelin Tire Corp.</u>, 963 F. Supp. 1436, 1442-43 (W.D. Ky. 1996) (rejecting categorical exclusion of experts who gain their knowledge working as litigation consultants).  Accordingly, an expert whose knowledge is gained while serving as an expert in litigation, yet who possesses educational or professional experience and training in the relevant field, may qualify as a witness under Rule 702, <u>see id.</u>, whereas a witness whose experience is limited to testifying as an expert, and who has no training or education in the relevant field, may not.  <u>See Thomas J. Kline, Inc. v. Lorillard, Inc.</u>, 878 F.2d 791, 799 (4th Cir. 1989)(plaintiff's expert precluded from testifying not only because her only relevant experience was acquired by testifying as an expert, but also because "[t]here was no indication . . . that [the expert's] general business education included *any* training in the area of antitrust or credit. . . .[and the expert] admitted that she lacked *any* other experience in such matters." (emphasis in original)).

In addition to his work as a litigation consultant, Demchick has an extensive background in the field of business valuation and in analyzing the finances of distressed companies.  Although Demchick's expertise in conducting solvency analyses was developed while serving as an expert in litigation, it is his expertise in business valuation that qualified him for such a

10

task in the first instance.  Accordingly, the court finds, on a

preliminary basis, that Demchick is qualified to offer expert

solvency opinions in this litigation notwithstanding that his

expertise in rendering such opinions was acquired through his

experience as an expert in litigation.[7]

B.

DEMCHICK'S METHODOLOGY

1.  Demchick's selective reliance on data favorable to the
    Trust's litigation position requires close scrutiny by
    the court, but does not warrant exclusion of Demchick's
    testimony at this juncture.

A qualified expert witness will only be permitted to testify

if his or her testimony "will assist the trier of fact to

understand the evidence or to determine a fact in issue."  Lippe

v. Bairnco Corp., 288 B.R. at 685 (quoting United States v.

Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999)).  The defendants

object to Demchick's methodology because, rather than relying

upon his own expertise, Demchick has "arrived at his opinions by

assessing the credibility of witnesses, deciding what weight to

give different documents and how to credit the work of others . .

. ."  (Mot. at 7.)  Most notably, when valuing the real estate

---

[7]  The defendants have also raised numerous Rule 702
objections to the methodology used by Demchick in his solvency
analyses.  The court will address those objections at trial.  See
In re Salem, 465 F.3d 767, 777 (7th Cir. 2006)(when trial court
serves both as Daubert gatekeeper and as factfinder, there is
less need for the court to make a Rule 702 determination in
advance of trial).

11

and improvements that were part of the subject transfer, Demchick
excluded from consideration the one appraisal report that
contradicts the Trust's litigation position (the "Fourth VC
Report").[8]  Moreover, in his deposition testimony, Demchick
explained that he found the appraisal prepared by the Trust's
other expert, Robert Wilson, to be more reliable than the Fourth
VC Report. (Mot. at 9.)  The defendants complain that Demchick's
self-serving determination of which reports and appraisals are
reliable constitutes an impermissible weighing of the evidence
that should have been left to the finder-of-fact.[9]

In his report, Demchick concludes that the Fourth VC Report,
which values the real estate at $42 million in direct
contradiction to the Trust's position, is unreliable for the
following reasons:

> (1) It was prepared subsequent to the actual
> transaction and, rather than being a valuation of property,
> its intended use was "for the allocation of the lump sum /
> sale purchase price to the individual assets sold based upon

_____

[8]  Also referred to by the parties as the Felsenthal
Appraisal.

[9]  The defendants contend that Demchick's "decision to pick
and choose from amongst various appraisals, accepting parts of
them and rejecting others without any discernible methodology,
requires that he be precluded from testifying at trial." (Mot. at
12.)  Rather than assessing whether Demchick has employed a
"discernible methodology," the more relevant inquiry is whether
an expert in the field would reasonably have relied upon only
those sources relied upon by Demchick.  Either way, the question
before the court is whether Demchick's exclusion of the Fourth VC
Report compromised Demchick's methodology, thereby warranting the
exclusion of his testimony as unreliable.

their market value relationship.";

(2) The amount contained in the Fourth VC Report is
more than two times the Market Value estimates;

(3) The same appraiser responsible for the Fourth VC
Report prepared three other estimates of market value during
this same time period that directly contradict this value
estimate;

(4) As of January 6, 2003, by which time the real
estate values would have likely increased from those of
January 1, 2001, the former quasi-head of VC valued the real
estate at $34 million.

