The Amended Memorandum Decision below is hereby
signed, correcting the original Memorandum
Decision's footnote numbering and correcting a
reference to a now-renumbered footnote.  The
original Memorandum Decision otherwise remains
unaltered.  Dated: May 19, 2008.



_____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re | ) |
| | ) |
| GREATER SOUTHEAST COMMUNITY | )   Case No. 02-02250 |
| HOSPITAL CORP. I, *et al.*, | )   (Chapter 11) |
| | )   (Jointly Administered) |
| Debtors. | ) |
| _____ | ) |
| | ) |
| SAM J. ALBERTS, TRUSTEE FOR | ) |
| THE DCHC LIQUIDATING TRUST, | ) |
| | ) |
| Plaintiff, | ) |
| | )   Adversary Proceeding No. |
| v. | )   04-10366 |
| | ) |
| HCA INC., *et al.*, | )   **[Not for Publication in** |
| | )   **West Bankruptcy Reporter]** |
| Defendants. | ) |

AMENDED MEMORANDUM DECISION CONSTITUTING THE
COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

Table of Contents

I.   FACTUAL AND PROCEDURAL BACKGROUND..........................3

II.  JURISDICTION, VENUE, AND STANDING........................8

III. THE MERITS OF ALBERTS' FRAUDULENT CONVEYANCE CLAIM......16

   A. Applicable Legal Standard.............................20

   B. Findings of Fact.....................................22

      1. Fair market value.................................23

         a. Market approach................................24

            (i) Guideline transactions.........................25

            (ii) Guideline public companies....................30

         b. Cost approach..................................32

            i.   Real property................................35

               (1) Highest and best use.......................36

                (A) Highest and best use as vacant............38

                (B) Highest and best use as improved..........45

               (2)  Value....................................47

                (A) Value of Reese Hospital site as vacant.....47

                (B) Value of Reese Hospital site as improved...49

            ii. Equipment.....................................61

            iii. Net working capital..........................66

            iv. Humana Contract...............................69

               (1) There is no evidence that the Humana
                   Contract existed on the Transfer Date.......71

               (2) There is no evidence that the Humana
                   Contract was assigned to Reese Corp.........77

i

(3) The PAA should not be deducted from
the value of Reese Hospital..................79

v.  Summary........................................80

c. Income approach....................................81

i.  Projected earnings..............................81

(A) M&P Projections............................83

(B) Reese Projections..........................84

(I)  Timing of the projections................91

(II) Starting point for projections..........102

(III)Problems at Reese Hospital..............110

(IV) Specific Assumptions....................114

(C) Demchick Projections......................119

(I)  Turnaround Scenario......................119

(II) Strategic Growth Scenario...............124

(D)  Modified projections.....................134

ii.  Net cash flow................................142

(A)  Depreciation and amortization...........143

(B)  Income taxes............................144

(C)  Net working capital.....................144

(D)  Capital expenditures....................145

(E)  Final net cash flow.....................149

iii. Weighted average cost of capital.............150

(A)  Discount rate (cost of equity)..........151

(I)  Risk-free rate..........................153

(II) Equity risk premium....................154

(III) Industry risk premium...................155

(IV)  Risk premium for size...................156

(V)   Specific company risk premium..........158

(B) After-tax cost of debt.....................159

(C) Debt-to-equity ratio.......................162

(D) Final WACC calculation.....................162

iv. Terminal value................................164

v.  Present value of net cash
    flow and terminal value.......................169

vi. Non-operating and excess assets...............172

vii. Final business enterprise value..............175

d. Other indications of value........................176

e. Reconciliation...................................178

2.   Good faith.......................................180

C. Conclusions of Law..................................191

IV.  CONCLUSION.........................................192

iii

The plaintiff Sam J. Alberts, trustee for the DCHC Liquidating Trust (the "Trust"), initiated this adversary proceeding to avoid and recover certain allegedly fraudulent transfers (the "Reese Transfers") from Michael Reese Medical Center Corporation ("Reese Corp."), as well as other debtors in this jointly administered bankruptcy case (collectively the "Debtors"), to defendants HCA Inc. ("HCA"), Galen Hospital Illinois, Inc. ("GHI"), and Western Plains Capital, Inc. ("Western," and collectively the "Defendants") under the Illinois Uniform Fraudulent Transfer Act, 740 Ill. Comp. Stat. 160/1 <u>et</u>

seq. (1990) (the "IUFTA"), pursuant to 11 U.S.C. § 544.[1]  The

court heard testimony and received into evidence numerous

exhibits and deposition excerpts over the course of a five-week

long trial commencing on January 19, 2007.  Having carefully

considered the evidence presented by the parties, the controlling

---

[1]  The allegations underlying this proceeding are set forth
in their final form in the Third Amended Complaint.  (D.E. No.
259, filed November 1, 2006 (the "Complaint" or "Compl.").)  The
affirmative defenses and counterclaims raised by the Defendants
are pled in their final form in Defendant Galen Hospital
Illinois, Inc.'s Answer to Second Amended Complaint;
Counterclaims for Damages and Set Off, (D.E. No. 61, filed August
5, 2005); Defendant HCA Inc.'s Answer to Second Amended
Complaint; Counterclaims for Damages and Set Off, (D.E. No. 62,
filed August 5, 2005); and Defendant Western Plains Capital,
Inc.'s Answer to Third Amended Complaint.  (D.E. No. 327, filed
December 4, 2006.  The affirmative defenses raised by Alberts in
response to the Defendants' counterclaims are pled in their final
form in the Plaintiff's Reply to Counterclaims of Galen Hospital
Illinois, Inc., (D.E. No. 63, filed August 23, 2005); and
Plaintiff's Reply to Counterclaims of HCA, Inc.  (D.E. No. 64,
filed August 23, 2005.)
    In addition to these foundational pleadings, the court
reviewed the following documents in arriving at its findings of
fact and conclusions of law: the Defendants' Revised Pre-Trial
Statement, (D.E. No. 449, filed January 17, 2007); the
Plaintiff's Amended Pretrial Statement, (D.E. No. 450, filed
January 17, 2007); the Plaintiff's Proposed Findings of Fact,
(D.E. No. 538, filed April 10, 2007 (the "Pl. Facts")); the
Plaintiff's Amended Post-Trial Brief Addressing Legal Issues and
Proposed Conclusions of Law, (D.E. No. 540, filed April 10, 2007
(the "Pl. Br.")); the Defendants' Post-Trial Brief, (D.E. No.
557, filed May 24, 2007 (the "Defs. Br.")); the Defendants'
Proposed Findings of Fact, (D.E. No. 558, filed May 24, 2007 (the
"Defs. Facts")); the Defendants' Rebuttal of Plaintiff's Proposed
Findings of Fact, (D.E. No. 559, filed May 25, 2007 (the "Defs.
Rebuttal")); the Plaintiff's Reply to Defendants' Post-Trial
Brief, (D.E. No. 573, filed July 6, 2007 (the "Pl. Reply")); and
the Plaintiff's Rebuttal to Defendants' Proposed Findings of
Fact, (D.E. No. 575, filed July 9, 2007 (the "Pl. Rebuttal")).

legal principles, and the court's prior rulings in this proceeding, the court concludes that final judgment should be entered in favor of the Defendants for the reasons that follow.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The following facts are no longer at issue.[2]  Reese Corp. was formed as a wholly-owned subsidiary of Doctors Community Hospital Corporation ("DCHC"), a privately-held healthcare management company organized under the laws of Delaware.  On July 8, 1998, Reese Corp. entered into an asset purchase agreement (the "APA") with GHI, a corporate subsidiary of fellow defendant HCA, for the purchase of Columbia Michael Reese Hospital and Medical Center ("Reese Hospital").  Also on July 8, 1998, Grant Hospital Corporation, another subsidiary of DCHC, signed a separate asset purchase agreement with Columbia Grant Hospital Inc. for the purchase of Grant Hospital.

On November 9, 1998, the parties signed the "Sixth Amendment" to the APA--the last such document signed prior to the

---

[2]  Unless otherwise noted, the facts set forth above are either deemed to be admitted or were found to be subject to summary judgment pursuant to various memorandum decisions entered by the court in December of 2006 and January of 2007.  See generally Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I), 365 B.R. 293 (Bankr. D.D.C. 2006) ("HCA I"); Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I), Case No. 02-02250, Adv. Pro. No. 04-10366, 2007 WL 80812 (Bankr. D.D.C. Jan. 3, 2007) ("HCA II"); Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I), Case No. 02-02250, Adv. Pro. No. 04-10366 (Bankr. D.D.C. Jan. 3, 2007) ("HCA III"); Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I), 365 B.R. 322 (Bankr. D.D.C. 2007) ("HCA IV").

purchase of the hospital.  The sale of both hospitals closed on

November 12, 1998 (the "Transfer Date").  At that time, various

lenders to Reese Corp. wired funds to a Wachovia bank account

owned by C/HCA Capital, LP (the "Capital LP").  The Capital LP

consisted of a general partner, C/HCA Capital, GP, Inc. (the

"Capital GP"), and a limited partner, Western.  Western owned the

Capital GP at the time of the Reese Transfers and merged into a

single entity with the Capital GP in December of 2000.  The

Capital LP ceased to exist in that same month.

On November 20, 2002, DCHC filed for chapter 11 relief along

with the other Debtors, including Reese Corp.  After protracted

proceedings lasting almost 18 months, the Debtors achieved

confirmation of their second amended plan of reorganization (the

"Plan") on April 5, 2004.  Section 6.6 of the Plan provides for

the creation of the Trust, which is charged with liquidating

certain assets of the Debtors and distributing the proceeds to

certain classes of creditors.  Among the assets transferred to

the Trust were fraudulent conveyance and other actions authorized

under chapter 5 of the Bankruptcy Code.

Acting in his capacity as trustee, Alberts initiated the

instant adversary proceeding on November 18, 2004.  After

amending his complaint twice, Alberts moved for summary judgment

on March 9, 2006.  That motion was granted in part and denied in

part in an oral decision dated April 4, 2006.  The court

4

subsequently entered an order reciting that Reese Corp. transferred at least $66,048,840.00 towards the purchase of Reese Hospital.

Alberts filed a motion for partial summary judgment on July 27, 2006, on the discrete issue of whether the Second Amended Complaint was barred by the IUFTA's statute of repose. See 740 Ill. Comp. Stat. § 160/10 (extinguishing any action brought under § 160/5(a)(1) or § 160/5(a)(2) of the IUFTA that is not brought "within 4 years after the transfer was made or the obligation was incurred"). HCA and GHI responded by filing both an opposition and a cross-motion for summary judgment. The very next day, Alberts filed a motion to amend his complaint a third time to include Western as a defendant. The court granted Alberts leave to add Western as a party in a decision and order entered on October 12, 2006.

On December 6, 2006, the court entered a memorandum decision and accompanying order resolving in part the motion for partial summary judgment filed by Alberts and the cross-motion for summary judgment filed by HCA and GHI. HCA I, supra n.2. The balance of those motions was decided in a memorandum decision and order entered on January 3, 2007, regarding the parties' responses to a separate order to show cause arising out of the court's earlier memorandum decision. HCA II, supra n.2. The court entered yet another memorandum decision and order partially

5

resolving a separate motion for summary judgment filed by GHI and HCA on January 3, 2007.  HCA III, supra n.2.  In that decision, the court fixed the value of the Reese Transfers at $68,048,840.00, a $2 million increase over the court's prior oral decision.  Also on January 3, 2007, the court entered a memorandum decision granting Alberts's motion to exclude certain expert reports furnished out of time by the Defendants, but denying Alberts's other motions in limine.  See generally Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I), 365 B.R. 315 (Bankr. D.D.C. 2007).

The court heard argument on a variety of matters on January 3, 2007, and January 4, 2007, in an effort to resolve as many outstanding issues as possible prior to the commencement of trial.  Of particular note, the court supplemented its January 3, 2007, memorandum decision by concluding that there was a genuine dispute of material fact as to the value of the property and rights received by Reese Corp. in return for the Reese Transfers. The court also denied a motion for summary judgment filed by Western and awarded summary judgment sua sponte to Alberts with respect to Western's affirmative defense under the IUFTA's statute of repose.  HCA IV, supra n.2.  Finally, the court denied the Defendants' motion to exclude one of Alberts' witnesses, Robert Wilson, from testifying and ordered further briefing and evidence with respect to their motion to exclude Alberts' other

6

expert, Neil Demchick, insofar as that motion sought to prevent
Demchick from testifying about a purchase accounting entry made
by DCHC after Reese Corp.'s purchase of Reese Hospital to reflect
losses anticipated on a provider contract with Humana purportedly
assigned to Reese Corp. from GHI (the "Humana Contract").

Trial commenced on January 19, 2007. Alberts called former
DCHC president Paul Tuft, former DCHC vice-presidents Mel Redman,
Erich Mounce, and Donna Talbot, and expert witnesses Robert
Wilson and Neil Demchick to the stand.[3]  The Defendants filed a
motion for judgment on partial findings pursuant to Fed. R. Civ.
P. 52(c) (as incorporated by Fed. R. Bankr. P. 7052) at the close
of Alberts's case-in-chief, which the court denied without
prejudice to renewal at the close of trial by way of oral
decision.  The Defendants presented only former HCA and GHI vice-
president Gregg Gerken and expert witnesses Michael Kimmel, James

---

[3]  Alberts also introduced excerpts from the deposition
testimony of the following witnesses: Carl George (Senior Vice
President of Development, HCA); David Hill (Legal Counsel for
Development, HCA); Tom Ramsey (Senior Real Estate Consultant,
HCA); Benjamin Burns (Litigation Counsel, HCA); Jim Childress
(Assistant Vice President of Tax, HCA); Dr. Roberto Diaz
(President of Physicians Hospitals and Health Care Centers,
Inc.); Laurie Taylor (Principal, Ernst & Young); David Felsenthal
(formerly with Valuation Counselors Group); Thomas Barry (Cain
Bros.); Dr. Enrique Beckmann (CEO of Michael Reese Hospital); and
Ken Bauer (former CEO of Michael Reese Hospital).

7

Yerges, and Kevin Moss.[4]  Over the course of the trial, the court
also conducted an evidentiary hearing to determine whether
Demchick should be permitted to testify as to the purchase
accounting entry made by DCHC to reflect anticipated losses on
the Humana Contract.  The court ultimately concluded that he
should not be allowed to testify on that discrete issue.

## II.  JURISDICTION, VENUE, AND STANDING

The court has subject-matter jurisdiction over this
proceeding pursuant to 28 U.S.C. § 1334(b).  This is a "core"
proceeding pursuant to 28 U.S.C. § 157(b)(2)(H), and the parties
have expressly consented to the entry of a final order by this

---

[4]  The Defendants also introduced excerpts from the
deposition testimony of the following witnesses: Carl George
(Senior Vice President of Development, HCA); David Hill (Legal
Counsel for Development, HCA); Tom Ramsey (Senior Real Estate
Consultant, HCA); Benjamin Burns (Litigation Counsel, HCA); Jim
Childress (Assistant Vice President of Tax, HCA); Dr. Roberto
Diaz (President of Physicians Hospitals and Health Care Centers,
Inc.); Laurie Taylor (Principal, Ernst & Young); Lance Poulsen
(President and founder of NCFE); Cindy Sehr (Outside Counsel for
DCHC); David Felsenthal (formerly with Valuation Counselors
Group); Thomas Barry (Cain Bros.); Dr. Enrique Beckmann (CEO of
Michael Reese Hospital); and Ken Bauer (former CEO of Michael
Reese Hospital).

court.[5]  This court is the appropriate venue for Alberts' suit

pursuant to 28 U.S.C. § 1409(a).

The court has previously concluded that Alberts has standing

to bring this suit as a representative of the estate pursuant to

---

[5]  Arguably, the parties retained their right to Article III
adjudication of the "private right" causes of action at issue
here even though Congress has designated fraudulent transfer
actions as "core" proceedings, see Granfinanciera, S.A. v.
Nordberg, 492 U.S. 31, 36, 40-64 (1989) (Seventh Amendment right
to jury trial applies to fraudulent conveyance actions brought by
chapter 11 trustee "notwithstanding Congress' designation of
fraudulent conveyance actions as 'core proceedings'"); In re Tex.
Gen. Petroleum Corp., 52 F.3d 1330, 1336 (5th Cir. 1995)
("Whether an Article III court is necessary involves the same
inquiry as whether a litigant has a Seventh Amendment right to a
jury trial."), although the matter is complicated by the
Defendants' decision to file counterclaims in this adversary
proceeding, see Langenkamp v. Culp, 498 U.S. 42, 44 (1990)
(defendant submits itself to equity jurisdiction of bankruptcy
court by filing proof of claim, thereby depriving itself of
Seventh Amendment right to jury trial); Peachtree Lane
Associates, Ltd. v. Granader, 175 B.R. 232, 236-38 (N.D. Ill.
1994) ("Several well reasoned, post-Langenkamp opinions have held
that the filing of a counterclaim in an adversary proceeding
instituted by a chapter 11 trustee or debtor-in-possession
qualifies as filing a 'claim[,]' thereby triggering the 'public
rights' process of allowance and disallowance of claims and the
restructuring of the debtor-creditor relationship."). But see
Beard v. Braunstein, 914 F.2d 434, 441-42 (3d Cir. 1990)
(defendant did not waive right to jury trial by filing mandatory
counterclaim); NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.),
203 B.R. 905, 909-13 (D. Del. 1996) ("this [c]ourt finds that a
party does not waive its right to a jury trial or its right to
object to jurisdiction and venue when it brings counterclaims
that . . . are permissive"). To resolve this potential problem,
the court entered an order on August 9, 2007, directing the
parties to file a joint statement indicating whether they
unanimously consented to the entry of a final judgment by this
court and, if no such consent could be reached, to file
supplemental post-trial briefs addressing the issue. (D.E. No.
578.)  The parties entered a joint statement of consent one week
later.  (D.E. No. 580, filed August 16, 2007.)

11 U.S.C. §§ 544(b) and 1123.  <u>HCA I</u>, 365 B.R. at 300-01.  On the
petition date, the Internal Revenue Service (the "IRS") held a
contingent claim against DCHC that arose in 2002, long after the
Reese Transfers were made.  Standing in the shoes of the IRS as a
creditor under 11 U.S.C. § 544(b), Alberts defeated the
Defendants' statute of limitations defense.  <u>Id.</u> at 299-312.
Notwithstanding the court's prior ruling that Alberts was acting
as the representative of the bankruptcy estate, the Defendants
argue for the first time in their post-trial brief that Alberts
lacks standing under Article III of the Constitution to pursue
this action because NCFE's bankruptcy was responsible for Reese
Corp.'s insolvency at the time that the IRS's contingent claim

arose.  (Defs. Br. 54-59.)[6]  Their arguments in this regard are
misguided.

"'No principle is more fundamental to the judiciary's proper
role in our system of government than the constitutional
limitation of federal-court jurisdiction to actual cases or
controversies.'"  <u>Raines v. Byrd</u>, 521 U.S. 811, 818 (1997)
(quoting <u>Simon v. Eastern Ky. Welfare Rights Org.</u>, 426 U.S. 26,
37 (1976)).  "'Article III standing . . . enforces [that]
requirement.'"  <u>DaimlerChrysler Corp. v. Cuno</u>, 126 S. Ct. 1854,

---

    [6] Alberts argues that the court's prior determination that
he is a representative of the estate constitutes the law of the
case with respect to standing.  (Pl. Reply 8.)  He is mistaken.
There are really "two strands" of federal standing jurisprudence:
"Article III standing, which enforces the Constitution's case-or-
controversy requirement, . . . and prudential standing, which
embodies 'judicially self-imposed limits on the exercise of
federal jurisdiction.'"  <u>Elk Grove Unified Sch. Dist. v. Newdow</u>,
542 U.S. 1, 11 (2004) ("<u>Elk Grove</u>") (quoting <u>Allen v. Wright</u>, 468
U.S. 737, 750 (1984)).  "[T]he prudential principles of standing
under Article III and the trustee's powers under the [B]ankruptcy
[C]ode are coextensive . . . ."  <u>In re Cannon</u>, 277 F.3d 838, 853
(6th Cir. 2002).  Thus, "if a trustee [or other representative of
the estate] has no power to assert a claim because it is not one
belonging to the bankrupt estate [or a claim conferred upon the
representative of the estate by another provision of the
Bankruptcy Code], then he also fails to meet the prudential
limitation that the legal rights asserted must be his own."
<u>Shearson Lehman Hutton, Inc. v. Wagoner</u>, 944 F.2d 114, 118 (2d
Cir. 1991).
    The Defendants' prior arguments about standing revolved
around whether Alberts could invoke § 544(b) as a legal and
equitable matter, <u>i.e.</u>, whether Alberts had "prudential" standing
in this case.  That specific issue was resolved in Alberts's
favor by the court's memorandum decision entered on December 6,
2006.  <u>HCA I</u>, 365 B.R. at 300-01.  The instant dispute concerns
"Article III" standing, a jurisdictional question which the court
must consider even at this extremely late stage in the case.
<u>Steffan v. Perry</u>, 41 F.3d 677, 697 n.20 (D.C. Cir. 1994).

1861 (2006) (quoting Elk Grove, 542 U.S. at 11).  "To meet the

standing requirements of Article III, '[a] plaintiff must allege

personal injury fairly traceable to the defendant's allegedly

unlawful conduct and likely to be redressed by the requested

relief." Raines, 521 U.S. at 818 (quoting Allen v. Wright, 468

U.S. 737, 751 (1984)) (emphasis supplied by the Court in Raines).

If, as the court concludes below, the Defendants' contention that

NCFE's bankruptcy was the intervening cause of Reese Corp.'s

insolvency is an affirmative defense, then the claims pled by

Alberts satisfied Article III requirements.  Even disregarding

the issue of which party was responsible for addressing the issue

in its pleading, the evidence shows that Alberts satisfied

Article III requirements.

    A fraudulent transfer harms both existing and future

creditors by reducing the amount of assets available for

distribution to creditors where the debtor-transferor is

insolvent and therefore unable to pay all creditors in full.  See

Official Comm. of Asbestos Claimants of G-I Holding, Inc. v.

Heyman, 277 B.R. 20, 33 (S.D.N.Y. 2002) (absestos claimants'

committee had standing to bring action to avoid and recover

fraudulent transfer because claims reserve might not be

sufficient to cover all asbestos claims, thereby causing such

claimants to suffer "injury in fact").  Consequently, a creditor

or estate representative usually establishes an injury "fairly

traceable" to the challenged transfer by satisfying the elements of the applicable fraudulent transfer statute.  See part III, infra.  Once those elements are established, the burden shifts to the transferee to demonstrate that "the transfer did not (1) reduce the res that would have been available to any creditor or creditors, (2) 'hinder, delay, or defraud' any creditor or creditors, []or (3) have any other adverse impact on any creditor or creditors generally."  Bear, Stearns Sec. Corp. v. Gredd, 275 B.R. 190, 196 (S.D.N.Y. 2002) ("Bear Stearns") (emphasis added).[7]

If Reese Corp. was rendered insolvent by the Reese Transfers, the Defendants cannot carry their burden with respect to harm.  There is simply no question that the Reese Transfers depleted assets of Reese Corp. that would have been available to pay other creditors had the transfers not taken place.  Nor is there any question that if the assets acquired by Reese Corp. in exchange for the Reese Transfers had not been worth the purchase price, Reese Corp.'s insolvency in November of 2002 would have

---

[7] Bear Stearns concerned an avoidance action brought pursuant to § 548 of the Bankruptcy Code, but the same basic principle (i.e., that the transferee bears the burden of showing that some other event caused the injury of a depleted res and an inability to pay creditors in full once proximate cause is established by the estate representative) applies with equal force under Illinois case law.  See Wehmeier v. UNR Indus., Inc., 572 N.E.2d 320, 337-38 (Ill. App. Ct. 1991) (holding that the assertion of an intervening event is an affirmative defense); Mich. Ave. Nat'l Bank v. State Farm Ins. Companies, 404 N.E.2d 426, 431 (Ill. App. Ct. 1980) ("the burden [is] on the defendants to raise and prove [an] affirmative defense").

been a result of its decision to spend all of the money that it
borrowed from NCFE and HCA towards the purchase of Reese
Hospital.  By transferring every asset at its disposal in return
for a hospital whose worth did not match its price, Reese Corp.
would have ensured its own insolvency for years to come.[8]

The motive for Reese Corp.'s decision to seek bankruptcy
relief is irrelevant.  The harm arising from a fraudulent
transfer is the depletion of the debtor's assets at a time when
the debtor cannot pay its creditors in full, not the response
taken by the debtor in response to that inability.  Even if Reese
Corp. had never filed for chapter 11 relief, the IRS would still

---

[8]  One could argue that Reese Corp. would have been rendered
insolvent just by borrowing money from NCFE and HCA because it
was so thinly capitalized that the fees and interest arising from
the debt owed to these lenders would have exceeded Reese Corp.'s
assets (less the amounts borrowed from the lenders, which is
offset against the assets, as the initial debt owed, to compute
net assets before such fees and interest).  Arguably, the
incurrence of these obligations by Reese Corp. constituted
fraudulent transfers in their own right.  But any nominal
insolvency that might have resulted from the fees and interest
charged by Reese Corp.'s lenders would not have displaced any
insolvency arising upon Reese Corp.'s acquisition of Reese
Hospital.  Subsequent debts arising as a result of the purchase
of Reese Hospital were "reasonably foreseeable" consequences of
the purchase and therefore not intervening events absolving the
participants in any underlying fraudulent transfer of wrongdoing.
Parsons v. Carbondale Twp., 577 N.E.2d 779, 786 (Ill. App. Ct.
1991); see also Coan v. Andersen (In re Andersen), 166 B.R. 516,
525 n.10 (Bankr. D. Conn. 1994) (recognizing "the right of a
future creditor to set aside a constructively fraudulent
conveyance if the debtor's then-existing debts were not paid
before the future creditor's obligation was created, or if then-
existing debts were paid off by the incurring of additional debt
rather than from the debtor's earnings").

have had every right to bring an action under the IUFTA on
November 20, 2002.  Standing in the IRS's shoes, Alberts was
entitled to assert his fraudulent conveyance claims for the
benefit of the bankruptcy estate, and thus for the benefit of
creditors other than just the IRS.  See Buncher Co. v. Official
Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d
245 (3d Cir. 2000).

Nor does it matter that the debt owed to the IRS might have
been paid in a matter of weeks if not days had Reese Corp.
avoided bankruptcy.  Section 544(b) places the representative of
the estate in the shoes of any unsecured creditor as of the
petition date, HCA I, 365 B.R. at 300 n.11, and the IRS could
have brought an action under the IUFTA on November 20, 2002,
notwithstanding the likelihood that its claim would be satisfied
later and its (hypothetical) suit rendered moot as a consequence.
"Even if the IRS . . . claims had been paid in full mere hours
after commencement of the case, that would not alter the estate
representative's ability to invoke § 544(b)."  Id. at 293
(citation omitted).  Reese Corp.'s intention to pay the IRS does
not alter the fact that the any fraudulent transfer made by Reese
Corp. in acquiring Reese Hospital four years prior deprived the
IRS of the certainty of recovery on its contingent claim until it
received payment.

Alberts has standing to pursue this action.  The Defendants'

15

arguments to the contrary are without merit.

　　III.　THE MERITS OF ALBERTS'S FRAUDULENT CONVEYANCE CLAIM

　　The basis for Alberts's suit is 11 U.S.C. § 544(b), which provides in pertinent part that the representative of the debtor's estate "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." Alberts contends, and has endeavored to prove at trial, that the Defendants have violated § 5(a)(1) of the IUFTA (Counts I and II of the Complaint), 740 Ill. Comp. Stat. 160/5(a)(1) (addressing actual fraud against existing or future creditors), § 5(a)(2) of the IUFTA (Counts III and IV of the Complaint), <u>id.</u> at 160/5(a)(2) (addressing constructive fraud against existing or future creditors), and even § 6(a) of the IUFTA (Counts V and VI of the Complaint), <u>id.</u> at 160/6(a) (addressing constructive fraud against creditors whose claims arose prior to the allegedly fraudulent transfer).

　　The court has already decided many of the legal and factual questions raised in this adversary proceeding by way of memorandum and oral decision.  These issues include:

- <u>Value of the Subject Transfers</u>.  The value of the Reese Transfers is at least $68,048,840.00, of which $2,000,000.00 was transferred in exchange for Reese Corp.'s delay in closing on the purchase of Reese Hospital.  <u>Id.</u> at 29.

16

- <u>Arm's-Length Negotiations</u>.  The Reese Transfers were the result of arm's-length negotiations between the parties. <u>HCA III</u>, slip op. at 28-29.

- <u>Alberts's Standing as Representative of the Estate</u>.  Alberts is a "representative of the estate" for purposes of 11 U.S.C. § 1123, which confers upon him the statutory authority to pursue causes of action under 11 U.S.C. § 544(b).  <u>HCA I</u>, 365 B.R. at 300-01; <u>see also</u> n.6, <u>supra</u>.

- <u>Existence of Unsecured Creditor on Petition Date</u>.  The IRS held an unsecured contingent claim for taxes on wages to be paid to Reese Hospital employees as of the petition date, thus giving Alberts standing to pursue this action under § 544(b).  <u>Id.</u> at 306-12; <u>HCA II</u>, 2007 WL 80812, at **2-3; <u>see also</u> n.6, <u>supra</u>.

- <u>Statute of Repose</u>.  The statute of repose set forth in § 10 of the IUFTA, 740 Ill. Comp. Stat. 160/10, does not apply in this case because Alberts derives his standing from a governmental creditor (the IRS), and the claims of governmental creditors cannot be extinguished by statutes of repose or limitation (other than those established by Congress) pursuant to the Supreme Court's ruling in <u>United States v. Summerlin</u>, 310 U.S. 414 (1940).  <u>HCA I</u>, 365 B.R. at 301-06; <u>HCA II</u>, 2007 WL 80812, at **2-3.  Moreover, Alberts's claims against Western relate back to the date of the filing of his first complaint against HCA and GHI because there is an identity of interests between the Defendants.  <u>HCA IV</u>, 365 B.R. at 332-33.

- <u>Counts V-VI of the Complaint</u>.  Final judgment in favor of the Defendants is appropriate with respect to Counts V-VI of the Complaint.  <u>HCA I</u>, 365 B.R. at 313-15.

Additionally, the court may now decide the following legal and factual issues addressed but not resolved in prior decisions and not contested at trial:

- <u>Initial Transferee</u>.  In a prior memorandum decision, the court declined to grant summary judgment in favor of Alberts with respect to whether the Capital LP was the initial transferee of the Reese Transfers until Western had an opportunity to present evidence that GHI did not have a "positive daily cash balance" when the Capital LP credited

17

its account for the Reese Transfers, and therefore was not contractually obligated to apply that credit towards amounts owed to the Capital LP.  HCA IV, 365 B.R. at 328-31, 333, and n.12.  Western presented no evidence in this regard at trial; consequently, the court concludes as a factual matter that Western, as the successor-in-interest to the Capital LP, is the "initial transferee" of the Reese Transfers for purposes of 11 U.S.C. § 550 in accordance with the reasoning set forth in HCA IV.

- Counts I, II, and IV of the Complaint.  In a prior memorandum decision, the court declined to grant summary judgment in favor of the Defendants with respect to Counts I, II, and IV of Alberts's second amended complaint even though Alberts had not produced any evidence that Reese Corp. had engaged in actual fraud (an element of Counts I and II) or that Debtors other than Reese Corp. were involved in the Reese Transfers, as alleged in Counts II, IV, and VI of the second amended complaint, because the Defendants did not put Alberts on notice that he needed to address these issues in response to the Defendants' cross-motion for summary judgment.  HCA I, 365 B.R. at 313 n.40.[9]  Alberts presented no evidence of actual fraud by Reese Corp. at trial, nor did he prove that any debtor other than Reese Corp. transferred any assets to the Defendants.  Final judgment in favor of the Defendants is therefore appropriate with respect to Counts I, II, and IV of the Complaint.[10]

Based on these findings, the only count in the Complaint requiring further analysis by the court is Count III, which seeks to recover the Reese Transfers pursuant to § 5(a)(2) of the IUFTA.  The statute reads in pertinent part:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was

---

[9]  The counts in the Complaint (the third amended complaint) mirror the counts listed in the second amended complaint.

[10]  This analysis furnishes an additional basis for dismissing Count VI (dismissed on other grounds already as mentioned above).

incurred, if the debtor made the transfer or
incurred the obligation . . . without receiving
a reasonably equivalent value in exchange for
the transfer or obligation, and the debtor:
        (A) was engaged or was about to engage in
a business or a transaction for which the
remaining assets of the debtor were
unreasonably small in relation to the business
or transaction; or
        (B) intended to incur, or believed or
reasonably should have believed that he would
incur, debts beyond his ability to pay as they
became due.

740 Ill. Comp. Stat. 160/5(b).

As the plaintiff in this proceeding, Alberts has the burden

of proving these elements by a preponderance of the evidence.  In

re Zeigler, 320 B.R. 362, 374 (Bankr. N.D. Ill. 2005) ("The

movant has the burden of proving fraud in law by a preponderance

of the evidence.").  Thus, to prevail on Count III of his

Complaint, Alberts must show that (1) Reese Corp. did not receive

"reasonably equivalent value" for the Reese Transfers and that

(2) Reese Corp. was insolvent at the time of the Reese Transfers

or as a result of the Reese Transfers.  Because the court

concludes that Alberts has failed to demonstrate by a

preponderance of the evidence that Reese Corp. did not receive

reasonably equivalent value for the Reese Transfers for the

reasons set forth below, it need not rule with respect to the

issue of insolvency.

19

A.   <u>Applicable Legal Standard</u>

The court has expounded in prior decisions about the meaning of the term "reasonably equivalent value" for purposes of § 5(a)(2) of the IUFTA.  As the court explained in <u>HCA III</u>:

> "What constitutes 'reasonably equivalent value' for purposes of the [IUFTA] has not been defined by Illinois case law," <u>Helms v. Roti (In re Roti)</u>, 271 B.R. 281, 303 (Bankr. N.D. Ill. 2002).   Consequently, "[r]easonably equivalent value is interpreted the same way under both [11 U.S.C.] § 548 and the [IUFTA] because the term, as used in the [IUFTA], is derived from § 548(a)(2)."  <u>Official Comm. of Unsecured Creditors of Crystal Med. Products, Inc. v. Pedersen & Houpt (In re Crystal Med. Products, Inc.)</u>, 240 B.R. 290, 300 (Bankr. N.D. Ill. 1990).
>
> "The test used to determine reasonably equivalent value in the context of a fraudulent conveyance [as contemplated by § 548] requires the court to determine the value of what was transferred and to compare it to what was received."  <u>Barber v. Golden Seed Co., Inc.</u>, 129 F.3d 382, 387 (7th Cir. 1997).  In addition to comparing the fair market value of the challenged transfer against the fair market value of the consideration received in exchange for the transfer, courts determine whether these values are reasonably equivalent by looking for "the existence of an arm's-length relationship between the debtor and the transferee" and good faith on the part of the transferee.  <u>Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.)</u>, 92 F.3d 139, 149 (3d Cir. 1996).  The issue "must be evaluated as of the date of the transaction."  <u>Daley v. Chang (In re Joy Recovery Tech. Corp.)</u>, 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002).

<u>HCA III</u>, slip op. at 7-8.

Alberts argues that the Defendants' good faith in receiving

20

the Reese Transfers is irrelevant to the court's determination as
to whether Reese Corp. received "reasonably equivalent value" for
those transfers.  (Pl. Br. 27-32; Pl. Reply 32.)[11]  The court
agrees with Alberts that the "fair market value of the
consideration received in exchanged for the transfer" is far and
away the most important factor in determining whether the
transferor received "reasonably equivalent value" for the
transfer, see Heritage Bank Tinley Park v. Steinberg (In re
Grabill Corp.), 121 B.R. 983, 994 (Bankr. N.D. Ill. 1990) ("Fair
market value at the time of the transfer should control."), but
"the concept of 'reasonably equivalent value' under fraudulent
transfer law is not, legally, identical to fair market value," In
re Commercial Fin. Services, Inc., 350 B.R. 559, 576 (Bankr. N.D.
Okla. 2005) (citing BFP v. Resolution Trust Corp., 511 U.S. 531,

---

[11]  Alberts suggests that the framers of the Uniform
Fraudulent Transfer Act intended to do away with any inquiry into
the good faith of the transferee when they drafted their model
statute, (Pl. Br. 29-30), yet the drafters intentionally lifted
the phrase "reasonably equivalent value" from the Bankruptcy
Code.  Uniform Fraudulent Transfer Act, prefatory note (1984).
"If anything is clear from the various uses of the word 'value'
in the Code, it is that Congress did not mean fair market value
when it used the term reasonably equivalent value." Bundles v.
Baker, 856 F.2d 815, 824 (7th Cir. 1988), abrogated in part on
other grounds by BFP v. Resolution Trust Corp., 511 U.S. 531, 540
(1994).