Based upon an examination of other portions of the Fourth VC

Report as well as the deposition testimony of Mr. Felsenthal,

Demchick found additional indicia of unreliability, including:

(1)  The Fourth VC Report incorrectly assumed EBITDA of
$9.5 million for 1998 based upon projected figures, when the
annualized actual 1998 EBITDA was negative $22 million;

(2) The Income Approach used in the Fourth VC Report
incorrectly assumed revenues of $202 million and EBITDA of
$7 million in the first year after the transaction, which
would have required that the business stop its declining
trend and realize an increase of about 40% over the
annualized 1998 levels;

(3) The discount rate of 13% used by Mr. Felsenthal did
not adequately consider the risks and required rates of
return to immediately change a hospital from a negative $22
milion EBITDA to a positive $7 million EBITDA;

(4) Felsenthal states in the Fourth VC Report and in
his deposition testimony that he simply accepts the client's
operating information and does not address its
reasonableness;

(5) In his deposition testimony, Felsenthal stated (1)
that he is not a certified real estate appraiser; (2) VC did
not have any MAI certified appraisers involved in the
November 1998 appraisal; (3) if an entity has no EBITDA, it
has no value; (4) the VC contract specifications form for
the contract related to the 1998 valuation of Reese noted

13

that "We do not believe it can be sold as a hospital."; (5)
Felsenthal does not appraise based upon actual operations,
but based upon projected operations; (6) the March 5, 1998
appraisal estimated asbestos removal costs at approximately
$18 million; (7) the September 1999 appraisal report,
estimated demolition and asbestos removal costs were
approximately $13 million; (8) Reese was very unique due to
its size and has no comparables; (9) the 1999 addendum
estimated demolition and asbestos removal costs were
approximately $9 million.

Experts are not required to base their opinions on every
potentially relevant data source available, no matter how flawed.
Instead, Rule 703 provides that experts may rely on facts or data
"of a type reasonably relied upon by experts in the particular
field in forming opinions or inferences upon the subject, the
facts or data need not be admissible in evidence." Fed. R. Evid.
703. Thus, if the sources relied upon by Demchick are of a type
reasonably relied upon by experts in performing a valuation
analysis, and if experts in the field would reasonably disregard
as unreliable those sources that Demchick has chosen not to rely
upon in forming his opinion, Demchick has not offended Rule 703.

"Under Fed. R. Evid. 703 experts are given wide latitude to
testify on facts otherwise not admissible in evidence and 'to
broaden the acceptable bases of expert opinion.'" Head v.
Lithonia Corp., 881 F.2d 941, 944 (10th Cir. 1989)(quoting Merit
Motors, Inc. v. Chrysler Corp., 569 F.2d 666, 672-73 (D.C. Cir.
1977). Nevertheless, the trial court, as gatekeeper, is
obligated to determine whether experts in the field routinely and
reasonably rely upon the evidence upon which the expert relied,

14

and at least some courts look to <u>Daubert</u> (a Rule 702 decision) in
fashioning a methodology for addressing the "reasonably relied
upon" requirement of Rule 703.  <u>See</u> <u>In re Paoli R.R. Yard PCB</u>
<u>Litigation</u>, 35 F.3d 717, 748 (3d Cir. 1994).  As noted in Wright
& Gold, Federal Practice & Procedure:

> If the gatekeeping function under Rule 703 is to be
> patterned after Daubert, it is necessary to identify
> what may be considered the objective earmarks of
> reasonable reliability.  The courts have identified
> several such factors.  These factors, many of which
> resemble the criteria identified in Daubert, include:
> Was the expert's basis published or documented in some
> other form?  Was the basis subjected to peer review?
> Was the experts's [sic] basis derived from sources that
> were impartial?  Was the basis for the opinion complete
> and logically sufficient? Was the expert's basis
> disclosed to the adverse party before trial? Was the
> opinion more than just a summary of another expert's
> opinion or inadmissible evidence?  Do most experts in
> the field rely on data of the type in question?  The
> presence of some of these factors can compensate for
> the absence of others.  Thus, under this Daubert-
> inspired approach, the courts are not bound to accept
> as conclusive on the issue of reliability the single
> fact that experts in the field rely on facts or data of
> the type in question.  On the other hand, the courts
> are free to accept this as relevant to that question.
> In accord with the flexible approach of Daubert, the
> trial court should have maximum discretion in weighing
> the various earmarks of reliability.