537 (1994)).[12]  Good faith has a place in the court's

consideration of the "totality of the circumstances" surrounding

the Reese Transfers, albeit a minimal one.

B.  Findings of Fact

In a previous memorandum decision, the court held that there

is no genuine dispute of material fact that the Reese Transfers

were the result of arm's-length negotiations between the parties.

HCA III, slip op. at 27-28.  Thus, the only factual findings

required by the court with respect to reasonably equivalent value

are those concerning the fair market value of Reese Hospital as

compared to the value of the Reese Transfers and the good faith

of Reese Corp. and the Defendants in entering into the

---

[12]  The court's position with respect to this issue is well
within the norm.  See, e.g., Beneficiaries under the Third
Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 (In
re Fruehauf Trailer Corp.), 444 F.3d 203, 213 (3d Cir. 2006)
(holding that determination of "reasonably equivalent value"
requires court to look to "the 'totality of the circumstances,'
including . . . the transferee's good faith"); Creditor's Comm.
of Jumer's, Castle Lodge, Inc. (In re Jumer's Castle Lodge,
Inc.), 338 B.R. 344, 354 (C.D. Ill. 2006) (same); Grochocinski v.
Knippen (In re Knippen), 355 B.R. 710, 726 (Bankr. N.D. Ill.
2006) (same); Pereira v. Wells Fargo Bank, N.A. (In re Gonzalez),
342 B.R. 165, 173 (Bankr. S.D.N.Y. 2006) (same); Kapila v. WLN
Family Ltd. P'ship (In re Leneve), 341 B.R. 53, 56-57 (Bankr.
S.D. Fla. 2006) (same); Kaler v. Red River Commodities, Inc. (In
re Sun Valley Products, Inc.), 328 B.R. 147, 156-57 (Bankr.
D.N.D. 2005) (same); Jones v. Williams (In re McDonald), 265 B.R.
632, 636 (Bankr. M.D. Fla. 2001) (same); Salven v. Munday (In re
Kemmer), 265 B.R. 224, 232 (Bankr. E.D. Cal. 2001) (same); Cohen
v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.), 264 B.R. 790, 813-
14 (Bankr. E.D. Va. 1999) (same); Samson v. U.S. West
Communications, Inc. (In re Grigonis), 208 B.R. 950, 956 (Bankr.
D. Mont. 1997) (same).

transaction that led to the Reese Transfers.

1. Fair market value

"The test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred and to compare it to what was received." Barber v. Golden Seed Co., Inc., 129 F.3d 382, 387 (7th Cir. 1997). The term "fair market value" refers to "the amount at which the property would change hands between a willing buyer and a willing seller, when the former is not under compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts." Jay E. Fishman et al., PPC's Guide to Business Valuations ¶ 201.4 (15th ed. 2005) (quoting Internal Revenue Service Ruling 59-60).[13] There are three basic methodologies employed for determining the fair market value of a business: (1) the "market" approach, (2) the "net asset" or "cost" approach, and (3) the "income" approach. Id. at ¶ 203.2; Shannon P. Pratt et al., Valuing a Business: The Analysis and Appraisal of Closely Held Companies, at 45 (4th ed. 2000).

---

[13] In an order entered on April 30, 2007, the court took judicial notice of, inter alia, the sixteenth edition to PPC's Guide to Business Valuations. (D.E. No. 546.) Unfortunately, the court was unable to obtain a copy of that more recent edition, and must use the fifteenth edition instead. To the extent that the sixteenth edition differs materially from the fifteenth edition with respect to any of the valuation principles discussed herein, the court will reconsider its findings of fact and conclusions of law at the appropriate time.

23

a.  <u>Market approach</u>

Under the market approach, a company's value can be
estimated by identifying and analyzing recent sales of comparable
assets.  Fishman et al., <u>supra</u>, ¶ 203.4.  There are two distinct
valuation methods: (1) the guideline transaction method and (2)
the guideline public company method.  <u>Id.</u> at ¶ ¶ 203.4, 600.3.
The guideline transaction method values the subject company by
comparing transactions involving companies with similar
characteristics to the subject company.  <u>Id.</u> at ¶ 600.4.  The
guideline public company method values the subject company using
the market price of the common stock of publicly traded companies
that have similar characteristics to the subject company.  <u>Id.</u> at
¶ 600.4.

The market approach requires a thorough search for
comparable transactions and companies and equally thorough
analysis and adjustment of the guideline data.  <u>Id.</u> at ¶ 203.4.
Comparable transactions or comparable public companies need not
be identical to the subject sale or subject company but must
provide a reasonable basis for comparison to the subject company.
The challenges are identifying "truly comparable" companies and
transactions and obtaining adequate information about those
companies and transactions.  <u>Id.</u> at ¶ 600.8.  (Trial Tr. 2184:17-
24, Feb. 7, 2007 (Demchick, N.).)  Even if true comparables can
be identified, the market approach leads to reliable and accurate

24

estimates of value only if adequate data on those comparables exist. Fishman et al., supra, ¶ 600.8.

After reviewing testimony and documentary evidence by Demchick on behalf of Alberts and by Moss on behalf of the Defendants, the court agrees with Alberts that there are no truly comparable transactions or public companies from which the court can derive an accurate and reliable fair market value for Reese Hospital using the market approach.

### (i) Guideline transactions

The guideline transaction method values Reese Hospital by comparing transactions involving companies with similar characteristics to Reese Hospital. Characteristics or measurements used to determine comparability of transactions include (1) revenue, (2) income, (3) EBITDA (earnings before income taxes, depreciation and amortization), and (4) number of beds in the hospital. (Trial Tr. 2148:8-10, Feb. 7, 2007 (Demchick, N.).)

Demchick determined that there were inadequate comparable transactions from which he could calculate the market value for Reese Hospital. Demchick searched a number of databases, including Irving, Levin and Associates, Pratt Stats., BIZ Comps., and the IBA Database, to identify potentially comparable private

sales of hospitals.[14]  (Trial Tr. 2185:6-13, Feb. 7, 2007
(Demchick, N.).)  He "searched for hospital-related transactions
or general and surgical hospitals between the years of 1996 and
1999, with revenues between 50 million and 300 million."  (Trial
Tr. 2185:9-13, Feb. 7, 2007 (Demchick, N.).)  This range is
sufficiently broad to cover any potentially comparable
transactions.

     This search yielded a pool of 329 transactions, which
Demchick then reviewed for comparability.  Demchick eliminated
most of the hospital sales because one or more of the following
factors was present: (1)the purchase price was not available; (2)
the income of the purchased entity was not available; (3) the
hospital was not in an urban area, (4) the purchase involved
multiple entities rather than a single hospital; (5) the EBITDA
measure was not available; or (6) the company had a positive
EBITDA measure.  (Trial Tr. 2188:3-2190-17,  Feb. 7, 2007
(Demchick, N.).)  EBITDA is a measure of profitability of a
company.  Demchick excluded transactions where the company's
EBITDA measure was not available or was positive because Reese
Hospital had a negative EBITDA measure at the time of the Reese
Transfers.

---

     [14]  Irving Levin and Associates is a firm that specializes
in gathering and publishing information about hospital-related
transactions.  Pratt Stats., BIZ Comps., and the IBA databases
gather information related to sales of closely-held businesses.

26

After eliminating transactions on the basis of these
measures, only one potentially comparable transaction remained,
the purchase of Coney Island Hospital, which Demchick analyzed
even though "it wouldn't be enough to really come to a meaningful
conclusion related to market value." (Trial Tr. 2191:1-2, Feb.
7, 2007 (Demchick, N.).) Demchick ultimately excluded Coney
Island as a comparable sale because the $67.1 million purchase
price listed in Irving Levin and Associates actually included $25
million of capital improvements paid for by the buyer rather than
the seller, thereby reducing the actual purchase price of Coney
Island Hospital to $42.1 million, which is significantly lower
than the $68,480,048 paid for the Reese Transfers.

In contrast to Demchick, Moss determined that the market
approach value of Reese Hospital as of November 12, 1998, was
between $74 and $90 million. Like Demchick, he used private
hospital sales data from Irving Levin and Associates and other
private transaction databases to identify comparable transactions
from which he estimated the market approach value of Reese
Hospital as of November 12, 1998. But unlike Demchick, Moss
determined that purchases of companies with positive EBITDA
margins constituted comparable transactions even though Reese
Hospital had a negative EBITDA at the time of transfer.[15]

---

[15] _See_ Defs. Ex. JV (Expert Report of Kevin B. Moss, CFA at
10, Aug. 16, 2006)(9.6% is the median EBITDA of Moss's pool of
comparable transactions).

27

According to Moss, purchases of positive EBITDA companies were properly considered comparable transactions because hospital purchasers in 1998 were not as concerned with profitability as acquiring market share and revenue for future potential.

After identifying purportedly comparable transactions, Moss calculated a price-to-revenue multiplier for each transaction by dividing the purchase price by the revenue of the purchased entity.  He then multiplied a range of these multipliers--from the 25th percentile to the 75th percentile--by Reese Hospital's approximately $150,000,0000 in revenue to calculate a range of values for Reese Hospital.

Moss also calculated price-to-revenue multipliers for purchases of companies of EBITDA margins of less than 2% of net revenue, on the basis that less than 2% EBITDA was an indication of poor financial performance.[16]  Moss testified that the .44 price-to-revenue multiple he calculated for the lower 25th percentile of those companies with EBITDA margins at less than 2 percent would be an appropriate revenue multiple to use to calculate a value for Reese Hospital.  (Trial Tr. 3545:14-23,

---

[16]  See Defs. Ex. JV (Expert Report of Kevin B. Moss, CFA at 14, Aug. 16, 2006)("I have included a summary of price to revenue multiples from transactions where the purchased hospitals have EBITDA margins of less than 2.0 percent of net revenue.  Michael Reese had negative EBITDA margins in 1998 and slightly negative EBITDA margins in 1997.  I have included transactions where the target had slightly positive EBITDA margins as comparable indications of hospitals with poor financial performance.").

28

3546:21-24, Feb. 20, 2007 (Moss, K.).)  Moss also testified that
his market approach value for Reese Hospital is based on a .45 to
.55 revenue multiplier.[17]  (Trial Tr. 3547:21-24, Jan. 20, 2007
(Moss, K.).)  Applying the .44 multiplier, the market approach
value of Reese Hospital is $66,000,000 (or .44 x $150,000,000
revenues), well below Moss' $74 to $90 million estimate of the
market approach value for Reese Hospital.[18]  A .5 price-to-revenue
multiple would yield a $75 million market approach value for Reese
Hospital.

The court does not credit Moss's market approach value
because he failed to identify truly comparable transactions from
which the court can derive a reliable value for Reese Hospital.
The market approach does not require the identification of
transactions identical to the sale of Reese Hospital in order to
reliably calculate its market value.  Indeed, identical
transaction data would be difficult if not impossible to identify
in such a specific context as this.  But the guideline
transactions used to calculate a value for Reese Hospital must
involve companies with characteristics similar enough to Reese

---

[17]  Moss's expert report and testimony indicate that he used
a .4 to .6 multiplier range based on his combined analysis of the
guideline public companies approach (discussed later) and the
guideline transactions approach, and that the appropriate EBITDA
multiplier under the guideline transactions method is .45 to .55.

[18]  Moss testified that the guideline public company
valuation method provides the upper boundary for pricing of Reese
Hospital under the market approach.

29

Hospital such that there is a reasonable basis for the comparison between the companies and there must exist adequate data about those transactions from which the court can derive a market approach value for Reese Hospital.  Here, as Demchick determined, there are no hospital-related transactions which involve companies with characteristics sufficiently similar to Reese Hospital to warrant a comparison under the market approach.  By including sales of companies that had positive EBITDA measures in his analysis while Reese Hospital had a negative EBITDA, Moss used transactions that were not adequately comparable to the sale of Reese Hospital.  The price-to-revenue multiples calculated by Moss are therefore not a reliable indicator of the market value of Reese Hospital.

(ii) <u>Guideline public companies</u>

The guideline public companies method values the subject company using the market price of the common stock of publicly traded companies that have similar characteristics to the subject company.  Proper guideline companies are companies that provide a reasonable basis for comparison to the company being valued.

Alberts again contends that there are insufficient comparables from which to derive a value for Reese Hospital under the market approach.  According to the Defendants and Moss, the market value of certain publicly traded guideline companies provides an understanding of the upper boundary for pricing in the

30

market.   But Moss selected seven publicly traded companies for his
guideline company analysis that have no similar characteristics to
Reese Hospital and are therefore inadequate comparables.   These
companies include HCA, Tenet Healthcare, Healthcare Management
Associates, Universal Health Services, Quorum Healthgroup,
Paracelsus Healthcare, and Province Healthcare.[19]

These companies, which are among the largest hospital
companies in the nation, are not even remotely comparable to Reese
Hospital.   Their revenues range from $585 million to $20.6
billion, and they are diversified companies that own non-hospital
operations.   Moreover, each had positive EBITDA measures during
the relevant time period, and collectively averaged an EBITDA
margin of 16.7%.   Most experienced positive trends in revenue and
net income between 1997 and 1998.   Reese Hospital, in contrast,
was a single hospital operation with a negative EBITDA and
operating losses at the time of the transfer.   It had revenues of

_____

[19]   Moss calculated that the market prices for these
companies was on average 1.2 times revenue.   He calculated this
multiplier by (1) calculating the market value of invested
capital ("MVIC") for each company, (2) dividing the MVIC for each
company by its revenue, and (3)calculating the average multiplier
after excluding Health Management Associates (4.99 MVIC/revenue)
and Province Healthcare (2.68 MVIC/revenue) as too high to
include in the calculation.   To calculate the MVIC of these
companies, Moss first calculated the market value of their equity
by multiplying stock price by the number of shares outstanding.
He then added their debt to the market value of equity to
calculate MVIC.   MVIC divided by revenue yields the multiplier
for each company.   (Trial Tr. 3541:9-14 (Moss, K.).)

just $150 million in 1998.  The court concludes that none of the publicly traded companies analyzed by Moss share similar characteristics with Reese Hospital.  Thus, there are no public companies that are sufficiently comparable to Reese Hospital to provide adequate guideline data for calculating the market value of Reese Hospital as of the Transfer Date.

Because no comparable guideline transactions or guideline companies exist, the court concludes that the market approach does not lead to an accurate or reliable value for Reese Hospital.

b.  <u>Cost approach</u>

The cost approach value of a business is based on the net aggregate value of its underlying assets.  Fishman et al., <u>supra</u>, ¶ ¶ 203.21, 701.1.  This approach focuses on the value of a company's assets in a hypothetical sale rather than on a company's earnings potential, which is the focus of the income approach. Fishman et al., <u>supra</u>, ¶ 701.2.  One of two valuation methods generally applies: (1) going concern value (which assumes that fair market value would be paid for the assets), or (2) liquidation value.  <u>Id.</u> at ¶¶ 701.3, 701.6.  The value of the business is determined by adjusting the company's assets and liabilities to their appraised fair market values or appraised liquidation values, depending on the valuation method used.  <u>Id</u>. at ¶ 203.22.

As a preliminary matter, the court concludes that going

concern value, and not the liquidation value, is the proper measure of Reese Hospital's value under the cost approach.  A company's net asset value under the going concern approach is the sum of the fair market values of each of its underlying assets. Fishman et al., _supra_, ¶¶ 203.21, 701.1.  Liquidation value equals the present value of "the net proceeds from liquidating the company's assets and paying off liabilities."  Fishman et al., _supra_, ¶ 701.1.  Liquidation value is appropriate when the company's current and projected net cash flows from continuing operations "are low compared to net assets, and the company is worth more _dead_ than _alive_" or "are low enough that its liquidation value is almost equal to its going concern value." Fishman et al., _supra_, ¶ 701.6 (emphasis in original).

Alberts contends that Reese Hospital was on its deathbed and that therefore Reese Hospital's liquidation value applies under the cost approach.[20]  Reese Hospital's accurate cost approach value

_____

[20]  Pl. Br. at ¶ 75, _citing_ _Heilig-Meyers Co. v. Wachovia Bank, N.A. (In re Heilig-Myers Co.)_, 319 B.R. 447, 457-58 (Bankr. E.D. Va. 2004); _Gillman v. Scientific Research Prods. Inc. of Delaware (In re Mama D'Angelo, Inc.)_, 55 F.3d 552, 555-56 (10th Cir. 1995) (noting that a company is on deathbed if only "nominally extant"); _Fryman v. Century Factors, Factor For New Wave (In re Art Shirt Ltd., Inc.)_, 93 B.R. 333, 341 (E.D. Pa. 1988) (determining that a company is on deathbed if it is "wholly inoperative, defunct or dead on its feet"); _cf._ _In re Taxman Clothing Co., Inc._, 905 F.2d 166, 170 (7th Cir. 1990) (holding that the company was not on its deathbed because "the assets that it could realize on in the ordinary course of its business exceeded the expenses of realizing on them, plus its (other) liabilities").

33

is not its liquidation value, but the value of the assets as part
of a going concern.  Pursuant to established principles of
business valuation, a liquidation analysis should be used only
when the company would be worth more dead than alive.  Fishman et
al., _supra_, ¶ 701.6.  Reese Hospital, despite declining revenues,
was not on its deathbed on November 12, 1998.  Reese Hospital was
worth more as a going concern than in liquidation, as is
demonstrated by the income approach discussed later.

Accordingly, a hypothetical prospective purchaser of Reese
Hospital, utilizing the cost approach to valuation, would have
looked to the value of the assets in place as part of a going
concern that would continue.  In other words, such a hypothetical
purchaser would ask what it would cost to replicate the assets it
was purchasing, namely, the fair market values of the assets, not
what the purchaser would receive if it liquidated the assets.

The court calculates that under the going concern cost
approach, the value of what Reese Corp. acquired in purchasing
Reese Hospital was approximately $57,985,984 as of November 12,
1998.  The assets included in this calculation are: (i) real
property ($25,307,763); (ii) equipment ($12,000,000); and (iii)
net working capital ($20,678,221) (which includes a right to a
refund to which Reese Corp. was entitled should the amount it paid
for net working capital exceed the actual net working capital).
The court also concludes as a factual matter that $24,700,000

34

should <u>not</u> be deducted from the value of Reese Hospital as a result of a purchase accounting adjustment made by Reese Corp. and DCHC in connection with the Humana managed care contract. The derivations of the values of Reese Hospital's real estate, equipment, and net working capital, and the basis for rejecting the Humana contract accounting adjustment are set forth below.

### i.   Real property

To calculate the value of the real estate of Reese Hospital under the cost approach, the court compared the highest and best use of the property as if it were vacant to the highest and best use of the property as improved to determine which use held more value. The highest and best use is that which generates the largest income for the property or earns the highest price in the market. The court estimated values for Reese Hospital's real property at its highest and best use as vacant and as improved. The court then assumed that the property would be put to the use that yielded the highest value. In summary:

- Reese Hospital could be used for its highest and best use in a vacant state (residential development) only if the existing improvements were first demolished. Because the costs of demolition exceeded the amount that would be paid for the land after such demolition, a purchaser would not buy Reese Hospital to put it to that use.

- The value of Reese Hospital as improved, put to its highest and best use of continued institutional use, was determined by examining what it would cost a hypothetical rational purchaser to replicate the hospital improvements on comparable land that could be acquired at the cheapest price for such institutional

35

use.

These approaches and conclusions are discussed in greater detail below.

To calculate the values for the property at its highest and best use as vacant and as improved, the court reviewed and relied on the written expert reports and testimony of Robert A. Wilson from Real Estate Counselors, International, Inc. ("RECI") and Matthew W. Kimmel of Deloitte Financial Advisory Services LLP ("Deloitte"). In addition to the testimony and expert reports prepared by Wilson and Kimmel, the court also reviewed and relied on two written appraisals performed by David S. Felsenthal of Valuation Counselors Group, Inc. ("Valuation Counselors").[21]

(1) <u>Highest and best use</u>

The highest and best use of the land as vacant and as improved must satisfy four criteria. The highest and best use must be (1) physically possible, (2) legally permissible, (3) financially feasible, and (4) maximally productive. Appraisal Inst., <u>The Appraisal of Real Estate</u> 307 (12th ed. 2001). These criteria are typically considered sequentially. <u>Id.</u> This means

---

[21] The court reviewed other appraisals of the property in the record, specifically those prepared by First Real Estate Services, Ltd., Wellspring Valuation, Ltd., Prime Appraisal, LLC, and a separate appraisal prepared by Real Estate Counselors, Inc. on July 18, 2003, but concludes that these reports were either too generalized to be useful or too remote in time to be relied upon in formulating values of the real estate at Reese Hospital.

that the court must consider whether a use is physically possible
and legally permissible before considering whether a use is
financially feasible and maximally productive.  _Id._  A financially
feasible use cannot be the highest and best use of a property if
that use is legally prohibited.  _Id._

 The highest and best use of land must be physically possible.
Whether a use is physically possible depends on the physical
characteristics of the site that might affect its highest and best
use.  _Id._ at 313.  Uses may be limited by physical characteristics
such as size, shape, accessibility, topography, and availability
of utilities.  _Id._  To test the physical possibility of a
property's use as improved, the court must also consider the size,
design, location and function of the improvements.  _Id._ at 317.

 The highest and best use of land must also be legally
permissible.  Whether a use is legally permissible turns on the
zoning, deed restrictions, building codes and environmental
restrictions.  _Id._ at 311.  The court may consider the reasonable
probability that the zoning of a property could be changed in
order to achieve the highest and best use of the property.  _Id._
To test the highest and best use of the property as improved, the
court also considers whether Reese Hospital as improved conforms
with existing legal requirements.  _Id._ at 316.

 A proposed or existing use must also be financially feasible
in order to qualify as the highest and best use.  Financially

37

feasible uses are physically possible and legally permissible uses
which produce an income or return to the owner of the subject
property equal to or greater than the amount needed to satisfy
operating expenses, financial obligations, and capital
amortization. Id. at 313-314. The court tests the financial
feasibility of Reese Hospital as improved by considering whether
there is market demand for Reese Hospital in its current state and
whether the existing use has a positive return on the investment.
Id. at 318.

Finally, the highest and best use must be the maximally
productive use of the subject property. A maximally productive
use as vacant and as improved is the financially feasible use
which produces the highest price or value to the property. See
id. at 314 ("Of the financially feasible uses, the highest and
best use is the use that produces the highest residual land value
consistent with the market's acceptance of risk and with the rate
of return warranted by the market for that use."). Possible
highest and best use conclusions for improved property include
continued use, renovation, addition, conversion and demolition.

(A) Highest and best use as vacant

The court concludes that the highest and best use of the
Reese Hospital site as vacant as of the Transfer Date was
residential use. Residential use was physically possible, legally
permissible, financially feasible and maximally productive on

38

November 12, 1998.

Wilson testified on behalf of the Trust that the highest and best use of the land as vacant on the Transfer Date was continued use as a hospital, primarily because of his opinion that it would be highly unlikely that a developer could successfully re-zone the property from institutional use to residential use.  Kimmel testified on behalf of the Defendants that residential use was the highest and best use of the Reese Hospital site as vacant on the Transfer Date.

The physical attributes of the Reese Hospital property, as vacant, permit a broad range of physically possible uses, including residential use.  Reese Hospital is located on a large parcel of land.  According to the Plat of Survey prepared by the National Survey Service, the Reese Hospital property is 1,625,293 square feet or about 37.3116 acres.[22]  The site consists of multiple lots separated by streets.  The property also has generally level terrain.  And its urban location and proximity to major roads provide good accessibility.  All utilities including gas, electricity, water, sewage and telephone are readily

---

[22]  Wilson and Kimmel disagree over the exact square footage of the Reese Hospital site.  Wilson relied on a Plat of Survey prepared by the National Survey Service, Inc. on April 17, 1998, which describes the size of the site as 1,625,293 square feet. Kimmel relied on assessment records provided by the Cook County Assessor Office which describe the size of the site at 1,659,142 square feet.  The court credits the Plat of Survey prepared by the National Survey Service and concludes that Reese Hospital is 1,625,293 square feet or about 37.3116 acres.

39

available.   These physical attributes are all favorable for
residential development.   The court therefore concludes that
residential use of the Reese Hospital site as vacant was
physically possible as of the Transfer Date.

Residential use must also be legally permissible in order to
qualify as the highest and best use of the Reese Hospital property
as vacant.   The Defendants contend that residential development
was legally permissible on the Transfer Date under existing zoning
at the Reese Hospital site limited only by the minimum green
space, maximum land coverage, and 1.5 floor-to-area ("FAR")
restrictions.[23]   Alberts disagrees, asserting that the zoning
permitted general residential development only for purposes of

-----

[23]   The existing zoning on November 12, 1998 contained the
following restrictions: (1)a minimum green space requirement of
30%; (2) a maximum land coverage restriction  of 31% on average;
and (3) a 1.5 maximum floor-to-area ("FAR") ratio restriction for
the property.   The 1.5 FAR restriction means that the total
square footage of any buildings on the property can constitute
only 1.5 times the square footage of the entire parcel.  (Pl. Ex.
233 at TRUST/HCA 21137.)

housing nurses and medical interns and residents.[24]

The court concludes as a factual matter that the existing
zoning permitted residential development only for housing certain
hospital employees.  Before October 11, 1962, the Reese Hospital
site was zoned "General Residential District."  On October 11,
1962, the zoning was reclassified to "Residential Planned
Development (Institutional)" and permitted housing expressly for
nurses, interns, and medical residents.  (Pl. Ex. 223 at
TRUST/HCA-02119.)  On June 6, 1984, the city reclassified the
zoning to "Michael Reese Hospital and Medial Center, Institutional
Planned Development No. 1," which was the zoning in place on
November 12, 1998.  (Id. at TRUST/HCA-021132.)  The zoning
permitted hospitals, medical offices, administrative buildings and
residential developments.  Notably, the city removed the word
"residential" from the title of the most recent amendment to the
zoning, perhaps to eliminate confusion about permissible land uses

---

[24] Kimmel testified that re-zoning of the site for
residential purposes was not necessary because the existing
zoning classification permitted limited residential development.
(Trial Tr. 3256:13-18 (Kimmel, M.).)  But Kimmel did not verify
whether the residential development permitted by the existing
zoning classification was limited to residences for nurses,
medical residents and other medical staff at Reese Hospital.
(Trial Tr. 3671:17-3672:1, Feb. 21, 2007 (Kimmel, M.))("THE
COURT: But doesn't it connote that the property, if used for
residential, will be used for an institutional residential
purpose?  THE WITNESS: I guess one could interpret it that way.
THE COURT: And you didn't get an opinion from a lawyer as to what
this zoning would be interpreted as meaning, is that correct?
THE WITNESS: I did not get an opinion from an attorney.").)

41

on the Reese Hospital site.  The Reese Hospital site has never had

residences other than for nurses, interns and medical residents,

and there has never been any general residential development on

the property.  The city could have specifically included general

residential development as a permissible land use in the zoning

documents had it intended for the Reese Hospital site to be used

in that way.

Even though the existing zoning did not permit residential

use, the court may consider for purposes of a highest and best use

determination whether "there [was] a reasonable probability that

the zoning could be changed" at for the Reese Hospital site to

permit residential use.  Appraisal Inst., supra, at 311.

Consideration of a zoning change includes an analysis of the

surrounding properties and their existing zoning classifications

and land uses.  Id.

The Defendants argue that a change in zoning for the Reese

Hospital site to permit residential development was reasonably

probable because the city was re-zoning land classified for other

uses to permit residential use.  (Trial Tr. 3253:22-25, Feb. 15,

2007 (Kimmel, M.) ("We did see, when looking at comparable

transactions that land was being re-zoned from either

manufacturing or other classes of zoning to residential.").)

Alberts disagrees, relying on Wilson's testimony that

reclassification of the Reese Hospital site to permit residential

42

development, while possible, would be highly unlikely because (1)
city approval of such changes has been historically low; (2) the
city would be opposed to non-institutional development of the site
as result of political pressures; and (3) the cost of securing the
zoning change would be more than the increase in the value of the
land.  The court finds Wilson's opinion less persuasive than
Kimmel's because Wilson did not research or rely on the results of
actual re-zoning applications.  (Trial Tr. 1355:23-25, Jan. 29,
2007 (Wilson, R.).)  Rather, he relied on what he could recollect
anecdotally from newspaper reports over the years and two projects
with which his company was involved.  (Trial Tr. 1356:1-1356:23,
Jan. 29, 2007 (Wilson, R.).)[25]

A zoning change would have been reasonably probable, assuming
the Reese Hospital property were vacant.  Surrounding properties
to the south and west of the Reese Hospital site were zoned for
residential use as of the Transfer Date.  There was, moreover, an
increasing demand for residential development in the neighborhood
on or around the Transfer Date.  The court therefore concludes
that residential use was a legally permissible use of the Reese
Hospital site as vacant as of November 12, 1998, given the
reasonable probability of obtaining a reclassification of the

---

[25]  Wilson also conceded that a zoning change for the Reese
Hospital site as of the Transfer Date was possible, but that does
not necessarily equate to reasonably probable.  (Trial Tr.
1357:14-24, Jan. 29, 2007(Wilson, R.).)

zoning to permit residential development.

Residential development must be a financially feasible use
and the maximally productive use of the Reese Hospital site, as
vacant.  According to Kimmel, a financially feasible and maximally
productive use of the Reese Hospital site as vacant would be
residential development given the strong demand for residential
development in the neighborhood.  (Defs. Ex. JZ (Expert Report of
Matthew G. Kimmel, Exhibit 3, at 25, Aug. 16, 2006).)  The demand
for commercial construction or a hospital facility in November
1998 was insufficient to justify either commercial or
institutional use as maximally productive.  Id.

Wilson disagreed.  He testified that the unusually large size
of the Reese Hospital site would require five to ten years to
develop and sell for residential purposes such that the costs to a
residential developer of carrying this land until fully developed
were too large to justify residential development as a financially
feasible and maximally productive use.  According to Wilson,
office, retail, and industrial uses were likewise not financially
feasible due to lack of market demand in the area.  In 1998, the
neighborhood was an inferior location, as compared with other
areas in the city, for office, retail and industrial space.  In
Wilson's view, there would have most likely been interest from
institutional users given the large size of the site but he could
not quantify market demand from institutional users or the

44

financial feasibility of any hospital project at the Reese
Hospital site. (<u>See</u> Pl. Ex. 210 (Appraisal of Robert A. Wilson,
Real Estate Counselors International, Inc. p. 61)(Jul. 21, 2006).)

Based on market data and land development trends in the area,
the court concludes there would have been a strong interest in
developing the Reese Hospital site, if vacant, for residential use
as of November 12, 1998. The court also concludes that there was
not sufficient demand to develop the Reese Hospital site as a
hospital as compared with the demand for residential development
at the time. Residential use was therefore not only a financially
feasible use but also the maximally productive use of the Reese
Hospital site, if vacant.

Having determined that, if the property <u>were</u> vacant,
residential use is physically possible, legally permissible,
financially feasible and the maximally productive use of the Reese
Hospital site, the court concludes that the highest and best use
of the Reese Hospital site as vacant as of the Transfer Date was
residential use.

(B) <u>Highest and best use as improved</u>

The court must next determine the highest and best use of the
Reese Hospital site, as improved, as of November 12, 1998, again
considering the four criteria described above. The highest and
best use of a property as improved may be continuation of the
existing use. Appraisal Inst., <u>supra</u>, at 315. Both Kimmel and

45

Wilson testified that the highest and best use of the Reese
Hospital site as improved as of November 12, 1998, was continued
use as a hospital and medical center.  The court agrees.  The use
of the land as a hospital and medical center was physically
possible on the Transfer Date.  Reese Hospital was also a legally
permissible use on the Transfer Date.  The existing zoning
permitted institutional development, including use of the property
as a hospital and medical center.  All plans for development of
the land were submitted to and approved by the city before
construction.  Reese Hospital was thus a legally conforming use of
the underlying land as of November 12, 1998.

The use of the site, as improved, was also financially
feasible and maximally productive on the Transfer Date.  Reese
Hospital has been treating patients for decades.  Its long-term
existence demonstrates a reasonably certain level of financial
feasibility and continued demand for its improvements' use as a
hospital and medical center.  Its neighborhood, as compared with
other areas in the city, was an inferior location for other uses,
such that the continued use of the improvements as a hospital and
medical center is also maximally productive.  Because the
continued use of Reese Hospital as a hospital and medical center
was physically possible, legally permissible, financially feasible
and maximally productive as of November 12, 1998, the highest and
best use of the Reese Hospital property as improved was continued

46

use as a hospital and medical center.

(2)  <u>Value</u>

Having determined the highest and best use of Reese

Hospital's real property as vacant (residential use) and as

improved (current use as a hospital and medical center), the court

must next estimate values for the use of the Reese Hospital site,

as vacant and as improved.  Assuming the property would be put to

use at its highest value, the value of Reese Hospital's land for

purposes of the cost approach is the higher of the values of the

land as vacant and as improved.

(A) <u>Value of Reese Hospital site as vacant</u>

The value of the Reese Hospital site as vacant is equal to

the value of the land less the costs of any demolition and

abatement.  <u>See</u> Appraisal Inst., <u>supra</u>, at 309 n.3.  Comparable

land sales are used to estimate the value of the land.  Proper

comparable land sales should have the same highest and best use as

vacant as the subject property.[26]  Because the Reese Hospital

site's highest and best use as vacant is residential use, proper

comparable land sales are those purchased for residential

development.  The value calculation is based on sales price per

---

[26]    <u>See</u> Appraisal Inst., <u>supra</u>, at 334 ("Regardless of how
physically similar a potential comparable sale is to the subject
site, if the comparable site does not have the same highest and
best use as though vacant as the subject, the transaction does
not qualify as a comparable sale and should be dismissed from
further consideration in the analysis of the subject property.").

47

square foot, the most common measure of price and value in the market. The price per square foot multiplied by the total number of square feet of the Reese Hospital site is equal to the value of the Reese Hospital site as vacant.

The value of the land after being rendered vacant and put to residential use as of November 12, 1998 was $11.70 per square foot or $19,016,000 (rounded) ($11.70 per square foot x 1,625,293 total square feet). This is derived by utilizing Kimmel's calculation that the land was worth $11.70 per square foot (a figure that favors Alberts), without deciding whether Wilson's higher figure was more accurate, and utilizing Wilson's calculation that the land consisted of 1,625,293 square feet.

The court must next estimate the costs of demolition and abatement necessary to vacate the Reese Hospital site and deduct those costs from the value estimated for the land if vacant for residential use. Kimmel did not think it necessary to calculate and deduct costs of demolition or environmental abatement. The court disagrees.

Valuation of the highest and best use of the land as vacant necessarily assumes that any physical impediments to such use (for example, a gorge running through the property) have been eliminated. Eliminating existing improvements must be taken into account, otherwise the contemplated highest and best use of the property as vacant would not be physically possible. Costs of

48

demolition as well as the cost of curing any environmental
problems, e.g., the removal of underground storage tanks, the
abatement of asbestos, should be deducted from the value that
results once the property is vacant.  See Appraisal Inst., supra,
at 309 n.3.

Felsenthal estimated the costs of demolition and asbestos
abatement.  (Pl. Ex. 107 at CBIZ2999 (An Appraisal of Michael
Reese Hospital and Medical Center by David Felsenthal, Valuation
Counselors Group).)  Felsenthal projected that building demolition
and asbestos abatement would cost $22,790,000 in total, $4,800,00
for building demolition (or $3.00 per square foot x 1,610,695
square feet in gross building area) and $17,990,000 for asbestos
abatement.  The court credits Felsenthal's estimation because his
analysis of these costs is thorough and conservative in comparison
to the alternatives.  After deducting costs in the amount of
$22,790,000, the value of the Reese Hospital site for residential
use is a negative $3,774,000.