29 FED. PRAC. & PROC. EVID. § 6274 (2006)(footnotes omitted).

In <u>Merit Motors</u>, 569 F.2d at 673, the expert testimony at
issue failed to satisfy the "reasonably relied upon" requirement
of Rule 703 because the expert largely ignored the two dominant
players in the automobile market.  The decision has been
described as holding that affidavits by experts who are

15

unfamiliar with the record are insufficient to withstand summary
judgment.  <u>See</u> <u>Ambrosini v. Labarraque</u>, 966 F.2d 1464, 1470 (D.C.
Cir. 1992).

As the finder of fact, I will address at trial whether the
reasons asserted by Demchick for disregarding the Fourth VC
Report are sufficiently logical and persuasive to conclude that
an expert in Demchick's field would reasonably not rely upon the
Fourth VC Report (and whether any other purported objective
criteria adduced by the Trust at trial establish that an expert
in Demchick's field could reasonably not rely upon that report).

The court agrees with the Trust that experts are virtually
always required to make certain threshold determinations as to
what data to consider and what data to disregard when forming an
opinion.  Nevertheless, an expert's selective exclusion of only
that data which is unfavorable to his client's litigation
position warrants close scrutiny by the court, and Demchick
should be prepared, at trial, to address what objective criteria
he relied upon in making such determinations.[10]  Furthermore, to

---

[10]  Similarly, the defendants complain that Demchick has
generally chosen to "credit portions of documents that are most
favorable to the Trust's litigation position, while discounting
sections of the same documents that are contrary to the Trust's
claims." (Mot. at 11.)  For example, Demchick has relied on the
equipment appraisal contained in the November 30, 1998 hospital
appraisal performed by David Felsenthal, but has disregarded
Felsenthal's conclusion, contained in that same report, that the
value of Reese Hospital's land and improvements as of November
12, 1998 was $42 million.  The defendants also complain that
Demchick's testimony relating to his income approach to valuation

the extent Demchick's proffered testimony purports to offer an

impermissible "expert opinion" as to the reliability of the

report prepared by the Trust's other expert, Robert A. Wilson,

the court, as finder-of-fact, is capable of making its own

determination as to Wilson's credibility and the reliability of

his report, and can disregard any impermissible expert testimony

allegedly offered by Demchick on that point.[11]

The defendants' motion raises legitimate concerns that

Demchick's exclusion of the Fourth VC Report may be the product

of a result-oriented methodology tailored to yield results

---

should be excluded because, in formulating his opinion, Demchick
selectively relied upon only those portions of the turnaround
projections that favor the Trust's litigation position. (Mot. at
17.)  Demchick should be prepared, at trial, to show that his
selective reliance on certain data was justified and that experts
in the field of business valuation would reasonably have relied
upon the available data in the same selective fashion.

[11]  The defendants contend that in assessing the reliability
of available data, Demchick made credibility determinations of
individuals such as Ms. Talbot, and that he purported to base
such assessments on his "three-plus years of experience being
involved in the matter and knowledge of facts during that
period." (Mot. at 16.)  Pointing to that statement, the
defendants complain that Demchick's only knowledge about the sale
of the hospital came secondhand from his work in this bankruptcy
case, and that he is therefore not competent to testify to any of
the facts in this adversary proceeding.  This argument is easily
disposed of because Demchick is being offered as an expert
witness, not a fact witness.  Thus, his lack of first-hand
knowledge of the underlying facts does not present a bar to the
admissibility of his expert testimony.  To the extent any of his
proffered testimony could be construed as an impermissible
"expert opinion" as to the credibility of witnesses, the court is
capable of disregarding such testimony.

favorable to the Trust.[12]  Although it remains the Trust's burden

to establish the reliability of Demchick's proffered testimony,

and although there remain doubts as to whether the Trust can

carry its burden, the court is not currently prepared to exclude

Demchick's testimony as unreliable under Rules 702 and 703 and

will not, at this juncture, exclude Demchick's report or

testimony based upon Demchick's failure to consider the Fourth VC

Report in formulating his valuation opinion.  Instead, given that

this is a bench rather than a jury trial, the court deems it more

appropriate to "hear the evidence and make its reliability

determination during, rather than in advance of trial."  In re

Salem, 465 F.3d 767, 777 (7th Cir. 2006).  The court reserves the

right to exclude or disregard Demchick's testimony if it later

determines that Demchick has failed to satisfy the standards of

Rules 702 and 703.[13]  Id.