(B)  <u>Value of Reese Hospital site as improved</u>

To determine the value of the Reese Hospital property as
improved as of November 12, 1998, the court estimates the value of
the land and the value of the improvements as of that date.  The
value of the land as vacant for institutional use is estimated
using comparable land sales.  The value of the improvements is
estimated by calculating the cost to replace the existing

49

improvements as of the valuation date, or the replacement cost of

new improvements, plus entrepreneurial profit, less depreciation.

The value of the land plus the value of the improvements equals

the value of the real estate.

The value of the land as vacant for institutional use

(without adjusting for the costs of immediately making the land

vacant because the existing improvements would continue in place)[27]

is the appropriate land value (when deriving the value of the

property as improved), and that value is derived by using

comparable sales of land for institutional use (not pricier sales

_____

[27]   Both experts assumed that the property would be used
indefinitely for institutional purposes, and made no prediction
as to when the improvements would eventually be demolished.  They
thus made no adjustment for the costs of demolition in valuing
the property as improved.  Contrary to Kimmel's testimony, the
court concludes that in appraising real estate, such costs are a
relevant factor if there is a likelihood of eventual demolition.
All other things being equal, a purchaser would likely be willing
to pay slightly more for Hospital X if it were exactly comparable
to Reese Hospital except that future demolition costs of Hospital
X's improvements would be lower and would not come close to
exceeding the value of the land once rendered vacant.  But that
does not materially affect the valuation analysis of the Reese
Hospital property, as improved, because the existing improvements
(whether at Reese Hospital or an alternative site) would likely
be used indefinitely.  The time value of money renders the costs
of demolition in the distant future relatively insignificant
compared to the costs that demolition as of the date of purchase
would entail, and the uncertainty on this record of when there
would be reason to demolish the improvements renders the issue
too speculative to make any precise adjustment to value based on
this consideration.  If the property continued to be used for
institutional purposes, it is not clear that all buildings would
have to be demolished.  In any event, such an adjustment to value
would not affect the court's conclusion that it should generally
reject the cost approach valuation of Reese Hospital in favor of
the higher income approach valuation.

of land for residential use).  The court credits the testimony of
Wilson that the land as vacant <u>for</u> <u>institutional</u> <u>use</u> should be
valued at $5.85 per square foot or $9,500,000 (rounded),[28] based on
roughly comparable land sales.[29]

Defying common sense, Kimmel opined that the value of the
land as if it were vacant and put to residential use (without
adjusting that value for the costs of demolition) should be
utilized as the land value, even though the value of the site as
improved and used for institutional purposes is what is being
considered in this branch of the valuation analysis.  A rational
purchaser thinking of buying Reese Hospital would have explored
how much it would cost to buy a comparable alternative site for
hospital use and to put in place comparable hospital improvements.
If that purchaser intended to use Reese Hospital as improved, he
would rely on the cost of land for comparable purposes, and

---

[28]  Wilson's report indicates that the market price of the
land as vacant for institutional use should be **$5.75** per square
foot, resulting in a rounded total value of $9,350,000.  (Pl. Ex.
210 (Appraisal of Michael Reese Hospital and Medical Center as of
November 12, 1998 at 73(Jul. 21, 2006)).)  But at trial, Wilson
testified that after correcting a mathematical error made while
adjusting one of the comparable land sales, the market price of
the land as vacant for institutional use should be **$5.85** per
square foot, resulting in a rounded total value of $9,500,000.
(Trial Tr. 1300:1-12, Jan. 29, 2007 (Wilson, R.); Pl. Ex. 1140.)

[29]  In searching for comparable land sales, Wilson found no
sales with institutional zoning, and resorted to sales of
property zoned for industrial and commercial use (with
adjustments as warranted).  That approach is acceptable under
principles of real estate appraisal.  Appraisal Inst., <u>supra</u>, at
437.

disregard the value of land for residential purposes: he would not pay more than what he would pay for replicating a comparable hospital elsewhere.[30]  Kimmel explained that the buildings would eventually become obsolete and be demolished, and so it was appropriate to use the value of the land as vacant for residential purposes.  But in an interim use approach, the property put to an interim use before being converted to highest and best use must take into account "different anticipated demolition costs" that apply to the subject property.  See Appraisal Inst., supra, at 324.  Kimmel's approach, as already noted, did not take into account demolition costs.

After estimating the value of the land, the court estimates the current cost of replacing the improvements on the Reese Hospital site.  The improvements include buildings, a parking garage, and site improvements.  To calculate the value of the improvements to the land, the court made a preliminary

---

[30]  To quote Kimmel, "[t]he Cost Approach is based on the principle of substitution, which states that no rational buyer would pay more for a property than the amount for obtaining a comparable site and constructing improvements of equal desirability and utility, assuming no undue delay."  Defs. Ex. JZ at 28 (Expert Report of Matthew G. Kimmel).  Such a purchaser would not pay residential-purpose-zoned land prices for land to construct a hospital when cheaper institutional-purpose-zoned land is available.  That a purchaser of Reese Hospital might realize that Reese Hospital's land could be converted to residential use once the improvements were demolished would not result in a higher price: as already discussed, it would cost more to demolish the improvements than the land would be worth when vacant and zoned residential.

determination as to the replacement cost of each improvement on
the property (including site improvements), added in projected
entrepreneurial profit, then made a preliminary determination as
to the amount of depreciation for each improvement and subtracted
the amount of depreciation from the replacement cost for each
improvement to arrive at a final value for each improvement.

The replacement cost for improvements is estimated using the
Marshall Valuation Service, which is a tool used to estimate
building costs for a particular point in time and depreciation
rates over a given period of time.  Wilson, Kimmel, and Felsenthal
all relied on the Marshall Valuation Service in deriving figures
for the replacement costs and depreciation rates.  Their
replacement cost and depreciate rate calculations based on the
Marshall Valuation Service are not universally identical, but this
is not unusual.  (Trial Tr. 1403:19-21, Jan. 29, 2007 (Wilson,
R.)("[N]o two appraisers [are] going to look at these same
buildings and same information and come up with the exact same
calculation.").)  So the court analyzed the sets of replacement
cost figures and depreciation rates as follows.

In determining the replacement cost of each building, the
court compared three sets of figures: the figures contained within
the Wilson Report, the figures contained within the Kimmel Report,
and the figures contained within the two Felsenthal Reports.
These were the only appraisal reports that set forth a calculation

53

for each individual improvement.

In comparing these figures to determine the replacement cost for each improvement, the court concludes that the figures derived by Felsenthal are more accurate than the figures derived by both Wilson and Kimmel for several reasons. First, Felsenthal's analysis is much more contemporaneous with the valuation date than either Wilson's or Kimmel's.  Felsenthal completed his reports on March 5, 1998, and February 11, 1999, whereas Wilson completed his report on June 21, 2006, and Kimmel completed his report on August 16, 2006.

Felsenthal's figures for the improvements are also more reliable than Wilson's figures because Felsenthal used the same value for the individual improvements in two separate reports--one for HCA and one for DCHC--thus refuting the suggestion made by Alberts at trial that Felsenthal inflated his value of the property to ensure that the value matched the purchase price of Reese Hospital (at least with respect to the property's improvements).  Wilson, on the other hand, has a strong incentive to provide the lowest value for the improvements in support of Alberts's case.

Felsenthal's figures for the improvements are more accurate than Kimmel's for a number of additional reasons.  Felsenthal used cost replacement values from the 1998 edition of the Marshall Valuation Service, whereas Kimmel used various editions of the service from later years and then used a primitive regression

54

analysis to arrive at a conclusion as to the value of the
improvements in 1998.  Kimmel used a variety of multipliers (e.g.,
local area multiplier, height multiplier, area multiplier) that
were not used by any other appraisers, thus calling into question
the propriety of this practice.  And finally, the cost replacement
value for improvements as calculated by Kimmel is much higher than
any other calculation of value, suggesting that it is a
statistical outlier and should not be credited.  His calculation
is 186% higher than Wilson's calculation, 36% higher than
Felsenthal's calculation, and 51% higher than the average of the
other three reports surveyed.

In comparing these figures to determine the replacement cost
for each improvement, the court also assumed that the figures
derived by Wilson were more accurate than the figures derived by
Kimmel because (1) Wilson's conclusions were much closer to those
reached by Felsenthal than the conclusions reached by Kimmel
(Wilson's total replacement cost value was 18% lower than that of
Felsenthal, whereas Kimmel's total replacement cost value was 36%
higher than that of Felsenthal); (2) Wilson's conclusions were
much closer to those reached in the other reports surveyed than
the conclusions reached by Kimmel (Wilson's total replacement cost
value was 3% lower than the mean of the conclusions reached in the
other reports, whereas Kimmel's total replacement cost value was
51% higher than the mean of the conclusions reached in the other
reports); and (3) Kimmel's methodology differs in significant ways

from the methodology used in every other report.

Consequently, in determining the replacement cost for those improvements that were appraised by Wilson and Kimmel but not by Felsenthal, the court credits the conclusions of value reached by Wilson, but applied a multiplier of 1.18 to account for the anticipated discrepancy between the value reached by Wilson and the value that would have been reached by Felsenthal.

In deciding the amount of entrepreneurial profit to add to the cost replacement value of the improvements, the court concludes as a factual matter that the profit rate should be 10% of the cost replacement value of the improvement, per Kimmel's testimony, because this appears to be the rate used in other appraisal reports surveyed.  Wilson's testimony that the rate should be 3% of the cost replacement value of the improvement due to the non-profit nature of most hospitals is not credible for a number of reasons.  First, Michael Reese was a for-profit hospital.  Second, Alberts fails to suggest any logical reason why a contractor would be willing to accept less of a profit based on the level of profitability of the enterprise serving as her client.  Finally, other appraisal reports surveyed applied an entrepreneurial profit rate of 10% of the replacement cost of the improvements at the property.  Based on the foregoing conclusions of fact, the court's replacement cost calculations inclusive of entrepreneurial profit but before depreciation are set forth

56

below.[31]

In determining the rate of depreciation for each improvement, the court applies the rates used by Wilson, Kimmel, and Felsenthal where they agree with each other, the rates used by Wilson and Kimmel where they agree with each other but not with Felsenthal's rates, the rates used by Wilson and Felsenthal where they agree with each but not Kimmel's rates, and the rates used by Kimmel and Felsenthal where they agree with each other but not Wilson's rates. When all three reports differed as to the depreciation rate for a particular improvement, the court, in all but one instance, applies the rate used by Kimmel because his depreciation analysis was more thorough than that of Wilson (_e.g._, Wilson used the _chronological_ _age_ of an improvement in determining its life expectancy rather than its _effective_ _age_) and the rates used by Felsenthal tended to be lower than any other depreciation analysis conducted by other appraisers.[32] The lone exception to this rule

_____

[31] The court's replacement cost calculations do not include an additional 5% to account for "soft costs," contrary to Kimmel's testimony, because the Marshall Valuation Service already accounts for most "soft costs" and the remaining costs identified by Kimmel under cross-examination are of a de minimis character. (Trial Tr. 3607:11-3608:16, Feb. 21, 2007 (Kimmel, M.).)

[32] Felsenthal calculated the overall depreciation rate at Michael Reese to be 87% of the value of the improvements. Wilson and Kimmel calculated the overall depreciation rate to be 92%, and the other three appraisal reports calculated depreciation rates ranging from 90-95%, with a mean of 91.67 percent. These figures strongly suggest that Felsenthal's depreciation rate was unduly low.

was with respect to the parking deck, where the court credits Felsenthal's depreciation rate (52%) instead of the depreciation rate used by Kimmel (47%) because Kimmel admitted under cross-examination at trial that he did not consider the functional obsolescence of the parking garage caused by its excess number of lots. (Trial Tr. 3616:12-3620:11, Feb. 21, 2007 (Kimmel, M.).) Wilson did not provide a depreciation rate for the parking deck.

Based on the foregoing factual conclusions, the court's findings regarding the value for each improvement are below.

| Building | Replacement Cost | Depreciation | Net Value |
|---|---|---|---|
| Power Plant | $759,330.00 | 96% | $30,373.20 |
| Laundry Building | $1,241,460.00 | 100% | $0.00 |
| Bensinger General Services | $3,896,640.00 | 94% | $233,798.40 |
| Main Hospital | $36,992,340.00 | 100% | $0.00 |
| Linear Accelerator | $3,937,158.50 | 96% | $157,486.34 |
| Klein & Kundstadter Building | $29,476,260.00 | 86% | $4,126,676.40 |
| Meyer House | $10,873,170.00 | 100% | $0.00 |
| Florsheim Professional Building | $2,347,290.00 | 100% | $0.00 |
| Rothschild Center | $20,161,350.00 | 100% | $0.00 |
| Mandel Clinic | $6,661,710.00 | 100% | $0.00 |

58

| | | | |
|---|---|---|---|
| Siegel Institute | $2,662,110.00 | 90% | $266,211.00 |
| Florsheim Library | $2,067,120.00 | 100% | $0.00 |
| Cummings Research Pavilion | $3,190,770.00 | 96% | $127,630.80 |
| Linear Accelerator Addition | $1,218,356.02 | 91% | $109,652.04 |
| Kaplan Surgical Wing | $10,971,180.00 | 93% | $767,982.60 |
| Kaplan Pavilion | $18,776,340.00 | 98% | $375,526.80 |
| Singer Pavilion | $9,478,260.00 | 98% | $189,565.20 |
| Friend Pavilion | $2,654,190.00 | 98% | $53,083.80 |
| Levinson Building | $4,134,240.00 | 98% | $82,684.80 |
| Blum Pavilion | $6,703,290.00 | 81% | $1,273,625.10 |
| Wexler Pavilion | $1,194,930.00 | 96% | $47,797.20 |
| Baumgarten Pavilion | $19,094,130.00 | 96% | $763,765.20 |
| Dreyfus Research Lab | $11,291,940.00 | 91% | $1,016,274.60 |
| Laz Chapman | $1,849,320.00 | 94% | $110,959.20 |
| Acute Care Center | $1,573,313.50 | 80% | $314,662.70 |
| Bensinger Park Field House | $153,259.70 | 96% | $6,130.39 |
| Administrative Center | $4,944,060.00 | 77% | $1,137,133.80 |

| | | | |
|---|---|---|---|
| Parking Deck | $8,324,800.00 | 52% | $3,995,904.00 |
| Other Site Improvements | $2,586,798.50 | 76% | $620,831.64 |
| Total | $229,215,116.22 | 93% | **$15,807,755.21** |

Finally, the value of the land is added to the value of the improvements to calculate a final valuation for the real estate of Reese Hospital. Here the value of the Reese Hospital site as improved for institutional use is $25,307,763 ($9,500,000 + $15,807,755).

The court concludes as a factual matter that the highest and best use of the land is as improved because the value of Reese Hospital as improved is greater than the value of the land as vacant. The value of Reese Hospital as improved is $25,307,763. The value of Reese Hospital as vacant is -$3,774,000, after subtracting the costs of demolition and asbestos abatement. The highest and best use of the Reese Hospital site as of November 12, 1998, was continued use as a hospital and medical center because that use returns a higher price in the market and is therefore the maximally productive use of the land. The court therefore finds that the real estate at Reese Hospital under the cost approach was worth $25,307,763 on November 12, 1998.

ii.  Equipment

Reese Hospital's equipment (which includes furniture) is the
second asset included in the computation of Reese Hospital's net
asset value under the cost approach.  The court finds as a factual
matter that the fair market value of Reese Hospital's equipment as
of November 12, 1998, was $12,000,000.  The parties could be
viewed as having stipulated that Reese Hospital's equipment was
worth $12,000,000 on the Transfer Date, Pl. Facts ¶ 213; Defs.
Facts ¶ 216; Defs. Br. at 20 ("both sides estimate the value of
the equipment at $12,000,000"), and the court thought that issue
had been put to rest in the parties' closing arguments in open
court.  However, after the trial, the Defendants have contended
that the record supports a finding of a $19,000,000 value for the
equipment.  (Defs. Facts ¶ ¶ 169-170, 176-177; Defs. Rebuttal at
126.)  The court views the evidence supporting a $19,000,000 value
as not persuasive in the face of overwhelming evidence supporting
the $12,000,000 value.

Both Alberts and the Defendants introduced documentary
evidence at trial that supports a finding that Reese Hospital's
equipment was worth $12,000,000 on the Transfer Date.  (Pl. Ex.
214 at TRUST/HCA-029153 (Memo from Donna Talbot to Lance Poulson
Re: Orderly Liquidation Value – Reese/Grant Orderly Liquidation
Appraisals)(Sept. 18, 1998); Pl. Ex. 233 at CBIZ2167 (An Appraisal
of Michael Reese Hospital and Medical Center as of November 30,
1998)(Feb. 11, 1999); Defs. Ex. WJ (An Appraisal of Michael Reese

61

Hospital and Medical Center as of November 30, 1998)(Feb. 11,
1999).)

Neither Alberts nor the Defendants presented independent
valuations of Reese Hospital's equipment, choosing instead to rely
primarily on existing equipment appraisals by Felsenthal and
Valuation Counselors.  However, both parties presented testimony
that clearly pointed to $12,000,000 as being the accurate
appraised value of the equipment as of the Transfer Date.
Demchick testified on behalf of the Trust that $12,000,000
appeared to be the "appropriate amount to use" for the fair market
value of the equipment when calculating the value of Reese
Hospital under the cost approach.  (Trial Tr. 1871:3-1873:8, Feb.
1, 2007 (Demchick, N.); Trial Tr. 1941:6-1946:25, Feb. 6, 2007
(Demchick, N.).)  Equipment appraisals by Felsenthal at Valuation
Counselors and Ernst & Young form the basis of Demchick's
conclusion.  (Trial Tr. 1941:6-1946:25, Feb. 6, 2007 (Demchick,
N.); Pl. Facts ¶ 213 n. 66.)  In a letter dated September 16,
1998, Felsenthal appraised the orderly liquidation value of Reese
Hospital's equipment as of June 1, 1998, at $12,000,0000.  (Pl.
Ex. 214 at TRUST/HCA-029153; Trial Tr. 1942:6-12, Feb. 6, 2007
(Demchick, N.).)  By orderly liquidation value, Felsenthal did not
mean that $12,000,000 is the value the equipment would earn in a
30-day liquidation sale.  Rather, he meant that $12,000,000 is the
value the equipment would earn in a sale that would occur within
six to twelve months from the valuation date, which is a typical

62

fair market value period.  In a report dated February 11, 1999,
Felsenthal estimated the market value of Reese Hospital's
equipment as of November 30, 1998, at $12,000,000.  (Pl. Ex. 233
at CBIZ2167.)

Demchick also noted that a document from Valuation
Counselors' production in this litigation denotes an original cost
of equipment totaling approximately $19,000,000 and a reproduction
cost totaling approximately $12,000,000.  (Pl. Ex. 403 at
CBIZ1098; Trial Tr. 1942:13-1943:7, Feb. 6, 2007 (Demchick, N.).)
Finally, Demchick considered a memo prepared by Ernst & Young
during an audit of Reese Hospital which estimates the fair market
value of the equipment at $10.8 million and which is dated
December 31, 1998.[33]  (Pl. Ex. 12 at EY 794 (DCHC-Grant and Reese
Sale Leaseback Memo)(Dec. 31, 1998); Trial Tr. 1945:14-24, Feb. 6,
2007 (Demchick, N.).)  After considering all of these valuations
of Reese Hospital's equipment, Demchick testified that $12,000,000
"seemed most appropriate" as the fair market value of Reese
Hospital's equipment.

---

[33]   The court gives that appraisal no weight.  DCHC sold
equipment to NCFE under a sale/leaseback agreement for $10.8
million as part of the financing arrangement for Reese Hospital.
(Pl. Ex. 12 at EY 793 (DCHC-Grant and Reese Sale Leaseback
Memo)(Dec. 31, 1998).)  The proceeds from the sale financed the
acquisition of Reese and Grant Hospitals.  The memo analyzes the
proper means for accounting for the sale/leaseback transaction
and indicates a fair market value of the equipment of $10.8
million.  Nothing in the record suggests how Ernst & Young
arrived at that value, and thus that valuation is not worthy of
consideration.

Moss, on behalf of the Defendants, likewise testified that the fair market value of Reese Hospital's equipment was $12,000,000.  (Trial Tr. 3548:15-22, Feb. 20, 2007 (Moss, K.); Trial Tr. 3817:18-20, Feb. 22, 2007 (Moss, K.).)  Kimmel, also on behalf of the Defendants, conducted a technical review of Valuation Counselors' appraisal of Reese Hospital as of November 30, 1998, and determined that "the methodology used to value the [equipment] of Michael Reese as of November 30, 1998, was acceptable and consistent with industry peers."  (Defs. Ex. JZ at 22-24 (Expert Report of Matthew G. Kimmel).)  And like Demchick, neither Moss nor Kimmel conducted any independent valuation of the equipment, relying instead on information contained in existing appraisal documents.  (Trial Tr. 3569:16-18, Feb. 20, 2007 (Moss, K.).); Trial Tr. 3236:11-17, Feb. 15, 2007 (Kimmel, M.); Defs. Ex. WJ (showing that the fair market value of Reese Hospital's equipment as of November 30, 1998, at $12,000,000).)

In suggesting that the evidence also supports a finding by the court that the equipment was worth as much as $19,000,000. Defendants point to an appraisal of the equipment prepared by Valuation Counselors on July 9, 1998, appraising the fair market value of the equipment at $19,160,000 as of June 1, 1998.  (Defs. Ex. PW at TRUST/HCA-171734-TRUST/HCA171736 (Appraisal of Equipment at Michael Reese Hospital and Medical Center)(Jul. 9. 1998).) Defendants' suggestion conflicts not only with their experts' testimony but also with their contemporaneous stipulation that the

64

equipment was worth $12,000,000 on the transfer date. (Defs.
Facts ¶ 216.)

The court agrees with the analyses of the witnesses at the
trial that of all the equipment appraisals in the record,
Felsenthal's report dated February 11, 1999, most accurately
values Reese Hospital's equipment as of the Transfer Date out of
all the equipment appraisals in the record. (Pl. Ex. 233 at
CBIZ2167.) This particular appraisal values the equipment as
worth $12,000,000 as of November 30, 1998, which is closest in
time to the Transfer Date, and does so utilizing an appropriate
cost approach. (Kimmel's technical review of this appraisal
approves the valuation methodology applied by Felsenthal in this
appraisal.) In contrast, Valuation Counselors' report dated July
9, 1998, values the equipment as of June 1, 1998, more than five
months prior to the Transfer Date, and is therefore too remote in
time to be an accurate indicator of the fair market value of Reese
Hospital's equipment as of the Transfer Date. Moreover, it is not
clear that the July 9, 1998, report utilized an appropriate cost
approach methodology (as it defined fair market value in continued
use as "including installation and assuming earnings support the
value reported," a definition not employed in other reports, thus
suggesting that it may have not have been a pure cost approach
valuation, but instead a hybrid approach that takes into account
the value of future income). Finally, the report is inconsistent
with a document prepared by Valuation Counselors in February 1999

65

(Pl. Ex. 403) totaling the original cost of the equipment as slightly over $19,000,000 (a value that would not likely have continued after acquisition because of depreciation, as indicated by the same document's estimate that reproduction cost would be only $12,452,440.

The July 9, 1998, appraisal report was prepared for DCHC, not the Defendants, and, accordingly, the $19,000,000 valuation in that report would have no bearing on the issue of whether the Defendants proceeded in good faith in the sale of Reese Hospital (other than that they permitted DCHC to have access to permit an appraisal to be conducted). However, it is evidence that Reese Corp. may have viewed the equipment as worth $19,000,000 in deciding to purchase Reese Hospital, and thus bears on its good faith.

In conclusion, the value of the equipment as of the Transfer Date was $12,000,000 under a cost approach.

### iii.   Net working capital

Net working capital acquired by Reese Corp. is the third asset included in the computation of the net value, under the cost approach, of the assets acquired by Reese Corp. in exchange for the Reese Transfers. As discussed in more detail below, under the terms of the APA, the parties arrived at an estimated value of approximately $20,600,000 for the net working capital of Reese Hospital, and GHI agreed to pay Reese Corp. for any shortfall in

66

that estimate.[34]  That obligation is part of the value the

Defendants transferred to Reese Corp. in exchange for the Reese

Transfers, and, accordingly, it must be included as part of the

net working capital received by Reese Corp.  When it is included,

the combined value of Reese Hospital's actual net working capital

and the value of GHI's obligation to refund any shortfall equals

$20,678,221.

Alberts argues that the value of the net working capital was

approximately $14,400,000.  (Pl. Facts ¶ 213; Trial Tr. 1940:12-

25, Feb. 6, 2007 (Demchick, N.).)  Defendants contend that the

correct fair market value of the net working capital was

approximately $20,600,000, which is the amount Reese Corp. paid

for net working capital on November 12, 1998.  (Pl. Ex. 10 at

HCA/MR-05072 (Closing Statement - Purchase and Sale of Michael

Reese Hospital and Medical Center)(Nov. 12, 1998)("Closing

Statement"); Defs. Facts ¶ 339; Defs. Br. at 20.)  Reese

Hospital's actual net working capital, as determined post-closing

by PriceWaterhouseCoopers ("PWC"), was approximately $14,400,000,

which is $6.2 million short of the $20,600,000 estimate contained

---

[34]  The closing statement for the purchase of Reese Hospital
reflects $20,678,221 in estimated Net Working Capital.

67

in the APA.[35]  Because the Defendants were obligated to refund that

$6.2 million, and that obligation is a category of working capital

acquired by Reese Corp. in exchange for the Reese Transfers, the

Defendants are correct that the net working capital acquired by

Reese Corp. equals approximately $20,600,000.[36]

The question is not whether the $6.2 million should be

included in the calculation of the value of <u>Reese Hospital's</u> net

working capital acquired by Reese Corp.  The net working capital

---

[35]  Net accounts receivable were the most significant
component of the net working capital calculation for the purchase
of Reese Hospital, as they were the largest of Reese Hospital's
current assets at the time.  (Trial Tr. 880:24-881:11, Jan. 25,
2007 (Talbot, D.).)  The $14,400,000 of actual working capital
may not have been collected immediately, but the record does not
permit a finding regarding the amount of delay.  Even if it did,
the lower value arising from a presumably relatively short
collection delay (that is, the lesser value as of the date of
closing of dollars collected in the future versus dollars
acquired at closing) would not materially affect the outcome.
Alberts bore the burden of proof in this regard, and failed to
adduce evidence to show the appropriate reduction.

[36]  On November 24, 1999, within eight days of the final
determination by PWC, GHI paid amounts due to Reese Corp. via
wire transfer after offsetting part of the amount due for payment
owed by Reese Corp. to GHI for ongoing information technology
services that GHI provided to Reese Hospital in the year after
the transfer.  The value of GHI's refund obligation ought to be
lowered slightly, from the precise amount of $6,249,437.00, to
account for the time value of money based on the foreseeable
delay in the PWC reconciliation process and the receipt of the
refund, but the adjustment would not materially affect the
valuation analysis.  Utilizing a generous 6% discount rate, for
example, and applying that to an estimated one-year period for
PWC to complete the reconciliation process and the refund to be
received, would result in a reduction of the value of the refund
obligation by less than $400,000, a figure that would not
materially alter the overall value of what Reese Corp. acquired
for the Reese Transfers.  In any event, Alberts bore the burden
of proof, but did not introduce evidence as to the appropriate
amount of the reduction of value.

68

received by Reese Corp. in exchange for the Reese Transfers
includes both <u>Reese Hospital's</u> net working capital and <u>Reese
Corp.'s</u> new item of net working capital, namely, GHI's obligation
to make up any shortfall in the estimated value of Reese
Hospital's net working capital.  The court finds that the fair
market value of the net working capital acquired by Reese Corp. on
the Transfer Date includes the value of GHI's obligation to refund
$6.2 million to Reese Corp. as a result of PWC's post-closing
reconciliation.  The fair market value of the net working capital
acquired by Reese Corp. on November 12, 1998, was thus
$20,678,221, the amount stated on the closing statement for the
purchase of Reese Hospital.

iv.  <u>Humana Contract</u>

At the time of Reese Hospital's acquisition in November 1998,
GHI and Reese Hospital served patients covered by Humana insurance
in connection with a managed care provider contract between Humana
and GHI (the "Humana Contract").  After Reese Corp. acquired Reese
Hospital on November 12, 1998, Reese Hospital continued to treat
Humana patients, operating under the terms of the Humana Contract.
(Trial Tr. 536:16-5376:1, Jan. 23, 2007 (Mounce, E.).)

The Humana Contract was important to Reese Hospital's
operations because it constituted a significant component of Reese
Hospital's business.  (Trial Tr. 544:6-9, 551:10-12, Jan. 23, 2007
(Mounce, E.); Trial Tr. 2790:7-9, Feb. 12, 2007 (Gerken, G.);
Trial Tr. 931:18-20, Jan. 25, 2007 (Talbot, D.).)  But the cost to

69

treat a Humana patient exceeded the reimbursement Reese Hospital
would receive from Humana.  (Trial Tr. 931:25-932:15, Jan. 25,
2007 (Talbot, D.).)  The reimbursement rates were so low that
Reese Hospital sustained ongoing losses as a result of the
contract.  (Trial Tr. 579:6-580:23, Jan. 23, 2007 (Mounce, E.);
Trial Tr. 931:25-932:15, Jan. 25, 2007 (Talbot, D.).)

        DCHC made a $24.7 million purchase accounting adjustment
("PAA") with respect to Reese Corp. in its financial statements
for the year ending December 31, 1998, to reflect losses
anticipated as a result of treating Humana patients according to
the terms and rates of the Humana Contract.  (Pl. Ex. 100 (Audited
Consolidated Financial Statements of DCHC for the years ending
December 31, 1997 and 1998)("The excess over fair value of the net
assets for Michael Reese in the amount of $24.4 million was
provided for as an impairment of long-lived assets under FAS 121
in 1998."); see also Pl. Ex. 163 (Work papers for the audited
consolidated financial statements for DCHC for the years ending
December 31, 1997 and 1998)(same).)  Those financial statements
were audited by Ernst & Young (although no formal audit opinion
ever issued).  On January 30, 2007, this court granted in part
Defendants' motion in limine to exclude Alberts's expert, Neil H.
Demchick, from opining that the $24.7 million PAA taken by DCHC
should be deducted from the value of Reese Hospital.  (Trial Tr.
1567:14-1576:25, Jan. 30, 2007 (Teel, J.).)

70

Alberts persists in arguing that $24.7 million should be deducted from the value of Reese Hospital as a result of the PAA made by DCHC and Reese Corp. to account for losses on the Humana Contract. (Pl. Facts ¶ 223.) The court disagrees. The court concludes as a factual matter that: (1) there is no evidence that the Humana Contract was still in existence at the time of the transfer; (2) there is no evidence in the record that the Humana Contract was assigned to Reese Corp. as part of the transfer; and (3) blind reliance should not be placed on the adjustment (even if it had been valid) when there is no persuasive evidence that a hypothetical purchaser of Reese Hospital on the Transfer Date (in contrast to a green shade-wearing accountant focused on arcane accounting procedures) would have viewed the accounting adjustment as reflecting a dollar-for-dollar reduction in the value of Reese Hospital.

### (1) There is no evidence that the Humana Contract existed on the Transfer Date

There is no evidence that the Humana Contract was still in existence on November 12, 1998. By the terms of the contract and a subsequent amendment, the contract expired on or about September 30, 1998, and therefore did not exist on the Transfer Date. Reese Corp. could not assume an expired contract. The testimony of DCHC's Mounce that the Humana Contract had not expired was ambiguous at best and reveals that DCHC and Reese Corp. decided to continue to operating under the terms of the Humana Contract,

71

without any proof that the contract still existed, as part of its strategy to negotiate more favorable reimbursement rates with Humana.

The original contract executed by Humana and GHI contained a three-year term commencing on March 1, 1993. (Pl. Ex. 1128 at TRUST/HCA 011607-TRUST/HCA 011608 (Hospital Services Agreement between GHI and Humana § 4.1).) Humana and GHI executed subsequent amendments to the original contract, most of which amended service rates. (Pl. Ex. 1130 at TRUST/HCA 011588-TRUST/HCA-011591(Amendment to Hospital Services Agreement between Humana and GHI, effective Jan. 1, 1995); Pl. Ex. 1129 at TRUST/HCA 011587 (Amendment to Hospital Services Agreement between Humana and GHI, effective Aug. 1, 1995); Pl. Ex. 1132 at TRUST/HCA 011584-TRUST/HCA 011586(Amendment to Hospital Services Agreement between Humana and GHI, effective Sept. 1, 1995), Pl Ex. 1131 at TRUST/HCA 011582-TRUST/HCA 011583(Amendment to Hospital Services Agreement between Humana and GHI, effective Feb. 1, 1997).)

One amendment to the Humana Contract executed by Humana and GHI extended the original contract term for two years beginning on January 1, 1996.[37] The factual record also indicates that the

_____

[37] (Pl. Ex. 1090 at Trust/HCA-192062 to TRUST/HCA-192-067(Amendment to Agreement between Humana and GHI)("The effective date of this Amendment shall be January 1, 1996 and it shall remain in effect for two years, subject to the termination provisions of the Agreement); see also Defs. Ex. BL at HCA/MR 10042 (Letter to Ms. Sandra McRee, Vice President of Operations, HCA and Mr. Ronald Dedic, Chief Financial Officer, Reese Hospital)(Sept. 20, 1996)(noting that the Humana Contract runs through the end of 1997).)

Humana Contract provided for a "runoff period" of nine months
after expiration or termination of the contract, during which
Reese Hospital, still owned by GHI, would continue to provide
services to Humana patients under the contract's terms.  (Pl. Ex.
1128 at TRUST/HCA 011607-TRUST/HCA 011608 (Hospital Services
Agreement between GHI and Humana § 4.3).)  Both Gregg Gerken, Vice
President of Development for HCA, and Erich Mounce, Senior Vice
President of Corporate Development at DCHC and DCHC's due
diligence coordinator for the acquisition of Reese Hospital,
affirmatively testified that the Humana Contract provided for such
a  "runoff period."  (Trial Tr. 2925:1-6, 2926:20-2927:1, Feb. 14,
2007 (Gerken, G.); Trial Tr. 692:15-693:2, Jan. 24, 2007 (Mounce,
E.).)

     Based on the original contract and its subsequent amendment,
the court concludes that the Humana Contract expired on or about
January 1, 1998, and that the runoff period ended on or about
September 30, 1998.  The court further concludes that the written
evidence indicates that the contract had expired on or about
September 30, 1998, and therefore did not exist on the Transfer
Date.  Reese Corp. could not assume an expired contract.

     But even if the evidence does not identify with certainty the
exact date of the contract's expiration, the record does not show
that the Humana Contract existed on the Transfer Date.  Testimony
by Mounce reveals that DCHC and Reese Corp. decided to continue to
operating under the terms of the Humana Contract, without any

73

proof that the contract still existed, as part of its strategy to
negotiate more favorable reimbursement rates with Humana.

While conducting due diligence, DCHC repeatedly requested
documentation from HCA in support of a valid, unexpired contract
between GHI and Humana.[38]  But DCHC never received proof of a
valid, unexpired contract between GHI and Humana as of the
Transfer Date.  (Trial Tr. 612:24-613:19, Jan. 23, 2007 (Mounce,
E.).)

HCA and DCHC executives provided conflicting testimony as to
whether the contract expired.  Gerken of HCA testified that the
Humana Contract had expired by November 12, 1998, when DCHC and
Reese Corp. acquired Reese Hospital.  (Trial Tr. 27906:5-8, Feb.
12, 2007 (Gerken, G.).)  He further testified that Reese Hospital
continued to see Humana patients and operate under the terms of
the contract after it had expired.  (Trial Tr. 2796:13-18, Feb.
12, 2007 (Gerken, G.).)