---

[12]  Demchick has, however, offered several explanations for
why he found the Fourth VC Report unreliable, and he has provided
a seemingly transparent picture of what he did and did not take
into consideration when formulating his valuation opinion.

[13]  If Demchick persuades the court that his methodology
satisfies the requirements of Rules 702 and 703, then the
significance of Demchick's selective reliance on some but not
other data will go to the weight, not to the admissibility, of
Demchick's testimony, and the defendants will be free to explore
the issue on cross-examination.  Ferrara & DiMercurio v. St. Paul
Mercury Ins., 240 F.3d 1, 9 (1st Cir. 2001); In re Salem, 465
F.3d 767, 777 (7th Cir. 2006).

    2.    Demchick is not barred from relying upon liquidation
        value in his reasonably equivalent value analysis.

In support of his opinion that the transfer was not made for reasonably equivalent value, Demchick's report concludes that "on a Liquidation Basis, the Fair Value of the Net Assets transferred by GHI to Reese Corp. equaled approximately $24.5 million." Demchick opines that although either a going concern method or a liquidation method can be used to determine the fair value of the net assets transferred, the liquidation method is more appropriate in this case because Reese Hospital was on its "deathbed" at the time of the sale.

The defendants urge that, when conducting a reasonably equivalent value analysis, courts look to fair market value, which is "the value a willing buyer would pay for the assets as a going concern," quoting <u>Daley v. Chang (In re Joy Recovery Tech. Corp.)</u>, 286 B.R. 54, 77 (Bankr. N.D. Ill. 2002), and "[l]iquidation value is only an issue for solvency analysis, and only then if a transferee is 'on its deathbed' at the time of transfer." (Mot. at 6.)  Accordingly, the defendants contend that Demchick's reasonably equivalent value opinion, which values Reese Hospital on a liquidation basis rather than as a going concern, must be precluded as legally irrelevant.

Although the court in <u>Joy Recovery</u> found it appropriate to rely upon the going concern value of assets in determining reasonably equivalent value, the parties in <u>Joy Recovery</u>

19

stipulated that the business being valued was solvent at the time of the alleged fraudulent transfer, and "there [was] no evidence that the company was facing its imminent demise when the transfer at issue occurred." Joy Recovery, 286 B.R. at 77. Here, in contrast, the question of Reese Hospital's solvency at the time of the transfer and its financial wherewithal to continue to operate at the time of the transfer are central to the dispute.

In his report, Demchick concludes that Reese Hospital was on its deathbed at the time of the transfer. Although the validity of this assumption is one of the issues to be litigated at trial, if the court finds that Reese Hospital was "on its deathbed" at the time of the transfer, it follows that experts in the field of business valuation might reasonably look to the liquidation value of Reese Hospital for purposes of a reasonably equivalent value analysis.

Thus, rather than exclude Demchick's testimony based upon what may turn out to be his misplaced reliance on the liquidation method of valuation, it is more appropriate to allow Demchick to testify, subject to the court's right to disregard such testimony as either irrelevant or of little probative value if it is later established that Reese Hospital was not, in fact, on its deathbed at the time of the transfer.

3.    The court will not, at this juncture, address the
defendants' objections to Demchick's treatment of the
Humana contract as an assumed liability.

The defendants contend that Demchick failed to follow the

appropriate standards when concluding that Michael Reese assumed

a managed care contract between Humana and Reese Hospital as part

of the transfer.  The court will defer resolution of this issue

until after it has decided the defendants' pending Motion to

Strike Demchick's Affidavit (D.E. No. 350, filed December 13,

2006), which raises similar issues and is currently set for

hearing on January 4, 2006.

II

Consistent with the foregoing, it is

ORDERED that the defendants' Motion to Preclude Plaintiff's

Expert Neil H. Demchick From Testifying at Trial (D.E. No. 284)

is DENIED, except with respect to the objections to Demchick's

treatment of the Humana contract as an assumed liability, which

is reserved for later determination.

[Signed and dated above.]

Copies to: All counsel of record.