Mounce of DCHC testified that Reese Corp. operated under the
Humana contract post-acquisition.  (Trial Tr. 537:20-25; 536:16-

---

[38]    (Trial Tr. 602:12-24, Jan. 23, 2007 (Mounce, E.); Trial
Tr. Feb. 12, 2007 (Gerken, G.); Defs. Ex. UH at TRUST/HCA-005502
and TRUST/HCA-005509)(Memo from Erich Mounce to Gregg Gerken re:
Reese due diligence follow-up))(Apr. 2, 1998)(noting that the
current Humana contract provided by HCA to DCHA for due diligence
purposes shows that it expired as of January 27, 1998); Defs. Ex.
UG at TRUST/HCA-005493 to TRUST/HCA-005494 (Letter from Eric
Mounce to Gregg Gerken re: outstanding due diligence issues)(Apr.
14, 1998)("Still awaiting . . . receipt of copy of any Humana
contract that has not expired."); Defs. Ex. UF at TRUST/HCA-
005486-TRUST/HCA-005487 (Memo from Erich Mounce to Gregg Gerken
re: Reese due diligence follow-up)(Apr. 21, 1998)(noting second
request for an unexpired Humana contract).)

537:1, Jan. 23, 2007 (Mounce, E.).)  According to Mounce's initial
and somewhat unclear testimony, DCHC received substantiation of an
unexpired contract between GHI and Humana prior to closing. (Trial
Tr. 542:19-546:19, Jan. 23, 2007 (Mounce, E.).)  Although the
Humana Contract expired at the end of 1998, it was somehow
"assigned" to DCHC in January 1999, only meaning that Reese Corp.
continued to operate under the terms of that contract on a month-
to-month basis until a new one could be negotiated,(Trial Tr.
611:23-612:1, Jan. 23, 2007 (Mounce, E.)).  However, Mounce
clarified that in fact DCHC did not receive a document showing an
unexpired contract; rather, DCHC received comfort that Reese
Hospital could continue to operate under existing terms of Humana's
expired contract with GHI until a new contract could be negotiated:

> Q: You have never seen, putting aside the
> belief, you have never seen a document that
> said – other than your early due diligence
> where you found expired contracts, you never
> found a contract that said it hadn't expired
> after the date set forth in your earlier memo,
> which was '97 or into '98, Early '98, January
> '98.  You have never seen that document have
> you?
>
> A: Let's see I'm pretty confident that I have
> seen documents renewing it up through the end
> of '97 and pricing moving on to '98, but to
> cover the period between the close and the
> 12/31/99, I just don't remember seeing the
> document.
>
> Q: Isn't it fact that you got comfort that
> Humana would continue the relationship
> informally until such time as you could
> negotiate as the new owner a new managed care
> contract.  Isn't that what happened?

> A: I think that we got comfort that the pricing
> would stay in place through the end of '98 and
> they would assign the old contract to us in '99
> and we would operate under that contract until
> we renegotiated a new contract.

(Trial Tr. 612:24-613:19, Jan. 23, 2007 (Mounce, E.).)

The court finds as a factual matter that DCHC never received proof of an existing, unexpired contract between GHI and Humana. Rather, DCHC decided to continue operating under the terms of the Humana Contract as part of its strategy to attempt to negotiate more favorable reimbursement rates from Humana. (Trial Tr. 551:19-555:1, Jan. 23, 2007 (Mounce, E.); Trial Tr. 2796:13-24, Feb. 12, 2007 (Gerken, G.); see also Trial Tr. 987:3-8, Jan. 25, 2007 (Talbot, D.) (noting that DCHC hoped to renegotiate the Humana Contract).)

Humana was a significant component of Reese Hospital's business, but because the reimbursement rates for Humana patients were so low, DCHC claims it was faced with the decision either to refuse to operate under the Humana Contract rates and therefore lose additional business or to renegotiate it. (Trial Tr. 552:1-24, Jan. 23, 2007 (Mounce, E.).) DCHC was reluctant to cease operating under the terms of the Humana Contract notwithstanding the low reimbursement rates because the lost business would be significant and extend beyond Humana patients. (Id.) Mounce testified that had DCHC ceased operating under the terms of the Humana Contract, some overhead costs of the hospital that were covered would no longer be covered. (Id.) In addition, there was

76

the likely possibility that Reese Hospital would not only lose the
physicians treating Humana patients, but also any other business
those physicians had at Reese Hospital.  (<u>Id.</u>)  DCHC viewed the
existing relationship between Humana and Reese Hospital as an
opportunity to negotiate higher reimbursement rates, which would in
turn improve Reese Hospital's operation results and increase its
revenues.  (Trial Tr. 580:16:23, Jan. 23, 2007 (Mounce, E.); Trial
Tr. 608:6-11, Jan. 24, 2007 (Mounce, E.).)  Indeed DCHC and Reese
Corp. representatives contacted Humana to begin negotiating
increased rates before the Transfer Date.  (Trial Tr. 726:22-
728:12, Jan. 24, 2007 (Mounce, E.).)  DCHC therefore continued to
operate under the terms of the expired Humana Contract not because
it was contractually obligated to do so but because it hoped to
leverage existing business with Humana in its negotiations with
Humana for better reimbursement rates.

(2) There is no evidence that the Humana
Contract was assigned to Reese Corp.

There is no evidence that the contract was assigned to Reese
Corp. as part of the transfer.  Pursuant to section 3.03 of the
APA, HCA was required to list all contracts assigned to Reese Corp.
on Schedule 3.03.  (Trial Tr. 2795: 1-5, Feb. 12, 2007 (Gerken,
G.); Defs. Ex. JY at HCA/MR-04556 (APA § 3.03).)  Section 3.03 of
the APA, entitled "Contracts," provides:

> Schedule 3.03 sets forth a <u>complete</u> <u>and</u>
> <u>accurate</u> list of all Contracts.  There are no
> other contracts to which Seller is a party or
> by which Seller or the Assets are bound that

77

> are material to the condition (financial ro
> other), business or results of operation of the
> Business or the Assets.  Seller has delivered
> to Buyer true, correct and complete copies of
> all of the Contracts listed on Schedule 3.03,
> including all amendments and supplements
> thereto.

(Defs. Ex. JY at HCA/MR-04556 (APA § 3.03)(emphasis added).)  The

Humana Contract was not listed on Schedule 3.03 to the Reese

Hospital APA.[39]  (Defs. Ex. JY at HCA/MR-4629 to HCA/MR-4683 (APA

Schedule 3.03); Trial Tr. 2795:1-2796:8; 2798:17-2800:24, Feb. 12,

2007 (Gerken, G.).)  The plain terms of the APA therefore do not

show that HCA assigned the Humana Contract to Reese Corp.  To the

contrary, it appears that HCA did not assign the Humana Contract to

Reese Corp., likely because that contract had already expired and

no longer existed.

Although Mounce testified that Reese Corp. acquired the Humana

Contract and continued to operate under the terms of that contract,

(Trial Tr. 549:14-19, Jan. 23, 2007 (Mounce, E.), Trial Tr. 551:19-

25, Jan. 23, 2007 (Mounce, E.)), he could not mean that it was

assumed as a legally binding contract on both parties.  It was

never established that an unexpired contract between Humana and GHI

was assigned to Reese Corp. or that Reese Corp. legally assumed a

Humana Contract.  Rather, Reese Hospital merely continued to

---

[39]  Further, DCHC did not include the Humana Contract on its
final listing of contracts to review prior to assumption by Reese
Corp.  (Defs. Ex. VP (Memo from Erich Mounce to Gregg Gerken re:
final listing of contracts)(Jun. 25, 1998)(final listing of
contracts that DCHC had to review prior to assumption did not
include the Humana Contract).)

operate under the terms of an expired Humana Contract post-
acquisition on a month to month basis.  That contract was acquired
or assigned to Reese Corp. only in that colloquial sense.  The
court therefore concludes as a factual matter that the evidence
does not show that the Humana Contract was assigned to Reese Corp.

### (3) The PAA should not be deducted
### from the value of Reese Hospital

Finally, the court concludes as a factual matter that the
$24.7 million PAA recorded in the unaudited consolidated financial
statements for the year ending December 31, 1998 for DCHC and Reese
Corp. should not be deducted from the value of Reese Hospital.

Financial accounting standards permit a company to account for
losses on a long-term contract that would be sustained over a
number of years in year one.  (Taylor Dep. 155:22-156:9, May 31,
2006)0; Trial Tr. 940:16-941:25, Jan. 25, 2007 (Talbot, D.).)  The
losses are recorded as a purchase accounting adjustment.  A
purchase accounting adjustment is permitted under financial
accounting standards if three requirements are satisfied: (1)the
contingency existed on the purchase date; (2) the losses were
likely to occur in the future; and (3) the losses could be
reasonably estimated.

DCHC and Reese Corp. recorded the PAA in connection with
losses anticipated as a result of operating under the terms of the
Humana Contract at Reese Hospital.  Because this court has
determined that there is no evidence that the Humana Contract

79

existed on the Transfer Date, the first requirement, that the contingency existed on the purchase date, is not satisfied.

The $24.7 million deduction, moreover, is just an accounting adjustment that does not reflect the assets of Reese Hospital from the perspective of a hypothetical purchaser and as such, should not be part of the net asset value calculation for Reese Hospital. From an accounting perspective, the accounting entry may or may not have been appropriate (assuming the contract was in existence and was assumed by Reese Corp.), but from the perspective of a hypothetical purchaser, the old expired Humana contract terms under which Reese Hospital was operating on November 12, 1998, was a factor affecting future cash flows, and the income approach to valuation is the appropriate vehicle for determining the effect of the existing relationship with Humana on the value of Reese Hospital.

The court therefore concludes that the PAA should not be deducted from the value of Reese Hospital under the cost approach.

v.  <u>Summary</u>

Based on the foregoing findings, the court concludes that the total cost approach value of Reese Hospital as of the Transfer Date using the net asset value method is $57,985,984, or the sum of its underlying assets: real estate as improved ($25,307,763); equipment ($12,000,000); and net working capital ($20,678,221).

### c. Income approach

"Under the income approach, the [valuation consultant] estimates the future ownership benefits and discounts those benefits to present value using a rate suitable for the risks associated with realizing those benefits." Fishman et al., supra, ¶ 203.3. There are two possible methods for reaching such an estimate: the "discounted future returns" or "discounted cash flow" method, and the "capitalized returns method." Id. ¶ ¶ 203.9- 203.11. "Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow ('DCF') method." Lippe v. Bairnco Corp., 288 B.R. 678, 689 (S.D.N.Y. 2003).

### i. Projected earnings

The first step in determining the value of a business enterprise under a DCF analysis is projecting the earnings before interest and taxes ("EBIT") of the business in question. Fishman et al., supra, ¶¶ 500.2, 505.27. These projections must be reasonable and based on reliable data. Id. ¶ 505.2. Moreover, the "forecasts . . . should not be used to demonstrate earnings capacity or cash-generating ability far in excess of what the company has actually been able to realize in the past." Id. ¶ 505.26.

In reaching its findings of fact with respect to the reasonably projected earnings for Reese Corp. as of the Transfer Date, the court considered five sets of projections: two versions

of a set of projections prepared by McGladrey & Pullen, LLP in the
early part of 1998 (the "M&P Projections"), (Pl. Ex. 224), that was
supplemented and amended in part by a report prepared in April of
1998 (the "M&P Report"), (Pl. Ex. 236), a set of projections
prepared by Donna Talbot on September 20-21, 1998 (the "Reese
September Projections"), (Pl. Ex. 300), a second set of projections
prepared by Talbot on October 22, 1998 (the "Reese October
Projections,"[40] and collectively with the Reese September
Projections the "Reese Projections"), (Pl. Ex. 222), and two sets
of projections prepared by Neil Demchick in connection with his
expert report rendered in this proceeding (collectively the
"Demchick Projections"). (Pl. Ex. 209.) Kevin Moss, the
Defendants' expert witness on this issue, relied upon the Reese
October Projections in determining a business enterprise value for
Reese Hospital. (Trial Tr. 3494:24-3495:2, Feb. 20, 2007 (Moss,
K.).)

The court carefully reviewed all of these projections, as well
as the testimony pertaining thereto by Talbot, Demchick, Moss, and

---

[40] There are actually two sets of Reese October
Projections: one that assumes the sale of Grant Hospital and
Reese Hospital's home health agency by December 31, 1998, and one
that does not. (Compare Pl. Ex. 144A at TRUST EXPERT 010791 with
id. at TRUST EXPERT 010797.) Given that even the Defendants'
expert witness was unwilling to adopt the former projections,
(Trial Tr. 3493:3-21, Feb. 20, 2007 (Moss, K.)), the court finds
as a factual matter that it would be unreasonable for a
hypothetical purchaser to use these projections in placing a
value on Reese Hospital. The court's references to the Reese
October Projections are therefore meant to refer only to those
projections assuming no sale of Grant or the hospital's home
health agency by December 31, 1998.

James Yerges, the Defendants' expert witness on the issue of
insolvency, and the deposition testimony of former Reese Hospital
chief executive officer Kenneth Bauer.  Having done so, the court
concludes as a factual matter that none of these projections offer
a totally realistic picture of the reasonably anticipated future
earnings for Reese Corp. as of November 12, 1998.  Each set of
projections suffers from one or more serious defects that prevents
the court from taking them at face value.

(A)  M&P Projections

The M&P Projections provide arguably the most objective
assessment of Reese Corp.'s future earnings because these
projections were prepared by outside consultants and not in
connection with this litigation.  (See Trial Tr. 3017:2-3018:3,
Feb. 14, 2007 (Yerges, J.) (describing the M&P Report as "a very
thoughtful and detailed plan")); Pl. Rebuttal ¶ 384 ("[p]laintiff
does not dispute that the M&P Report was 'detailed and
thoughtful'").)  Unfortunately, the projections suffer from two
glaring deficiencies.  First, they are based on Reese Hospital's
financial performance through 1997, and do not take into account
the massive downturn in revenue that occurred in 1998 prior to the
sale.  (Trial Tr. 2072:4-2073:2, Feb. 6, 2007 (Demchick, N.).)
This renders the projections hopelessly outdated.

Second, the M&P Projections do not provide the level of detail
necessary to ensure their accuracy.  Donna Talbot identified this
weakness in the M&P Projections in her testimony:

83

> As I recall, we had several meetings with RGAG,
> DCHC, and McGladrey and Pullen representatives as
> we reviewed their business plan; and I didn't
> like the way that their financial model was
> building revenue because I didn't think it was
> detailed enough and I wanted to build the revenue
> from the bottom up looking at the different
> reimbursement methodologies and the different
> pay[o]rs.

(Trial Tr. 971:19-25, Jan. 25, 2007 (Talbot, D.).)[41]  Similarly,

Paul Tuft criticized the McGladrey Report for containing "pretty

basic, almost hospital management-101 type stuff."  (Trial Tr.

109:21-23, Jan. 19, 2007 (Tuft, P.).)

In short, the M&P Projections and the McGladrey Report are too

far removed from the Transfer Date and too generalized to provide a

reasonable forecast of Reese Corp.'s earnings as of the Transfer

Date.  These documents are useful only insofar as they provide

information that supports or contradicts other projections

submitted to the court.

(B)  <u>Reese Projections</u>

Donna Talbot created the Reese Projections based on the

financial model provided by the M&P Projections and the M&P Report.

(Trial Tr. 973:2-6, Jan. 25, 2007 (Talbot, D.).) These projections

incorporated the historical data presented in those earlier

documents, (Trial Tr. 973:2-4, Jan. 25, 2007 (Talbot, D.)), but

were more specific than the M&P Projections.  (Trial Tr. 971:19-25,

---

[41]  Talbot later criticized the M&P Projections for failing
to "break . . . out" the various sources of revenue identified in
the Reese September Projections.  (Trial Tr. 1590:24-1591:2, Jan.
30, 2007 (Talbot, D.).)

Jan. 25, 2007 (Talbot, D.).)  The Reese Projections also made

adjustments to reflect changes to the business plan for Reese

Hospital made by DCHC, NCFE, and RGAG (the "Reese Management

Team").  (Trial Tr. 973:7-12, 978:8-13, Jan. 25, 2007, 1718:10-

1719:3, Jan. 30, 2007 (Talbot, D.).)

These projected business changes, the so-called "Strategic

Assumptions," were last set forth in a November 4, 1998, document

prepared by Donna Talbot (Pl. Ex. 115).  The Strategic Assumptions

fall into three basic categories.  The first category consists of

assumptions that volume in particular departments or units at Reese

Hospital would increase as a result of capital expenditures.  These

assumptions included:

- An assumption that a new emergency room ("ER") would be
  built,[42] leading to an increase in ER volume of 25%, (Trial Tr.
  980:4-18, Jan. 25, 2007, 1714:25-1715:8, Jan. 30, 2007
  (Talbot, D.); Pl. Ex. 115);[43]

---

[42]  The cost of the new ER was estimated between $2.5
million, (Pl. Ex. 115), and $5.5 million.  (Trial Tr. 569:8-12,
Jan. 23, 2007 (Mounce, E.).)

[43]  There is some indication in the record that ER volume
could be increased in part simply by decreasing patient wait
times.  (Bauer Dep. 49:2-50:4, June 14, 2006; Pl. Exs. 236 at
TRUST-HCA-027738, 1015 at TRUST/HCA-013434.)  But the primary
cause of the ER's perceived inefficiency was its distant
location, and the prerequisite for any meaningful growth in
volume was its relocation.  (Bauer Dep. 53:9-17, June 14, 2006;
Trial Tr. 980:4-18, Jan. 25, 2007, 1714:25-1715:8 (Talbot, D.)
(basis for projected 25% increase in ER volume "was that through
the relocation of the emergency room, that it would be a place
that would, you know, [become] medically more appealing to the
consumer to come to and also for the ambulance drivers"); Pl.
Exs. 236 at TRUST-HCA-027745, TRUST-HCA-027749, 1015 at
TRUST/HCA-013434.)

- An assumption that the pediatric unit would grow 10% per year and the obstetrics/gynecology ("OB/GYN") department would grow 5% per year as a result of increased marketing, (Trial Tr. 982:18-983:2, Jan. 25, 2007, 1716:9-13, Jan. 30, 2007 (Talbot, D.); Pl. Exs. 115, 1015 at TRUST/HCA-013437);[44] and

- An assumption that the hospital would purchase new cardiac catheterization equipment,[45] which would double the cardiac catheterization volume at Reese Hospital. (Trial Tr. 984:9-

---

[44] Former Reese Corp. president Bryan Breckenridge also testified before the Illinois Health Facilities Planning Board (the "Illinois Health Board") that Reese Corp. would increase the volume of its OB/GYN program in part because of the "present recruiting activities of two new OB[/]GYNs." (Pl. Ex. 1015 at TRUST/HCA-013437.) Breckenridge further testified that pediatric volume would increase in part because Reese Corp. had initiated "discussions with a large tertiary provider or two in [the] marketplace about enhancing the pediatric services at Michael Reese," (Pl. Ex. 1015 at TRUST/HCA-013437-TRUST/HCA-013438), and that providing "clinics into the community to reach out to the young families" there "would also be a factor" in the company's assumption that pediatric volume would increase. (Pl. Ex. 1015 at TRUST/HCA-013438.) Donna Talbot made clear at trial, however, that growth in both the OB/GYN and pediatric programs would be driven primarily if not exclusively by "a marketing program that would try to attract pregnant women into the facility." (Trial Tr. 982:18-983:2, Jan. 25, 2007 (Talbot, D.); see also Trial Tr. 1716:10-13, Jan. 30, 2007 (Talbot, D.) ("The OB/GY[N], pediatrics was related to the increased marketing dollars focused on bringing the mothers into Michael Reese, the expectant mothers.")

[45] The Defendants baldly assert that "the Reese Projections do not specifically tie immediate cardiac cath volume increases to the capital expenditure in 1998," (Defs. Rebuttal ¶ 174G), but the Strategic Assumptions and testimony by Donna Talbot and Dr. Enrique Beckmann suggest otherwise. (Trial Tr. 984:9-11, Jan. 25, 2007 (Talbot, D.) (assumption that cardiac catheterization volume would double was based on feeling that "if we purchased a new piece of cardiac cath equipment, [] the physicians would be more attracted to Michael Reese because of the new equipment"); Beckmann Dep. 72:13-1, Apr. 12, 2006 (goal of increased cardiac catheterization volume in 1998 was not met "[b]ecause that required a capital outlay that was never implemented"); Pl. Ex. 300 ("$1,200,000 will be spent at Reese on Cardiac Cath equipment, Reese Cardiac Catheterization volume will double").)

11, Jan. 25, 2007, 1715:25-1716:4, Jan. 30, 2007 (Talbot. D.);
Pl. Ex. 115.)[46]

The second category of assumptions centers around the recruitment of physicians, which would presumably drive up patient volume and revenue.   These assumptions include:

- An assumption that ambulatory surgeries would increase by 14.4%, or 698 additional surgeries per year, (Trial Tr. 981:6-19, Jan. 25, 2007; 1596:18-1597:5, Jan. 30, 2007 (Talbot, D.); Pl. Exs. 115, 1015 at TRUST/HCA-013435-TRUST/HCA-013436); and

- An assumption that the rehabilitation exempt unit at Reese Hospital would increase 15% per year up to a 90% occupancy rate. (Trial Tr. 1092:16-1093:7, Jan. 25, 2007, 1597:6-16, 1674:11-16, 1714:7-8, Jan. 30, 2007 (Talbot, D.); Pl. Exs. 115, 1015 at TRUST/HCA-013438.)[47]

---

[46]   Other assumptions of this nature <u>not</u> included in the Reese Projections were that (1) a new linear accelerator would be built in 1999, increasing revenue by 10 percent, (Trial Tr. 1716:4-5, Jan. 30, 2007 (Talbot, D.); Pl. Ex. 115), (2) Reese Hospital would open a twenty-five-bed skilled nursing facility ("SNF") in the second quarter of 1999, (Trial Tr. 1081:16-18, Jan. 25, 2007 (Talbot, D.); Pl. Ex. 115), and (3) Reese Corp. would develop assisted and senior living on the hospital's campus, (Trial Tr. 1081:3-9,Jan. 25, 2007 (Talbot, D.); Pl. Ex. 115).  The court concludes as a factual matter that it would be unreasonable to project any future returns from these expenditures based on the Reese Management Team's calculation that the projects were too costly and time-consuming to implement right away.  (Trial Tr. 1676:14-1677:4, Jan. 30, 2007 (Talbot, D.).)

[47]   Another assumption of this nature <u>not</u> included in the Reese Projections was that Reese Corp. would "[r]ecruit two neurosurgeons from the University of Illinois," which would "double [the] current volume" in neurosurgery.  (Pl. Ex. 115.) The court concludes as a factual matter that it would be unreasonable to project any future returns from the recruitment of these neurosurgeons because such a projection was evidently too speculative for the Reese Management Team to include such returns in the Reese Projections.

In addition to these very specific assumptions, the Reese Management Team assumed that total patient days at Reese Hospital would be at most 91% of total patient days at the hospital for 1996 for the balance of 1998, 97.82% of the 1996 figures in 1999, 105% of the 1996 figures in 2000, 112% of the 1996 figures in 2001, and 119% of the 1996 figures in 2002. (Trial Tr. 1580:24-1581:12, 1734:5-19, Jan. 30, 2007 (Talbot, D.); Pl. Ex. 115.)[48]

The third category of assumptions relates to proposed operational or management changes that would either cut costs or improve the rate of return on Reese Hospital's charges. These assumptions include:

- An assumption that the ratio of employees, full-time equivalents ("FTEs"), to adjusted patient stay would be reduced, such that salaries and wages, benefits, and contract labor expenses would constitute no more than 42% of net patient revenue effective January 1, 1999, (Trial Tr. 878:2-13, 973:25-974:9, Jan. 25, 2007 (Talbot, D.); Pl. Ex. 115);

- An assumption that improved training in and oversight of coding techniques would result in a higher Medicare case mix

---

[48]   Plaintiff's Exhibit 115, prepared November 14, 1998, lists the percentage of 2006 revenues to be achieved for 2000 through 2002 as 1.05%, 1.12%, and 1.19%. Obviously what was meant was that revenues would increase by factors of 1.05, 1.12, and 1.19.

index of 1.4, (Trial Tr. 1586:7-1588:20, Jan. 30, 2007
(Talbot, D.); Pl. Exs. 115, 300 at TRUST/HCA-007589);[49]

- An assumption that the psychiatric unit at Reese Hospital
  would be bifurcated into a "geri-psych cost[-]based unit" and
  a diagnosis-related group ("DRG") unit, thereby resulting in
  an increase in disproportionate share ("DSH") payments, (Trial
  Tr. 1093:11-22, Jan. 25, 2007 (Talbot, D.); Pl. Ex. 115; Defs.
  Ex. QH at TRUST/HCA-175847); and

- An assumption that certain costs incurred by HCA, including
  management fees, "MIS" costs, insurance costs, bad debt
  collection expense recovery costs, and costs associated with
  HCA's "national branding campaign" could be reduced or
  eliminated altogether, (Trial Tr. 870:8-11, 974:10-19,
  1069:18-1070:22, Jan. 25, 2007, 1698:2-11, Jan. 30, 2007
  (Talbot, D.); Pl. Exs. 144A at TRUST/HCA-007667, 1016 at
  TRUST/HCA-007175, TRUST/HCA-007629).[50]

Alberts concedes that most of these assumptions are reasonable

in the abstract. (Pl. Rebuttal ¶¶ 399-401, 410.) Instead, he

argues, first, that the _timing_ of the assumptions is unreasonable

---

[49] There is a potential discrepancy between the Strategic
Assumptions and the Reese Projections with respect to this
assumption. The Strategic Assumptions list the case mix index
for Reese Hospital as of April of 1998 as 1.29, whereas the Reese
Projections list the case mix index for Reese Hospital as 1.36
for 1998. (Pl. Exs. 115, 300 at TRUST/HCA-007589.) The court
finds as a factual matter that the case mix index listed in the
Reese Projections is the better indicator of the actual case mix
index at Reese Hospital as of the Transfer Date because the
projections appear to incorporate financial information received
by Reese Corp. after April of 1998. (Trial Tr. 1580:15-17, Jan.
30, 2007 (Talbot, D.).)

[50] Other assumptions of this nature _not_ included in the
Reese Projections were that (1) Reese Corp. would successfully
convert its contractual arrangement with Humana (based on the
fallacious assumption that such a contract was in place and
assigned to Reese Corp. into a "global risk contract," (Trial Tr.
585:5-21, Jan. 23, 2007 (Mounce, E.); Pl. Ex. 115), (2) Reese
Hospital would decrease its ancillary utilization of Humana
patients, (Trial Tr. 649:22-650:20, Jan. 23, 2007 (Mounce, E.);
Pl. Ex. 115), and that (3) the hospital would "[t]rim back
teaching programs based on analysis of high cost programs," (Pl.
Ex. 115).

because it appears from the Reese October Projections[51] that all of

the assumptions--including those dependent on capital

contributions--are projected to go into effect as of the Transfer

Date. (Pl. Facts ¶¶ 173-74, 180-81; Pl. Rebuttal ¶¶ 399-401,

410.)[52]  Moreover, he contends that the Reese Management Team failed

to account for the steep decline in revenue at the hospital in

1998. (Pl. Facts ¶ 172.)  Alberts further asserts that the Reese

Projections failed to take into account "the existing problems and

challenges at Reese Hospital," (Id. ¶ 175), including the

hospital's "reliance on declining government reimbursement rates,

certain third-party managed care providers with ever-reducing

reimbursement rates, union labor, as well as increased

competition," (Id. ¶ 176).  Finally, Alberts challenges the

reasonableness of two specific assumptions: the assumption that the

case-mix index for Medicare coding could be improved to 1.4, (Pl.

Rebuttal ¶ 401(g)), and the assumption that salaries and wages,

---

[51]  The Reese September Projections posit a hypothetical
1998 in which Reese Corp.'s turnaround plan was in effect as of
January 1, 1998. (Trial Tr. 2065:10-2066:9, Feb. 6, 2007
(Demchick, N.).)  Presumably, this is why Kevin Moss and James
Yerges relied on the Reese October Projections even though the
Reese September Projections were much more detailed.

[52] In point of fact, the projections assume operational
growth at Reese Hospital as of November 1, 1998; i.e., eleven
days before Reese Corp. assumed control of the hospital.
Although it would have made sense for the Reese Management Team
to project earnings for the entire month of November at the time
that the Reese Projections were made, the projections should have
at least been modified by Kevin Moss and James Yerges to reflect
the actual Transfer Date.

benefits, and contract labor expenses would account for only 42% of net patient revenue by January 1, 1999, (Pl. Facts ¶ 177).[53]

### (I)  Timing of the projections

The court agrees with the first criticism made by Alberts. Donna Talbot testified that at least one strategic assumption (namely, the assumption that salaries and wages, benefits, and contract labor would cost no more than 42% of net patient revenue by January 1, 1999) was "phased" into the Reese Projections, (Trial Tr. 1585:14-22, Jan. 30, 2007 (Talbot. D.)), and the Reese September Projections suggest that other strategic assumptions were "phased" in as well, (Pl. Ex. 300 at TRUST/HCA-007585).  But she provided no rationale as to how the Reese Management Team determined the amount of improvement that would be made in the last forty-nine days of 1998, nor did she explain why the baseline for volume at Reese should be calculated as a percentage of 1996 patient days as of the Transfer Date when volume was much smaller in 1998.

In any event, the Reese September Projections, which served as the basis for the Reese October Projections, clearly project

---

[53]  Alberts also disputes the reasonableness of the Reese Management Team's assumption that it could renegotiate its managed care contract with Humana, (Pl. Facts ¶¶ 182-86), but this assumption was not (with one minor exception discussed below) factored into the Reese Projections, (Trial Tr. 1663:15-1664:7, 1703:15-1704:2, 1706:2-15, 1741:15-18, Jan. 30, 2007 (Talbot, D.); Pl. Ex. 300), which renders Alberts's objection moot.  The court discusses the contract between HCA and Humana at greater length in its findings of fact with respect to the "cost approach" to valuation.  See part III.B.1.b.iv, supra.

immediate increases in volume based on operational changes that
could not have gone into effect in 1998. (Pl. Ex. 300 at
TRUST/HCA-007585.) Neil Demchick hit this particular nail on the
head in his trial testimony:

> [T]here are a number of strategic assumptions
> that suggested that there were things that were
> going to be done to [] improve the revenue
> position at [Reese Hospital], and the linear
> accelerator was an example of one, the moving of
> the emergency room is [an] example of another,
> cardiac cath lab is another, and that even though
> those would all take time to put into place, the
> revenue was included in the projections
> immediately from the time of the transaction,
> beginning in 1998 and carried forward through
> 1999.

(Trial Tr. 4313:7-18, March 1, 2007 (Demchick, N.).)

The Defendants assert that the volume increases projected by
the Reese Management Team could have been accomplished without any
capital expenditures notwithstanding the Reese Management Team's
conclusions to the contrary.[54] They rely almost exclusively on the
testimony of expert witness Kevin Moss to support this dubious
proposition. (Defs. Rebuttal ¶¶ 174A-174G.) Moss testified at
trial that the volume increases projected by the Reese Management
Team could be accomplished quickly because "the main drivers in the
cash flow" are "the volume of what the physicians admit to the

---

[54] The Defendants also assert that "there is not, in any
event, a 25% increase in emergency room revenue calculated in the
projections for 1998," (Pl. Rebuttal ¶ 174B), that "there is no
25% increase in ambulatory surgery revenue calculated in the
projections for 1998," (Id. ¶ 174C), and that "there is no 15%
increase in rehabilitation exempt unit revenue calculated in the
projections for 1998," (Id. ¶ 174D), but all of these assumptions
concerned growth in volume, not growth in revenue, (Pl. Ex. 300).

92

facilities" and "controlling the expenses that are being incurred

on the ancillaries," and "[t]hose two things can occur very

quickly." (Trial Tr. 3527:1-4, 22-23, Feb. 20, 2007 (Moss, K.).)

There are many problems with this testimony.  First and foremost,

Moss is <u>not</u> an expert in hospital operations.  (Trial Tr. 3400:14-

20, 3401:4-8, Feb. 20, 2007, 3711:10-23, Feb. 21, 2007, 3869:6-13

(Moss, K.).)  Although Moss testified that he performed the same

type of analysis that an operations consultant would have performed

in ascertaining the reasonableness of the Reese Projections, (Trial

Tr. 3869:14-22, Feb. 22, 2007 (Moss, K.)), he was not qualified as

an expert in hospital operations, (<u>see</u> Trial Tr. 3406:3-5, Feb. 20,

2007 (Moss, K.) (qualifying Moss "as an expert in the area of

valuation of hospitals" generally)),[55] and the court does not credit his testimony to the extent that he purports to be one.[56]

Second, Moss did not actually testify that the inevitable delay caused in implementing those Strategic Assumptions requiring capital expenditures would have no effect on the Reese Projections. To the contrary, Moss acknowledged on the witness stand that "[t]here would be a small timing difference" caused by the delay

---

[55] Moss clarified the scope of his expertise during his direct examination as follows:

> So . . . I've done a lot of work with respect to joint ventures, whether it's surgery centers and for those types of things. But really, pairing up with the consulting people[,] and it's going in and looking at someone's business operations and do you improve them, and what should they change and what's the economic benefit. And my side of that is the financial side. It's looking at the cash flows and does it make sense for the entity to go through this process, to do the transformation.

(Trial Tr. 3401:2-10, Feb. 20, 2007 (Moss, K.) (emphasis added).)

[56] There is very little evidence in the record concerning the operational analysis that went into the Strategic Assumptions. Donna Talbot identified Dr. Enrique Beckmann and Cheryl LaCoste as the members of the Reese Management Team with the strongest operational background, (Trial Tr. 1688:20-21, Jan. 25, 2007, 1756:4-16, Jan. 30, 2007 (Talbot, D.)), yet neither of these witnesses appeared at trial, and LaCoste was apparently never even deposed. Moreover, Beckmann was a career physician who had never risen higher than department head at Reese Hospital prior to his participation in the Reese Management Team, (Trial Tr. 1688:1-22, Jan. 30, 2007 (Talbot, D.); Beckmann Dep. 14:8-15:4, Apr. 12, 2006), and who had only "a somewhat removed view of what was . . . happening at the hospital," (Beckmann Dep. 48:7-8, Apr. 12, 2006). The idea that Beckmann served as the de facto operations expert for the team only undermines the court's confidence in the Strategic Assumptions that underlie the Reese Projections.

94

between Reese Corp.'s takeover of the hospital and the effectuation
of the Reese Management Team's business plan, (Trial Tr. 3526:6-7,
Feb. 20, 2007 (Moss, K.)), but did not adjust the Reese Projections
because he "didn't have the information to calculate" the effects
of that difference, (Trial Tr. 3526:7, Feb. 20, 2007 (Moss, K.)).
Moss further testified that even though certain Strategic
Assumptions, such as the strategic assumption regarding ER volume,
required capital expenditures to go into effect, (Trial Tr. 3528:6-
21, Feb. 20, 2007 (Moss, K.)), and even though he did not know when
those strategic assumptions would go into effect, (Trial Tr.
3529:6-18, Feb. 20, 2007 (Moss, K.)), he accepted the Reese
Projections at face value because "the projections were done
annually" and he couldn't "pinpoint when in the year" any of the
Strategic Assumptions would go into effect, (Trial Tr. 3529:3-5,
Feb. 20, 2007 (Moss, K.)).  This does not suggest that the Reese
Projections were correct, but rather that Moss lacked the
information necessary to correct them.[57]

     Third, the court does not believe that Reese Hospital could
have swelled the ranks of its physicians to the degree contemplated

---

[57]  Moss "could not tell" if volume increases predicated on
the construction of a new ER were included in the Reese
Projections for 1998, (Trial Tr. 3529:21, Feb. 20, 2007 (Moss,
K.)), even though it is plain from the face of the Reese
September Projections that they were, (Pl. Ex. 300 at TRUST/HCA-
007585).  Moss attempted to excuse his ignorance on this point by
opining that "[t]he cash flows in [19]98 from a valuation
standpoint were not that material," (Trial Tr. 3530:6-7, Feb. 20,
2007 (Moss, K.)), but even if that were true, the court would
still expect a more careful analysis from an expert witness of
his pedigree.

by the Reese Projections within six weeks of the Transfer Date.

Kenneth Bauer testified at his deposition that Reese Hospital had

long suffered from "town-and-gown issues" because the hospital "had

a long history of being an academic center that was dominated by

the academic physicians." (Bauer Dep. 42:17-22, June 14, 2006.)[58]

Bauer specifically criticized the notion that ambulatory surgery

volume would increase immediately by 698 surgeries per year:

> Q. No. 5 says "Reese Ambulatory Surgeries will
> increase 698 surgeries per year or 14.4%. ASU
> represents 24.79 percent of 1997 outpatient
> revenue." Are you familiar with that assumption?
>
> A. Yes.
>
> Q. Was that reached?
>
> A. I don't believe that it was. And if you'll
> recall the previous discussion we had about the
> inadequate primary care base and the need for
> that to ultimately channel patients to surgeons,
> and the low surgery volume of the institution,
> all of those factors play into this situation
> here.
>
> Q. So was this a reasonable assumption to make?

---

[58] The Defendants object to the admission of this testimony
into evidence on the grounds that the witness lacks personal
knowledge of the events described in his testimony and that the
document referred to in the testimony is hearsay. This objection
is overruled because Bauer testified based on his own personal
recollection, not Exhibit 1 to his declaration, and because
Bauer, the former CEO of Reese Hospital, (Bauer Dep. 17:6, June
14, 2006), testified that he "made very overt efforts to work
with community physicians," (Bauer Dep. 43:2-3, June 14, 2006),
thereby demonstrating personal knowledge and laying a foundation
for his testimony regarding the problems with physician
recruitment at Reese Hospital. (The Defendants' objection to
Bauer's testimony that he was CEO at Reese Hospital as irrelevant
is overruled because the testimony is obviously relevant, else
the court would not have cited it.)

> A.    It's a reasonable assumption if you can
> expand the primary care base.  <u>Can you do that in
> the course of two months?  No.  Over time can you
> do that?  Yes.</u>
>
> Q.    How much time?
>
> A.    <u>I would say a couple of years.</u>

(Bauer Dep. 98:12-99:4, June 14, 2006 (emphasis added).)

Dr. Enrique Beckmann also noted the "difficulty in recruiting and retention of qualified personnel" at Reese Hospital. (Beckmann Dep. 44:4-5, Apr. 12, 2006.)  This was just one component of "a steady ratcheting down" of the hospital's condition "over the course of two-and-a-half decades."  (Beckmann Dep. 71:6-7, Apr. 12, 2007.)[59]  Beckmann noted that it was impossible for Reese Hospital to expand its outpatient volume because the hospital had lost its network of clinics years earlier when Reese Hospital was sold by Humana, (Beckmann Dep. 74:15-75:9, Apr. 12, 2007)[60]--testimony consistent with the testimony of Kenneth Bauer, (Bauer Dep. 37:10-38:2, June 14, 2006).[61]

---

[59]   The Defendants object to the admission of this testimony into evidence, but do not provide any grounds for their objection.  The objection is overruled.

[60]   The Defendants object to the admission of this testimony into evidence on the grounds that the testimony is irrelevant. It is not, and the objection is overruled.

[61]   The Defendants object to the admission of this testimony into evidence on the grounds that the question preceding the testimony calls for speculation and that the answer lacks foundation and is hearsay.  These objections are overruled as moot because the court cites Bauer's testimony only to show that the testimony is not contrary to Beckmann's explanation.

Moreover, even those Strategic Assumptions regarding physician recruitment depended at least in part on capital expenditures. Again, this point was made by Kenneth Bauer in his deposition testimony:

> If you were trying to attract a community physician to bring his patients to your hospital and he has a choice of going to Michael Reese or Mercy Hospital, which is within half a mile, or two or three other hospitals that are within two to three miles, a number of factors come into play as to why he chooses to go to one place or another. Some of the primary ones are can he get in, see his patients, and get out really quickly so that he minimizes his time investment because his time is his revenue.
>
> Another factor is if he sends patients to a particular institution and he ends up getting nothing but complaints from those patients, he runs the risk of losing those patients for his practice because he took them one place or another. And so it's a matter of institutions competing against each other to create an environment where physicians can care for their patients timely, efficiently, and with good patient satisfaction in the outcome.

(Bauer Dep. 51:8-52:1, June 14, 2006.)

In contrast to the firsthand knowledge of Reese Hospital's situation at the time of the Transfer Date held by Bauer and Beckmann, Moss lacked the information necessary to draw any conclusions as to how quickly Reese Hospital could recruit physicians:

> THE COURT: How would you ascertain, if you were assigned the task of forming an opinion, as to whether the volume projections were reasonable?
>
> THE WITNESS: Are you asking me what I would do in a situation where it was not a valuation back in 1998, but if today, I were going into a facility?

98

THE COURT: No, in 1998.

THE WITNESS: Okay.  The difficult thing about
1998 is we can look at the market environment.
I can look at the information in the McGladrey
report.  I can look at how many physicians can
admit to the hospital, and I know that we are in
a large market, but I can't actually go in and
talk to the doctors.  I can't do a ZIP code
analysis on the hospital and look at case rates
per thousand for different types of health issues
that people have and figure out where am I losing
patients in my service area and where are they
going to another hospital because I don't have
that level of detail.  When you have that level
of detail, you can identify very quickly where
you can go to get more volume, because you know
who the important physicians are based on that
analysis; but in this case, what we have is we
just have a large market with ample opportunity
to pick up revenue if the management team does
focus on the physicians themselves and taking
care of their physician relationships.

. . .

THE COURT: Is there anything additional you could
have done to ascertain the reasonableness of the
volume projections in preparing your report?
Could you have turned to your operational folks
at Deloitte and had them give you assistance in
evaluating the reasonableness of the projections?

THE WITNESS: The problem had to do with the time
period that has passed.  The operational people
would want more detail than was available.  They
would want billing information, and I didn't have
that type of billing information.

(Trial Tr. 3867:15-3868:14, 3869:3-13, Feb. 22, 2007 (Moss, K.).)

    Moss could only determine that in November of 1998 there was

"a large market with ample opportunity to pick up revenue," (Trial

Tr. 3868:12, Feb. 22, 2007 (Moss, K.)), by "look[ing] at the size

of the market and the number of doctors and the capacity within the

99

facility to provide that volume," (Trial Tr. 3869:15-17, Feb. 22,

2007 (Moss, K.)).[62]  But the mere fact that a

---

[62]  An earlier colloquy between the court and Moss
reinforces this conclusion:

> THE COURT: The bottom line is you did not
> attempt to go into the projections that were
> made by Doctors Community Healthcare
> Corporation. . . . You did not attempt to
> determine their reasonableness beyond general
> familiarity with what had occurred in the
> market with which you had familiarity.
>
> THE WITNESS: Your Honor, in looking at the
> projections, I benchmarked the projections
> against the industry data to determine if the
> relative ratios were consistent with the
> industry information.
>     So, that would be testing things like the
> salaries expense, you know, wages and payroll,
> looking at the other items, the other line
> items they had on the income statement. So, I
> did that. . . . The projections themselves,
> though, most of the line items in those
> projections drive, somehow, off of the volume
> that is in the projections.
>
> THE COURT: And it is as to the volumes that
> you assumed that the projections were
> reasonable on the part of DCHC?
>
> THE WITNESS: That is correct, Your Honor.
>
> . . .
>
> THE COURT: . . . [Y]ou explain that based on
> an analysis, none of the revenues as a
> function of inpatient and outpatient volumes
> appear unreasonable.
>
> THE WITNESS: That is correct.
>
> THE COURT: So, you did not attempt to
> ascertain whether the inpatient and outpatient
> volumes were reasonable. You simply looked at
> those volumes and tested the revenues as a
> function of those and determined that the

hospital <u>could</u> recruit physicians and cut costs does not mean that

it is reasonable to project that this particular hospital <u>would</u>

have done so as a result of any specific operational changes, let

alone those changes actually planned by the Reese Management Team.

Tellingly, the Defendants' own expert witness on the issue of

insolvency, James Yerges, testified that a turnaround of a

hospital's operations "doesn't happen overnight," (Trial Tr.

3069:13, Feb. 14, 2007 (Yerges, J.)), and that the turnaround plan

at Reese Hospital would "take what remains in 1998 and all of

1999," (Trial Tr. 3069:16, Feb. 14, 2007 (Yerges, J.)).  The court

does not credit the testimony of Moss insofar as he asserts that

---

revenue projections were reasonable, and you
tested the expenses as a function of revenues
and determined that the expenses were a
reasonable projection; correct?

THE WITNESS: Correct.

(Trial Tr. 3865:2-3867:10, Feb. 22, 2007 (Moss, K.).)

101

Reese Hospital could have reached the cash flow figures set forth

in the Reese Projections in six weeks.[63]

(II)  <u>Starting point for projections</u>

The court also agrees with Alberts that the Reese Projections

are defective because they do not account for the severe downturn

in revenue at Reese Hospital in 1998.  Implicit in the court's

conclusion that the Reese Projections should have accounted for the

delay in implementing the Reese Management Team's turnaround plan

is the notion that the projections should have used the actual

profits and losses for the hospital in 1998 as a baseline from

---

[63]  In support of his position that the Reese Projections
could be reached in a matter of weeks, Moss provided the
following example:

> There is actually an example of that within
> the industry, Allegheny East, which were the
> Pittsburgh hospitals of Allegheny.
>     My recollection is that I saw some
> information where they were losing roughly 25
> million a month is what I recall, so a
> substantial loss.  Those facilities were
> purchased about the time of this transaction
> with Reese.  In the 10K of the buyer, which
> would have been only a month and a half later,
> in their 10K, they disclosed that they had
> already had the facilities operating at break
> even.

(Trial Tr. 3527:10-19, Feb. 20, 2007 (Moss, K.).)

Assuming for the moment that Moss's offhand "recollection"
is accurate, the court does not see how the fact that one other
hospital apparently went from monthly losses of $25 million to
break even in a six-week period establishes the reasonableness of
projecting that this particular hospital would have done the
same.  The question Moss was supposed to address was whether the
Reese Projections were reasonable, not whether they were
possible.

which volume, revenue, and cash flow would "ramp up" as the turnaround plan went into effect.  The Reese Projections did not do this: they used the historic figures for the hospital as a "starting off point," (Trial Tr. 1718:16, Jan. 30, 2007 (Talbot, D.)), modified those figures to reflect the Reese Management Team's Strategic Assumptions, (Trial Tr. 978:4-13, Jan. 25, 2007, 1718:17-18, Jan. 30, 2007 (Talbot, D.)), and, in an attempt to account for the downturn in 1998, then "capped" the total number of patient days arising out of those assumptions by a percentage of the actual patient days for the hospital in 1996, (Pl. Ex. 300).[64]

Alberts asserts, and Neil Demchick testified at trial, that the Reese Management Team used Reese Hospital's financial performance in 1997 as the starting point for its projections, (Pl. Facts 172; Trial Tr. 2065:10-2066:9, Feb. 6, 2007 (Demchick, N.)), but Donna Talbot testified that the Reese Management Team "took the three year historical data that we got from HCA and then the stump period data . . . through August of 1998" as the "starting point" for the Reese Projections, (Trial Tr. 1666:21-23, Jan. 30, 2007

---

[64] The Reese Management Team used the 1996 patient days figure instead of the 1997 figure because "the hospital announced their intention to sell [Reese Hospital] in 1997 and this announcement had a negative impact on volume." (Pl. Ex. 115; Trial Tr. 1582:2-7, Jan. 30, 2007 (Talbot, D.).)  But the sale of Reese Hospital was announced in December of 1997, by which time any impact of the announcement on the volume at Reese Hospital for that year would have been marginal at best.  (Pl. Facts ¶ 23; Defs. Rebuttal ¶ 23.)  The use of 1996 data when 1997 data regarding patient days was available is yet another flaw in the Strategic Assumptions and Reese Projections.

(Talbot, D.)).[65]  These positions are not as irreconcilable as they
might seem.  The 1998 patient days total projected in the Reese
September Projections corresponds to 90.81% of the patient days at
the hospital in 1996,[66] reflecting the Strategic Assumption to that
effect by the Reese Management Team.  (Pl. Exs. 115, 300 at
TRUST/HCA-0075883-TRUST/HCA-0075885.)[67]  This "cap" of 91% was set
based on the Reese Management Team's consideration of the patient
day data for the months leading up to Transfer Date and was
intended to reflect the drop-off in volume at the hospital in 1998.
(Trial Tr. 1581:5-19, 1735:6-9, Jan. 30, 2007 (Talbot, D.).)  In
that sense, Talbot is correct when she states that the Reese
Projections incorporate the "stump period data" for 1998.

---

[65]  Talbot could not recall or explain why she did not
incorporate the Reese Hospital financial statement for September
of 1998 into the Reese Projections, (Trial Tr. 1670:21-1671:1,
1735:10-1736:3, Jan. 30, 2007 (Talbot, D.)), but she agreed that
she was "not too focused" on the performance of Reese Hospital in
"the most immediate several months" preceding the Transfer Date
because she "had the history upon which [she] would be relying
before the uncertainty that arose upon the announcement of the
sale of Michael Reese,"(Trial Tr. 1735:10-15, Jan. 30, 2007
(Talbot, D.)).

[66]  The total number of patient days projected for 1998 in
the Reese September Projections is 97,220, or 90.80% of the
107,075 patient days experienced in 1996; however, when the
patient days projected for each unit in Reese Hospital are added
together, they yield a slightly larger number of 97,238, or
90.81% of the 1996 patient day total.

[67]  Similarly, the 1999 patient days projected in the Reese
September Projections total 97.82% of the patient days at Reese
Hospital in 1996 as stated in the Strategic Assumptions.  (Pl.
Ex. 115.)

At the same time, all of the figures set forth in the Strategic Assumptions reference 1997 data.  For example, the Strategic Assumption that the rehabilitation unit at Reese Hospital would "increase 15% per year" translates into a projection that there will be 360 Medicare cases in 1998 on an annualized basis, a 15% increase over the 313 Medicare cases at the hospital in 1997. (Pl. Ex. 300 at TRUST/HCA-007584.)  Similarly, the Strategic Assumptions regarding growth in inpatient and outpatient volume are converted into percentages of growth over 1997 figures and then applied to those figures to arrive at annualized projections for 1998.  (Pl. Ex. 300 at TRUST/HCA-007583-TRUST/HCA-007585.)  In other words, the Reese Management Team used 1997 data as a jumping off point for all of their projections, and then curtailed those projections only to the extent that the figures projected exceeded the cap on patient days.

Such a process is obtuse under the best of circumstances.  It would be defensible to the extent that the cap placed on the projections accurately reflects the state of affairs at the hospital as of the Transfer Date, but the cap does not do so.  In this case, the percentage of 1996 patient days used as a cap in the Reese Projections for 1998 (91%) actually results in a <u>higher</u> figure than the actual number of patient days for Reese Hospital in 1997 (92,192 days, or 86.10% of the 1996 figure of 107,075).  (Pl. Ex. 300 at TRUST/HCA-007585.)  Moreover, the cap on patient days does not affect any projections regarding outpatient cases, which

105

outstrip the actual number of inpatient cases in both 1996 and
1997.  (Pl. Ex. 300 at TRUST/HCA-007583-TRUST/HCA-007585.)[68]
Consequently, the Reese Projections forecast net revenue at Reese
Hospital in the days immediately following Reese Corp.'s takeover
of the hospital that, annualized, would have exceeded not only

---

[68]  The court reached the conclusion that the patient days
totals for 1996 and 1997 and patient days projections for 1998
and 1999 do not include outpatient cases by adding the patient
days totals and projections for each unit in Reese Hospital.
Presumably, patient days are not recorded for outpatient services
because outpatient services are by definition events of less than
one day.

Reese Hospital's actual performance in 1997, but its performance in 1996 as well.[69]

These assumptions are unreasonable.  Assuming that the "cap" on patient days reflects the average of the inpatient, rehabilitative, and psychiatric volume as of November 1, 1998, and the projected volume in those units on December 31, 1998 (to account for the "ramp up" in volume over that period of time), and that the Reese Management Team anticipated that volume would be

---

[69]   The court determined that the Reese September Projections forecast an annualized net patient service revenue figure of $178,883,210.94 by replicating the unit-specific worksheets created as part of those projections and adding the values produced by those worksheets.  The actual net patient service revenues for the hospital in 1996 and 1997 were $171,435,208.00 and $155,125,064.00, respectively.  (Pl. Exs. 137 at HCA/MR 08017 (listing total net revenue for 1996 at $174,299,798.00, of which all but $2,864,590.00 came from net patient service revenue); 136 at HCA/MR 08014 (listing total net revenue for 1997 at $157,855,735.00, of which all but $2,730,671.00 came from net patient service revenue).)  The court's calculations for 1998 of $178,883,210.94 in projected annualized revenues based on projected post-acquisition performance vary somewhat from the total net patient service revenue figures set forth in the Reese Projections, (Pl. Ex. 300 at TRUST/HCA-007580 (projecting net patient service revenue of $45,063,000.00 for the last three months of 1998, or $182,755,500.00 annualized)); Pl. Ex. 144A at TRUST EXPERT 010801 (projecting net patient service revenue of $30,042,000 for the last two months of 1998, also $182,755,500.00 when annualized)), but the differences relate to minor computational discrepancies within the Reese Projections, not differences in methodology or underlying assumptions, and the court finds as a factual matter that the projections are unreasonable to the extent that they project excessive amounts of revenue as a result of computational errors or because the Reese Management Team rounded up sub-totals of revenue.

stable throughout 1999,[70] the annualized number of patient days at
Reese Hospital as of November 1 would have to equal 83.80% of the
patient days total for 1996--a figure almost identical to the
patient days total of 1997 (86% of the patient days for 1996).[71]
Given that the Reese Management Team knew "[t]hat the volumes were
declining" at Reese Hospital as the year progressed and knew "that
the [patient] days were continuing to decline even though [the
team] didn't have the financial statements," (Trial Tr. 865:6-7,
Jan. 25, 2007, 1720:18-19, Jan. 30, 2007 (Talbot, D.); see also
1735:8-9, Jan. 30, 2007 (Talbot, D.) ("I think we knew where the
days were going.")), it makes no sense for the team to have assumed

------

[70]    The Strategic Assumptions increase the cap for projected
patient days by seven percent every year beginning in 2000,
presumably to account for long-term growth at the hospital.  This
suggests that the Reese Management Team believed that the 97.82%
cap assumed for 1999 is intended to reflect a consistent volume
of patients throughout 1999: if the 1999 cap merely represented
an average between a lower figure at the beginning of the year
and a higher figure at the end of the year, the cap for 2000
would be seven percent above the later (and higher) value, not
the average of the two figures.  The fact that the end value for
1999 is the same as the average for 1999 necessarily means that
the Reese Management Team anticipated that the start value, end
value, and average value in 1999 would all be the same.

[71]    The court arrived at the percentage of 83.80% by
reversing the normal process for arriving at an average.  The
process may be represented by the following equation: $x=(y*2)-z$,
where "x" equals annualized total patient days for 1998 (using
November 1, 1998 projected volume)expressed as a percentage of
1996 patient days, "y" equals annualized projected total patient
days for 1998 (using average volumes for November and December
1998) expressed as a percentage of 1996 patient days, and "z"
equals 1999 patient days (the volume projected to be reached by
December 31, 1998) expressed as a percentage of 1996 patient
days.

that patient days would be almost if not precisely at 1997 levels upon Reese Corp.'s arrival.

Similarly, if one assumes that the annualized projected number of outpatient cases at Reese Hospital for 1998 represents the average of the actual number of cases in 1998 pre-transfer and the annualized projected number of cases as of December 31, 1999, then the actual number of cases at Reese Hospital prior to November 1, 1998, would have been 104,161 (the result of (108,519*2)-112,877),[72] or 2,150 cases more than Reese Hospital had in 1997.  Even more disturbing, applying the same methodology to the projected net patient service revenue figures for the hospital results in a "starting point" in net patient service revenue of $166,043,698.81--approximately $15 million more than the actual annualized net patient service revenue figure for Reese Hospital as of November 1, 1998.

These numbers are damning to any defense of the Reese Projections' reasonableness.  Either the Reese Management Team assumed full operational turnaround at the hospital as of Reese Corp.'s first day in control of the hospital--a self-evidently absurd notion--or they assumed that the numbers would "ramp up" from figures that do not remotely reflect the realities at Reese

---

[72]  In that calculation, 108,519 is the annualized projected number for 1998, and 112,877 is the projected number at December 31, 1999.  When 104,161 and 112,877 are averaged, the result is 108,519.

Corp. as of the Transfer Date.  Either way, the Reese Projections
are flawed in their inception and cannot be taken at face value.

(III)  <u>Problems at Reese Hospital</u>

Alberts argues that the Reese Projections did not take into
account certain looming obstacles for success at Reese Hospital,
such as a decline in governmental reimbursement rates due to the
Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251
(1997) (the "BBA"), a decline in reimbursement rates in certain
third-party insurance contracts, union difficulties, and increased
competition.  He is correct in one respect: the Reese Projections
do not predict any decrease in the reimbursement rates for its
contract with Humana, and, in one instance, appear to predict an
increase in the reimbursement rate.  (Pl. Ex. 300 at
TRUST/HCA-007620-TRUST/HCA-007621.)[73]  The Reese Projections are
unreasonable to the extent that they predict an increased
reimbursement rate for outpatient services performed on Humana
patients because Reese Corp. lacked the necessary leverage to
negotiate a better contract with Humana.  (Trial Tr. 440:23-442:14,
Jan. 23, 2007 (Redman, M.) ("we had no negotiating power").)

---

[73]  Neil Demchick also testified that the Reese Projections
were unreasonable in part because they did not take into account
the competition from nearby Mercy Hospital, (Trial Tr. 2385:19-
24, Feb. 8, 2007 (Demchick, N.)), but as Dr. Enrique Beckmann
noted in his deposition, "if they've [<u>i.e.</u>, Mercy Hospital and
Reese Hospital] been able to exist for 125 years, side by side,
both of them providing very valuable services to the community
and being viable enough to stay longer than most institutions can
stick around in the world, then I don't know that the argument is
valid," (Beckmann Dep. 169:1-9, Feb. 1, 2007).

110

Although a hypothetical purchaser would likely have assumed that there was some chance of renegotiating the Humana terms, the court assumes in Alberts's favor that the purchaser would not have utilized an increased reimbursement rate for outpatient services performed on Humana patients in its projections of revenues because Humana would always have the upper-hand in any negotiations with Reese Hospital due to its relationship with Mercy Hospital.  (This assumption results in understating the value of Reese Hospital because a hypothetical purchaser would likely assign some value to

the chance of renegotiating the Humana terms,[74] but, even so, the value the court ultimately determines for what Reese Corp. received exceeds the Reese Transfers.  Accordingly, for ease of analysis, the court assigns zero value to the prospect of renegotiating the Humana terms, without actually deciding what value that prospect would have.)

The other criticisms levied by Alberts are unfounded.  The Reese September Projections predict lower reimbursement rates for inpatient services performed on Medicare patients, thereby

---

[74] Erich Mounce testified that the Reese Management Team "believed that we would be able to renegotiate [the Humana] contract to a much higher per diem and obtain some [carve] outs," (Trial Tr. 580:19-21, Jan. 23, 2007 (Mounce, E.)), because he "had been very successful in renegotiating contracts," (Trial Tr. 580:18-19, Jan. 23, 2007 (Mounce, E.)). See also Trial Tr. 583:5-16, Jan. 23, 2007 (Mounce, E.) ("[W]e believed under a new ownership . . . that we would be able to get it up to that market rate. We had been very successful before doing that . . ." and there is no "reason to believe that a buyer in the market of this hospital would have taken any different view . . . of what could be achieved with respect to the Humana contracts."); Trial Tr. 614:3-7, Jan. 23, 2007 (Mounce, E.) (felt Reese Corp. could negotiate new rates very quickly after November 12, 1998). (Donna Talbot testified similarly.) But the court finds this belief somewhat unreasonable because, as Melvin Redman made clear in his direct testimony, Humana always had the upper-hand in any negotiations with Reese Corp. due to its relationship with Mercy Hospital, Reese Hospital's nearby neighbor and primary competitor. (Trial Tr. 475:23-476:11, Jan. 23, 2007 (Redman, M.).) A hypothetical purchaser of Reese Hospital would likely have realized that Humana would have the upper-hand in any negotiations due to that relationship with Mercy Hospital, and would have taken that into account in projecting future revenues. It is difficult to say, however, whether a purchaser would ascribe absolutely no value to the chance of successful renegotiations with Humana. Both Talbot and Mounce had experience in the health field, and the court is not inclined to treat their view of the possibility of renegotiation with Humana as totally unreasonable.

reflecting the predicted effects of the BBA.  (See Pl. Ex. 300 at

TRUST/HCA-007589 (projecting decline from $355.23 to $304.78 for

capital diagnostic related group ("DRG") code of 1.0).)[75]  And while

Donna Talbot testified that Reese Hospital did not improve its

collection practices as much as expected due in part to the

difficulties involved with dealing with a group of unionized

employees, (Trial Tr. 987:19-990:16, Jan. 25, 2007 (Talbot, D.)),

she also testified that hospital management could have fired those

employees and used outside contractors with much better results at

the outset of Reese Corp.'s management but decided not to do so

because management wanted to be "compassionate" to Reese Hospital's

---

[75]  It is difficult for the court to assess whether the
Reese September Projections adequately reflect the changes
wrought by the BBA given the admission by Neil Demchick under
cross-examination that he had not quantified the expected effect
of the BBA.  (Trial Tr. 2377:15-20, Feb. 8, 2007 (Demchick, N.).)
As the burden of proof with respect to this issue rests with
Alberts, the court finds as a factual matter that the adjustments
made to DRG coding rates in the Reese September Projections
adequately address the changes reasonably predicted to occur as a
result of the BBA.  For the same reason, the court rejects
Demchick's testimony that, in part, the Reese Projections were
unreasonable because they did not take into account the costs of
operating as a teaching hospital.  (Trial Tr. 1904:11-17, Feb. 1,
2007 (Demchick, N.).)

employees, (Trial Tr. 1073:13-1075:9, Jan. 25, 2007 (Talbot, D.)).[76]

Finally, the court has already reviewed the testimony of Kevin Moss

regarding the potential for volume increases in the market, which

suggests that Reese Hospital could have met its volume and revenue

targets if it had executed an operationally sound turnaround plan.

(Trial Tr. 3868:8-14, Feb. 22, 2007 (Moss, K.) ("what we have

is . . . a large market with ample opportunity to pick up

revenue").)

(IV)   Specific assumptions

Alberts challenges the reasonableness of the Reese Management

Team's Strategic Assumptions that Reese Hospital could improve its

Medicare case mix index from 1.36 to 1.4 and that salary-related

expenses could be limited to an amount not exceeding 42% of net

patient revenue by January 1, 1999.  (Pl. Facts ¶ 177; Pl. Rebuttal

---

[76]   Alberts argues that the Reese Management Team should not
have projected increased collections because the team did not
plan to outsource the collections department at the outset of the
ownership transfer, but rather believed unreasonably that it
could improve the collections practices of in-house employees.
(Pl. Rebuttal ¶ 422(g)(iv) (citing Trial Tr. 990:20-24, Jan. 25,
2007 (Talbot, D.)).)  Ultimately, it does not matter whether the
strategy to reach this projection adopted by the Reese Management
Team was reasonable so long as the projection was reasonable
based on what an objective purchaser with a reasonable strategy
for improving collections practices at Reese Hospital could have
achieved.  In this case, a reasonable purchaser would have
adopted Talbot's outsourcing strategy from the beginning, thereby
improving the collections practices at Reese Hospital in a manner
commensurate with the Reese Projections.

¶ 401(g).)[77]  The projected improvement in the Medicare case mix
index was premised on the notion that new management could teach
Reese Hospital employees better coding techniques.  (Trial Tr.
1586:5-1588:20, Jan. 30, 2007 (Talbot, D.); Bauer Dep. 96:15-97:1
(June 14, 2006).)  This assumption does not strike the court as
unreasonable on its face, and Alberts points to no evidence
suggesting to the contrary.  The court therefore finds as a factual
matter that this was a reasonable assumption (subject to the
court's earlier findings regarding the manner in which this
assumption was implemented in the Reese Projections).

The Strategic Assumption regarding salary-related expenses is
a different story.  As Neil Demchick pointed out at trial, the
percentage of revenue allocated for such expenses in the Reese
Projections is lower than that allocated in the M&P Projections,

---

[77]  In his rebuttal testimony, Neil Demchick asserted that
the Reese Projections included volume increases in the rehab unit
that could only be explained by recourse to the Reese Management
Team's Strategic Assumption that a new linear accelerator would
be purchased, thereby increasing volume in the rehab unit by 10%
per year, even though this projected growth was supposed to be
omitted from the Reese Projections.  (Trial Tr. 4249:15-25, March
1, 2007 (Demchick, N.).)  Demchick bases this opinion on the
10.65% increase in outpatient Medicare and Humana net patient
service revenue from 1997 to 1999 in the Reese September
Projections.  (Trial Tr. 4251:18-23, March 1, 2007 (Demchick,
N.).)  This projected increase of 10.65% is actually the result
of separate assumptions made by the Reese Management Team
regarding growth in outpatient volume as a result of the
relocation of the ER and projected increase in the number of
ambulatory surgeries at Reese Hospital, and has nothing to do
with the omitted Strategic Assumption regarding the procurement
of a linear accelerator.  (See Pl. Ex. 300 at TRUST/HCA-007585
(projecting 10.65202% increase in outpatient revenue in 1999 as a
result of increases in ER volume and ambulatory surgeries).)

and the M&P Report noted that the level of FTEs at Reese Hospital

was already below industry standards and that management would

expect, at best, to achieve only modest cost savings related to

staffing level changes.  (Trial Tr. 2054:17-2055:2, Feb. 6, 2007

(Demchick, N.); Pl. Ex. 236 at TRUST-HCA-027715.)  Kenneth Bauer

poured more cold water on this assumption:

> If you look at the comparative statistics across
> the industry, if you look at salaries, wages and
> benefits on a hospital-wide basis, 42 percent
> allocated to salaries, wages and benefits is the
> absolute low end of the range.  It is
> representative of the most efficient operating
> institutions in the country.  Many of the
> Columbia HCA hospitals operate at near that
> level.  The range extends from 42 percent to more
> typically into the 48, 49 percent with a number
> of institutions even operating at the 52 to 55
> percent range.
> Specifically[,] when you're looking at a 45-
> acre campus and 27-some buildings in a very
> inefficient environment, my observation would be
> to go to the most efficient operating pattern in
> the space of six weeks of operation is not a
> realistic assumption.

(Bauer Dep. 95:4-18, June 14, 2006.)

Bauer was not the only witness to testify about the unique

inefficiencies plaguing Reese Hospital.  Donna Talbot testified at

length about the unique challenges presented by the size of Reese

Hospital's campus and its impact on the Reese Management Team's

salary-related Strategic Assumptions:

> Q.  Was there anything that you found unique
> about the campus of that Michael Reese Hospital?
>
> A.  It was a huge campus.  It was very odd to me
> that, you know, you had all these overhead
> functions, like medical records, IT, accounting,

116

that literally were a mile from the main hospital
building where administration was.   They had
several different buildings stretched out through
the campus where patient care was related, and
you know, you would have, like, central supply
and pharmacy downstairs into one of those
tunnels, and they would have to distribute all of
these things, you know, to all these different
buildings.   It was really unlike anything I had
ever seen before.   Just from a size perspective.

. . .

Q.   Did that layout cause problems once the
hospital was purchased?

A.   Yes, it did.

Q.   What were those problems?

A.   It was a lot more costly than we had
anticipated.   We had had a plan to consolidate
the campus and ran into some problems with that.
Some of the old buildings had asbestos in it,
which obviously is a concern.   But I don't think
we really realized the impact on the number of
full-time equivalents that would be required
because of the sheer size of the campus.   From a
security perspective, a housekeeping perspective,
you know.   It was really, I think more than we
had imagined.

Q.   So those problems were not realized until
after the sale occurred, is that correct?

A.   That's--I mean, we obviously recognized it
was a huge campus.   I just don't think--I think
as we looked at, you know--one of our big
assumptions was we were going to reduce the
number of full-time equivalents so that the ratio
of salaries to net revenue was more comparable to
what you would see in the industry.   And as we
looked at reducing these FTEs, you know, we would
make reductions in housekeeping, security, I
don't think we realized how many people we would
have to keep on board simply because of the size
of the facility.
     I mean, you just think about transporting
patients to X-ray and lab, you know, in a

117

> facility that size, you know, there are costs
> associated with that, having the place cleaned.
> I don't think we really understood the true cost
> of that.

(Trial Tr. 876:25-878:13, Jan. 25, 2007 (Talbot, D.).)

Talbot returned to this issue later in her testimony:

> First of all, as I indicated before, the cost of
> operating at Michael Reese far exceeded what we
> estimated. We understood that, you know, we had
> a big campus and it was sprawled over, but I
> don't think we really understood, you know, how
> many more FTEs it took to run a campus of that
> size.
>
> . . .
>
> Q. When you were creating the strategic
> assumptions, Ms. Talbot, were you taking into
> account, at that point in time, that this is a
> very large campus?
>
> A. We understood it was a very large campus. I
> don't think we--what we didn't understand was we
> knew it would add cost. We didn't understand how
> much it would add cost. I don't think that we
> adequately factored in the size of the campus and
> what that would do; the fact that it required
> more FTEs than a majority of the departments,
> just by how far they had to travel to get from
> one place to another.

(Trial Tr. 987:12-17, Jan. 25, 2007, 1728:10-20, Jan. 30, 2007

(Talbot, D.).)

Taken together, this testimony suggests that a reasonable

purchaser would have known of the difficulties in cutting the FTE-

to-patient ratio at Reese Hospital as a result of the size of the

hospital's campus and the sprawl of its facilities, but that the

Reese Management Team failed to take these difficulties into

account fully in preparing the Reese Projections. The court

118

therefore agrees with Alberts that the Reese Management Team's

Strategic Assumption regarding salary-related expenses is

unreasonable.

### (C)  Demchick Projections

Finally, the court rejects the Demchick Projections.  Demchick

provided two very different set of projections.  The first set

assumed that Reese Hospital would only be able to return to its

1996 level of performance after one year (the "Turnaround

Scenario").  The second, more optimistic set of projections is

based on the assumption that Reese Hospital could reach the revenue

figures projected by the Reese Management Team after a year's delay

(the "Strategic Growth Scenario").  These projections are largely

not rooted in any kind of operational reality; consequently,

neither set of projections carries any weight with the court.

### (I)  Turnaround Scenario

Demchick's Turnaround Scenario differs from the Reese

Projections in four ways:

- It eliminates all of the capital expenditures included in the
  Strategic Assumptions, leaving only $2.5 million to be spent
  in 1998 and $9 million to be spent in 1999 for computer
  upgrades, (Trial Tr. 2108:8-16, Feb. 7, 2007 (Demchick, N.);
  Pl. Ex. 209 ¶ 61(b));

- It uses the projected personnel expenses set forth in the M&P
  Projections; i.e., 45% of net patient service revenue, (Trial
  Tr. 2083:12-14, Feb. 6, 2007 (Demchick, N.); Pl. Ex. 209
  ¶ 61(a)(2));

- It projects that Reese Corp. will be able to return Reese
  Hospital to 1996 revenue levels by 2000, (Trial Tr. 2083:14-
  21, Feb. 6, 2007 (Demchick, N.); Pl. Ex. 209 ¶ 60(a)); and

119

- It projects fixed expenses totaling $26,375,000.00 for 1999, (Trial Tr. 2106:18-25, Feb. 6, 2007 (Demchick, N.)).

With the possible exception of the use of the M&P projected personnel expenses, none of these "adjustments" improve the Reese Projections in any way.  Given that Demchick himself concedes that the Reese Management Team's Strategic Assumptions are reasonable in the abstract, it makes no sense to pretend that those strategies for growth would not be available to a hypothetical purchaser, as the Turnaround Scenario appears to contemplate.[78]  Nor does it make any sense to project fixed expenses for 1999 simply by "look[ing] and focus[ing]" on the historic averages at Reese Hospital and picking "whichever was the lower amount on the averages of 1995 to

---

[78]  Neil Demchick states in his expert report (the "Demchick Report") that the Turnaround Scenario "best reflect[s] a valuation of the hospital that is being purchased, Reese, before significant changes to operations planned by DCHC beyond simply the 'turnaround.'" (Pl. Ex. 209 ¶ 61(a).)  That is not the appropriate way to project earnings for a business enterprise where a reasonable purchaser would make operational changes (at least some of which would almost always require the infusion of capital) to the business once the purchaser assumed control of the business.  See Fishman et al., supra ¶ 505.6 (explaining that the business projections used in determining the enterprise value of a business using the DCF approach should be "based on the actual conditions that exist now and that are expected to exist in the future").

1998 or 1995 to 1997," as Demchick testified.  (Trial Tr. 2101:16-
18, Feb. 6, 2007 (Demchick, N.).)[79]

Indeed, the Turnaround Scenario is flawed in its very
conception because it assumes that Reese Hospital would return to
its 1996 level of performance by the year 2000 when, in fact, such
a "scenario" is highly unlikely.[80]  If, as the Turnaround Scenario
contemplates, a hypothetical purchaser would not infuse capital
into Reese Hospital, it stands to reason that the hospital would
never be able to return to its 1996 level of performance because

_____

[79]  Demchick testified that he used the lowest historical
average because he "tried to be more conservative" in his
approach, (Trial Tr. 2101:20-21, Feb. 6, 2007 (Demchick, N.)),
but the net effect of his approach--focusing solely on historic
expense totals with respect to fixed expenses while using
different historic information in projecting revenue and variable
expenses--is to create an arbitrary mishmash of numbers that does
not and could not reflect the market conditions in the area
surrounding the hospital at the time of the Reese Transfers or
the operational reality of the hospital as of the Transfer Date.

[80]  Demchick indicated at trial and in his expert report
that he used Reese Hospital's 1996 figures as the target revenue
for his Turnaround Scenario because he assumed that Reese
Hospital would "be able to return to the level that HCA was
operating the hospital at in 1996, which was before the decline
started, or even to the 1997 level plus about 3 percent per year
in patient revenues."  (Trial Tr. 2083:12-21, Feb. 6, 2007
(Demchick, N.); see also Pl. Ex. 209 ¶ 61(a).)  As the court
previously indicated, the sale of Reese Hospital was not
announced until December of 1997, so any effect that the
announcement of the sale would have had on the hospital's
performance that year would be minuscule at best.  The point is
moot in any event because a hypothetical purchaser armed with the
Reese Management Team turnaround plan would not have decided by
fiat that revenue at the hospital would reach a specific total
from a prior year and then reverse engineer its projections to
reach that goal, but rather would have projected increases in
volume and cuts in expenses based on operational assumptions and
calculated net earnings accordingly.

the same conditions that led to the decline in the hospital's
performance (the changed emphasis in the health care industry from
inpatient to outpatient care, the drift of Humana-associated
physicians to Mercy, the deterioration of the facilities on campus,
etc.) would persist.  A hypothetical purchaser might be able to
implement cost-cutting measures that would stem or even partially
reverse the negative cash flow at Reese Hospital in the months
immediately preceding the sale of the hospital, but it could not
have stopped the "steady ratcheting down" of the hospital's
condition "over the course of two-and-a-half decades."  (Beckmann
Dep. 71:6-7, Apr. 12, 2007.)

On the other hand, if a hypothetical purchaser were able to
expend new capital in the service of a sound turnaround plan, one
would not expect the revitalized hospital, with new management, a
different business plan, and improved facilities and equipment, to
post earnings exactly or even approximately equal to the earnings
posted by the hospital years prior except by coincidence.  The
hospital's net earnings might be more or less than the totals from
1996, but they would be different one way or the other because the

hospital itself would be different.  Either way, Demchick's use of 1996 figures is arbitrary.[81]

Demchick could have allayed the court's concerns by demonstrating that there was an operational basis for concluding that the revenue projected for Reese Hospital in 1999 should match the revenue collected in 1996.  But Demchick is, if anything, even less credible than Kevin Moss in terms of operational expertise. Aside from "a bit of consulting work that related not to actual turnarounds but to some strategic restructuring initiatives at two other hospitals," (Trial Tr. 2369:13-16, Feb. 8, 2007 (Demchick, N.)), Neil Demchick has no experience whatsoever in the area of hospital operations, (Trial Tr. 2369:11-2370:1, Feb. 8, 2007 (Demchick, N.)).  Demchick's lack of operational expertise in the hospital arena makes his arbitrary decision to project a return to 1996 revenue levels even more suspect.

---

[81] Demchick admitted at trial that he created the Turnaround Scenario under the assumption that the purchaser of the hospital would not undertake many of the turnaround strategies devised by the Reese Management Team because it would lack the cash to do so and because "that would be new things that [the purchaser] would do."  (Trial Tr. 1897:3-18, Feb. 1, 2007 (Demchick, N.).)  But a reasonable purchaser lacking sufficient capital to turn Reese Hospital into a profitable business would not have purchased the hospital in the first place, which is why a valuation expert should not consider whether the purchaser would be able to fund those capital expenditures that would make the hospital profitable.  (Trial Tr. 2483:9-19, Feb. 20, 2007 (Moss, K.).)  Rather, the capital expenditures necessary to make the purchased business profitable are subtracted from the business' projected EBITDA as part of the calculation of a projected net cash flow for the business, which is then discounted and added to the business' discounted terminal value to arrive at a final business enterprise value.  See part III.B.1.c.ii.(D), infra.

123

The Turnaround Scenario is really nothing more than a thought-experiment.  Its assumptions are arbitrary and its projections unrealistic.  The court finds as a factual matter that the projections arising from the Turnaround Scenario are unreasonable and unreliable for purposes of determining the fair market value of Reese Hospital as of the Transfer Date.

(II)  <u>Strategic Growth Scenario</u>

The differences between the Reese Projections and Demchick's Strategic Growth Scenario are more extensive.  They include:

* An adjustment to the projected amount of capital expenditures whereby such expenditures are spread out evenly over the course of 1999 and 2000, (Trial Tr. 2127:10-2128:3, Feb. 7, 2007 (Demchick, N.));

* An adjustment to the projected amount of revenue increases and expense decreases whereby the increases and decreases projected to occur in 1999 in the Reese Projections occur in 2000, with 1999 serving as a mid-point, (Trial Tr. 2084:7-12, Feb. 6, 2007 (Demchick, N.));

* An adjustment of projected salary-related expenses whereby such expenses are projected to consume 45% of total net revenue at Reese Hospital instead of 42% of net patient service revenue as projected by the Reese Management Team, (Trial Tr. 2092:13-15, Feb. 6, 2007 (Demchick, N.));

* An adjustment to projected sales and use tax expenses whereby such taxes are projected to consume 1.2% of net patient service revenue, (Trial Tr. 2096:7-2097:25, Feb. 6, 2007 (Demchick, N.));

* An adjustment to the projected amount of bad debt whereby such expense is projected to consume 3.6% of net patient service revenue, (Trial Tr. 2098:22-24, Feb. 6, 2007 (Demchick, N.));

* An adjustment to projected costs for repairs and maintenance, rents and leases, and utilities whereby such expenses are projected to be lower than the figures set forth in the Reese Projections, (Trial Tr. 2101:16-2103:24, Feb. 6, 2007 (Demchick, N.)); and

124

- An adjustment to projected other operating expenses whereby such expenses are projected to consume $3.2 million in 1999, (Trial Tr. 2105:13-16, Feb. 6, 2007 (Demchick, N.)).

Unlike his Turnaround Scenario, Demchick's Strategic Growth Scenario is rooted in a sound premise. The evidence in the record overwhelmingly indicates that it would take at least a year for Reese Corp. to implement the Reese Management Team's turnaround plan and begin to reap the benefits of that plan. Donna Talbot "believed it was going to take at least a year" for the operations at the hospital to turn around. (Trial Tr. 973:10-14, Jan. 25, 2007 (Talbot, D.); see also Trial Tr. 1084:5-8, Jan. 25, 2007 (Talbot, D.) ("It was my belief, based on what we were trying to accomplish that, over the period of a year, we would be able to implement our turn around plan, positively cash flow and begin rebuilding it to what it used to be." (emphasis added.)); Trial Tr. 1666:13-16, Jan. 30, 2007 (Talbot, D.) ("Q. Now, in your mind, at this period in time, how long did you think it would take to turn around the hospital again? A. As I recall, it was about a year.").) Mel Redman "believed it would take us two or three years to effect any kind of turn around," but admitted that "[i]n Scottsdale, in our corporate office, we would close the doors and doubt it if we could ever do that . . . ." (Trial Tr. 439:20-440:4, Jan. 23, 2007 (Redman, M.).) James Yerges, the Defendants' own expert witness, testified that "it is reasonable to expect that

it would take 14 months for this turn around to be complete."
(Trial Tr. 3214:12-14, Feb. 15, 2007 (Yerges, J.).)[82]

The court agrees with Demchick that the benefits of the
Strategic Assumptions should have been spread out over the course
of 1999 to account for the inevitable delay in implementing the
Reese Management Team's business plan.  But the manner in which
this delay has been incorporated into the Reese Projections by
Demchick in his Strategic Growth Scenario is too imprecise to be
accepted wholesale.  Demchick did not attempt to parse the Reese
Projections unit-by-unit to adjust the volume projections that
drive the projected revenue figures for Reese Hospital, nor did he
distinguish between Strategic Assumptions that could be
accomplished quickly (such as improvements in Medicare case mix
coding or bifurcation of the psychiatric unit)[83] and those that
could not (such as relocation of the ER).  He simply took the
revenue figures projected by the Reese Management Team for 1999,

---

[82]    Paul Tuft, the former DCHC and Reese Corp. CEO who
negotiated the purchase of Reese Hospital, gave the most
optimistic assessment as to how quickly the Reese Management
Team's turnaround plan would take.  He felt that it would take
six to 12 months to turn the hospital around.  (Trial Tr. 94:14-
22, 148:15-19, Jan. 19, 2007, 226:5-8, Jan. 22, 2007 (Tuft, P.).)

[83]    As the Defendants correctly point out, there is no
evidence in the record suggesting that it was unreasonable for
the Reese Management Team to assume that the bifurcation of the
psychiatric unit could occur as soon as the transfer of ownership
to Reese Hospital was complete.  (Defs. Rebuttal ¶ 174A.)  Ken
Bauer testified that the bifurcation of the unit did not occur
until May of 1999, (Bauer Dep. 97:8-15, June 14, 2006), but that
means only that Reese Corp. did not implement this part of its
turnaround plan for six months, not that a hypothetical purchaser
could not have implemented this strategy right away.

126

determined the rate of growth from an annualized 1998 figure to

that projected rate and the rate of reduction in variable expenses

as a percentage of net patient service revenue using the same two

sets of figures, and divided the rate of growth in revenue and

reduction in variable expenses as a percentage of net patient

service revenue in half to reach projected figures for 1999 and

assumed 100% of that growth would be accomplished in 2000.  (Trial

Tr. 2126:15-2127:3, Feb. 6, 2007, 2476:3-2477:25, Feb. 8, 2007

(Demchick, N.); Pl. Ex. 209 ¶ 62(b).)

There are two major problems with this practice.  The first is

that it fails to provide for any improvement at Reese Hospital

whatsoever in 1998.[84]  This is a major oversight because, as Donna

Talbot testified at trial, much of the downturn in cash flow at the

hospital over the course of 1998 was caused by the fact that the

hospital had been on the market for so long.  (Trial Tr. 869:2-9,

1084:23-1086:5, Jan. 25, 2007 (Talbot, D.).)  Indeed, the Reese

---

[84]  Demchick assumed that Reese Corp. would not be able to
improve the operations at Reese Hospital during the "stump
period" in 1998, so he ascribed a pro rata portion of Reese
Hospital's actual profits and losses from January 1, 1998,
through November 12, 1998, to that time period.  (Trial Tr.
1850:22-1851:25, Feb. 1, 2007 (Demchick, N.).)  He testified that
he made this assumption because that period coincides with "the
holidays, and we didn't expect that a lot would be happening
during the last 7 week period."  (Trial Tr. 2120:8-10, Feb. 6,
2007 (Demchick, N.).)  This assumption is unreasonable.  A
reasonable purchaser would implement its turnaround plan as soon
as possible because of the financial situation at the hospital as
of the Transfer Date.  A purchaser would not have waited until
the new year to make those changes necessary to improve the
hospital's performance.

  Demchick also erred in annualizing Reese Hospital's 1998
profits and losses by using data that would not have been
available to a hypothetical purchaser as of the Transfer Date.
(Trial Tr. 1853:19-1854:3, Feb. 1, 2007 (Demchick, N.).)  He
should have annualized the hospital's performance through October
31, 1998, and then used a pro rata amount of that annualized
number for his projections.  (Trial Tr. 1854:1-3, Feb. 1, 2007
(Demchick, N.).)  Demchick's flawed methodology reduced the
annualized total net revenue at Reese Hospital by approximately
$5 million.  (Compare Trial Tr. 1850:22-1851:9, Feb. 1, 2007
(Demchick, N.) ("Q. [H]ow did you come up with the annualized
revenue of [$]145,200,000?  A.  What we did is, . . . [w]e
decided the most appropriate way to annualize it was to look at
December 31st, 1998, and then basically back down to November
12th.") with  Trial Tr. 2469:12-15, Feb. 8, 2007 (Demchick, N.)
("Q.  Well, let's look at the--if you do that math,
[$]125,466,154 times 365 over 304, I'll represent to you that you
get [$]150,641,928.  A.  Okay.").)  Demchick attempted to justify
his use of a lower annualized revenue figure for 1998 by
asserting that "December is a slower month" for Reese Hospital
than the rest of the year, (Trial Tr. 2469:3-11, Feb. 8, 2007
(Demchick, N.)), but the court does not find this unsupported
post hoc explanation credible for the reasons set forth above.

128

Management Team used 1996 figures as the starting point for their

patient day projections precisely because they believed that Reese

Hospital's year in ownership limbo artificially depressed the

hospital's performance in late 1997 and 1998.

This analysis is reasonable.  As Kevin Moss explained in his

direct testimony:

> The hospital facility was up for sale, it can
> create uncertainty with respect to the doctors
> and that can cause declines within the facility.
> And that's something that is very commonly seen
> within the industry and it's something that
> certainly was having an impact on this hospital
> facility at that point in time.

(Trial Tr. 3433:2-9, Feb. 20, 2007 (Moss, K.).)[85]  The court has

little regard for Moss's testimony that Reese Hospital could have

reached the revenue figures set forth in the Reese Projections, but

that does not mean that a hypothetical purchaser of Reese Hospital

should not have expected to make _any_ improvements in the hospital's

operations during the "stump period" of 1998.

The second major flaw in Demchick's Strategic Growth Scenario

is that it assumes that a twelve-month delay in reaching the Reese

Management Team's Strategic Assumptions would translate into a

twelve-month delay in reaching the revenue and expense figures (as

---

[85]   Moss expanded on this point later on in his testimony:

> When it's known that a facility is on the
> market, typically, a transaction can occur
> fairly quickly when a hospital is put on the
> market.  And as you can see by the large
> volume of transactions that have been out
> there, it was an active market, so you could
> put a hospital up for sale and move out of it
> fairly quickly and so you could have a
> seamless transition with your physicians.
>       When we've had a protracted sale, the
> physicians become concerned.  Physicians are
> people that, you know, they want to know where
> they're admitting their patients, how they're
> going to be cared for, what equipment and
> support will be provided for them.  They want
> to make sure it's a good place for their
> patients and a good place for them to operate.
>       And during the time period when you have
> uncertainty with these facilities, they have
> admitting rights at other hospitals and they
> can send their patients to other facilities.
> And that's what happens to hospitals when you
> have this protracted sales process, it can
> damage volume.

(Trial Tr. 3435:22-3436:14, Feb. 20, 2007 (Moss, K.).)

130

modified by Demchick) set forth in the Reese Projections.  This is
not necessarily so, particularly with respect to variable expenses.
For example, there is no reason why it would take a full year for
Reese Corp. to improve the collection practices at Reese Hospital
to the point where bad debts would consume only 3.6% of net patient
service revenue as opposed to the 6.2% figure projected by
Demchick.  (Pl. Ex. 209 at Ex. H-1.)  For that matter, there is no
reason why all of the expenses labeled "variable" by Demchick
should be calculated as a percentage of net patient service revenue
when the Reese Projections contain much more detailed formulae for
calculating many of those expenses at an operational level.  (Pl.
Ex. 300 at TRUST/HCA-007628, TRUST/HCA-007630.)[86]

    The court also disagrees with Demchick's adjustment of the
Reese Management Team Strategic Assumption regarding salary-related
expenses from the 42% figure (as a percentage of net patient
service revenue) assumed by the Reese Management Team to a much

---

[86] Demchick noted that the Reese Management Team calculated
bad debt as a percentage of accounts receivable rather than as a
percentage of net patient service revenue, a practice that he
"questioned . . . a little bit," (Trial Tr. 2098:17, Feb. 6, 2007
(Demchick, N.)), but given Demchick's lack of operational
expertise in the health care arena and the extensive operational
experience of the Reese Management Team, (see Trial Tr. 2370:2-
2373:16, Feb. 8, 2007 (Demchick, N.) (establishing the eighty-six
years of cumulative healthcare experience held by the Reese
Management Team)), the court questions whether Demchick is really
in a position to critique the Reese Projections in this manner.
Moreover, the percentage of accounts receivable that the Reese
Management Team used in calculating bad debts was 20%, which
amounts to 3.4% of Reese Hospital's net patient service revenue,
or 0.02% less than the bad debt expense calculated by Demchick.
(Trial Tr. 2098:11-12, 22-24, Feb. 6, 2007 (Demchick, N.).)  The
difference is so minuscule as to be irrelevant.

higher figure for 2000 (45% of total net revenue, or 47.07% of net patient service revenue).[87]  By simply declining to hire new FTEs in 1999 and 2000,[88] the hospital would have projected salaries totaling $68,162,245.73,[89] contract labor totaling $2,105,655.00 (using Demchick's percentage of total net revenue),[90] and employee benefits totaling $13,632,449.15,[91] for a grand total of $83,900,349.88. That amounts to 41.68% of net patient service revenue or 39.85% of

---

[87]  Demchick calculated variable expenses as a percentage of total net revenue (i.e., net patient service revenue plus other operating revenue) rather than as a percentage of net patient service revenue.  (Trial Tr. 2088:18-2089:11, Feb. 8, 2007 (Demchick, N.); Pl. Ex. 209 at Ex. J.)  He provided no explanation for this deviation from the methodology employed by the Reese Management Team.

[88]  It is unclear whether the Reese Management Team intended to lay off FTEs upon the transfer of Reese Hospital or simply believed that they could maintain the same number of FTEs as there were on the Transfer Date after patient volume started to grow. (Compare Trial Tr. 878:5-11, Jan. 25, 2007 (Talbot, D.) ("one of our big assumptions was we were going to reduce the number of full-time equivalents") with Pl. Ex. 300 at TRUST/HCA-007627 (projecting salaries for 1998 and 1999 using the 1997 figure for total FTEs at Reese Hospital).)

[89]  The court arrived at this figure by using the methodology set forth in the Reese September Projections, (Pl. Ex. 300 at TRUST/HCA-007627), with inflation added for the year 2000.

[90]  The Reese September Projections do not set forth a discernible methodology for calculating contract labor, forcing the court to use Demchick's method instead.

[91]  The court used the Reese Management Team's methodology for calculating employee benefits rather than Demchick's method. Demchick projected employee benefits as totaling $14,739,587.00 in 2000, (Pl. Ex. 209 at Ex. H), which would lead to a revised total of $85,007,487.73.  That amounts to 42.23% of net patient revenue as projected by Demchick for 2000 or 40.38% of total net revenue as projected by Demchick for 2000.

132

total net revenue, figures right in line with the Reese Management Team's expectations.

The court does not mean to suggest that Reese Hospital could have increased its volume to the levels projected by the Reese Management Team or even by Demchick without hiring additional FTEs. Indeed, the court agrees with Demchick that the Strategic Assumption regarding salary-related expenses as a percentage of net patient service revenue is unreasonable. But that does not mean that the court accepts Demchick's 45% figure as reasonable, either. If HCA had been able to limit Reese Hospital's salary-related expenses to 45% of net patient service revenue, as it did in 1996, (Pl. Exs. 137 at HCA/MR 08017; 219 at Ex. J), it stands to reason that a well conceived, properly executed turnaround plan would eventually produce even better results.

Demchick's Strategic Growth Scenario has some good ideas (delay the growth projected by the Reese Management Team to account for the delay in implementation of the team's turnaround plan, adjust projected salary-related expenses to reflect more reasonable expectations, etc.), but it executes those ideas in very poor fashion. Some of the adjustments, such as the decision to project bad debts as 6.2% of total net revenue in 1999 or the decision to project salary-related expenses as 45% of total net revenue for 2000, seem more the product of a desire to achieve a lower projected EBITDA figure for the hospital than an objective analysis of the reasonableness of the Reese Management Team's Strategic

133

Assumptions.  The court finds that the projections derived from this scenario are unreasonable and should not be used in determining the business enterprise value of Reese Hospital as of the Transfer Date.

(D)  <u>Modified projections</u>

The court's findings of fact with respect to the M&P, Reese, and Demchick Projections leave it with two options.  First, the court could conclude that there are no credible projections from which it can derive a business enterprise value, and that the court's conclusion with respect to the fair market value of Reese Hospital on November 12, 1998, under the income approach should be that no such value can be ascertained.  The court would then be left to determine the hospital's fair market value using the "cost" and "market" approaches to valuation, or to rule that a hypothetical purchaser would have relied largely on a discounted cash flow valuation, and that, absent a reliable DCF valuation, Alberts has not proven what a hypothetical purchaser would have paid for Reese Hospital.

The more arduous choice would be to credit the Reese Projections in part and then modify the projections consistent with the evidence presented at trial--to attempt, as best the court can, to correct the Reese Management Team's mistakes.  This approach is fraught with peril, for the court is a simple factfinder, not a hospital operations expert, and the Reese Projections "ha[ve] a lot of detail behind them."  (Trial Tr. 3479:19-20, Feb. 20, 2007

134

(Moss, K.).)  The court is not an appraiser and has no desire to play that role for purposes of this proceeding.

Nevertheless, the court finds that it can and should make certain adjustments to the Reese Projections in this instance.  It would be inappropriate for the court to rule against Alberts on this dispositive factual issue simply because it is time consuming for the court to make proper factual findings.  And the projections, while dense, are intelligible and susceptible to modification; _i.e._, the court can incorporate its factual findings with respect to the Strategic Assumptions that informed the projections into the projections themselves.  Under the circumstances, modifying the Reese Projections to reflect the court's factual findings with respect to the Reese Management Team's Strategic Assumptions yields the fairest and most honest factual findings that the court can make.

The court therefore finds as a factual matter that the Reese Management Team Strategic Assumptions are reasonable subject to the specific factual findings listed below in summary form, and adopts the Reese Projections as reasonable business projections for Reese Hospital as of the Transfer Date as modified below:

• For the reasons set forth in the court's discussion of the Reese Projections, the court finds as a factual matter that a hypothetical purchaser would use (properly) annualized 1998 figures as the starting point for its projections.

• Based on the testimony of Donna Talbot and Kevin Moss, the court finds as a factual matter that a well-conceived, properly executed turnaround plan put into effect on November 12, 1998, would have returned Reese Hospital to its 1997 level

135

of volume by the end of the "stump period" in 1998. (Trial Tr. 869:2-9, 1084:23-1086:5, Jan. 25, 2007 (Talbot, D.); 3433:2-9, 3435:22-3436:14, Feb. 20, 2007 (Moss, K.).) The court therefore finds as a factual matter that a hypothetical purchaser would have projected net patient service revenue at Reese Hospital for the "stump period" of 1998 as a prorated average of the annualized figures for 1998 (based on the last 1998 data available before the Transfer Date, the October 31, 1998, year-to-date data) and the actual figures from 1997.[92]

• Based on the testimony of Donna Talbot, Mel Redman, and James Yerges, the court finds as a factual matter that it would have taken eighteen months from January 1, 1999, for Reese Hospital to have achieved the Reese Management Team's Strategic Assumptions with respect to volume growth except insofar as volume growth was predicated on the relocation of the ER. (Trial Tr. 973:10-14, 1084:5-8, Jan. 25, 2007, 1666:13-16, Jan. 30, 2007 (Talbot, D.); Trial Tr. 439:20-440:4, Jan. 23, 2007 (Redman, M.); Trial Tr. 3214:12-14, Feb. 15, 2007 (Yerges, J.).) The court therefore finds as a factual matter that a hypothetical purchaser would have reduced the volume increases projected by the Reese Management Team to account for this eighteen-month delay.

• For the reasons set forth in the court's discussion of the Reese Projections, the court finds as a factual matter that it would have taken one year from January 1, 1999, for Reese Corp. to have relocated the ER. See part III.B.1.c.i.(B), supra. The court therefore finds as a factual matter that a hypothetical purchaser would not have included the upward adjustments for volume anticipated to occur as a result of the ER relocation until 2000.

• For the reasons set forth in the court's discussion of the Reese Projections, see part III.B.1.c.i.(B), supra, the court finds that it was unreasonable for the Reese Management Team to have expected to be able to renegotiate its payment arrangement with Humana at better rates. The court therefore finds as a factual matter that a hypothetical purchaser would not have projected an increased reimbursement rate for Humana cases in the outpatient unit.

_____

[92] The court would have preferred to craft projections averaging the volume levels at Reese Hospital between the Transfer Date of November 12, 1998, year-to date figure annualized for 1998, and 1997, but the Transfer Date year-to-date numbers were not included in the record, and likely would not have been available to a hypothetical purchaser.

- Based on the deposition testimony of Ken Bauer, the court concludes as a factual matter that a reasonable purchaser would not have spent any money on marketing Reese Hospital during the "stump period" of 1998.  (Bauer Dep. 104:5-22, June 14, 2006.)  The court therefore finds that a hypothetical purchaser would not have projected any expenses for marketing in the "stump period" of 1998.

- As a corollary to the findings set forth above, the court finds as a factual matter that a reasonable purchaser would have spent the amounts contemplated in the Reese Management Team Strategic Assumptions for marketing over an eighteen-month period beginning on January 1, 1999.  The court therefore finds that a hypothetical purchaser would project marketing expenses for 1999 equal to a prorated amount of the expenses set forth in the Reese Management Team Strategic Assumptions and for 2000 would have projected an average of the prorated amount of such expenses and the monthly expenses projected by the Reese Management Team to occur in 2000.

- Based on the lack of any evidence presented at trial suggesting that Reese Corp. could have renegotiated the costs of the insurance contracts held by Reese Hospital for the "stump period" of 1998, the court finds as a factual matter that the insurance rates for the hospital would have remained the same during that time frame.  The court therefore finds that a hypothetical purchaser would not have projected lower insurance rates for Reese Hospital during the "stump period" of 1998.

- For the reasons set forth above, the court finds as a factual matter that a hypothetical purchaser would use (properly) annualized 1998 figures as the starting point in determining the number of projected equivalent inpatient days ("EIPDs") for 1998.  Given the absence of any evidence in the record that would allow the court to calculate an annualized figure of EIPDs for 1998, the court finds as a factual matter that the most accurate estimation of the annualized number of EIPDs at Reese Hospital as of the Transfer Date is a figure

137

reflecting 87.25% of the EIPDs for 1997.[93]  The court therefore finds as a factual matter that a hypothetical purchaser would use 87.25% of the actual 1997 EIPD figures for Reese Hospital as its starting point in determining projected EIPDs for 1998.

• For the reasons set forth above, the court finds as a factual matter that it would have taken eighteen months from January 1, 1999, for Reese Hospital to have achieved the Reese Management Team's Strategic Assumptions with respect to EIPD growth.  (Trial Tr. 973:10-14, Jan. 25, 2007, 1666:13-16, Jan. 30, 2007 (Talbot, D.); Trial Tr. 439:20-440:4, Jan. 23, 2007 (Redman, M.); Trial Tr. 3214:12-14, Feb. 15, 2007 (Yerges, J.).)  The court therefore finds as a factual matter that a hypothetical purchaser would have reduced the volume increases projected by the Reese Management Team to account for this eighteen-month delay.

• For the reasons set forth in the court's discussion of the Reese Projections, see part III.B.1.c.i.(B), supra, the court finds as a factual matter that a well-conceived, properly executed turnaround plan would have been able to reduce variable expenses at Reese Hospital, but that this plan would not have been fully effective until January 1, 1999.  The court therefore finds as a factual matter that a hypothetical purchaser would have reasonably projected any decrease in costs-per-patient at Reese Hospital for the "stump period" of 1998 as a prorated average of the annualized figures for 1998 (based on year-to-date figures as of October 31, 1998) and the Reese September Projections for the last three months of 1998.

• For the reasons set forth in the court's discussion of the Reese and Demchick Projections, the court finds as a factual

---

[93]  The court arrived at the discount percentage of 87.25% as follows.  First, the court determined the difference between 1996 EIPDs totals and 1997 EIPDs totals as a percentage decrease: the result of this calculation is 11.59 percent.  The court then multiplied this figure by 110% to account for the increasingly steep decline of the hospital's performance in 1998.  (This latter percentage was determined by calculating the decline in net patient service revenue from 1996 to 1997, comparing the difference in revenue to the difference in EIPDs totals for the two years, and then using the same ratio of percentage decline in net patient service revenue to percentage decline in EIPDs totals from 1996 to 1997 to arrive at an estimated percentage decline in EIPDs in 1998 using the percentage decline in net patient service revenue from 1997 to the annualized figure for 1998.)  The court subtracted the result (12.75%) from 100 to arrive at a percentage (87.25%) of 1997 EIPDs totals for 1998.

matter that a well conceived, properly executed turnaround plan could have reduced the FTE-to-patient ratio at Reese Hospital to a greater extent than that projected by McGladrey & Pullen, but to a lesser extent than that projected by the Reese Management Team, see part III.B.C.1.i.(B)-(C), supra, and that the salaries for any given year would never be less than the cost of maintaining the salaries of the existing number of FTEs as of the Transfer Date in any event.  The court therefore finds as a factual matter that a hypothetical purchaser would reasonably project that once the turnaround plan was fully implemented, salaries and wages at Reese Hospital would be the larger of (1) 35.31% of net patient service revenue or (2) the costs of maintaining, as of the anticipated transfer date, the number of FTEs set forth in the Reese September Projections at the hours per pay period and wage rate per hour (plus periodic inflation) set forth in those same projections.  (Pl. Ex. 300 at TRUST/HCA-007627).[94]

- As a corollary to this finding, the court finds as a factual matter that projected salaries for the "stump period" in 1998 would match the salaries projected for the last three months in 1998 in the Reese September Projections once those projections were prorated for the shorter "stump period" in 1998.

Based on these specific factual findings, the court finds as a factual matter that a hypothetical purchaser would reasonably

---

[94]   The 35.31% figure represents the average of the percentage of net patient service revenue projected to be consumed by salaries and wages in 1999 in the second version of the M&P Projections (approximately 36.87%) and the percentage of net patient service revenue projected to be consumed by salaries and wages in 1999 in the Reese October Projections (33.75%).

project the following revenue for Reese Hospital from November 12,

1998, through December 31, 2002:[95]

|  | 11/12/98-<br>12/31/98 | 1999 | 2000 | 2001 | 2002[96] |
|---|---|---|---|---|---|
| Net Patient Service Revenue | $20,005,551.26 | $162,587,960.45 | $181,038,031.12 | $202,703,867.02 | $214,608,759.36 |
| Other Operating Revenue | $1,037,069.04 | $8,580,737.42 | $10,292,000.00 | $11,335,472.63 | $11,833,039.26 |
| Total Net Revenue | $21,042,620.31 | $171,168,697.88 | $191,330,031.12 | $214,039,339.64 | $226,441,798.62 |

Further, the court finds as a factual matter that a

hypothetical purchaser would reasonably project the following

expenses for Reese Hospital from November 12, 1998, through

December 31, 2002:

---

[95] The calculations made by the court to arrive at the figures listed below were made on Excel spreadsheets that are not easily appended to the pdf version of this memorandum decision that is being signed electronically for entry by the clerk. The court will therefore list only the final results of those calculations in these findings of fact and conclusions of law, but will transmit to the parties the spreadsheets and will direct the clerk of the court to maintain a disk containing the spreadsheets as an exhibit in the proceeding (incorporated by reference into this memorandum decision), and to post the spreadsheets on the court's website so that they are available to the public for viewing.

[96] Projections should be made only "until a stabilized level of operations (growth and sustainable profit margins) is achieved." Fishman et al., supra, ¶ 505.27. "This level will usually be reached when future operations are not expected to differ from normal operations . . . except as a result of normal growth." Id. Under the court's projections, that year is 2001. However, the court must also calculate a terminal value and a terminate net cash flow for Reese Hospital, which requires the projection of revenue and expenses for the year following the first year of stabilized operations at the hospital, i.e., 2002. See part III.B.1.c.iv., infra.

140

|  | 11/12/98-12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| **Fixed Costs** | | | | | |
| Repairs & Maintenance | $698,672.94 | $4,830,090.24 | $4,974,992.95 | $5,124,242.74 | $5,277,970.02 |
| Rents & Leases | $400,391.09 | $3,071,979.12 | $3,164,138.49 | $3,259,062.65 | $3,356,834.53 |
| Utilities | $649,887.30 | $5,382,047.55 | $5,543,508.97 | $5,709,814.24 | $5,881,108.67 |
| Other Professional Fees | $33,483.33 | $256,899.17 | $264,606.14 | $272,544.33 | $280,720.66 |
| Marketing Expense | $0.00 | $1,442,000.00 | $831,725.00 | $178,190.00 | $183,535.70 |
| Other Taxes (Real Estate) | $193,229.03 | $1,482,539.85 | $1,527,016.05 | $1,572,826.53 | $1,620,011.33 |
| Insurance | $1,147,723.29 | $4,202,400.00 | $4,397,255.40 | $4,602,083.47 | $4,817,431.00 |
| Depreciation & Amortization | $3,194,800.00 | $9,083,000.00 | $10,652,000.00 | $11,120,000.00 | $11,586,000.00 |
| Other Operating Expenses | $566,960.63 | $4,276,492.50 | $4,567,270.48 | $4,871,957.72 | $4,950,447.21 |
| **Total Fixed Expenses** | $6,885,147.61 | $34,027,448.43 | $35,922,513.48 | $36,710,721.67 | $37,954,059.10 |
| **Variable Costs** | | | | | |
| Salaries & Wages | $8,704,816.44 | $66,176,937.60 | $68,162,245.73 | $71,567,842.03 | $75,771,054.67 |
| Contract Labor | $597,047.68 | $2,965,946.75 | $3,302,514.89 | $3,697,745.36 | $3,914,915.66 |
| Employee Benefits | $1,784,922.61 | $13,235,387.52 | $13,632,449.15 | $14,313,568.41 | $15,154,210.93 |
| Professional Fees | $1,682,837.25 | $12,140,340.00 | $13,970,585.96 | $15,981,141.90 | $17,593,340.68 |
| Supplies & Other | $2,742,195.97 | $23,798,567.97 | $26,227,299.52 | $28,783,622.88 | $30,599,332.50 |
| Other Taxes (Sales & Use) | $119,317.72 | $915,455.76 | $942,919.43 | $971,207.02 | $976,033.81 |

141

| | | | | |
|---|---|---|---|---|
| Contract Services | $3,046,059.83 | $20,594,805.75 | $22,640,133.19 | $24,715,409.65 | $26,221,712.32 |
| Bad Debts | $1,306,567.77 | $5,749,399.46 | $6,401,826.77 | $7,167,969.27 | $7,588,947.43 |
| Total Variable Costs | $19,983,765.28 | $145,576,840.81 | $155,279,974.64 | $167,198,506.51 | $177,819,548.00 |
| Total Operating Expenses | $26,868,912.89 | $179,604,289.24 | $191,202,488.12 | $203,909,228.18 | $215,773,607.11 |

Combining these projections, the court finds as a factual matter that a hypothetical purchaser would reasonably project the following EBIT for Reese Hospital from November 12, 1998, through December 31, 2002:

| | 11/12/98- 12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Total Net Revenue | $21,042,620.31 | $171,168,697.88 | $191,330,031.12 | $214,039,339.64 | $226,441,798.62 |
| Total Operating Expenses | $26,868,912.89 | $179,604,289.24 | $191,202,488.12 | $203,909,228.18 | $215,773,607.11 |
| EBIT | -$5,826,292.58 | -$8,435,591.36 | $127,543.00 | $10,130,111.47 | $10,668,191.52 |

ii.   Net cash flow

The second step in determining the enterprise value of a business is to ascertain its net cash flow for each of the years in which projections are made.  To arrive at this figure, the factfinder must add projected depreciation and amortization to and subtract projected income taxes, net working capital expenditures, and capital expenditures from the projected EBIT.  Fishman et al., supra, ¶¶ 505.25, 505.39-505.43 & Ex. 5-20.  (Trial Tr. 2120:18-

2121:12, Feb. 6, 2007 (Demchick, N.); Defs. Ex. JV at Ex. 2-8-2-9.)
The court addresses each of these components of the net cash flow
equation in turn.

(A)  Depreciation and amortization

Moss and Demchick provided different projections for
depreciation and amortization in their respective DCF analyses.
Moss adopted the Reese Management Team projected figures as his
own; Demchick created his own figures supposedly "based upon Reese
projections," (Pl. Ex. 209 at Ex. I n.5), but they are actually
much smaller in amount, (Pl. Ex. 209 at Ex. I (projecting
$5,894,390.00 in depreciation and amortization for 1999 as compared
with the $9,056,000.00 projected by the Reese Management Team)).
In the absence of any evidence in the record as to the lack of
reasonableness of the Reese Projections with respect to
depreciation and amortization,[97] the court finds as a factual matter
that these projections are reasonable and adopts them for purposes

---

[97] Demchick never explained why he deviated so sharply from
the Reese Projections, though he did describe his projections as
an "averaging" that "is not really relevant to the ultimate
answer" of Reese Hospital's business enterprise value because
"when you look at the valuation, it is not a cash flow item, so
it gets added back." (Trial Tr. 2104:16-20, Feb. 6, 2007
(Demchick, N.).)  This answer is not entirely correct:
depreciation and amortization is considered a fixed expense that
is deducted from a business's total net revenue as part of the
EBIT calculation, so the lower the depreciation and amortization,
the higher the business's EBIT will be, which, in turn, means
that the income taxes on that EBIT (assuming the EBIT is
positive) will be higher, as well.  See part IIIB.1.c.ii.E,
infra.

of the court's findings of fact with respect to the projected net
cash flow at Reese Hospital.

### (B)   Income taxes

"The company's expected federal and state tax rates should be
used" in projecting income taxes for the business subject to
valuation.  Fishman et al., supra, ¶ 505.25.  The Illinois
corporate income tax during the years for which the court's
projections have been made was 4.8%, 35 Ill. Comp. Stat. 5/201
(1990), and the federal rate was 34% for taxable income between
$335,000.00 and $10,000,000.00 and 35% for taxable income between
$10,000,000.00 and $15,000,000.00.  Fishman et al., supra, at Ex.
5-18.  The court therefore finds as a factual matter that a
hypothetical purchaser would reasonably project state and federal
income taxes totaling 38.80% of the projected EBIT for Reese
Hospital in 2002.[98]

### (C)   Net working capital

Both Moss and Demchick provided projections for capital that
would need to be invested at Reese Hospital to ensure a sufficient
amount of net working capital to finance accounts receivable,
inventory, and the like on a forward-going basis.  (Trial Tr.
2121:2-7, Feb. 6, 2007 (Demchick, N.).)  (Neither expert reduced

_____

[98]  There are no projected income taxes for Reese Hospital
in the years 1998-2001 because there are projected net operating
losses for the hospital in 1998 and 1999 that carry over through
2001.  (See Trial Tr. 2120:18-24, Feb. 6, 2007 (Demchick, N.)
(explaining that net operating losses are carried over from one
year to the next in determining whether there is taxable income
for a particular year).

144

the projected net working capital requirements by the approximately
$20,600,000 net working capital that Reese Corp. purchased from
HCA.  That $20,600,000 is taken into account by the court in the
reconciliation process.)  Demchick based his projections for net
working capital off of the historic average of net working capital
required as a percentage of total net revenue.  (Pl. Ex. 209 at Ex.
O.)  Moss used a percentage of total net revenue "based on [the]
guideline companies median level."  (Defs. Ex. JV at Ex. 2-Ex. 6.)
Moss gives no explanation as to which companies he used as a
guideline, and in any event Demchick's method of determining the
projected net working capital demands of the hospital reflects more
faithfully the idiosyncracies of Reese Hospital.  The court
therefore finds as a factual matter that a hypothetical purchaser
would reasonably project net working capital infusions to be the
difference between the prior year's net working capital and 10% of
the total net revenue for the year in which the projection of net
working capital is made.

### (D)  Capital expenditures

Demchick and Moss also differed with respect to projected
capital expenditures to made over the course of the five years
following the Transfer Date.  Moss's projections, "based on
projections from Doctors Community Healthcare Corporation," (Defs.
Ex. JV at Ex. 6 n.3), contemplate $9,730,000.00 in capital
expenditures in the "stump period" of 1998, $15,800,000.00 in
capital expenditures in 1999, and $4,000,000.00 in annual

145

expenditures thereafter.  (Defs. Ex. JV at Ex. 2-Ex. 6.)  Demchick

projects capital expenditures in the amount of $3,036,986.00 in

1998, $19,350,000.00 in 1999, $10,350,000.00 in 2000, and

$4,000,000.00 in the years thereafter, (Pl. Ex. 209 at Ex. N-1).

Neither of these projections strike the court as reasonable.

Added together, Moss's projected capital expenditures total

$37,530,000.00.  This is $6.67 million <u>less</u> than the capital

expenditures contemplated in the Reese Management Team Strategic

Assumptions.[99]  Even if one were to assume that Reese Corp. would

not make an expenditure of $4 million in 1998, the capital

expenditures projected by Moss do not meet the requirements of the

Strategic Assumptions.

Demchick's projections are no better.  His Turnaround Scenario

assumes that, except for computer upgrades, all capital

expenditures will be spent evenly over the course of 1999 and 2000.

(Trial Tr. 2127:11-2128:21, Feb. 6, 2007 (Demchick, N.); Pl. Ex.

---

[99]  The Reese Management Team assumed that $1.2 million
would be spent on cardiac catheterization equipment in 1998, $2.5
million would be spent on computer upgrades in 1998 and $9
million spent in 1999, $6 million would be spent on a linear
accelerator in 1999, $2.5 million would be spent to relocate the
ER in 1998, $1 million would be spent on a 25-bed SNF unit in
1999, $2 million would be spent on cosmetic enhancements in 1998,
and $4 million would be spent each year for miscellaneous needs.
(Pl. Ex. 115; <u>see also</u> Trial Tr. 1890:12-15, Feb. 1, 2007
(Demchick, N.) (explaining that the Reese Management Team
projected $4 million in capital expenditures every year in
addition to the expenditures contemplated in the Strategic
Assumptions); Defs. Ex. JV at Ex. 2-Ex.6 (projecting $4 million
in annual expenditures every year after 1999).)  These
expenditures total $44.2 million
(1.2+2.5+9+6+2.5+1+2+4+4+4+4=44.2).

209 at Ex. N-1.)  This projection is unreasonable: a hypothetical purchaser with sufficient capital to purchase Reese Hospital would expend capital as quickly as possible to achieve operational turnaround more quickly, and would presumably prioritize some projects (e.g., purchasing new cardiac catheterization equipment) over others (e.g., the construction of an SNF unit).  The Strategic Assumptions contain just this sort of prioritization.  (See Pl. Ex. 115 (assuming that some expenditures will be made in 1998 and others in 1999).)

Moreover, both Moss and Demchick project capital expenditures for projects that were not included in the Reese Projections without modifying those projections to account for the benefits one would expect from the omitted projects.  (Trial Tr. 3485:19-3486:17, Feb. 20, 2007 (Moss, K.) ("Q. . . . [D]id you include the six million as part of the capital expenditures on Exhibit 6 to your report?  A.  The six million is in there.  Q. . . . [D]o the . . . DCHC projections account for the increased revenue resulting from that capital expenditure?  A.  No, you do not see those projections."); compare Pl. Ex. 209 at Ex. N-1 (projecting expenditures for, inter alia, 25-bed SNF unit) with Trial Tr. 4249:20-4250:5, March 1, 2007 (Demchick, N.) ("For the skilled nursing facility, the strategic assumptions are silent as to whether it's included or not.  But if we look through the projections, there does not appear to be any indication that it is included.").)  This is manifestly unreasonable.  A hypothetical

147

purchaser would not want to expend capital on projects so
speculative that the purchaser cannot even project any benefits
arising from those projects.  Capital expenditures of this nature
should have been removed from the expert witness' projections.

The court therefore finds as a factual matter that neither
Kevin Moss nor Neil Demchick accurately projected the capital
expenditures that a hypothetical purchaser would reasonably project
for the years following the Transfer Date.  Instead, the court
finds that the expenditures contemplated in the Strategic
Assumptions are reasonable and has created its own projections for
capital expenditures based on those assumptions with the following
modifications:

- For the reasons set forth above, the court finds as a factual
  matter that a hypothetical purchaser would not reasonably
  project capital expenditures towards the acquisition of a linear
  accelerator and 25-bed SNF unit in 1999.  See discussion, supra.
  Therefore, the court does not include these expenditures in its
  calculation of projected capital expenditures.

- The court finds as a factual matter that it would have taken
  until the end of 1999 for a hypothetical purchaser to relocate
  the ER at Reese Hospital because a project of that size and
  complexity would take approximately one year to complete at a
  minimum.  (See Bauer Dep. 53:19-25, June 14, 2006 (describing
  the ER relocation project as a project that "would have required
  a major renovation of existing space").)  The court therefore
  finds as a factual matter that a hypothetical purchaser would
  reasonably project capital expenditures totaling the amount
  contemplated in the Strategic Assumptions to be spread out over
  the "stump period" of 1998 and all of 1999.

- For the same reason, the court finds as a factual matter that it
  would have taken until the end of 1999 for a hypothetical
  purchaser to complete cosmetic enhancements to Reese Hospital,
  and therefore finds as a factual matter that a hypothetical
  purchaser would reasonably project capital expenditures totaling
  the amount contemplated in the Strategic Assumptions to be

148

spread out over the "stump period" of 1998 and all of 1999.  <u>See</u>
discussion, <u>supra</u>.

- Based on the agreement of the parties that the Reese Management
  Team contemplated annual capital expenditures of $4 million in
  addition to the expenditures listed in the Strategic
  Assumptions, (Defs. Ex. JV at Ex. 2-Ex.6; Pl. Ex. 209 at Ex. N-
  1), the court finds as a factual matter that a hypothetical
  purchaser would reasonably project miscellaneous capital
  expenditures equal to the prorated amount projected by the Reese
  Management Team for 1998 ($536,986.30) and miscellaneous
  expenditures totaling the amount projected by the team
  ($4,000,000.00) thereafter.

Based on the Reese Management Team's Strategic Assumptions as

modified above, the court finds as a factual matter that a

hypothetical purchaser would have projected capital expenditures

totaling $4,769,595.00 in 1998,[100] $16,967,391.30 in 1999,[101] and

$4,000,000.00 every year thereafter.

                    (E)    <u>Final net cash flow</u>

Based on the specific factual findings set forth above, the

court finds as a factual matter that a hypothetical purchaser would

reasonably project the following net cash flow adjustments for

Reese Hospital from November 12, 1998, through December 31, 2002:

_____

[100]   The court reached this figure by adding $1,200,000.00
projected for cardiac catheterization equipment, $2,500,000.00
projected for computer upgrades, $295,893.72 projected for
relocation of the ER (as modified by the court), $236,714.98
projected for cosmetic enhancements (as modified by the court),
and $536,986.30 for miscellaneous expenditures (as modified by
the court).

[101]   The court reached this figure by adding $9,000,000.00
projected for computer upgrades, $2,204,106.28 projected for
relocation of the ER (as modified by the court), $1,763,285.02
projected for cosmetic enhancements (as modified by the court),
and $4,000,000.00 for miscellaneous expenditures.

|  | 11/12/98-12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Depreciation & Amortization | $3,194,800.00 | $9,083,000.00 | $10,652,000.00 | $11,120,000.00 | $11,586,000.00 |
| Income Taxes | $0.00 | $0.00 | $0.00 | $0.00 | -$4,139,258.31 |
| Net Working Capital | -$21,937.09 | -$1,442,264.86 | -$2,016,133.32 | -$2,270,930.85 | -$1,240,245.90 |
| Capital Expenditures | -$4,769,595.00 | -$16,967,391.30 | -$4,000,000.00 | -$4,000,000.00 | -$4,000,000.00 |
| Total Cash Flow Adjustments | -$1,596,732.09 | -$9,326,656.17 | $4,635,866.68 | $4,849,069.15 | $2,206,495.79 |

Combining these figures to the projected EBIT for Reese Hospital calculated above, see part III.B.1.c.i, supra, the court finds as a factual matter that a hypothetical purchaser would reasonably project the following net cash flow at Reese Hospital from November 12, 1998, through December 31, 2002:

|  | 11/12/98-12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| EBIT | -$5,826,292.58 | -$8,435,591.36 | $127,543.00 | $10,130,111.47 | $10,668,191.52 |
| Total Cash Flow Adjustments | -$1,596,732.09 | -$9,326,656.17 | $4,635,866.68 | $4,849,069.15 | $2,206,495.79 |
| Net Cash Flow | -$7,423,024.67 | -$17,762,247.53 | $4,763,409.68 | $14,979,180.61 | $12,874,687.31 |

iii.   Weighted average cost of capital

The next step in the court's determination of the business enterprise value of Reese Hospital under the income approach is to determine the appropriate discount rate to apply to the projected net cash flow set forth above.  "[A] discount rate represents the total expected rate of return (stated as a percentage) that a buyer

150

(or investor) would demand on the purchase price of an ownership
interest in an asset (such as U.S. Treasury bills) given the level
of risk inherent in that ownership interest." Fishman et al.,
supra, ¶ 501.2. "A company's forecasted net cash flows or earnings
are discounted to a present value at the discount rate." Id.
¶ 501.3.

Both Demchick and Moss went beyond formulating a discount rate
to apply to the projected net cash flow at Reese Hospital by
considering both the cost of equity (the discount rate) and the
cost of debt to arrive at a weighted average cost of capital, or
"WACC." As Neil Demchick explained at trial, "[i]f you were doing
an equity value, you would only look at the cost of the equity, but
because we are doing a business enterprise value, it is the
weighted average cost of capital, which is a weighing of the cost
of equity and the cost of debt." (Trial Tr. 2109:5-9, Feb. 6, 2007
(Demchick, N.).) The cost of debt must be adjusted by the
applicable tax rate to arrive at an after-tax cost of debt.
Shannon P. Pratt et al., Valuing a Business: The Analysis and
Appraisal of Closely Held Companies 185 (4th ed. 2000). The cost
of capital and after-tax cost of debt is then weighted and averaged
to arrive at the WACC. Id.

(A)   Discount rate (cost of equity)

"[T]here are two primary techniques for determining a
company's discount rate--the build-up method and the [capital asset
pricing model ('CAPM')] method, which is based on guideline company

151

data." Fishman, et al., <u>supra</u>, ¶ 502.1. Demchick used the build-up method to derive a discount rate; Moss chose the CAPM method. (<u>See</u> Trial Tr. 2108:17-2119:16, 2129:15-2130:13, Feb. 6, 2007 (Demchick, N.) (explaining the process whereby Demchick arrived at his discount rate); Trial Tr. 3500:14-3502:12, Feb. 20, 2007 (Moss, K.) (explaining the process whereby Moss arrived at his discount rate); <u>see also</u> Pl. Ex. 209 at Ex. M-1 (showing the calculations made by Demchick to reach a discount rate); Defs. Ex. JV at Ex. 2-Ex. 8 (showing the calculations made by Moss to reach a discount rate).) The build-up method is "[t]he most commonly used method for the smaller, closely held company," Fishman et al., <u>supra</u>, ¶ 502.1, whereas "[a] method based on guideline company data [<u>i.e.</u>, the CAPM method] should be used instead of the build-up method whenever valid guideline company data can be found," <u>Id.</u> ¶ 503.1.

In this case, the build-up method is the appropriate method to determine the discount rate to be applied to the projected net cash flow at Reese Hospital because the companies used by Moss as guidelines for his CAPM method are not truly comparable to Reese Hospital. The build-up method requires the valuation consultant to determine the appropriate risk-free rate of return for a hypothetical investor, add a premium for extra risk assumed by the investor in purchasing equity, then add or subtract risk premiums from the resultant average market return for the business's industry and size, as well as for any other relevant risk factors. <u>Id.</u> ¶ 502.1, Ex. 5-7.

(I)  <u>Risk-free rate</u>

"The risk-free rate of return is the return an investor could obtain from a low-risk guaranteed investment." <u>Id.</u> ¶ 502.4. Demchick used a risk-free rate of 5.50% in calculating his discount rate. (Pl. Ex. 209 at Ex. M-1.) Moss used a risk-free rate of 5.46% in calculating his discount rate using the CAPM method. (Defs. Ex. JV at Ex. 2-Ex. 8.)[102]

"Most consultants use the 20-year U.S. Treasury yield to maturity as of the valuation date as the risk free rate because it most closely corresponds to the time horizon of many equity holders in closely held companies." <u>Id.</u>  The risk-free rate of return for the 20-year Treasury Bill, Constant Maturity Rate as of November 12, 1998, was 5.46%.  Federal Reserve Statistical Release H.15 Selected Interest Rates, http://www.federalreserve.gov/releases/h15/19981116/.  The court

---

[102]  The CAPM method "is applied in almost the same manner as the build-up method except that adjustments are made based on comparing the company being valued to the average guideline company rather than to the average S&P 500 company." Fishman et al., <u>supra</u>, ¶ 503.5.  This adjustment is made by multiplying the equity risk premium, discussed later, by a beta value that reflects market volatility.  <u>Id.</u> ¶ 503.10, Ex. 5-12. Consequently, there is no need for an industry adjustment (discussed later) to the average return derived from adding the risk-free investment rate to the modified equity risk premium, as there often is when using the build-up method.  <u>Id.</u> ¶ 502.21.

therefore finds as a factual matter that the appropriate risk-free
rate in calculating a discount rate is 5.46 percent.[103]

### (II)  Equity risk premium

"The equity risk premium is the extra return earned by an
average equity investor in excess of the return on long-term
Treasury securities."  Fishman et al., supra ¶ 502.7.  Demchick
used an equity risk premium of 7.80%.  (Pl. Ex. 209 at Ex. M-1.)
Moss used an equity risk premium of 5.88% in calculating his
discount rate using the CAPM method.  (Defs. Ex. JV at Ex. 2-Ex.
8.)  Demchick arrived at his equity risk premium by relying on data
set forth in Stocks, Bonds, Bills and Inflation 1998 Yearbook,
Ibbotson Associates, Inc. (1998) (the "Ibbotson 1998 Yearbook").
(Trial Tr. 2110:21-2111:12, Feb. 6, 2007 (Demchick, N.); Pl. Ex.
209 at Ex. M-1 n.2.)  Moss arrived at his equity risk premium by
relying on internal rates used at his accounting firm, Deloitte
Financial Advisory Services, LLP.  (Defs. Ex. JV at Ex. 2-Ex. 8.)

As Neil Demchick correctly noted at trial, the Ibbotson
yearbook "is sort of the Bible," (Trial Tr. 2111:10, Feb. 6, 2007
(Demchick, N.)), for determining equity risk premiums.  See Fishman
et al, supra, ¶ 502.7 (recommending use of the Ibbotson yearbook).

---

[103]  Demchick testified at trial that his risk-free rate of
5.50% "relates to the ten year treasury bond rate," (Trial Tr.
2110:11-13, Feb. 6, 2007 (Demchick, N.)), but his expert report
cites the 20-year rate as its source even though it uses the
percentage provided by the ten year rate, (Pl. Ex. 209 at Ex. M-
1).  This suggests that Demchick either rounded up the 20-year
rate or accidentally calculated his discount rate using the ten
year rate instead.

Moss himself relies on data provided by the Ibbotson 1998 Yearbook in determining the appropriate size premium to use in calculating the discount rate. <u>See</u> part III.B.1.c.iii.A.(IV), <u>infra</u>. The court prefers "the most used well-known and widely used" source for determining equity risk premiums, Fishman et al., <u>supra</u>, ¶ 502.7, over the internal rates used at Kevin Moss's place of employment. The court therefore finds as a factual matter that the appropriate equity risk premium to be used in calculating the discount rate is 7.80 percent.

(III)   <u>Industry risk premium</u>

Having determined the risk-free rate of return and the equity risk premium, the court must now determine the extent to which the average market return obtained by adding those rates should be adjusted to account for an industry risk premium. Fishman et al., <u>supra</u>, ¶ 502.18. "Industry risk represents the risks in the company's industry compared to the market as a whole." <u>Id.</u> ¶ 502.20. The industry risk premium takes into account the fact that "some industries have higher-than-average risk for investors, and other industries have lower-than-average risk." <u>Id.</u>

Demchick adjusted his average market return by subtracting 3.63% as a size premium. He explained that he reduced his average market return by this amount because "the health care industry is actually an industry that is not seen as [being as] risky as other industries or as the market as a whole," (Trial Tr. 2112:24-2113:1, Feb. 6, 2007 (Demchick, N.)), and specifically took the figure of

155

3.63% from the Ibbotson 1998 Yearbook, (Trial Tr. 2113:1-10, Feb. 6, 2007 (Demchick, N.)).  Moss did not provide an industry risk premium adjustment as part of his CAPM analysis.  See n.102, supra.

Demchick's analysis is sound, contradicts his client's interest in inflating the discount rate as much as possible, and is not disputed by any evidence in the record.  The court therefore finds that the average market return calculated by adding the appropriate risk-free rate of return to the appropriate equity risk premium should be reduced 3.63% to account for the appropriate industry risk premium.

(IV)  Risk premium for size

The average market return should also be adjusted for a risk premium relating to the size of the company that is being valued. Fishman et al., supra, ¶ 502.18.  Both Demchick and Moss cited Ibbotson as the source for their respective size adjustments, but they arrived at different figures.  Demchick used a size premium adjustment of 3.30%, (Pl. Ex. 209 at Ex. M-1), whereas Moss used a size premium adjustment of 5.40% in calculating his discount rate using the CAPM method, (Defs. Ex. JV at Ex. 2-Ex. 8).

The court agrees with both experts that the Ibbotson 1998 Yearbook is "[a] good starting point for determining a risk premium for the size of a company." Fishman et al., supra, ¶ 502.26.  The Ibbotson 1998 Yearbook provides size premiums for companies according to the amount of their market capitalization.  Ibbotson 1998 Yearbook, supra, at Table 7-6.  Different size premiums are

156

used depending upon the decile of market capitalization into which the company being valued falls.  Id.  The tenth, or lowest, decile assigned a size premium is reserved for companies with $130,402,000.00 in market capitalization or less.  Id. at Table 7-5.

The Reese Management Team anticipated that Reese Hospital would receive equity contributions in the amount of $10 million in 1999.  (Pl. Ex. 115.)  Although it is logical to assume that a hypothetical purchaser with more capital would be willing to invest more money than that in the hospital, it is not reasonable to assume that such a purchaser would invest more than twice the hospital's purchase price anytime soon after purchasing it.  The court therefore finds as a factual matter that the average market return calculated by adding the appropriate risk-free rate of return to the appropriate equity risk premium should be increased 5.36% to account for the appropriate risk premium for size.[104]

---

[104]  Demchick asserted in his expert report that he used a 3.3% size premium because he expected capitalization at Reese Hospital to be "below $261 million."  (Pl. Ex. 209 at Ex. M-1.) He therefore used a size premium assigned to the aggregation of the ninth and tenth deciles by Ibbotson.  Ibbotson 1998 Yearbook, supra, at Table 7-6.  But there is no reason why Demchick should have expected capitalization to rise above the tenth decile, and as a consequence no reason why he should not have used the size premium for that decile rather than the size premium for the aggregated ninth and tenth deciles.
   As best the court can tell, Moss simply rounded up the size premium for companies in the tenth decile in the Ibbotson 1998 Yearbook to arrive at his size premium of 5.4 percent.  The court sees no reason why the number should have been rounded up in such fashion, and declines to do so in finding the appropriate size premium as a factual matter.

(V)   <u>Specific company risk premium</u>

The final adjustment that the court needs to make is for risk factors specific to Reese Hospital.  Fishman et al., <u>supra</u>, ¶ 502.19.  "The determination of other risk factors . . . that should be considered in building up a . . . discount rate involves a great deal of judgment--perhaps more so than any other rate component."  <u>Id.</u> ¶ 502.33.  Based on the projections arising from his Strategic Growth Scenario, Demchick used a specific company risk premium of 12% to create a discount rate for his Turnaround Scenario.  (Trial Tr. 2129:15-2130:11, Feb. 6, 2007 (Demchick, N.); Pl. Ex. 209 at Ex. M-1.)[105]  Moss used a specific company risk premium of 23% to create a discount rate for the DCHC Projections using the CAPM method.  (Defs. Ex. JV at Ex.2-Ex.8.)

Moss's specific company risk premium of 23% reflects the comparatively higher probability that Reese Hospital would fail to meet the projections made by the Reese Management Team, whereas Demchick's lower premium of 12% reflects his modification to those projections by delaying revenue growth and expense reductions over the course of one year.  The court's findings of fact with respect to projected EBIT at Reese Hospital are even more conservative than

---

[105]   Demchick used a specific company risk premium of 8% in determining a discount rate for use in his Turnaround Scenario. (Trial Tr. 2113:15-2114:20, Feb. 6, 2007 (Demchick, N.).)  He used a higher premium for purposes of his Strategic Growth Scenario because that scenario assumed greater revenue growth and net cash flows than the Turnaround Scenario, and therefore was less likely to occur.  (Trial Tr. 2130:2-11, Feb. 6, 2007 (Demchick, N.); Pl. Ex. 209 at Ex. M.)

158

Demchick's Strategic Growth Scenario in most respects (e.g., the court finds as a factual matter that it would have taken Reese Hospital eighteen months to reach the volume levels projected by the Reese Hospital Team, whereas Demchick assumed that it would take the hospital one year to reach the revenue), but are less conservative in others (e.g., the court finds as a factual matter that Reese Hospital would have been able to reduce its salary-related expenses to lower levels than those assumed by Demchick). Given that Demchick testified that his specific company risk premium was probably too low, (Trial Tr. 2130:8-9, Feb. 6, 2007 (Demchick, N.)), the court finds as a factual matter that the average market return calculated by adding the appropriate risk-free rate of return to the appropriate equity risk premium should be increased by 13.50%, slightly more than the adjustment made by Demchick, to account for the appropriate specific company risk premium.

(B)  After-tax cost of debt

The court has already found as a factual matter that the appropriate income tax rate to be applied to the cost of debt is 0% for the years 1998-2001 and 38.8% for 2002.  See part III.B.1.c.ii.B, supra.  The only remaining question is whether the pre-tax cost of debt should be the 12.00% figure used by Demchick, (Pl. Ex. 209 at Ex. M-1), the 7.30% figured used by Moss, (Defs. Ex. JV at Ex. 2-Ex. 8), or a different figure altogether.

159

The court finds as a factual matter that the 7.30% figure used by Moss is the appropriate pre-tax cost of debt to use in calculating the WACC.  This figure is based on Moody's Baa corporate bond rate on November 12, 1998.  (Defs. Ex. JV at Ex. 2-Ex. 8.) Demchick, in contrast, admitted under cross-examination that he based his cost of debt on the interest rate charged by NCFE.  (Trial Tr. 2313:7-10, Feb. 7, 2007 (Demchick, N.) ("Q. . . . Now your pretax cost of debt, that I believe you selected based on the NCFE lending rate?  A.  Yes."); see also Pl. Ex. 209 at Ex. 54 (describing the cost of debt as "based upon" the "NCFE interest rate").)[106]  Demchick's use of the actual interest rate charged by NCFE was in error, as Kevin Moss explained at trial:

> Q.  Simply focusing on the borrowing rate, what is reflected there is 7.3 percent and the source is Moody's B corporate bond rate as of November 12, 1998.  Why did you select that borrowing rate for your cost of debt capital?
>
> A.  When doing the analysis, we are looking at what the typical buyer would do.  We are looking at the financing of the typical buyer in the market.  The discount rate is a blending of the equity rate and the debt rate.  In this case, the market data shows that the companies that were capitalized out there, the public companies were 60 percent equity, 40 percent debt.

---

[106]  Demchick suggested at trial that his 12% cost of debt reflected the lack of assets at the hospital.  (Trial Tr. 2551:17-2552:16, Feb. 9, 2007 (Demchick, N.).)  Even if the court were willing to credit this change in his approach, it would still reject the cost of debt selected by Demchick because the assets held by Reese Hospital would be more than sufficient to finance the purchase of the hospital assuming that the purchaser was able to invest a reasonable (i.e., market average) amount of capital.  See discussion, infra.

So, this 7.3 percent is based on somebody
coming in and capitalizing this business with 40
percent debt.

Q.  Why did you choose the Moody's B rate?

A.  The Moody's B rate represents a rate that is
not a junk quality of debt, but still a good
quality debt rate.  If you look at these assets,
just to give you a feel for the Reese business,
what this implies is a 40 percent debt load on the
facility.
     So, let's just say the facility is worth $80
million.  That is the enterprise value for the
facility, okay.  An $80 million facility, it is
easy to do the math on 40 percent debt on that.
That is going to be $32 million.  So, four times
the eight gets you to [$]32 million in debt.  So,
what the valuation analysis implies here and what
is used in the capital structure is it assumes
that the typical buyer, they pay an $80 million
price.  They finance it [$]32 million with debt
and the rest is financed with equity.
     Now, can they put [$]32 million in debt on
this facility at a B double A rate?
     Well, the facility has [$]29 million in
accounts receivable.  It has roughly another five
million in supplies [and] inventory and then you
get to the personal property and the real estate
values.  So, there is ample collateralizable value
there to have a B double A rate for somebody
looking at purchasing the facility.

(Trial Tr. 3512:15-3513:25, Feb. 20, 2007 (Moss, K.))

     The court has already found as a factual matter that the fair

market value of the net assets at Reese Hospital approximates

$57,985,984.  See part III.B.1.b.v, supra.  This implies that the

assets at Reese Hospital could have been used as collateral to

161

support a purchase price as high as $134,002,320.19.[107]  Any purchaser with a reasonable amount of investment capital could afford to purchase the hospital; therefore, the court finds as a factual matter that the Moody's Baa rate as of November 12, 1998, is the appropriate cost of debt to be used in calculating the WACC to be applied to the projected net cash flow at Reese Hospital.

(C)   <u>Debt-to-equity ratio</u>

Demchick and Moss used similar, though not identical, debt-to-equity ratios in crafting their respective WACCs.  Demchick relied on "levels of the industry during the time period per www.estatementstudies.com" to arrive at an applicable debt-to-equity ratio of 43.1% to 56.9 percent.  (Pl. Ex. 209 at Ex. M-1.)  Moss relied on "comparable company research" to arrive at a similar ratio of 40% to 60 percent.  (Defs. Ex. JV at Ex. 2-Ex. 8.)  In the absence of any evidence in the record as to which companies Moss used as his guidelines in formulating his debt-to-equity ratio, the court finds as a factual matter that Demchick's ratio of 43.1% debt to 56.9% equity is appropriate.

(D)   <u>Final WACC calculation</u>

Based on the foregoing factual findings, the court finds as a factual matter that the following calculation represents the

---

[107]   The court ascertained this amount by dividing the value of Reese Hospital's net assets by the percentage of the purchase price that a reasonable purchaser would finance through debt (in this case, 43.1% of the purchase price (<u>see</u> part III.B.1.c.iii.(C), <u>infra</u>)).

appropriate cost of equity to apply to the projected net cash flows at Reese Hospital from the "stump period" of 1998 through 2002:

| | |
|---|---:|
| Risk-Free Rate | 5.46% |
| Equity Risk Premium | + 7.80% |

| | |
|---|---:|
| Average Market Return | 13.26% |

| | |
|---|---:|
| Industry Premium Adjustment | -3.63% |
| Size Premium Adjustment | 5.36% |
| Specific Company Risk Premium Adjustment | + 13.50% |

| | |
|---|---:|
| Cost of Equity | 28.49% |

The court further finds as a factual matter that the following calculation represents the appropriate after-tax cost of debt to apply to the projected net cash flows at Reese Hospital from the "stump period" of 1998 through 2002:

| | 11/13/98-2001 | 2002 |
|---|:---:|:---:|
| Pre-Tax Cost of Debt | 7.30% | 7.30% |
| Income Tax Rate | x (1 - 0.00%) | x (1 - 38.80%) |

| | | |
|---|:---:|:---:|
| After Tax Cost of Debt | 7.30% | 4.47% |

Applying the appropriate debt-to-equity ratio to the cost of equity and after tax cost of debt, the court finds as a factual matter that the following calculation represents the appropriate equity portion of WACC and debt portion of WACC to apply to the

163

projected net cash flows at Reese Hospital from the "stump period" of 1998 through 2002:

|  | 11/13/98-2001 | 2002 |
|---|---|---|
| Cost of Equity | 28.49% | 28.49% |
| Percent of Equity | x 56.90% | x 56.90% |
| **Equity Portion of WACC** | **16.21%** | **16.21%** |
| After Tax Cost of Debt | 7.30% | 4.47% |
| Percent of Debt | x 43.10% | x 43.10% |
| **Debt Portion of WACC** | **3.15%** | **1.93%** |

Combining these weighted figures, the court finds as a factual finding that the following calculation represents the appropriate WACC to apply to the projected net cash flows at Reese Hospital from the "stump period" of 1998 through 2002:

|  | 11/13/98-2001 | 2002 |
|---|---|---|
| Equity Portion of WACC | 16.21% | 16.21% |
| Debt Portion of WACC | + 3.15% | + 1.93% |
| **WACC** | **19.36%** | **18.14%** |

iv.   <u>Terminal value</u>

The fourth step in the court's determination of the business enterprise value of Reese Hospital using the income approach is to ascertain a terminal value for the hospital.  Fishman et al., <u>supra</u>, ¶¶ 505.3, 505.45, Ex. 5-20.  The terminal value of a company is the

164

value of the company as of "the first full year after the company reaches a stabilized level of growth and sustainable profit margins." Id. ¶ 505.45. Although "[s]everal methods can be used to estimate the value of a company during the terminal year," id. at ¶ 505.46, "the one that is most often used by valuation consultants[] is the capitalization of the terminal year operations based on the Gordon Model." Id. The Gordon Model derives the terminal value of a company by dividing the terminal net cash flow (the first net cash flow resulting from a stabilized level of growth) by the discount rate less long-term growth. Id. at ¶¶ 505.46.

Kevin Moss used a different method for determining the terminal value of Reese Hospital. He multiplied the terminal EBITDA by a market multiple of five to arrive at a terminal value. (Trial Tr. 2502:23-3503:1, Feb. 20, 2007 (Moss, K.); Defs. Ex. JV at Ex. 2-9, Ex. 2-Ex. 6.) Moss explained his decision to use an EBITDA multiple as follows:

> I know that normally in an income approach,
> people think of, well, you have the discount
> rate that goes the whole period of the cash
> flows. The terminal value is the discount
> rate minus some growth assumption and that is
> the value of the business. But the problem
> you have in a business like this is it's
> looking very different four years from now.
> If I used a high discount rate over the life
> of the entire business, you come up with a
> value that doesn't make sense in 2002 for the
> business.
>
> . . .

From amongst the three methods you can use in
the income approach, in this situation, I
think it was preferable to do it this way and
that's why I did it like this.  The multiples
in the market are very well known.  I guess
one important thing that people miss in a
multiple is a market multiple is just the
inverse of that cap rate that I mentioned.
So, market multiples are impacted by risk and
growth.  Cap rates are just that.  They are
risk and growth.  Those are the two factors
that go into the cap rate.

So, when you develop your cap rate, you
use your market data.  A cap rate would be the
economic information showing the three percent
growth.  You would be calculating a discount
rate using [CAPM] and [CAPM] is driven off of
market data.  Your growth is driven off of
market data.  A market multiple is the same
thing.  It's working off of market data.  What
are investors paying and what are their views
with respect to risk and growth?

On a hospital, in a hospital that is a
profitable hospital facility, it's generating
a decent margin like the rest of the industry,
which is what we show Reese doing in 2002.
You can get a five times EBITDA multiple on
this facility.

So, I did it that way because it is a
cleaner depiction of value.

(Trial Tr. 3504:4-12, 3509:5-3510:3, Feb. 20, 2007 (Moss, K.).)

While the court recognizes that the market multiple method is a
procedure "commonly used to estimate the terminal value," Pratt et
al., supra, at 186, it finds as a factual matter that the market
multiple method is not the appropriate way to determine the terminal
value in this particular case.  First, "[t]he market multiple brings
a major element of the market approach into the income approach,"
id. at 187, and "[m]any valuation analysts prefer to keep the income
approach and market approach as discrete from each other as

166

possible," id. Moreover, Moss testified that "a market multiple is just the inverse of [a] cap[italization] rate," (Trial Tr. 3509:9-10, Feb. 20, 2007 (Moss, K.)), and that a market multiple has to be adjusted to capture the risk in attaining the terminal net cash flow, (Trial Tr. 3510:4-15, Feb. 20, 2007 (Moss, K.) ("A hospital that is profitable from the get go would be seven times EBITDA for a big, profitable hospital.  The hospital that we have here in 2002 was valued using a five times EBITDA multiple.  So, there is a 30 percent discount in value right there.").  This suggests that a market multiple is really just an easier way of making the same calculation performed (with more rigor) by the Gordon Model.  (See, e.g., Trial Tr. 3511:10-3512:10, Feb. 20, 2007 (Moss, K.) (explaining that the "five times EBITDA multiple" used by Moss was the standard multiple that he personally used when advising investment bankers in the late 1990s); Defs. Ex. JV at Ex. 2-9 (explaining that EBITDA multiple was based on "observed EBITDA multiples for publicly traded healthcare providers and private hospital transactions").)

The court therefore finds as a factual matter that the Gordon Model is the appropriate method for determining the terminal value of Reese Hospital.  The court does, however, recognize the point made by Moss that the market multiple method has value as a "sanity check" for the figure derived through the Gordon Model.  (Trial Tr. 3511:25-3512:4, Feb. 20, 2007 (Moss, K.).)  The court therefore finds as a factual matter that it is appropriate to determine the

167

implied EBITDA multiple arising from the terminal value calculated using the Gordon Model as a "sanity check" on the Gordon Model approach.

Unlike Moss, Neil Demchick used the Gordon Model to arrive at his terminal value. (Trial Tr. 2314:23-2316:22, Feb. 7, 2007 (Demchick, N.); Pl. Ex. 209 at Exs. G, H.) He assumed long-term growth of five percent for his Strategic Growth Scenario. (Trial Tr. 2482:23-2483:5, Feb. 7, 2007 (Demchick, N.); Pl. Ex. 209 at Ex. H.) However, the court has already found that the long-term growth in volume projected in the Reese October Projections provides a more accurate gauge of the long-term growth to be expected at Reese Hospital. See part III.B.1.c.i.(D), supra. The court has therefore calculated long-term growth of EBIT based on the 7% long-term growth in volume projected by Reese Corp. Compared to 2001, the terminal year 2002 shows approximately a 5.31% growth in EBIT, representing the presumed long-term growth in revenues. As noted previously, in calculating the terminal value, the terminal net cash flow must be divided by the discount rate less long-term growth. Accordingly, the court reduced the WACC figure (of approximately 18.14%) by the presumed long-term growth of revenues (of approximately 5.31%), to arrive at a rate of 12.82 % to be used in computing the terminal value.

Based on these findings of fact, the court finds as a factual matter that the following calculation represents the appropriate terminal value for Reese Hospital:

| | |
|---|---|
| Terminal Net Cash Flow | $12,874,687.31 |
| Adjusted Discount Rate for Terminal Net Cash Flow | ÷ 12.82% |
| **Terminal Value** | **$100,390,116.02** |

> ### v.  Present value of
> ### net cash flow and terminal value

The penultimate step in determining the business enterprise value of Reese Hospital as of the Transfer is to determine the present value of the projected net cash flows and projected terminal value of the hospital. Fishman et al., supra, ¶¶ 505.3, 505.50, Ex. 5-20. The present value is determined by dividing the full value (i.e., the discounted projected net cash flows and capitalized terminal value) by 100% of that net cash flow or terminal value plus the applicable discount or capitalization rate raised to a pre-determined discount period exponentially. Id. ¶ 505.51. "Whenever a company's terminal value is estimated using the Gordon Model, . . . it should be discounted back to a present value using the same term as the last year of the forecast." Id. ¶ 505.52.

Demchick calculated his discount period by dividing the days in the "stump period" of 1998 (49) by the total number of days in the year (365) and then adding one period for every year thereafter. (Trial Tr. 2316:24-2317:11, Feb. 7, 2007 (Demchick, N.).) Moss, on the other hand, used a mid-year discounting convention to arrive at a discount period. (Trial Tr. 3740:24-3741:11, Feb. 21, 2007 (Moss, K.).) This method "assumes that annual cash flows or earnings are

169

received, on average, at the middle of each period." Fishman et al., <u>supra</u>, ¶ 505.58.

The court finds as a factual matter that it is appropriate to use a mid-year discounting convention in determining the present value of the projected net cash flow and terminal value for Reese Hospital. As Kevin Moss pointed out at trial, "[t]he cash flows in a hospital facility are fairly evenly distributed throughout the year." (Trial Tr. 3844:16-17, Feb. 21, 2007 (Moss, K.).) The most effective way to reflect this steady stream of cash is to use the mid-year convention. Fishman et al., <u>supra</u>, ¶ 505.58.

The court does not, however, adopt Moss's discount period methodology <u>in</u> <u>toto</u>. Moss applied his mid-year convention to a terminal value derived from a market multiple, <u>see</u> part III.B.1.c.iv, <u>supra</u>, whereas the court has found as a factual matter that the Gordon Model is the appropriate way to determine the terminal value for Reese Hospital. <u>Id.</u> The use of a mid-year convention requires that the court alter its calculation of the terminal value because the Gordon Model "assumes that cash flows will be received at the end of each year, which is inconsistent with the preceding mid-year discounting technique." Fishman et al., <u>supra</u>, ¶ 505.61. The calculation should be modified by multiplying the terminal net cash flow by 100% plus the WACC raised to the ½ power before dividing the resulting figure by the WACC less long-term growth.

170

The court therefore finds as a factual matter that the appropriate discount period to be applied to the calculation for determining the present value of the net cash flow and terminal value projected for Reese Hospital is .07 for the "stump period" in 1998,[108] .64 for 1999,[109] 1.64 for 2000, 2.64 for 2001, 3.64 for 2002, and 4.14 for the terminal value.   The court further finds that the following calculation represents the terminal value at Reese Hospital using the modified Gordon Model:

| | |
|---|---|
| Terminal Net Cash Flow | $12,874,687.31 |
| WACC | x (1 + 18.14%)$^{1/2}$ |
| | |
| Modified Terminal Net Cash Flow | $13,993,567.80 |
| Capitalization Rate | ÷ 12.82% |

| | |
|---|---|
| Terminal Value (under modified Gordon Model) | $109,114,564.17 |

Combining these findings, the court finds as a factual matter that the following calculation represents the present value of the projected net cash flows at Reese Hospital from November 13, 1998, through December 31, 2002:

---

[108]  The court arrived at this figure by means of the following calculation: 49 (representing the number of days in the "stump period" of 1998) ÷ 365 (representing the number of days in the year) ÷ 2 (to account for the mid-year convention).  (Trial Tr. 3520:4-10, Feb. 20, 2007 (Moss, K.))

[109]  The court arrived at this figure by means of the following calculation: 49 (representing the number of days in the "stump period" of 1998) ÷ 365 (representing the number of days in the year) + .5 (to account for the mid-year convention).  (Trial Tr. 3520:11-14, Feb. 20, 2007 (Moss, K.).)

171

|  | 11/13/98-12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Net Cash Flow | -$7,423,024.67 | -$17,762,247.53 | $4,763,409.68 | $14,979,180.61 | $12,874,687.31 |
| Discount Factor | $\div (1 + 19.36\%)^{0.07}$ | $\div (1 + 19.36\%)^{0.64}$ | $\div (1 + 19.36\%)^{1.64}$ | $\div (1 + 19.36\%)^{2.64}$ | $\div (1 + 18.14\%)^{3.64}$ |
| Present Value of Net Cash Flows | -$7,331,646.61 | -$15,860,431.89 | $3,563,581.79 | $9,388,766.96 | $7,018,763.88 |

The court further finds as a factual matter that the following calculation represents the present value of the terminal value:

Terminal Value (under modified Gordon Model)       $109,114,564.17
Discount Factor                                    $\div (1 + 18.14\%)^{4.14}$

Present Value of Terminal Value                    $54,728,670.52

### vi.   Non-operating and excess assets

The last step in determining the final business enterprise value of Reese Hospital under the income approach is to add the non-operating and excess assets purchased by Reese Corp. in exchange for the Reese Transfers.  Id. ¶ 505.65.  Moss anticipated income from the sale of excess land at the Reese Hospital campus in the amount of $6.65 million based upon the valuation performed by Kimmel. (Trial Tr. 3516:1-10, Feb. 20, 2007 (Moss, K.); Defs. Ex. JV at Ex. 2-Ex. 6).  Demchick estimated the value of excess land at the Reese Hospital campus to be at most $5 million.  (Trial Tr. 2178:18-2179:5, Feb. 7, 2007 (Demchick, N.); Pl. Ex. 209 at 60.)

172

The court does not credit either witness's testimony in this regard.  As Robert Wilson explained in his expert testimony, any unused land at the Reese Hospital campus would ordinarily be classified as "surplus," i.e., unsaleable land, "because it's all . . . under [the] institutional zoning classification [used] to run [the] hospital facility."  (Trial Tr. 1273:3-6, Jan. 26, 2007 (Wilson, R.); see also Trial Tr. 1275:24-1276:13, Jan. 26, 2007 (Wilson, R.) ("[F]or land to be excess . . . , it has to be. . . something that we can market . . . and they'll recognize it as valuable land and pay something for it. . . . Surplus land is just . . . a little extra acre maybe in the back of the property or to the side that nobody would be interested in . . . .").)  Nor could the surplus land at the Reese Hospital campus be re-zoned into separate parcels for residential use, for such a procedure would almost certainly cause the remainder of the institutionally-zoned property at the Reese Hospital campus to be in violation of the green-space and "footprint" requirements of that zoning.  (See Trial Tr. 1253:15-20, Jan. 26, 2007 (Wilson, R.) (explaining that "the actual footprints of the buildings" on the developed part of the Reese Hospital campus "probably cover[ed] . . . almost 25 percent of the site, and then with [the] parking area it's probably over 50 percent").)  A purchaser seeking to sell surplus land at Reese Hospital would therefore need to both parcel out the surplus land under a residential zoning scheme and alter the zoning restrictions on the remainder of the property to realize any income through the

sale of the surplus property--a process which strikes the court as
unlikely given the difficulties and delays appurtenant to the re-
zoning process.  (See Trial Tr. 1254:4-1255:12, Jan. 26, 2007
(Wilson, R.) (describing the zoning process in Chicago as "a nine-
step process of review" several plans and studies that can take
anywhere from "194 days . . . up to five years" to complete).)

   But if Moss and Demchick erroneously swelled the business
enterprise value of Reese Hospital by considering the surplus real
estate at the Reese Hospital campus as an asset to be sold, they
committed a far greater error to the detriment of the hospital's
value by failing to consider the assets purchased by Reese Corp. in
the form of the net working capital sold to Reese Corp. at the time
of the hospital's purchase.  See part III.B.1.b.iii, supra.  The
court has already concluded that this net working capital, when
considered in tandem with the Defendants' reconciliation guarantee,
necessarily equaled the amount paid for the net working capital,
i.e., $20,678,221.  Id.  These assets must be added to the value of
Reese Hospital as if normally capitalized to fully reflect the

business enterprise value of the hospital.  Fishman et al., <u>supra</u>

¶ 505.65(e).[110]

vii.   <u>Final business enterprise value</u>

Based on these findings, the court finds as a factual matter

that the following calculation represents the final business

enterprise value for Reese Hospital using the income approach:

---

[110]   Theoretically, the net working capital purchased by
Reese Corp. could be included in the income stream for the
projections used by the court to determine the value of Reese
Hospital as if it were normally capitalized.  After all, a
reasonable purchaser would not expect to collect the revenues
generated from its post-transaction operations immediately, but
rather would depend on the income stream from the net working
capital until post-transaction revenues began to trickle in.
Alternatively, it could be argued that the net working capital
purchased by Reese Corp. as a non-operating asset, should be
considered separately as the court has done, but that as a
consequence the court should project no revenue whatsoever for
Reese Hospital until the hospital began to collect on its
accounts receivables.

Ultimately, neither approach is feasible.  There is no
information in the record from which the court can ascertain the
average delay in the hospital's collection of accounts
receivables, and thus no way to incorporate the income stream
from the net working capital into the court's projections.
Further, financial projections used to calculate a discounted
cash flow must be made in compliance with generally accepted
accounting principles, Fishman et al., <u>supra</u> ¶ 505.8, and those
principles require that income be recorded on an accrual basis
rather than on a cash basis.  Finally, if the court were to
project Reese Hospital's income on a collection (as opposed to an
accrual) basis, it would need to include additional projected
value in the form of the (uncollected) accounts receivable held
by Reese Hospital's owner at the end of the terminal year, which
would cancel out any shortfall in initial income for the
hospital's owner.

| | |
|---|---:|
| Present Value of 11/13/98-12/31/98 Net Cash Flow | -$7,331,646.61 |
| Present Value of 1999 Net Cash Flow | -$15,860,431.89 |
| Present Value of 2000 Net Cash Flow | $3,563,581.79 |
| Present Value of 2001 Net Cash Flow | $9,388,766.96 |
| Present Value of 2002 Net Cash Flow | + $7,018,763.88 |
| Total Present Value of Projected Net Cash Flows | -$3,220,965.87 |
| Present Value of Modified Terminal Value | + $54,728,670.52 |
| Value As If Normally Capitalized | $51,507,704.65 |
| Non-Operating and Excess Assets | $20,678,221.00 |
| **Total Business Enterprise Value** | **$72,185,925.65** |

### d. Other indications of value

The court concludes that the offer made by Physicians, Hospitals and Healthcare Centers, Inc. ("PHHC") to purchase Reese Hospital is not reliable indicator of value for Reese Hospital.

PHHC, through Dr. Roberto Diaz, a physician and owner and officer of PHHC, offered to purchase both Reese Hospital and Grant Hospital for $95 million plus net working capital on or about February 18, 1998.[111]  This figure is not a reliable indicator of value for Reese Hospital because the court cannot accurately derive a separate value for Reese Hospital from PHHC's combined offer to purchase both hospitals.

---

[111]  HCA did not accept PHHC's offer because they had already signed a letter of intent from DCHC on February 17, 1998.  (Trial Tr. 2753:8-13, 2756:13-23, Feb. 12, 2007 (Gerken, G.).)

176

Moreover, PHHC, was never actually interested in purchasing
Reese Hospital, and the offer lacks reliability as a value for
Reese Hospital on this basis as well. Diaz emphasized in
deposition testimony that PHHC only bid on Reese Hospital because
it wanted to buy Grant Hospital, and the two hospitals were a
package deal. (Diaz Dep. 38:1-5, Dec. 6, 2005 ("[W]hat I remember
of this deal is my main interest was Grant Hospital.  However, if
I remember correctly, they would not sell Grant Hospital as an
individual hospital.  It was a package deal."); Diaz Dep. 38:12-
14, Dec. 6, 2005 ("[G]iven the nature of how the bid process was,
you couldn't really separate the two.").)

An October 22, 1998 proposal from Zevco Enterprises, Inc.
("Zevco") for the sale and leaseback of all of Reese Corp.'s and
Grant Corp.'s assets, purportedly for the purpose of providing a
cash infusion to Reese Corp. and Grant Corp., is likewise an
unreliable value indicator.  (Pl. Ex. 213.)  Zevco proposed to
purchase both hospitals' real property and improvements as well as
equipment and personal property for $48 million, $9 million of
which was attributable to Grant Hospital assets.  Zevco's $39
million sale/leaseback proposal for Reese Hospital's assets does
not imply a negative value for Reese Hospital because Zevco did
not intend by its proposal to establish a value for Reese
Hospital.  The purpose of the proposal was to provide a cash
infusion to Reese Corp. and does not purport to present a value
for Reese Hospital.  The court therefore concludes as a factual

177

matter that Zevco's financing offer should not be relied upon in
formulating a value for Reese Hospital.

     e.   <u>Reconciliation</u>

"The process of reconciliation is the analysis of the
alternative valuation indications in order to arrive at a final
value estimate." Pratt et al., <u>supra</u>, at 439. The court has
determined that the value of Reese Hospital was approximately
$57,895,984 using the cost approach, <u>see</u> part III.B.1.b.v, <u>supra</u>,
and approximately $72,186,000 (rounded to the nearest thousandth)
using the income approach, <u>see</u> part III.B.1.c.vii, <u>supra</u>.
Although there is an approximate gap of $14,431,000 between these
two conclusions, the values are not unduly inconsistent with each
other. Even "[e]xperienced analysts expect to derive a range of
value indications when alternative valuation approaches are used."
Pratt et al., <u>supra</u>, at 441. "These alternative indications,
then, imply the reasonable range of values for the subject
business," <u>id.</u>, and "provide mutually supportive evidence as to
the final value estimate," <u>id.</u>

"An intuitively appealing method of concluding the value
estimate" is "(1) to use a subjective but informed judgment and
decide on a percentage weight to assign to the indications of each
meaningful valuation approach or method and (2) to base the final
value estimate on a weighted average of the indications of the
various methods." <u>Id.</u> at 445. "If the income available for
distribution to the business owner is the primary value driver,

178

then it may be appropriate that one or more methods within the

income approach dominate the value conclusion." Id. at 443.  In

this case the court finds as a factual matter that it is

appropriate to give greater weight to its income approach

determination than to its cost approach determination precisely

because a hypothetical purchaser would reasonably expect to earn

income based on the hospital's operation rather than accumulate

wealth through the acquisition of its assets.  Kevin Moss summed

this point up nicely in his trial testimony:

> The cost approach is something that, if you
> look at the valuation texts, often refers to
> it as a floor on the value.  So if the cost
> approach value comes out lower than the income
> and market approach, what it implies is that
> the income and market approach are more
> appropriate indicators of value.
>       So, for instance, a technology company,
> to use an extreme example, you could have a
> cost approach that indicated they just had a
> few hard assets and nothing more, but on a
> market and income approach, they could be
> worth millions of dollars.  In that case, you
> would not look at the cost approach.  You
> would look at your earnings driven approach as
> the income and market approaches.
>       So, part of the reconciliation of
> approaches is to look at the income and market
> approach and see if they are in excess of the
> cost approach.  If they are in excess of the
> cost approach, it just indicates that there is
> potentially some type of intangible asset in
> the business like work force, physician
> relationships, certificates of need, or it
> could also indicate that, you know, there is
> something wrong in the values in your cost
> approach.  Maybe it didn't come up with a
> correct value on one of the hard asset
> categories.

(Trial Tr. 3588:8-3589:4, Feb. 20, 2007 (Moss, K.).)

179

Based on the trial testimony of Kevin Moss and the guidelines for reconciliation set forth above, the court finds as a factual matter that it is appropriate to explicitly weight its determinations of value for Reese Hospital heavily in favor of the income approach. The court therefore finds as a factual matter that the following calculation represents the fair market value of Reese Hospital as of the Transfer Date:

$$(\$57,985,984 \times .25) + (\$72,185,925.65 \times .75) = \$68,635,940.24$$

Thus, the court finds as a factual matter that the fair market value of Reese Hospital as of the Transfer Date is **$68,635,940.24**.

2. <u>Good faith</u>

As explained above, the good faith component of reasonably equivalent value has a place in the court's consideration of the "totality of the circumstances" surrounding the purchase of Reese Hospital. This court has already determined that the APA was the result of arm's length negotiations between the parties. <u>HCA III</u>, slip op. 27-28 (Bankr. D.D.C. Jan. 3, 2007). The remaining question is whether Reese Corp. and the Defendants acted in good faith in entering into the APA.

Alberts contends that the Defendants acted in bad faith in connection with the sale of Reese Hospital while the Defendants maintain that there is no evidence of bad faith. The court concludes as a factual matter that the purchase of Reese Hospital

was conducted in good faith, and that Alberts has failed to offer
any evidence of bad faith.

Alberts argues that the Defendants intentionally failed to
disclose to Reese Corp. the magnitude of Reese Hospital's
financial losses, specifically by failing to provide financial
information for Reese Hospital after August 1998 and by
restricting DCHC's ability to conduct due diligence in late
September 1998. According to Alberts, if DCHC could have had
access to Reese Hospital's financial information for September and
October 1998, DCHC would have known that the financial condition
of the hospital had further declined and may have decided not to
buy Reese Hospital.

The court concludes that there is no evidence demonstrating
that the Defendants concealed or otherwise failed to disclose
financial and operating information for Reese Hospital in bad
faith. DCHC executives testified that they were aware of the
financial condition of Reese Hospital and the fact that Reese
Hospital was sustaining losses in 1998. DCHC bought Reese
Hospital because it was an under-performing hospital. (Trial Tr.
193:11-25, Jan. 22, 2007 (Tuft, P.); Trial Tr. 72:4-6, Jan. 19,
2-7 (Tuft, P.)("The mission of DCHC was to acquire hospitals,
primarily in urban areas, and primarily hospitals that were under-
performing.").) DCHC executives had a business plan for turning
around Reese Hospital and were confident that they understood what
it would take to improve the hospital's financial performance.

181

That the financial performance of Reese Hospital may have
further declined before the transaction closed is not unusual and
did not surprise DCHC representatives.  DCHC executives testified
that uncertainty associated with a pending sale may have an
adverse effect on many aspects of hospital operations, including
the financial performance of a hospital.  (Trial Tr. 201:15-19,
Jan. 22, 2007 (Tuft, P.); Trial Tr. 1085:2-6 Jan. 25, 2007
(Talbot, D.); see also Trial Tr. 3433-3437, 3796:1-11, Feb. 20,
2-7 (Moss, K.).)  Because there were closing delays, it is no
surprise then that uncertainty about the future of Reese Hospital
may have resulted in additional financial losses.

Although Reese Hospital's financial information for September
and October may have revealed additional losses, there is no
evidence that HCA concealed or refused to provide such
information.  To the contrary, DCHC executives Talbot and Mounce
testified that HCA never refused their requests for information.
Talbot, who coordinated DCHC's financial review of Reese Hospital,
does not recall specifically asking HCA for Reese Hospital's
financials for September of 1998.  (Trial Tr. 1670:4-5, 24-25,
Jan. 30, 2007 (Talbot, D.).)  And DCHC likely would not have
received October financials before closing due to an approximately
fifteen-day period between the closing of the month and the
availability of financials for the prior month.[112]  Additionally,

---

[112]   HCA, moreover, was obligated by the APA to provide
monthly financials within thirty, not fifteen, days of the end of
the prior month.

there is no evidence indicating that DCHC would have decided not
to buy Reese Hospital had DCHC reviewed the September and October
financials.

There is also no evidence indicating that DCHC or Reese Corp.
were denied access to Reese Hospital's financial and operating
information during due diligence or otherwise.  HCA granted DCHC
full access to information about Reese Hospital from execution of
the letter of intent in February of 1998 through closing on
November 12, 1998, consistent with the requirements in the APA.
(See Pl. Ex. 2 (APA § 5.01).)[113]  And Reese Corp. represented and
warranted to GHI that it had full access to and had inspected and
investigated to its satisfaction the financial and operating
information of Reese Hospital.  (See Pl. Ex. 2 (APA § 4.08).)[114]

───────────────────

[113] GHI agreed in section 5.01 of the APA to provide Reese
Corp. full and complete access to the books and records of Reese
Hospital until the closing date. Section 5.01 provides:

> Between the date of this Agreement and the Closing
> Date, Seller shall afford to the officers and
> authorized representatives and agents of Buyer
> full and complete access to and the right to
> inspect the plant, properties, books and records
> of Seller relating to the Assets, and will furnish
> Buyer with such additional financial and operating
> data and other information as to the business and
> properties of Seller relating to the Assets as
> Buyer may from time to time reasonably request
> without regard to where such information may be
> located.

[114] Section 4.08 of the APA provides: "Buyer has had full
and free access to and has inspected and investigated to its
satisfaction the Business of Seller, the Assets, and the
Hospital." (Pl Ex. 2.)

The initial due diligence period commenced sometime in February of 1998 and was complete when the parties signed the APA in July of 1998.  After securing the necessary regulatory approvals for the sale by the end of August, NCFE asked to refresh its due diligence regarding the accounts receivable and assets of the hospital.  This due diligence occurred in September of 1998. DCHC also requested information from HCA beyond the initial due diligence period.

DCHC executives had full access to the hospital and its management, employees, doctors, and documents during this entire time period.  Mounce and Talbot testified that they always received the information they requested of HCA, and that they were never denied information.  (Trial Tr. 624:5-7, Jan. 24, 2007 (Mounce, E.) ("QUESTION: And ultimately you believe that you had obtained everything you had asked for? ANSWER: Correct, I do, sir.); Trial Tr. 1670:6-8, Jan. 30, 2007 (Talbot, D.)("THE COURT: You don't recall being refused anything either?  THE WITNESS: No, I don't."); Trial Tr. 670: Jan. 24, 2007 (Mounce, E.)("But if I ever needed something, I'm sure that I could have gotten it from Greg Gerken or I did, because I was never specifically told, 'You couldn't have . . ., something").)  And the record does not show that HCA ever provided DCHC false information.  (Trial Tr. 138:18-21, Jan. 22, 2007 (Tuft, P.)("THE COURT: [D]id you ever determine that any of the information that had been given to you by HCA was false information?  THE WITNESS: I never did."); Trial Tr. 624:8-

10, Jan. 24, 2007 (Mounce, E.)("QUESTION: You don't believe you were ever provided any false information correct?  ANSWER: No, Sir.").)

The record indicates that beginning in late September 1998, HCA did exercise a greater degree of control over how DCHC accessed information about Reese Hospital.  On September 29, 1998, DCHC told HCA it would be unable to close on September 30, 1999 as required by an amendment to the APA.  HCA was uncertain whether the transaction would ever close, and according to Gerken, that uncertainty combined with DCHC's unfettered access to Reese Hospital was interfering with management of the hospital.  (Trial Tr. 2771:4-12, Feb. 12, 2007 (Gerken, G.).)  So HCA asked DCHC to run due diligence requests through Gerken's office.  Gerken also asked the then-CEO of Reese Hospital to stop providing information to DCHC employees and representatives absent Gerken's authorization.  (Pl. Ex. 998 (E-mail from Gregg Gerken to Rich West, Scott Winslow re: Sale of Hospitals to DCHC, Sept. 29, 1998).)  This request was in place for only a short period of time until HCA and DCHC negotiated another extension of time for closing.  HCA continued to grant DCHC requests for information during this time and up to closing.  (Trial Tr. 2962:13-2963:15, Feb. 14, 2007 (Gerken, G.).)

In this instance, HCA justifiably wanted to exercise some control over how DCHC accessed information about Reese Hospital. Closing had already been delayed, and HCA did not have full

185

confidence that the sale would go through.  DCHC had previously

enjoyed more than full access to information about Reese Hospital;

it had enjoyed unfettered access.  (Trial Tr. 670:19-20, Jan. 25,

2007 (Mounce, E.) ("We didn't have free access like we did, the

willy-nilly thing that we talked about before.").)  HCA was not

restricting access to or preventing disclosure of critical

financial information.  HCA was simply trying to bring order to

the manner in which DCHC requested information about Reese

Hospital in an effort to minimize any negative consequences the

ongoing due diligence and pending sale had on the management and

operation of Reese Hospital.  The court therefore concludes that

the factual record does not support a finding of lack of good

faith on the basis that HCA withheld or concealed financial

information from DCHC or restricted DCHC's access to information.

Alberts additionally argues that the Defendants acted in bad

faith by insisting on an inflated amount of net working capital in

order to receive a higher purchase price for Reese Hospital.  The

court declines to find any absence of good faith here because HCA

and DCHC acted at all times in accordance with the APA's

procedures for finalizing net working capital.  GHI and Reese

Corp. contractually agreed to postpone a final determination of

net working capital until after closing, and GHI and Reese Corp.

followed the post-closing procedures set forth in the APA.  They

submitted their dispute over the amount of net working capital to

PWC for a final determination.  PWC determined that Reese Corp.

186

overpaid by $6.2 million.  GHI refunded the excess amount to Reese
Corp. as expressly required by the APA.  The fact that HCA and
DCHC may have disagreed over the amount of net working capital
transferred or the methodology for calculating the accounts
receivable component of net working capital does not equate to bad
faith.  Whatever concerns existed over the appropriateness of
applying one calculation methodology or another are irrelevant, as
the APA bound the parties to a course of action which involved
review of the net working capital calculation by an independent
third party.  And the Defendants could not have been motivated to
artificially inflate the net working capital because the APA
provided for the refund to Reese Corp. of any overpayment.  The
court therefore concludes as a factual matter that Alberts has
failed to show that the net working capital was not calculated in
good faith.

Alberts additionally argues that the Defendants took
advantage of DCHC's relative inexperience in purchasing and
running a hospital as large as Reese Hospital in bad faith.  The
court concludes as a factual matter that the record does not
support a finding of bad faith on this basis.  Although Reese
Hospital may have been the largest hospital purchased by DCHC at
that time in terms of size and revenues, DCHC executives were
sophisticated and experienced professionals in the healthcare
industry, some having worked in the field for decades.  DCHC
executives had successfully turned around distressed hospitals and

187

were confident they could do the same with Reese Hospital.
Throughout due diligence, Reese Corp. was represented by outside
counsel at two major law firms, advised by independent consultants
McGladrey & Pullen, and assisted by investment banking firms.
Thus, whatever new challenges DCHC faced due to the size of Reese
Hospital, DCHC executives were not naive and inexperienced in
matters of finance and acquisitions or in the industry such that
HCA could have taken advantage of them.

Finally, Alberts asserts that HCA entered into the
transaction with DCHC in bad faith knowing that DCHC had
difficulty securing financing for the purchase.  The court again
declines to find any lack of good faith.  First, DCHC and Reese
Corp. represented and warranted to GHI that it had the financial
ability to consummate the transaction.  (Pl. Ex. 2 (APA § 4.06).)[115]
 Although NCFE, which was providing most of the purchase financing
to Reese Corp., was characterized by Tuft as "more expensive" than
other potential lenders, it was nonetheless highly-rated by Duff &
Phelps Credit Rating Co., a nationally recognized debt-rating
agency.  And NCFE conducted due diligence and committed to

---

[115]   Section 4.06 of the APA provides: "Buyer has or will
have by Closing the financial ability to consummate the
transactions contemplated by this Agreement."  (Pl. Ex. 2 (APA §
4.06).)

financing the purchase.[116]  HCA reasonably believed that Reese Corp.
would be able to close the deal based on financing Reese Corp.
obtained from NCFE, at least as of July 1998 when the APA was
signed.  Gerken of HCA testified that HCA was generally aware that
NCFE was financing Reese Corp.'s purchase of Reese Hospital.
Gerken also testified that he believed NCFE was a "well regarded
financing institution primarily providing financing in the health
care sector" whose "securities were investment grade rated by
certain rating agencies including Duff & Phelps."  (Trial Tr.
2779:12-16, Feb. 12, 2007 (Gerken, G.).)

HCA was more than likely not aware that DCHC would have any
challenges or issues financing the purchase of Reese Hospital
until after the APA was signed in July 1998.  HCA did know that
Reese Corp.'s closing delays in September and October were
connected to financing issues.  Gerken testified that HCA was
aware that Reese Corp. was unable to close at the end of September
at least in part because NCFE was still raising funds to finance
the purchase.  (See Pl. Ex. 943 (Letter from Greg Gerken to Paul
Tuft)(Sept. 30, 1998)("Confirming our conversation yesterday
afternoon, you have advised me that you are experiencing further
additional delays with respect to your financing and will not be
able to fund your acquisition of [Reese Hospital] today, September

---

[116]  NCFE financed the majority of Reese Corp.'s purchase of
Reese Hospital.  Of the $68,048,840 purchase price, NCFE provided
Reese Corp. approximately $43,308,357 in accounts receivable
financing and approximately $10,800,000 for equipment
sale/leaseback financing.

30, 1998, as required under the [APA].”); Pl Ex. 1072.)  Gerken
also testified that he held a favorable view of NCFE as a
financing institution at that time and that his view did not
change despite the closing delays.

In response to Reese Corp.’s closing delays, HCA acted in
good faith.  HCA agreed to provide extensions to DCHC upon
learning that DCHC would be unable to close at the end of August,
at the end of September, and again at the end of October.  The
court has already concluded that $2 million of the value of the
Reese Transfers was in exchange for Reese Corp.’s delay in closing
on the purchase of the hospital.  HCA also agreed to provide
$17,500,000 worth of seller financing for the Reese Transfers,
$14,000,000 of which is attributable to the purchase of Reese
Hospital, upon learning from DCHC that the financing it had
secured from NCFE was insufficient.  (See Defs. Ex. CS (Promissory
Note Secured by Mortgages (Grant and Michael Reese Properties)
Nov. 12, 1998); Defs. Ex. DT at HCA/MR-20626 (Fifth Amendment to
the Asset Purchase Agreement between Reese Corp. and GHI, Sept.
30, 1998)(amending section 2.01 to provide for $14,000,000 in
seller financing).)  But this does not constitute bad faith.
Seller financing is not unusual, and HCA loaned to Reese Corp. on
fair and reasonable terms.  HCA’s loan included a fixed 8.5%
interest rate and was secured by mortgages on the property.  (See
Defs. Ex. DT at HCA/MR-20626 (Fifth Amendment to the Asset
Purchase Agreement between Reese Corp. and GHI, Sept. 30, 1998).)

190

The totality of the evidence demonstrates that the Defendants acted in good faith.  The court concludes that HCA afforded DCHC full access to financial and operating information and fulfilled all requests for such information up through closing.  The evidence does not indicate that HCA concealed information or provided false information about state of Reese Hospital's financial affairs.  The court also finds that there is no evidence that the Defendants acted in bad faith by extending the closing date and by providing seller financing on reasonable terms to allow DCHC and Reese Corp. to secure sufficient financing to close the deal.  Given the lack of evidence of bad faith, the court concludes that the sale was conducted in good faith.

C.  <u>Conclusions of Law</u>

Based on the foregoing findings of fact, the court concludes as a matter of law that Reese Corp. received reasonably equivalent value for the Reese Transfer.  All three of the factors used to make this determination--whether the transaction was made at arm's length, the fair market value of the property received as compared to the value of the property transferred, and the intentions of the parties in making the transfers--favor the Defendants.  If anything, the court's findings of fact with respect to the fair market value of Reese Hospital as of the Transfer Date suggest that Reese Corp. received <u>more</u> than reasonably equivalent value for the Reese Transfers, not less.  The court's findings of facts are complex, but the legal conclusion to be drawn from those

191

findings is not difficult.  Alberts has not demonstrated by a preponderance of the evidence that Reese Corp. did not receive reasonably equivalent value in exchange for the Reese Transfers. His sole remaining count in this proceeding is therefore infirm, and judgment must be rendered in favor of the Defendants.

IV.   CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the court will award final judgment with costs in favor of the Defendants.

Final judgment follows.

[Signed and dated above.]

Copies to:

Lucius B. Lau                        Jeffrey W. Kilduff
Jeffrey E. Schmitt                   Lani R. Miller
White & Case LLP                     Stephen D. Brody
701 Thirteenth Street, N.W.          O'Melveny & Myers LLP
Washington, DC 20005                 1625 Eye Street, NW
Counsel for the plaintiff            Washington, DC 20006
                                     Counsel for the defendants