**The document below is hereby signed.**

**Dated: February 21, 2012.**



**S. Martin Teel, Jr.**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                              )
                                   )
GREATER SOUTHEAST COMMUNITY        )    Case No. 02-02250
HOSPITAL CORPORATION I,            )    (Chapter 11)
                                   )    (Jointly Administered)
                Debtor.            )
_____)
                                   )
SAM J. ALBERTS, TRUSTEE FOR        )
THE DCHC LIQUIDATING TRUST,        )
                                   )
                                   )
                Plaintiff,         )
                                   )
           v.                      )    Adversary Proceeding No.
                                   )    04-10366
HCA INC., *et al.*,                )
                                   )
                Defendants.        )

MEMORANDUM DECISION RE
MOTION OF PLAINTIFF FOR RECONSIDERATION AND AMENDMENT
OF THE MEMORANDUM DECISION CONSTITUTING THE COURT'S FINDINGS
OF FACT AND CONCLUSIONS OF LAW, AND TO ALTER OR AMEND JUDGMENT

     The plaintiff, Sam J. Alberts, in his capacity as Trustee

for The DCHC Liquidating Trust, has filed a motion for

reconsideration and amendment of the court's Memorandum Decision
Constituting the Court's Findings of Fact and Conclusions of Law
and to alter or amend the related Judgment, both entered on May
12, 2008, pursuant to Rules 52(b) and 59(e) of the Federal Rules
of Civil Procedure, as incorporated into this proceeding by Rules
7052 and 9023 of the Federal Rules of Bankruptcy Procedure,
respectively.  The defendants, HCA Inc. ("HCA"), Galen Hospital
Illinois, Inc. ("GHI"), and Western Plains Capital, Inc.,
have opposed the motion, and Alberts has filed a reply to that
opposition.  The motion will be denied.

In its Memorandum Decision (which, shortly before Alberts
filed his motion for reconsideration, was amended on May 20,
2008, by an Amended Memorandum Decision to correct footnote
numbering errors) the court ruled that the defendants were
entitled to judgment as a matter of law because Michael Reese
Medical Center Corp. ("Reese Corp.") received on the "Transfer
Date" at least reasonably equivalent value in exchange for
$68,048,840 in "Subject Transfers."  Amended Mem. Dec. at 191.
Alberts has not convinced me that reconsideration is appropriate
or that, if reconsideration were granted, it would alter the
conclusion that Reese Corp. received reasonably equivalent value.

I

As stated in *Fields v. Vilsack,* --- F. Supp. 2d ---, 2012 WL
256051, at *2 (D.D.C. Jan. 30, 2012):

Rule 59(e) allows a district court to correct its own mistakes in the period immediately following the entry of an order. *White v. N.H. Dep't of Emp't Sec.*, 455 U.S. 445, 450 (1982). Though a court has considerable discretion in granting Rule 59(e) motions, it only needs to do so when it finds that there has been an intervening change of controlling law, that new evidence is available, or that granting the motion is necessary to correct a clear error or to prevent a manifest injustice. *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam). Moreover, "[a] Rule 59(e) motion to reconsider is [neither] ... an opportunity to reargue facts and theories upon which a court has already ruled," *New York v. United States*, 880 F.Supp. 37, 38 (D.D.C. 1995), nor a vehicle for presenting theories or arguments that could have been advanced earlier. *Kattan v. District of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993). And Rule 59(e) motions are generally granted only in extraordinary circumstances. *Liberty Prop. Trust v. Republic Props. Corp.*, 570 F. Supp. 2d 95, 97 (D.D.C. 2008) (citing *Niedermeier v. Office of Max S. Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001)).

*See also Armenian Assembly of America, Inc. v. Cafesjian,*

--- F. Supp. 2d ---, ---, 2011 WL 4014297, at *5 (D.D.C. Sept.

12, 2011).

A Rule 52(b) motion is similarly limited. Rule 52(b), like

Rule 59(e), permits "the correction of any manifest errors of law

or fact that are discovered, upon reconsideration, by the trial

court." *Nat'l Metal Finishing Co. v.*

*BarclaysAmerican/Commercial, Inc.*, 899 F.2d 119, 123 (1st Cir.

1990). *See also Johnson v. Greater Southeast Cmty. Hosp. Corp.*,

1996 WL 377147, at *2 (D.D.C. June 24, 1996) (Rule 52(b) "give[s]

the trial court an opportunity to correct manifest errors of law

or fact, make additional findings, or take other action that is

in the interest of justice."). Nevertheless, a Rule 52(b)

3

motion:

> cannot be a substitute for an appeal. "A party who
> failed to prove his [or her] strongest case is not
> entitled to a second opportunity to litigate a point, to
> present evidence that was available but not previously
> offered, or to advance new theories by moving to amend a
> particular finding of fact or conclusion of law." 9C
> Wright & Miller , Federal Practice and Procedure, § 2582
> (3d ed. 2009)[;] *Gutierrez v. Ashcroft*, 289 F. Supp. 2d
> 555, 561 (D.N.J. 2003).

*Salazar v. District of Columbia*, 685 F. Supp. 2d 72, 75 (D.D.C.
2010), *aff'd*, 633 F.3d 1110 (D.C. Cir. 2011). *See also Diocese
of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386, 1397 (8th
Cir. 1996); *Fontenot v. Mesa Petrol. Co.*, 791 F.2d 1207, 1219
(5th Cir. 1986).

## II

Alberts contends that in ascertaining value under the income
approach, the court erred in how it addressed the $20,678,221 of
net working capital that Reese Corp. purchased from GHI.[1]  He
contends, for example, that the court double counted the

---

[1]  HCA, as the parent of GHI, participated in the due
diligence process (of providing information to Reese Corp. and
its parent Doctors Community Hospital Corporation ("DCHC")
incident to their making a decision whether to make a purchase)
and agreed to lend funds to Reese Corp. for part of the purchase
price.  On occasion, the Amended Memorandum Decision lapsed into
referring to HCA as though it were the seller.  *See*, *e.g.*,
Amended Mem. Dec. at 77-78, 91 n.53, 145, 182 n.112.  The Amended
Memorandum Decision is hereby amended in those instances to
reflect that GHI was the seller.  The Amended Memorandum
Decision's discussion of HCA's conduct in the due diligence
process, and of its good faith, Amended Mem. Dec. at 180-191, is
similarly amended to treat such discussion as relating to GHI as
well.

$20,678,221: he argues that the court factored in net working capital in its net cash flow analysis for the hospital ("Reese Hospital") that Reese Corp. acquired in the transaction, and that, accordingly, the court double counted the net working capital when it added in the $20,678,221 as an excess or nonoperating expense.   I reject Alberts' contentions regarding the $20,678,221 of net working capital for the following reasons.

A

The $20,678,221 figure consists of two components: the actual net working capital being sold plus GHI's obligation to make up any shortfall if the actual net working capital sold was worth less than $20,678,221.   GHI, as seller, and Reese Corp., as purchaser, arrived at an estimated value of $20,678,221 for the existing net working capital of the hospital being acquired by Reese Corp.   The asset purchase agreement defined net working capital as the difference between current assets (consisting principally of existing accounts receivable generated by pre-transfer events and existing inventory) being acquired by Reese Corp. and current liabilities that were being assumed by Reese Corp.   *See* Trust Ex. 2 at HCA/MR-04549.   GHI agreed to pay Reese Corp. for any shortfall in that estimate.

In other words, even if there proved to be a shortfall in the estimate, Reese Corp. was to receive net working capital having a combined value of $20,678,221: the sum of the actual net

working capital acquired *plus* GHI's obligation to pay for any
shortfall in the estimate (which is treated as augmenting the net
working capital to have it match the $20,678,221 figure).

B

Before addressing Alberts' double counting argument at
length in part C, below, it is useful to summarize how the court
treated the $20,678,221 of net working capital.  The court valued
the acquired assets under an income approach by first valuing the
assets as though the $20,678,221 of net working capital *had not
been* acquired by Reese Corp. (which would have resulted in a
value of $51,507,704.65 under the income approach).  The court
then asked what would be added to that $51,507,704.65 value under
the income approach if, as occurred, the $20,678,221 of net
working capital had *also* been acquired by Reese Corp.  It stood
to reason that the value of that $20,678,221 in net working
capital ought to be added to the $51,507,704.65 to arrive at a
total value of $72,185,925.65 under the income approach.  There
was no double counting.

The court recognized that the value of the $20,678,221 in
net working capital ought to be adjusted for the time value of
money to reflect the dates of collection of accounts receivable,
the date of collection on GHI's guarantee of the shortfall, and
the dates of Reese Corp.'s payment of accounts payable included
in net working capital.  But Alberts failed to present evidence

6

to permit an adjustment for the time value of money, and, in any event, any such adjustment would have been insufficient materially to alter the outcome. *See* Amended Mem. Dec. at 68 nn.35 and 36. Accordingly, the court valued the net working capital acquired as worth $20,678,221.

C

In making his double counting argument, Alberts contends that the $20,678,221 was included in the court's net cash flow calculations utilized to arrive at an intial Value As If Normally Captialized of $51,507,704.65. In actuality, the Amended Memorandum Decision made clear that the $20,678,221 was *not* being included in the court's net cash flow calculations. The court factored in *net working capital requirements* in its net cash flow analysis, but the $20,678,221 was *not* utilized to reduce the projected net working capital requirements (Amended Mem. Dec. at 144-45).

Instead, in its discounted cash flow model, the court took into account future accounts receivable on an accrual basis in accordance with the generally accepted accounting procedures that are utilized in performing a valuation based on an income approach. Such future accounts receivable, *not* in existence on the transfer date, were distinct from the $20,678,221 that *was* in existence on the transfer date (the sum of accounts receivable and other forms of working capital in existence as of the

7

transfer date plus GHI's obligation to pay for any shortfall in the estimate of working capital). In other words, the court's discounted cash flow model was based on accruals of amounts that would be owed for future patient services and for operating revenue generated by other post-transfer events, and those amounts were unrelated to the $20,678,221 in working capital transferred on the sale date. Alberts' assertion that the court included the net working capital "and related revenue, interest income, and expenses" in its discounted cash flow calculation (Pl. Mot. Recons. at 12 n.8) is simply wrong.

As the court explained, the record lacked sufficient information to permit the court, in making projections of net cash flow, to include the $20,678,221 in those projections as net working capital on hand to utilize in operations:

> Theoretically, the net working capital purchased by Reese Corp. could be included in the income stream for the projections used by the court to determine the value of Reese Hospital as if it were normally capitalized. After all, a reasonable purchaser would not expect to collect the revenues generated from its post-transaction operations immediately, but rather would depend on the income stream from the net working capital until post-transaction revenues began to trickle in. Alternatively, it could be argued that the net working capital purchased by Reese Corp. as a non-operating asset, should be considered separately as the court has done, but that as a consequence the court should project no revenue whatsoever for Reese Hospital until the hospital began to collect on its accounts receivables.
> Ultimately, neither approach is feasible. There is no information in the record from which the court can ascertain the average delay in the hospital's collection of accounts receivables, and thus no way to incorporate the income stream from the net working capital into the

court's projections.  Further, financial projections used
to calculate a discounted cash flow must be made in
compliance with generally accepted accounting principles,
Fishman et al., supra ¶ 505.8, and those principles
require that income be recorded on an accrual basis
rather than on a cash basis.  Finally, if the court were
to project Reese Hospital's income on a collection (as
opposed to an accrual) basis, it would need to include
additional projected value in the form of the
(uncollected) accounts receivable held by Reese
Hospital's owner at the end of the terminal year, which
would cancel out any shortfall in initial income for the
hospital's owner.

Amended Mem. Dec. at 175 n.110.  Accordingly, instead of

including the $20,678,221 in the court's calculation of the

initial "Value As If Normally Capitalized" of $51,507,704.65

under the income approach, the $20,678,221 was added to that

value as a stand-aside asset, as though it were a non-operating

asset, to arrive at the "Total Business Enterprise Value" of

$72,185,925.65 under the income approach.  (Amended Mem. Dec. at

174-76.)

D

Alberts contends that the court was in error in concluding

(Amended Mem. Dec. at 175 n.110) that the evidentiary record did

not permit the $20,678,221 reliably to be factored into the

income stream calculation.  (Pl. Reply at 6-7, ¶ 11.)  But it

does not matter whether the court was in error.  Even if the

court *was* wrong, and the $20,678,221 could reliably be factored

into the income stream calculation, Alberts has not provided

calculations showing what the value would be if the $20,678,221

9

in net working capital were factored into the court's income stream calculation. If the $20,678,221 of net working capital were factored into the income stream calculation, the resulting "Value As If Normally Capitalized" of $51,507,704.65 would necessarily increase by $20,678,221, with an adjustment for the time value of money. As noted in part B above, the adjustment for the time value of money (to reflect the dates of collection of the accounts receivable and GHI's guarantee included in the $20,678,221, and the dates of payment of accounts payable included in the $20,678,221) would be insufficient to have a meaningful impact on the outcome of this proceeding.

E

Alberts contends that non-operating or excess assets usually are not added dollar-for-dollar as the court did with the $20,678,221 that it treated as a non-operating asset. (Pl. Mot. at 12 n.8). In support of this argument, Alberts cites Jay E. Fishman *et al.*, *PPC's Guide to Business Valuations* (18th ed. 2008) (hereinafter "PPC's 18th ed."), ¶ 503.32 at 5-39 ("Public markets recognize when a company has excess assets or nonoperating property, although investors *usually* do not build the amount into the price dollar-for-dollar." (emphasis added)). A non-operating or excess asset, by definition, does not enhance the operational value of a business. Such an asset usually would require liquidation costs in order to realize the asset's value,

10

thus making an investor leery of building the asset's fair market value into a company's price dollar-for-dollar. That is not the case, for example, when cash is paid for cash. When cash acquired for cash is arbitrarily treated as a non-operating asset (because it is a wash), there is no reason not to value the cash dollar-for-dollar. Similarly, when (as here) working capital to be acquired is treated as a non-operating or excess asset, no liquidation costs are necessary to realize the value of the cash, and the working capital will be collected in due course (via a collection department whose costs are already an expense taken into account in cash flow projections with respect to collection of *other* accounts receivable). The cash realized from collection of the accounts receivable can be disbursed immediately to creditors, or the cash can be held in a deposit account for eventual distribution to creditors. Accordingly, net working capital ought to be valued dollar-for-dollar, unlike the typical non-operating or excess asset. As noted above, although the net working capital ought to be adjusted for the time value of money, Alberts failed to present evidence to permit such an adjustment, and the adjustment would not have materially affected the outcome.

F

Finally, Alberts raises an estoppel argument. Both Moss (the defendants' expert) and Demchick (Alberts' expert) provided

11

projections for capital that would need to be invested at Reese
Hospital to ensure a sufficient amount of net working capital to
finance accounts receivable, inventory, and the like on a
forward-going basis, but neither expert reduced the projected net
working capital requirements by the $20,678,221 in net working
capital that Reese Corp. purchased from GHI.  Alberts attempts to
invoke estoppel doctrines to turn this alleged error of both
experts to his advantage, and thereby to reap a windfall by
wiping out $20,678,221 of value.  In his reply to the defendants'
opposition to the motion, Alberts contends:

> Defendants [sic] argument that net working capital may be
> properly included as a nonoperating or excess asset
> should be stricken as violating principals [sic] of
> estoppel.  *See Alberts v. Paul Tuft et al., (In re
> Greater Southeast Community Hospital Corp. I, et al.)*,
> 333 B.R. 506, 534 (Bankr. D.D.C. 2005) ("The purpose of
> judicial estoppel] is to 'protect the integrity of the
> judicial process ... by prohibiting parties from
> deliberately changing positions according to the
> exigencies of the moment[.]'") (quoting *New Hampshire v.
> Maine*, 532 U.S. 742, 749-50, 121 S.Ct. 1808, 149 L.Ed.2d
> 968 (2001)); *Donovan v. U.S. Postal Service*, 530 F.Supp.
> 894 (D.D.C. 1981) (judicial estoppel applies when (1) the
> same facts are at issue, (2) the judicial body was led
> astray, and (3) the assertions were not based on fraud,
> inadvertence or mistake); *Mick's At Penn. Ave., Inc. v.
> BOD, Inc.*, 389 F.3d 1284, 1289 (D.C. Cir. 2004) ("Under
> the doctrine of equitable estoppel, a party with full
> knowledge of the facts, which accepts the benefits of a
> transaction, contract, statute, regulation or order may
> not subsequently take an inconsistent position to avoid
> the corresponding obligations or effects.") (quoting
> *First Am. Disc. Corp. v. Commodity Futures Trading
> Comm'n*, 222 F.3d 1008, 10 16 (D.C. Cir. 2000)).  It is
> without dispute that Defendants, like Plaintiff, argued
> that net working capital should be included in the cash
> flow projections, not as an excess or nonoperating asset.
> See Expert Report of Kevin Moss, at Ex. 5 to Ex. 2.

12

Defendants cannot now change this fundamental position merely because the Court erred in their favor.

Pl. Reply at 3-4, ¶ 7.  Commonsense dictates that doctrines of estoppel do not bar a court from disregarding erroneous testimony, regardless of the proponent of that testimony, and deciding a case based on the actual state of affairs.  The court was not led astray by the experts' testimony.  Accordingly, I reject Alberts' estoppel argument.

III

Alberts further contends that the court committed error by not including a discount for lack of marketability in its income approach, stating:

> The value under the Income Approach "represent[s] marketable interests and should be adjusted if the company's shares are not readily marketable." PPC's 18th ed. ¶ 510.1(b) at 5-62.  Obviously, shares in closely held businesses are not readily marketable, which in turn, reduces value.  As PPC states at Section 510.6, "[i]f the ownership interest being valued is in fact closely held, the consultant may need to lower the company's estimated value by applying a discount for lack of marketability." *Id.* ¶ 510.6 at 5-62.  It is "reasonable to make an adjustment from the estimated (but uncertain) sale value of the subject controlling business interest at some undetermined time in the future to a cash equivalency value as of the valuation date, reflecting the time, costs, and risks attendant to achieving such a sale." [Quoting Shannon Pratt *et al.*, *Valuing a Business* 412 (4th ed. 2000).]  "This valuation adjustment, or discount, is the discount for illiquidity (i.e., the discount for lack of marketability of the controlling business ownership interest)" and reflects that selling a 100% ownership interest is a "lengthy, expensive, and uncertain undertaking." *Id.*  Whether operated by Reese Corp. or Defendant Galen Hospital Illinois, Inc., it is without dispute that Reese Hospital was a closely-held business.

13

Pl. Mot. Recons. at 14-15, ¶ 29.  The materials Alberts cites,
however, are addressing valuing how much could be obtained for an
ownership interest in a company, not valuing a set of assets
purchased by a company.  The question is what the assets Reese
Corp. acquired were worth, not what the shares in Reese Corp.
could be sold for.  Discounts for illiquidity of shares in a non-
public company frequently arise in estate tax cases in which a
decedent's shares in a closely held corporation are being valued,
with the issue being what the shares could be sold for, an amount
that indeed may be affected by lack of liquidity of the shares.
In contrast, in this adversary proceeding, a fraudulent
conveyance action, the issue is whether Reese Corp. paid too much
for the assets it acquired to operate a hospital, not what amount
the shareholder of Reese Corp. would have obtained at a later
date if it attempted to sell its ownership interest in Reese
Corp.  After all, a publicly traded company could have purchased
the assets that Reese Corp. acquired from GHI and the value of
those assets as part of its aggregate assets, in contributing to
the market value of its shares, would not be affected by a
illiquidity discount.  For purposes of fraudulent conveyance law,
the value to Reese Corp. of the assets it acquired ought not be
any different than the value those assets would have had to a
hypothetical purchaser that was a publicly traded company.  GHI
ought not be penalized for having sold the assets to a privately

14

owned company instead of a publicly traded company.

In any event, Reese Hospital was not sold by a closely held company.  GHI, as a subsidiary of HCA, a publicly traded company, had excellent accounting systems in place required of such a company.  Accordingly, in contrast to many a private company, it was readily able to respond to Reese Corp.'s requests for current financial data pertinent to the assets being acquired.  Such superior information systems of a publicly traded company versus a private company are a critical reason why shares of a closely held company require a discount for illiquidity.  Pratt, *et al.*, *Valuing a Business* at 415-16.

For the foregoing reasons, making any discount for illiquidity is inappropriate in this proceeding.  In any event, the court's income approach to valuation, using the discounted cash flow method, already took into account the size of the hospital, the hospital's current poor earnings, and the uncertainty of achieving projected future income flows, all matters bearing on the illiquidity discount that would be associated with disposing of the shares of a non-public company owning a single hospital in a private sale.  Accordingly, as in *Chartwell Litigation Trust v. Addus Healthcare, Inc. (In re Med Diversified, Inc.)*, 346 B.R. 621, 640 (Bankr. E.D.N.Y. 2006), "[t]here would be no basis for further discounting the numbers except to further depress the value" of the company.

15

For all of these reasons, I reject Alberts' argument that the court erred by not including a discount for lack of marketability.

IV

Alberts further argues that the court committed error in its income and expense projections by miscalulating the amount of variable professional fees expense, stating:

> Apart from one unexplained exception, the Court appears to have utilized the updated Reese October Projections when the amounts differed from the Reese September Projections. The one exception concerns professional fee expenses (e.g., fees for non-employee doctors). The Court does not provide a reason for departing from the Reese October Projections on the issue of professional fees, and therefore, the exception appears to be a mere oversight. However, the effect of this oversight impacts value significantly. The professional fee expenses in the Reese October Projections were revised and increased, both in dollars and as a percentage of net patient service revenue, compared to the projected professional fee expenses contained in the Reese September Projections, from a range of 7.1% to 8.0% to a range of 9.1% to 9.6%. When the October 1998 projections for professional fee expenses as a percentage of net patient service revenue are applied to the Court's analysis, the value under the Income Approach is reduced by $13,374,500.92.

Pl. Mot. Recons. at 3. The court rejects this argument for the following reasons. The issue is whether the court erred in its

approach toward calculating variable professional fee expenses,

and, if so, whether that alters the outcome.[2]

A

One of the perils in the court having attempted to do its

own discounted cash flow analysis, amply demonstrated by Alberts'

motion for reconsideration, is that the record lacks evidence

explaining how the Reese Management Team[3] derived the Reese

October Projections of variable professional fees expense figures

which (in contrast to the Reese September Projections) simply

state a naked total amount of professional fees without any

breakdown as to how those fees were calculated.  Without evidence

explaining how the Reese October Projections calculated total

professional fees, the court deemed it inappropriate to assume

that they could be utilized to project variable professional fees

for future years.  Because the Reese Management Team did not

"show their work" in the Reese October Projections, the court

cannot know what formula that team relied upon in calculating

--------

[2]  For the years that the two Projections overlap, both the
Reese September and October Projections appear to have used the
same amount for non-variable professional fees (called "[f]ixed
. . . professional fees" or "professional fees legal, acctg,
consulting" in the Reese September Projections, and called
"[o]ther professional fees" in the Reese October Projections.)

[3]  The Reese Management Team consisted of representatives
from DCHC, a group of doctors who had formed Reese-Grant
Acquisition Group, Inc. ("RGAG"), and the management team hired
to eventually run Reese Hospital and Grant Hospital (a second
hospital that DCHC had a subsidiary acquire).

variable professional fees in arriving at the team's naked
statement of such fees in those Projections.  It is possible that
the Reese Management Team used a different methodology to
calculate the variable component of professional fee expenses in
the Reese October Projections.  The Reese Management Team could
have determined that this expense category would represent a
percentage of net patient service revenue based on historical
data, or modified the expense calculation as the hospital became
more stable.  Indeed, Alberts focused on the
percentage of net patient service revenue when he filed his
motion for reconsideration.  *See* Pl. Mot. Recons. ¶¶ 20-23 and
Ex. M.

     The court declined to speculate how the Reese October
Projections calculated variable professional fees.  Accordingly,
as the starting point for calculating variable professional fees,
it utilized the Reese September Projections which articulated an
operational formula (missing from the Reese October Projections)
for variable professional fees.  The "[v]ariable portion of
professional fees" listed in the Reese September Projections were
derived by multiplying the projected total number of equivalent
inpatient days (EIPDs) for each year, and multiplying that by the
"[v]ariable professional fees per EIPD" for each year.  (Pl. Ex.
300 at TRUST/HCA-007628.)  The court concluded that, from an
operational standpoint, it made sense to project variable

18

professional fees for future years as a function of EIPDs (after the court revised projected EIPDs).  The court resorted to the Reese September Projections because only those included a statement of the variable professional fees per EIPD.

The court was able to make a projection, based on its assumptions as to growth, regarding EIPDs for future years.  The court attempted to ascertain expenses affecting value on an operational basis, and not as a percentage of revenues.  It is not readily apparent that the court committed error in its findings regarding variable professional fee expenses.

Alberts, however, observes in his reply to the opposition to the motion for reconsideration that:

> For 1999, net patient service revenue in both the Reese September Projections and the Reese October Projections equals $194,221,000. However, professional fees increased from $13,898,000 in the Reese September Projections (or 7.2% of net patient service revenue) to $17,771,000 in the Reese October Projections (or 9.2% of net patient service revenue), which is not reflected in the Court's conclusions.  Because revenue did not change in the Reese October Projections, neither did patient volume and EIPD, and therefore, the professional fees per EIPD must have increased.

Reply at 9.  The Reese October Projections are somewhat inconsistent with that observation, as the 9.2% ratio does not hold constant, ranging from 9.1% to 9.6% for the years 2000 through 2002, as shown on Exhibit M to the motion for reconsideration.  Whatever formula the Reese October Projections utilized to compute variable professional fees remains hidden.

19

Nevertheless, I will proceed to address the outcome that would result if I accepted Alberts' revisions of projected variable professional fees.

### B

If I accept Alberts' argument regarding the appropriate amount of variable professional fees, he has not convinced me that the value that Reese Corp. gave up exceeded the value of what Reese Corp. acquired.  Because the value the court determined was more than what Reese Corp. paid, the court occasionally made assumptions in Alberts' favor as to some issues without actually deciding the correctness of such assumptions. Importantly, as to the issue of reimbursement rates to be paid by Humana, the court assumed in Alberts' favor that such rates would remain unchanged without deciding whether that would actually be the case.  Amended Mem. Dec. at 110-112.[4]  As discussed below, any decrease in value based on the increase in variable professional fees asserted by Alberts is offset when the court sets aside that assumption regarding Humana reimbursement rates and decides what value to accord the possibility that such rates might be increased.

Critically, patients served under a managed care arrangement

---

[4]  With one minor exception, relating to an increased reimbursement rate for Humana cases in the outpatient unit, the Reese Projections did not include the anticipated Humana changes. Amended Mem. Dec. at 91 n.53; 136.  The court's projections included no renegotiated Humana rates.

with Humana were a significant component of Reese Hospital's
business, but the Hospital's costs to treat a patient exceeded
Humana's reimbursement rates. Amended Mem. Dec. at 69-70. DCHC
adopted a strategy to negotiate more favorable reimbursement
rates with Humana. Amended Mem. Dec. at 74. Although there were
ancillary benefits from continuing to operate under the existing
terms under which Reese Hospital was operating with Humana, "DCHC
viewed the existing relationship between Humana and Reese
Hospital as an opportunity to negotiate higher reimbursement
rates, which would in turn improve Reese Hospital's operation
results and increase its revenues." Amended Mem. Dec. at 77.
Nevertheless, the court assigned no value to the possibility of
renegotiating terms with Humana.  The court stated:

> Although a hypothetical purchaser would likely have
> assumed that there was some chance of renegotiating the
> Humana terms, the court assumes in Alberts's favor that
> the purchaser would not have utilized an increased
> reimbursement rate for outpatient services performed on
> Humana patients in its projections of revenues because
> Humana would always have the upper-hand in any
> negotiations with Reese Hospital due to its relationship
> with Mercy Hospital.  (**This assumption results in
> understating the value of Reese Hospital because a
> hypothetical purchaser would likely assign some value to
> the chance of renegotiating the Humana terms**, but, even
> so, the value the court ultimately determines for what
> Reese Corp. received exceeds the Reese Transfers.
> Accordingly, for ease of analysis, the court assigns zero
> value to the prospect of renegotiating the Humana terms,
> without actually deciding what value that prospect would
> have.)

Amended Mem. Dec. at 111-112 (emphasis added). As the court
noted in the accompanying footnote:

21

Erich Mounce testified that the Reese Management Team "believed that we would be able to renegotiate [the Humana] contract to a much higher per diem and obtain some [carve] outs," (Trial Tr. 580:19-21, Jan. 23, 2007 (Mounce, E.)), because he "had been very successful in renegotiating contracts," (Trial Tr. 580:18-19, Jan. 23, 2007 (Mounce, E.)). See also Trial Tr. 583:5-16, Jan. 23, 2007 (Mounce, E.) ("[W]e believed under a new ownership . . . that we would be able to get it up to that market rate. We had been very successful before doing that . . ." and there is no "reason to believe that a buyer in the market of this hospital would have taken any different view . . . of what could be achieved with respect to the Humana contracts."); Trial Tr. 614:3-7, Jan. 23, 2007 (Mounce, E.) (felt Reese Corp. could negotiate new rates very quickly after November 12, 1998). (Donna Talbot testified similarly.) But the court finds this belief somewhat unreasonable because, as Melvin Redman made clear in his direct testimony, Humana always had the upper-hand in any negotiations with Reese Corp. due to its relationship with Mercy Hospital, Reese Hospital's nearby neighbor and primary competitor. (Trial Tr. 475:23-476:11, Jan. 23, 2007 (Redman, M.).) A hypothetical purchaser of Reese Hospital would likely have realized that Humana would have the upper-hand in any negotiations due to that relationship with Mercy Hospital, and would have taken that into account in projecting future revenues. It is difficult to say, however, whether a purchaser would ascribe absolutely no value to the chance of successful renegotiations with Humana. **Both Talbot and Mounce had experience in the health field, and the court is not inclined to treat their view of the possibility of renegotiation with Humana as totally unreasonable.**

Amended Mem. Dec. at 112 n.74 (emphasis added). In addressing whether value should be ascribed to the possibility of favorable renegotiation of Humana reimbursement terms, the court relied on Redman's testimony, which was based on negotiations with Humana *after* the Transfer Date. Such reliance was error. In the hindsight of post-closing negotiations, it is evident that Humana had the upper hand in any negotiations due to its close

relationship with Mercy Hospital, but hindsight is not a permissible way of performing a fraudulent conveyance valuation. *See Cooper v. Ashley Commc'ns, Inc. (In re Morris Commc'ns NC, Inc.)*, 914 F.2d 458, 466, 475 (4th Cir. 1990) (transfer must be evaluated as of the date of the transfer, and not based on later events). *See also Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of, Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 151 (3d Cir. 1996) (rejecting a test under which "only successful investments can confer value on a debtor" as such a test would entail impermissible hindsight, and recognizing that a debtor may embark on a venture that takes some risks that could generate value without such a venture giving rise to a fraudulent conveyance when the venture fails). DCHC and Reese Corp. representatives contacted Humana to begin negotiating increased rates before the Transfer Date. (Trial Tr. 726:22-728:12, Jan. 24, 2007 (Mounce, E.).) There is no suggestion in the record that those early negotiations ought to have caused Reese Corp. to realize that continuation of negotiations after Reese Corp.

purchased Reese Hospital had little chance of being successful.[5]

Both Mounce and Talbot believed that Reese Hospital would be able to negotiate a 15% increase in Humana rates.  The belief that Humana rates could be successfully renegotiated, a belief formed before the closing of the sale, was not lightly held. Mounce's testimony, which I found credible, was as follows:

> THE COURT: What was the degree of certitude that you had that this increase in per diems [for Humana reimbursement rates] by 15 percent with inclusion of stop loss would be achieved, if you could put a percentage on it?
>
> THE WITNESS: I think that based on our prior experience, that we were very confident, 85, 90 percent confident, we would get this because if you remember, I testified earlier that we really, we were looking for 20 or 25 percent increase and and I'm sure that that is what we were asking for, but this was a conservative kind of presentation and with the inclusion of stop loss, that actually, from a financial perspective artificially increases the per diem because a stop loss means that after so many days, you stop getting that per diem and you get a different reimbursement, i.e., typically what we were looking for was a percent of charges, which then is much higher. And so it starts going back from day one of the ad mission [sic] going forward. For example, if someone comes in with a heart attack and our stop loss traditionally has so much in gross charges and if the gross charges exceeded $300,000, then Humana would go back to day one and pay you a different way compared to if it was done under

---

[5]  Moreover, had Reese Corp. raised capital, and made the capital improvements to Reese Hospital that a hypothetical purchaser would have made (as posited in the court's valuation analysis), that would have improved its ability to attract doctors and patients, and might have placed Reese Corp. in a stronger negotiating posture with Humana.  In comparison, GHI had neglected Reese Hospital in many ways, and its failure to renegotiate reimbursement terms with Humana may have been symptomatic of GHI's approach towards its management of the hospital.

the per diem.

As Talbot explained:

> Well, they were paying under market.  You know, it is
> very common to renegotiate contracts when you can prove
> to the managed care company that their costs are higher
> than what they are paying you.  It's done all the time.

Trial Tr. 1704:25-1705:4, Jan. 30, 2007.  The Reese Projections

generally did not include the anticipated Humana changes, and

Talbot viewed that as a "very conservative" approach towards

projecting revenues.  Trial Tr. 1663:2-7, Jan. 30, 2007 (Talbot,

D.)  Talbot, in addressing "low hanging fruit," Trial Tr.

1075:14-1076:6, Jan. 25, 2007 (Talbot, D.), really thought that

Reese Corp. would be able successfully to renegotiate the Humana

contract within the first six months of 1999, and Reese Corp. was

"very surprised" when it was unable to do so.  *Id.*, at 1075:24-

1076:6.

In other words, Talbot and Mounce viewed Reese Corp. as

having a better than even chance of achieving the 15% increase in

Humana reimbursement rates.  No evidence was presented that

rebuts the reasonableness of that belief.  Alberts has not

convinced me that a hypothetical purchaser would have discovered

before purchasing Reese Hospital that Humana's close relationship

with Mercy Hospital would doom any effort at obtaining better

reimbursement rates from Humana.  Because Alberts bore the burden

of proof at trial, I find that a hypothetical purchaser would

have ascribed a 50% probability to the prospect of achieving a

25

15% increase in Humana reimbursement rates.

The revenues from the Humana contract were projected by the court to be $72,404,122.26 in 1999; $77,626,280.23 in 2000; $84,684,762.35 in 2001; and $90,612,695.72.  A hypothetical purchaser would reasonably assume that there was a 50% chance that a 15% increase in Humana reimbursement rates could be achieved by mid-1999.  The value of that 50% chance is $2,715,154.58 ($72,404,122.26 x 50% x 15% x only 50% of the year) for 1999; $5,821,971.02 for 2000; $6,351,357.18 for 2001; and $6,795,952.18 for 2002, an aggregate of $21,684,434.95.  (Even at only a 30% probability of achieving a 15% increase in reimbursement rates, the aggregate would exceed $13,000,000.)

In contrast, Alberts contends that by not utilizing the Reese October Projections with respect to variable professional fees, the court understated variable professional fees by $12,342,344.34 for the years 1998 through 2002.  The $21,684,434.95 increase in revenues attributable to the 50% probability-adjusted chance of achieving improved Humana rates dwarfs that $12,342,344.34 in increased expenses that would be attributable to increasing variable professional fees as Alberts contends is appropriate.  Even taking into account the lag time (until mid-2009) that it would take to obtain improved Humana reimbursement rates, it is obvious that the increase in value attributable to assigning a probability-adjusted value to the

prospect of negotiating better Humana reimbursement rates readily offsets the decrease in value that would arise if the court were to accept the increase in variable professional fees asserted by Alberts.[6]

In summary, the court determines that (1) taking into account the value that would be ascribed by a reasonable hypothetical purchaser to the prospect of renegotiating the Humana contract and (2) accepting Alberts' position regarding what a reasonable hypothetical purchaser would determine were variable professional fees, a hypothetical purchaser would ascribe a value to Reese Hospital greater than the amount previously determined by the court. Accordingly, Alberts has not shown that the variable professional fees issue results in a value less than what Reese Corp. transferred in exchange for its purchase.

C

Moreover, the issue is not whether fair market value was received, but whether reasonably equivalent value was received.

---

[6]  In 1998 and 1999, the change urged by Alberts with respect to variable professional fees would aggregate $2,888,709.64. The increase in revenues (based on a probability factor of 50%) for anticipated improved Humana reimbursement rates would be $2,715,154.58. The $173,555.08 difference fast becomes inconsequential because in 2000 the increase in revenues (based on a probability factor of 50% for anticipated improved Humana reimbursement rates) would be $5,821,971.02 versus an increase of only $3,027,729.22 in variable professional fees as urged by Alberts.

27

Talbot and Mounce did not act unreasonably, based on their extensive experience in the field of hospital management, in ascribing a better than 50% chance to successfully renegotiating a 15% increase in Humana reimbursement rates. Even if it were assumed that such an adjustment ought to be substantially less because the chance of renegotiating Humana rates was speculative, that is not the same as rejecting Talbot's and Mounce's good faith professional perspective regarding the prospect of achieving improved Humana reimbursement rates in deciding whether reasonably equivalent value was paid. Their perspective ought not be rejected in deciding whether reasonably equivalent value was paid.

Reese Corp. paid $66,048,840.00 to GHI in the transaction. Under the Illinois statute at issue, Alberts bore the burden of establishing that Reese Corp. received less than "reasonably equivalent value" in exchange for the transfer. 740 ILL. COMP. STAT. § 160/5(a). Even if Alberts succeeded in showing that the value of what Reese Corp. received was less than $66,048,840.00, that would not necessarily establish that Reese Corp. received less than reasonably equivalent value.

As observed in *Wachovia Secs., LLC v. Jahelka*, 586 F. Supp. 2d 972, 1015 (N.D. Ill. 2008):

> In determining whether reasonably equivalent value was received under the UFTA, courts should consider how that phrase has been construed under the Bankruptcy Code. *Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362,

28

374-75 (Bankr. N.D. Ill. 2005); *In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir. 1998).

There is no fixed formula for determining reasonable equivalence. *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997).  To resolve this question of fact, a court must evaluate the "totality of the circumstances" by addressing three primary factors: 1) the value of what was transferred compared to the value of what was received; 2) the existence of an arm's length relationship between the debtor and the transferor; and 3) good faith on the part of the transferee.  Mem. Op. of Jan. 2, 2007 (deciding Defs.' Mot. for Summary Judgment) at 7.  *See also Barber v. Golden Seed Co.*, 129 F.3d at 387; *Helms v. Roti (In re Roti)*, 271 B.R. 281, 295 (Bankr. N.D. Ill. 2002), *aff'd sub nom. Nelmark v. Helms*, 2003 WL 1089363 (N.D. Ill. Mar 11, 2003); *In re R.M.L., Inc.*, 92 F.3d at 148-49; *In re Morris Commc'ns NC, Inc.*, 914 F.2d at 467; *Peltz v. Hatten*, 279 B.R. 710, 736-37 (D. Del. 2002), *aff'd*, 60 F. App'x 401 (3d Cir. 2003).

Professor Jack F. Williams has persuasively observed that the case law has adopted a functional approach to the reasonably equivalent value issue, and that under that approach:

> The court should consider a trilogy of indicators in assessing reasonably equivalent value.  First, did the parties to the transfer act in good faith? . . . Second, was the transfer between a willing purchaser and a willing seller at a price to which they agreed at arm's length? . . . Third, if a market for the asset exists, what is the fair market value at the time of the transfer?  The astute reader, knowledgeable about basic economic theory, readily recognizes that the answer to

indicators one and two should have a direct impact on the answer to indicator three. After all, the definition of the fair market value of something is the price arrived at by arm's length negotiation between a willing buyer and a willing seller, neither acting under compulsion.

. . .

Reasonably equivalent value presupposes a range of values with the parameters of good faith and an arm's length transaction providing substance. It will be the rare case, indeed, where indicators one and two are met and not indicator three because each factor builds on itself. Good faith is necessary for a finding of a willful arm's length transaction which, in turn, is necessary for a finding that the price paid is in the appropriate range of values.

. . . [T]he courts have never required a dollar-for-dollar exchange. Something less than the actual market value of the asset may be acceptable so long as the values exchanged do not shock the conscience. "Inadequacy of price does not mean an honest difference of opinion as to price, but a consideration so far short of the real value of the property as to startle a correct mind, or shock the moral sense." [Quoting 37 Am. Jur. 2d *Fraudulent Conveyances* § 18, at 708 (1968).] Again, it is hard to imagine the case where the parties acted in good faith, reaching a price through a willful sale at arm's length, and still conclude that the values exchanged shock the conscience. Thus, in practice, indicators one and two will serve as proxies for indicator three in most if not all cases. Therefore, as long as the divergence from the actual fair market value arises in an arm's length transaction and is attributable to good faith negotiations, then the transfer price is within the range of acceptable consideration, that is, reasonably equivalent value. **This concept recognizes that the buyer can get a good deal, even a great deal, but not an obscene deal at the expense of the debtor's creditors, that is, when the debtor is insolvent.**

**The functional approach to reasonably equivalent value recognizes that the purpose of fraudulent transfer law is not to allow the debtor to re-trade a transaction struck in good faith and arrived at by arm's length negotiations. Such a transfer should not be a viable target of fraudulent transfer law.**

30

Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 BANKR. DEV. J. 55, 84-86 (1991) (footnotes omitted and emphasis added).  The court in *Peltz v. Hatten*, 279 B.R. at 738, embraced that very type of functional approach:

> When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight.

(citations omitted.)

In other words, fraudulent conveyance law does not posit perfect knowledge on the part of a hypothetical purchaser of a business, but asks instead whether the actual purchaser and the seller acted in a way that was designed and intended to achieve a just result from the perspective of the actual purchaser's creditors, and did not result in the actual purchaser's paying an amount so disproportionate to the fair market value of the property that it shocks the conscience of the court.  There is a wide range in the value that a purchaser, acting in good faith and with due diligence, could assign to a business it is acquiring, particularly when the business is as complicated as a hospital, and such a purchaser's purchase ought not be set aside as a fraudulent conveyance when some assumption it made in that fashion proves wrong.  Fair market value, determined by a court later, does not alone provide the answer as to whether reasonably

31

equivalent value was received.

This transaction was an arm's length transaction, and GHI (and its parent corporation, HCA) acted in good faith.  The court must give some weight to those factors in determining whether the transfer was for reasonably equivalent value.  *See In re R.M.L. Inc.*, 92 F.3d at 148; *In re Morris Commc'ns NC, Inc.*, 914 F.2d at 467 (noting that whether sale was an "an arm's length transaction between a willing buyer and a willing seller" is a factor of "considerable importance").  GHI (and its parent corporation, HCA) reasonably facilitated Reese Corp.'s gathering information incident to making the purchase.  There was a substantial period of time that Reese Corp. conducted due diligence, and subjected GHI's operational data to extensive scrutiny by professionals with long-standing experience in hospital operations, and with extensive assistance of outside professionals.  In this regard, courts have placed weight on whether the debtor engaged in "appropriate internal and external processes in its purchase decision, including conducting due diligence, consulting with investment bankers, venture capitalist . . . [and] an accounting and consulting firm with expertise" in the relevant industry.  *See Peltz*, 279 B.R. at 738.  While DCHC and Reese Corp. did not obtain appraisals of the Reese Hospital before closing the purchase, that does not demonstrate a lack of good faith on their part in deciding to complete the purchase.  As noted in the

Amended Mem. Dec. at 187-88:

> DCHC executives were sophisticated and experienced
> professionals in the healthcare industry, some having
> worked in the field for decades.   DCHC executives had
> successfully turned around distressed hospitals and were
> confident they could do the same with Reese Hospital.
> Throughout due diligence, Reese Corp. was represented by
> outside counsel at two major law firms, advised by
> independent consultants McGladrey & Pullen, and assisted
> by investment banking firms.    Thus, whatever new
> challenges DCHC faced due to the size of Reese Hospital,
> DCHC executives were not naive and inexperienced in
> matters of finance and acquisitions or in the industry
> such that HCA could have taken advantage of them.

Moreover, the overall reasonableness of the transaction was
reviewed by a nationally recognized rating agency, Duff & Phelps,
which in connection with rating NCFE's AAA-rated debt, conducted
its own separate and independent due diligence.  Mounce Trial
Test., Jan. 23, 2007 at 532:3-17.  Finally, the Illinois Health
Facilities Planning Board reviewed and approved the purchase
after holding several hearings and obtaining detailed information
regarding the sale.  Defs.' Ex. VN; Talbot Trial Test., Jan. 30,
2007 at 1639:25-1642:6.

DCHC, Reese Corp.'s parent corporation, was headed by Paul
Tuft, who had long experience in dealing with the financial
aspects of hospitals, and DCHC, through subsidiaries or
otherwise, had acquired several hospitals (albeit none the size
of Reese Hospital).  In addition, at the outset of investigating
purchasing the hospital, and continuing through to the closing of
the sale, Tuft dealt with a group of doctors, who had formed

Reese-Grant Acquisition Group, Inc. ("RGAG"), who were familiar inside and out with Reese Hospital's operations, who were enthusiastic that with their participation Reese Hospital could be turned around, and with whom DCHC planned to have Reese Corp. partner in acquiring Reese Hospital.[7]  Tuft was of the reasonable view that such doctor support, a critical factor in how well a hospital succeeds, was a big plus in deciding whether to purchase the hospital.  Well before the deal was closed, Tuft had consulted with Kenneth Bauer, an experienced hospital operations professional, regarding the hospital's strengths and weaknesses and what Reese Corp. could do to improve it, and by late summer of early fall 2008, Bauer had been hired to run the hospital. Finally, DCHC and Reese Corp. engaged in extensive "due diligence" examining GHI records regarding the operation of Reese Hospital, and, had prepared extensive projections regarding what they believed could be achieved.

That some of the Reese Projections were viewed by this court

---

[7]  McGladrey & Pullen, a regional independent accounting firm, met with representatives of DCHC and RGAG in reviewing a possible business plan for turning around Reese Hospital. Eventually, in May 2008, Talbott decided that some of McGladrey & Pullen's conclusions were not appropriate, and she and Cheryl LaCoste (who was a former CFO at Reese Hospital and who was acting as a consultant for RGAG) took over making financial projections based on management assumptions of RGAG and DCHC. Nevertheless, McGladrey & Pullen had prepared a financial model that included all of the historical data from Reese Hospital, and Talbott and LaCoste took the core aspects of the model and then built on top of it, with modifications.

as unreasonable in fixing a value for the assets, does not mean
that Reese Corp. (in conjunction with its parent, DCHC) did not
act in good faith.  Talbot credibly testified that her
projections were made in good faith, were believed by the Reese
Management Team to be attainable, and were not manipulated to
insure that lending would be secured to accomplish the purchase.
Indeed, the team members even examined the projections from a
worst case perspective because they realized that they were
putting up a huge amount of money to buy Reese Hospital.  Talbot
even met with Ken Bauer in the summer of 1998, before he was
hired to run the hospital, to go over the assumptions and
projections, and took comfort in his financial expertise and
experience being located in Chicago.  That the team made
assumptions that proved overly optimistic does not mean that it
was not attempting to make an honest and reasonable effort to
assure that it was paying an appropriate price for the hospital
and that the hospital could achieve a sound financial future
justifying the purchase.  The court's disagreement with some of
Reese Corp.'s projections as overly optimistic does not establish
that the Reese Management Team was not making a good faith,
reasonable effort to assure that it was receiving fair market

value in the transaction.[8]

Here, experienced hospital operations professionals were of the view that there was a good possibility of favorable renegotiated terms being reached with Humana.  In proceeding to make the purchase based, in part, on that assumption, they cannot be viewed as having acted unjustly with respect to Reese Corporation's creditors.  Fraudulent conveyance law ought not operate as a guaranty or warranty, to be used as a tool to set aside an insolvent entity's purchase of a business, on the basis that an assumption the purchaser made regarding what it could

---

[8]  For example, the biggest immediate strategy Reese Corp. envisioned implementing was the reduction of the number of full time equivalents which was supposed to take place January 1st of 1999.  The Reese Management Team looked at national benchmarks, and the ratio of salary and benefit expense to patient revenue at Reese Hospital far exceeded the national benchmarks, and felt that they could bring those numbers down closer to what other for profit hospitals did.  That goal did not take place to the extent projected because Reese Corp. had not appreciated how difficult that goal would be to accomplish because of the physical configuration of Reese Hospital's buildings, and because Reese Corp. did not consolidate buildings as soon as it had planned to bring hospital units closer together.  To arrive at a determination of fair market value, under a discounted cash flow analysis, the court took a more pessimistic view of the impact of the hospital's physical configuration.  But different prospective purchasers may reasonably take different views of how successful the business being acquired will be.  Here, the view that the number of full time equivalents could be reduce was taken by individuals with considerable experience in hospital operations and turning around financially distressed hospitals, acting in a good faith, reasonable effort to assure that fair market value was being received for the Subject Transfers.  That the court might fix *fair market value* at one figure does not mean that a different figure, based on assumptions made in a good faith and a reasonable effort to assure that fair market value was being received, is not *reasonably equivalent value*.

achieve in that business – an assumption arrived at in good faith and based on experience in the field of the business being acquired – later proved wrong.

Accordingly, in ascertaining whether reasonably equivalent value was received, the court must take into account the increased profitability that was projected to likely result via achieving more favorable Humana reimbursement terms. Alberts has not shown that such increased value would be offset, in reasonably equivalent value analysis, by the reduction in value that would result from using the Reese October Projections with respect to professional fees.

D

In its original decision, the court rejected the projections of Alberts' expert, Demchick, as not being rooted in any kind of operational reality. The court could have ruled that Alberts had not established his case on the basis that, without a reliable discounted cash flow analysis, Alberts had not shown what a hypothetical purchaser would have paid for the assets that Reese Corp. acquired.

Instead, the court attempted (with considerable trepidation, given its lack of expertise in hospital operations and valuations) to show that even if the court embarked on its own discounted cash flow projections after making what the court thought were appropriate adjustments to the Reese Projections,

the result was the same: Alberts had not shown that Reese Corp. paid less than the value of what it received. Specifically, the court credited the Reese Projections in part and modified the projections in part consistent with the evidence presented at trial to attempt to derive an appropriate discounted cash flow analysis. Even under that approach, the court concluded that Reese Corp. paid less for the assets it acquired than they were worth, thus further supporting the finding that Alberts did not present sufficient evidence to carry his burden of proving that less was paid for the assets than they were worth.

As the court recognized, however, that approach was fraught with peril. This court's discounted cash flow analysis was an attempt to buttress the conclusion that Alberts had failed to present expert testimony establishing the value of the property, and was rife with uncertainty as to whether the court's assumptions were correct. Moreover, the trial in this adversary proceeding took place long after the transaction at issue had closed, with the result that assessing the value of what Reese Corp. received in the transaction was the equivalent of viewing the transaction through a darkly tinted window.

As the plaintiff, Alberts suffers the consequences of any resulting doubts as to the reliability of the evidence regarding events and conditions at the time of the transaction in reaching a clear picture of the value of what Reese Corp. received.

Alberts bore the burden of proving the fair market value of the property for purposes of ascertaining whether the assets received were reasonably equivalent value, and the fair market value remains in doubt.  I conclude that Reese Corp. received "reasonably equivalent value."  I make this finding taking into account:

- the arm's length nature of the transaction;

- the good faith of both parties;

- the due diligence of Reese Corp. in pursuing the purchase;

- the large degree of uncertainty regarding what assumptions a hypothetical purchaser would have made in purchasing the property and thus the large degree of uncertainty regarding the true fair market value of what Reese Corp. received in the transaction;

- the failure of Alberts to offer reliable expert testimony with which to fix the fair market value of the property Reese Corp. received;

- the lack of any expert valuation testimony by anyone having expertise in hospital operations; and

- this court's lack of expertise in hospital operations and in making appropriate assumptions (regarding such matters as discount rates) in performing a discounted

cash flow analysis.

I conclude that Alberts has not established that GHI did not

transfer to Reese Corp. reasonably equivalent value based on the

asserted error regarding projected variable professional fees.

V

Finally, Alberts points to an alleged error in how the court

dealt with depreciation and amortization in calculating a

terminal value in its income approach to valuation.  He argues:

> The Court also miscalculated the depreciation and
> amortization expense used to reach the terminal value in
> its Income Approach.  Specifically, the Court calculated
> that depreciation for the one-time, 1999 capital
> expenditures extended into perpetuity, rather than having
> them substantially expire after 2004, as is appropriate.
> As a result, the depreciation and amortization expense
> included within the Reese October Projections for the
> years 1998 through 2002 and used by the Court are higher
> because they include depreciation for capital
> expenditures (mostly relating to the purchase of medical
> and computer equipment) at the level of $16,967,391
> projected for 1999.  Because a typical taxable life for
> this type of equipment would be approximately five years,
> and capital expenditures were projected to be reduced to
> $4 million in 2000 and for each year thereafter (adjusted
> for long term growth), the depreciation and amortization
> expense would significantly decrease in 2005.  The
> decrease in the depreciation and amortization expense has
> the effect of increasing the income tax expense due to
> the reduced deduction, and in turn, reducing net cash
> flow.  When the depreciation and amortization expense is
> properly adjusted, the value is reduced by $7,754,375.42.

Pl. Mot. Recons. at 3-4.  In support of his argument, Alberts has

submitted spreadsheets (Pl. Mot. Recons. Ex. O, copy attached

hereto) prepared by his expert's valuation firm.

A

The court projected that Reese Hospital would achieve stabilized operations in 2001 and for purposes of calculating a terminal value and a terminal net cash flow for Reese Hospital, projected revenue and expenses for the year following the first year of stabilized operations at the hospital, *i.e.*, 2002. Amended Mem. Dec. at 140 n.96. The court treated the terminal year 2002 as having a stabilized amount of depreciation and amortization, $11,586,000, and utilized that in calculating a terminal value.[9]

---

[9] The court treated the depreciation and amortization figures in the Reese October Projections (Pl. Ex. 144A at p. 13) as sound because the record lacked any evidence as to the lack of reasonableness of those projections with respect to depreciation and amortization. Amended Mem. Dec. at 143-44. HCA's expert adopted the same projections. The projected depreciation and amortization figures were:

| | |
|---|---|
| 11/12/98 to 12/31/98: | $3,194,800.00 |
| 1999: | $9,083,000.00 |
| 2000: | $10,652,000.00 |
| 2001: | $11,120,000.00 |
| 2002: | $11,586,000.00 |

Alberts does not assert that the court committed error in adopting those depreciation and amortization figures. *See* Pl. Reply at 11, ¶ 23 ("Plaintiff's position is . . . not that the Court's adoption of the depreciation expenses from 1998 to 2002 in the Reese October Projections is incorrect.").

Alberts criticizes the court for "extend[ing] the
depreciation for the 1998 and 1999 capital expenditures into
perpetuity, rather than having it end in 2004," arguing further
that "as a result of the relatively large capital expenditures in
1998 and 1999, and corresponding relatively large depreciation
for approximately the following five years (through 2004), Reese
Hospital would not be expected to reach stabilized cash flows
until 2005." (Pl. Mot. Recons. at 14.)  At trial, however,
Demchick identified 2002 as the year of stabilized operations and
the basis for calculation of the terminal value for discounted
cash flow analysis.  *See* Defs.' Ex. JV, Tab 2 at Ex. 6; Demchick
ppt. at 68, 72.  Alberts did not argue at trial, and the experts'
reports did not contend, that based on the prospect that
depreciation and amortization would decrease in the years after
2002, a later year should be used for calculating a terminal year
value.  It is inappropriate after the trial has concluded for
Alberts to inject a new argument into this proceeding.

Alberts contends in his reply to the opposition to his
motion that he is not attempting to inject a new issue into the
proceeding because this issue was created by the court's use of
the depreciation expense from the Reese October Projections for
its terminal year calculation and thus this was not an issue at
trial.  Pl. Reply at 11-12, ¶ 24.  Alberts, however, never argued
(contrary to his own expert's opinion) that the year 2002 would

42

*not* be a stabilized year of operations for purposes of

depreciation and amortization expense, or that 2002 was an

inappropriate year for determining a terminal year value.

Alberts responds to the defendants' argument that the court

followed the same methodology that his own expert followed by

contending:

> Demchick did not reduce his projected terminal year
> depreciation expenses to reflect the depreciation
> decline in 2005 because his terminal year projections
> were already at a substantially lower level ($6.4
> million).  Pl.'s Ex. 209.

Pl. Reply at 13, ¶ 27.  This argument is unpersuasive.

Demchick's projections of capital expenditures included

substantial capital expenditures in the years 1999 and 2000, much

of which was for equipment[10] that (according to the reasoning of

---

[10]  Demchick's projection and the court's ultimate
projection of capital expenditures for a discounted cash flow
analysis were as follows:

| Year | Demchick's Projection of Capital Expenditures | Court's Projection of Capital Expenditures |
|------|-----------------------------------------------|--------------------------------------------|
| 1998 | $3,036,986.00 | $4,769,595.00 |
| 1999 | $19,350,000.00 | $16,967,391.30 |
| 2000 | $10,350,000.00 | $4,000,000.00 |
| 2001 | $4,000,000.00 | $4,000,000.00 |
| Each succeeding year | $4,000,000.00 | $4,000,000.00 |

Alberts' motion for reconsideration) would be fully depreciated

by the year 2005.  Demchick presumably included the depreciation

of such equipment in his projections of depreciation and

amortization.[11]  Yet, in utilizing 2002 as an appropriate year

for calculating a terminal year value, Demchick treated his

depreciation and amortization figure for the year 2002 as a

stabilized figure even though that figure (under the reasoning of

---

[11]  Demchick argued that depreciation and amortization
should stabilize in 1999 at $5,894,390.00 (compared with the
$9,056,000.00 projected by the Reese Management Team and adopted
by this court) and increase at 3.0% per year from 1999 onward
without variation. (*See*, *e.g.*, Pl.'s Tr. Ex. 209 at G-1 (showing
depreciation and amortization for 1999 increasing at 3.0% per
year thereafter); Demchick trial ppt. at 65 (same).)  As the
court noted (Amended Mem. Dec. at 143 n.97), Demchick never
explained why he deviated so sharply from the Reese Projections'
depreciation and amortization figures (set forth in n.9, *supra*).
Because the year 2000 included a substantial increase over
the year 1999 in capital expenditures, it made no sense that
Demchick treated depreciation and amortization as stabilizing in
1999 (except for a 3% per year increase thereafter).  Demchick
described his projections as an "averaging" that "is not really
relevant to the ultimate answer" of Reese Hospital's business
enterprise value because "when you look at the valuation, it is
not a cash flow item, so it gets added back." (Trial Tr. 2104:16-
20, Feb. 6, 2007 (Demchick, N.).)  As the court recognized,
however, the depreciation and amortization has an impact on
income taxes, which does influence value, and thus criticized
Demchick's averaging approach.  Amended Mem. Dec. at 143 n.97.
However, no testimony or argument was presented at trial to
alert the court that depreciation and amortization would decrease
after 2002, thus increasing income taxes and adversely affecting
value (such as to make the year 2002 an inappropriate terminal
year because depreciation and amortization, and thus income
taxes, were not at a stabilized level).  Nor was testimony or
argument presented to demonstrate how to quantify the stabilized
level of depreciation and amortization in a terminal year 2005.
It is too late after the trial has concluded for Alberts to
inject these issues into the proceeding.

Alberts' motion for reconsideration) would necessarily be lower after 2005 because (under the reasoning of Alberts' motion for reconsideration) Demchick's projections of extraordinary expenditures in 1999 and 2000 on equipment (*see* n.10, *supra*) would have been fully depreciated by then.[12]   Accordingly, the court *did* follow the same methodology as Demchick, utilizing whatever was determined to be the depreciation and amortization for 2002 as a stabilized figure, making it appropriate to utilize the year 2002 for purposes of determining a terminal year value.

In arguing, erroneously, that the court's analysis injected a new issue into the proceeding, and that he thus should be allowed to raise his new argument, Alberts cites *Monarch Healthcare v. Superior Court*, 93 Cal. Rptr. 2d 619, 622 (Ct. App. 2000), which noted that a party should be provided the opportunity to address a new issue raised by the trial court "so that the ensuing order does not issue like a 'bolt from the blue

---

[12]   That would make the year *2006* the appropriate terminal year if one accepts Demchick's projection that relatively large capital expenditures would cease only in 2000.   Alberts argues that under *the court's* projections the year *2005* would be the appropriate terminal year.   In contrast to Demchick's projection that relatively large capital expenditures would cease *in 2000*, with capital expenditures reaching a stabilized level of $4,000,000 per year only in 2001, the court projected that relatively large capital expenditures would cease *in 1999*, with capital expenditures reaching a stabilized level of $4,000,000 per year in 2000.   Under the reasoning of Alberts' motion for reconsideration, the depreciation of the equipment component of those large capital expenditures, *as projected by the court*, would be completed by 2004 (not 2005), thus making the year 2005 an appropriate year for computing a terminal year value.

out of the trial judge's chambers.'" (citations omitted).[13]  It
is Alberts who has raised an issue like a "bolt from the blue,"
not the court.  No one opined or argued at trial that
depreciation would not be at a stabilized level in 2002.  The
issue that Alberts seeks belatedly to inject into the proceeding
was created by the court's utilization of the same methodology
that Alberts' expert followed of utilizing the projected
depreciation and amortization expense figure for the year 2002
(whatever that amount was) as a stabilized depreciation and
amortization expense figure.

Alberts finally argues that the failure of Demchick to raise
the issue at trial does not prevent the court from correcting a
common and easily correctable error, noting that "[a] common
error in estimating future depreciation and capital expenditures
is to have depreciation exceeding capital expenditures.  This
cannot happen into perpetuity." (Quoting Jay E. Fishman, *et al.*,
*PPC's 18th ed.*, at ¶ 502.55, 5-21.)  The error, however, arose
from Alberts' failure to present evidence or argument alerting
the court that in performing a valuation it ought to take into

---

[13] Alberts also cites *Kanelos v. Kettler*, 406 F.2d 951, 954
n.15 (D.C. Cir. 1968) (court should afford the party against whom
a judgment is rendered the opportunity to address a new point
raised by the court in its decision "which the losing party had
no occasion to address with evidence"); and *State v. Bell*, 899
P.2d 1000, 1003 (Kan. 1995) (when an appellate court raises a new
issue sua sponte, counsel for all parties should be afforded a
fair opportunity to address the new issue before the issue is
finally determined).

account the fact that depreciation and amortization after 2002
would decrease.  An error in Demchick's report would not have
been binding on Alberts at trial, but Alberts bore the burden of
raising his argument at trial or in his post-trial submissions,
and not belatedly raising it only in a post-judgment motion.

It is inappropriate under Rule 59(e) to consider an argument
that could, and should, have been raised before the judgment
issued.[14]  "Rule 59(e) motions are aimed at reconsideration, not
initial consideration."  *District of Columbia v. Doe*, 611 F.3d
888, 896 (D.C. Cir. 2010) (quoting *Nat'l Ecological Found. v.
Alexander*, 496 F.3d 466, 477 (6th Cir. 2007)).[15]  Similarly, a
Rule 52(b) motion may not be used to raise an argument that could
have been raised prejudgment.  *See Diocese of Winona v.
Interstate Fire & Cas. Co.*, 89 F.3d at 1397; *Fontenot v. Mesa
Petrol. Co.*, 791 F.2d at 1219; *Salazar v. District of Columbia*,

---

[14]  *See Carter v. Wash. Metro. Area Transit Auth.*, 503 F.3d
143, 145 n.2 (D.C. Cir. 2007); *Kattan v. District of Columbia*,
995 F.2d at 276; *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th
Cir. 1996) (Rule 59(e) "does not provide a vehicle for a party to
undo its own procedural failures, and it certainly does not allow
a party to introduce new evidence or advance arguments that could
and should have been presented to the district court prior to the
judgment."); *Fed. Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260,
1268 (7th Cir. 1986); *Fields v. Vilsack*, 2012 WL 256051, at *2;
*Armenian Assembly of America, Inc. v. Cafesjian*, 2011 WL 4014297,
at *5.

[15]  The issue Alberts seeks tardily to interject is not
based on an intervening change in the law or on evidence that was
unavailable at trial, and thus does not fit within any of the
exceptions to the impropriety of raising a new issue post-
judgment.

47

685 F. Supp. 2d at 75.  In any event, Alberts' failure to raise
the issue before entry of judgment only serves to emphasize the
uncertain nature of valuation, and the necessity in fraudulent
conveyance law to treat "reasonably equivalent value" as not the
same thing as "fair market value."  If Alberts' own expert
committed the very same error that Alberts complains the court
committed in arriving at a fair market value, and if, as he
notes, the error is a common one, this only serves to demonstrate
that in their transaction the parties might in good faith have
believed that fair market value was being exchanged.

B

Addressing the issue of the impact of post-2002 depreciation
on value would be opening a can of worms, and this strengthens my
conclusion that granting reconsideration on this issue would be
inappropriate.  The defendants would be entitled to present
spreadsheets prepared by their own expert to rebut the belated
spreadsheet analysis of Alberts' expert (Pl. Mot. Recons. Ex. O)
regarding depreciation.  Moreover, if I were to consider Alberts'
request to address this issue, he has made assumptions regarding

depreciation that are not supported by the record.[16]

1.

First, Alberts omits on his spreadsheets (Pl. Mot. Recons.
Ex. O) $3,140,000 of depreciation in 2003 on various equipment.
The court projected that a total of $15,700,000 would be spent in
1998 on equipment purchased as part of the sale from GHI
($12,000,000), cardiac catheterization equipment ($1,200,000),
and computer Y2K ($2,500,000). Alberts' Exhibit O lists these as
having a 5-year asset life, and shows no depreciation with
respect to these assets in 1998 (the assets being projected to be
purchased in late 1998), and $3,140,000 of depreciation for these
assets in each of the years 1999, 2000, 2001, and 2002, but none
in 2003. In other words, the depreciation for the final and
fifth year of depreciation at $3,140,000 per year is missing. At

_____

[16] Had Demchick raised the issue in his expert report, it
might have led to in-depth discovery of DCHC and Reese Corp.
personnel regarding the amount and nature of anticipated capital
expenditures (or expert testimony regarding the amount and nature
of capital expenditures that a hypothetical purchaser would
make), and expert testimony regarding the impact of the amount
and nature of depreciation expenses on value. Now that the trial
has concluded, unless the court were to reopen discovery and the
evidentiary record, it is too late for that to occur. The
consequence is that the record has gaping holes regarding facts
pertinent to the issue. Because Alberts bears the burden of
proof, he suffers the consequences of the deficient evidentiary
record. It follows that if reconsideration were granted, and
when the evidentiary record does not supply an answer, the court
would be required to make assumptions in favor of the defendants
regarding the amount and nature of anticipated capital
expenditures a purchaser would make.

a tax rate of 38.88%, $3,140,000 of depreciation in 2003 would
have decreased income taxes in 2003 (and increased cash flow in
2003) by $1,220,832.  For purposes of a discounted cash flow
analysis, the court determined that a discount factor of 46.14%
was appropriate for the year 2003's net cash flow.  Applying that
46.14% discount factor to an increased cash flow for 2003 of
$1,220,832 results in an increased value (under an income
approach) of $563,291.88, reducing to $7,191,083.64 the
$7,754,375.42 decrease in such value that Alberts' spreadsheets
show.  *See* Exhibit 1 hereto.

2.

Second, the defendants correctly observe that Alberts has
relied upon facts that are not supported by the evidentiary
record.  In its discounted cash flow analysis, the court
projected that there would be $2,500,000 in capital expenditures
with respect to the relocation of the emergency room at Reese
Hospital.  In the spreadsheets attached as Exhibit O to the
motion (spreadsheets that were not offered at trial), Alberts has
calculated depreciation on that $2,500,000 in capital
expenditures based on an assumption that 50% of the expense would
be related to building costs (with an asset life for tax purposes
of 39 years), with the remaining 50% related to equipment (with
an asset life for tax purposes of 5 years).  (Pl. Mot. Recons.

Ex. O at 2 nn.(d) & (e).)[17]  Nothing in the evidentiary record

supports the assumption that the $2,500,000 in emergency

relocation capital expenditures would relate 50% to equipment.

The court would commit clear error if it adjusted its findings

based on this factual assumption that is without substantial

evidentiary support in the record.  *Cuddy v. Carmen*, 762 F.2d

119, 124 (D.C. Cir. 1985) ("a finding is 'clearly erroneous' if

it is without substantial evidentiary support" in the record).

Alberts' reply to the defendants' opposition to his motion met

this contention with silence, and the point is taken as conceded.

If Alberts' spreadsheets (Pl. Mot. Recons. Ex. O) are adjusted to

treat the emergency room relocation as 100% a real property

expense (and to include the $3,140,000 of depreciation omitted

for the year 2003 discussed in the preceding paragraph), the

result is that the decrease in value on the spreadsheets is

reduced to $6,839,904.55.  *See* Exhibit 2 attached hereto.

3.

    Third, this same error exists as to another part of the

spreadsheets (Pl. Mot. Recons. Ex. O).  The court found as a

factual matter that a hypothetical purchaser would reasonably

---

[17]  The spreadsheets treat the annual depreciation relating
to the building costs for the emergency room relocation as
stabilized at $28,257.77 as of 2002 for purposes of a terminal
value calculation, but treat the equipment depreciation as
stabilized at zero in 2005 after the equipment has been fully
depreciated in 2004.

project miscellaneous capital expenditures equal to $536,986.30
for 1998, and $4,000,000.00 per year thereafter.  Alberts'
spreadsheets (Pl. Mot. Recons. Ex. O) treat all of those
miscellaneous capital expenditures as relating to property with a
five-year depreciation schedule under the Internal Revenue Code.
Nothing in the record permits a determination of what percentage
of those miscellaneous capital expenditures would be depreciable
over five years instead of being treated under the Internal
Revenue Code as property subject to a longer depreciation period.
If the depreciation of those annual capital expenditures of
$536,986.30 for 1998, and $4,000,000.00 per year for the years
1999 through 2001 are treated as being 100% for 39-year property,
and the annual expenditure of $4,000,000 in later years is
treated as five-year property, this would reduce the
$6,839,904.55 figure arrived at in the previous paragraph to
$4,810,931.05.  *See* Exhibit 3 hereto.[18]

_____

[18]  I recognize that it is possible that the percentages of
property that is equipment versus real property would likely be
the same each year.  My hunch as a layperson is that a hospital
would be spending funds principally on replacing equipment (a
category that tends to wear out more quickly than real property
improvements), but Reese Hospital may have had unique real
property improvements that were needed.  The bottom line is that
it is pure speculation what the actual percentages would be for
each year.  The witness who prepared the Reese October
Projections was not queried at trial regarding the nature of the
annual $4 million in miscellaneous capital expenditures.  When
necessary evidence is unavailable to make a finding, that
requires that an assumption be made in the defendants' favor.
*See* n.16, *supra*.

4.

Fourth, the record contains evidence raising doubts about
the correctness of Alberts' assumptions concerning the rate at
which property would depreciate.  Alberts assumes (in Pl. Mot.
Recons. Ex. O) that all equipment would be depreciated over a
five-year period, and in this regard he cites 26 U.S.C.
§ 168(e)(3)(B)(iv) (five-year property includes "any qualified
technological equipment") and (i)(2)(A)(iii) (qualified
technological equipment includes "any high technology medical
equipment").  Pl. Mot. Recons. at 15, ¶ 26.  But the Reese
September Projections indicated that there would be a seven-year
tax depreciable life for $10,700,000 of non-computer equipment
projected as being purchased in 1998 and 1999, with only computer
equipment being depreciated based on a five-year tax depreciable
life.  *See* Trust Ex. 300 at TRUST/HCA-007586.  If the non-
computer equipment purchased in 1998 and 1999 are treated as
seven-year property, and (the assumptions set forth in parts 1
through 3, above, are kept in place), that would result in only a
negative $1,594,569.87 change in value under an income approach
to valuation.  *See* Exhibit 4 hereto.

C

Even if I were to grant reconsideration, and recompute value
based on the impact of certain capital expenditures being rapidly
depreciated such that 2002 would not be an appropriate terminal

53

year for a discounted cash flow analysis, that would not alter my

conclusion that reasonably equivalent value was given to Reese

Corp.  Based on the analysis set forth in parts V.B.1 and V.B.2,

above, Alberts would not be able to demonstrate that any more

than a $6,839,904.55 reduction in value (computed under an income

approach) would be appropriate.[19]  That $6,839,904.55 would

change the discounted cash flow value from $72,185,925.65 found

in the court's opinion to $65,346,021.10.  Under the court's

prior opinion (*see* Amended Mem. Dec. at 180), this would mean

that the value of Reese Hospital on the transfer date would be:

$$($57,985,984 \times .25) + ($65,346,021 \times .75) = $63,506,011$$

That $63,506,011 represents 93.32% of the $68,048,840.00 value of

the Reese Transfers.  If the defendants transferred property

worth $63,506,011 in exchange for Reese Transfers of $68,048,840,

this would represent for them a good deal, even a great deal, but

because there would be only a 6.68% shortfall in value received,

and because the parties acted in good faith and made the transfer

at a price to which they agreed at arm's length, it would not

represent "an obscene deal at the expense of the debtor's

creditors," Jack F. Williams, *Revisiting the Proper Limits of*

*Fraudulent Transfer Law*, 8 BANKR. DEV. J. at 86, and, the court

---

[19]  I will assume in Alberts' favor (without deciding) that
he would be able to point to evidence to convince me (despite my
concerns in parts V.B.3 and V.B.4, above) that the $6,839,904.55
would be an appropriate decrease in value (under the income
approach).

would find that reasonably equivalent value was exchanged.  *Id.*
at 84-86.  Taking into account my previous discussions in this
proceeding of the law regarding reasonably equivalent value, I
conclude that the $63,506,011 would be reasonably equivalent
value.  The reconsideration sought by Alberts would not change
the outcome.

VI

Based on the foregoing, an order follows denying Alberts'
motion for reconsideration.

[Signed and dated above.]

Copies to: Counsel of record.

# **Exhibit O**

**Capital Expenditures**

| Asset: | 1998 | (a) | 1999 | (a) | 2000 | (a) | 2001 | (a) | 2002 | (a) | 2003 | (b) | 2004 | (b) | 2005 | (b) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Building | $ 25,000,000.00 | | $ - | | $ - | | $ - | | $ - | | $ - | | $ - | | $ - | |
| Equipment | 12,000,000.00 | | - | | | | | | | | | | | | | |
| Cardiac Cath Equipment | 1,200,000.00 | | - | | | | | | | | | | | | | |
| Computer Y2K | 2,500,000.00 | | 9,000,000.00 | | - | | | | | | | | | | | |
| ER Relocation | 295,893.72 | | 2,204,106.28 | | - | | | | | | | | | | | |
| Cosmetic Enhancements | 236,714.98 | | 1,763,285.02 | | - | | | | | | | | | | | |
| Other (a) | 536,986.00 | | 4,000,000.00 | | 4,000,000.00 | | 4,000,000.00 | | 4,000,000.00 | | 4,212,800.00 | | 4,436,920.96 | | 4,672,965.16 | |
| Total CapEx | $ 4,769,594.70 | | $ 16,967,391.30 | | $ 4,000,000.00 | | $ 4,000,000.00 | | $ 4,000,000.00 | | $ 4,212,800.00 | | $ 4,436,920.96 | | $ 4,672,965.16 | |

**Annual Accumulated Depreciation (c)**

| Asset: | Asset Life | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | Terminal Year 2005 |
|---|---|---|---|---|---|---|---|---|---|
| Building | 39 | | $ 641,025.64 | $ 641,025.64 | $ 641,025.64 | $ 641,025.64 | 641,025.64 | $ 641,025.64 | $ 641,025.64 |
| Equipment | 5 | | 2,400,000.00 | 2,400,000.00 | 2,400,000.00 | 2,400,000.00 | - | - | - |
| Cardiac Cath Equipment | 5 | | 240,000.00 | 240,000.00 | 240,000.00 | 240,000.00 | - | - | - |
| Computer Y2K Capex of $2,500,000 | 5 | | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | - | - | - |
| Computer Y2K Capex of $9,000,000 | 5 | | 900,000.00 | 1,800,000.00 | 1,800,000.00 | 1,800,000.00 | 1,800,000.00 | 900,000.00 | - |
| ER Relocation Capex of $295,894 — 1/2 of capex related to Bldg (d) | 39 | | 3,793.51 | 3,793.51 | 3,793.51 | 3,793.51 | 3,793.51 | 3,793.51 | 3,793.51 |
| ER Relocation Capex of $295,894 — 1/2 of capex related to relocation (e) | 5 | | 29,589.37 | 29,589.37 | 29,589.37 | 29,589.37 | 29,589.37 | - | - |
| ER Relocation Capex of $2,204,106 — 1/2 of capex related to Bldg (d) | 39 | | 14,128.89 | 28,257.77 | 28,257.77 | 28,257.77 | 28,257.77 | 28,257.77 | 28,257.77 |
| ER Relocation Capex of $2,204,106 — 1/2 of capex related to relocation (e) | 5 | | 110,205.31 | 220,410.63 | 220,410.63 | 220,410.63 | 220,410.63 | 110,205.31 | - |
| Cosmetic Enhancements Capex of $236,715 | 5 | | 47,343.00 | 47,343.00 | 47,343.00 | 47,343.00 | 47,343.00 | - | - |
| Cosmetic Enhancements Capex of $1,763,285 | 5 | | 176,328.50 | 352,657.00 | 352,657.00 | 352,657.00 | 352,657.00 | 176,328.50 | - |
| Other 1998 Capex of $536,986 | 5 | | 107,397.20 | 107,397.20 | 107,397.20 | 107,397.20 | 107,397.20 | - | - |
| Other 1999 Capex of $4,000,0000 | 5 | | 400,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 400,000.00 | |
| Other 2000 Capex of $4,000,0000 plus one year of growth at 5.32% | 5 | | | 400,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 400,000.00 |
| Other 2001 Capex of $4,000,0000 plus one year of growth at 5.32% | 5 | | | | 400,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 800,000.00 |
| Other 2002 Capex of $4,000,0000 plus one year of growth at 5.32% | 5 | | | | | 400,000.00 | 800,000.00 | 800,000.00 | 800,000.00 |
| Other 2003 Capex of $4,000,0000 plus one year of growth at 5.32% | 5 | | | | | | 421,280.00 | 842,560.00 | 842,560.00 |

Prepared by Invotex Group

**Annual Accumulated Depreciation (c)**

| | Asset Life | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | Terminal Year 2005 |
|---|---|---|---|---|---|---|---|---|---|
| Other 2004 Capex of $4,000,0000 plus one year of growth at 5.32% | 5 | | | | | | | 443,692.10 | 887,384.19 |
| Other 2005 Capex of $4,000,0000 plus one year of growth at 5.32% | 5 | | | | | | | | 467,296.52 |
| Other Depreciation & Amortization (f) | | 3,194,800.00 (f) | 3,513,188.58 (f) | 3,081,525.88 (f) | 2,749,525.88 (f) | 2,415,525.88 (f) | 2,544,031.86 (b) | 2,679,374.35 (b) | 2,821,917.07 (b) |
| | | $ 3,194,800.00 | $ 9,083,000.00 | $ 10,652,000.00 | $ 11,120,000.00 | $ 11,586,000.00 | $ 9,395,785.98 | $ 8,625,237.19 | $ 7,692,234.70 |

Notes:
(a) Source - Court's Opinion and related spreadsheets.
(b) Capital Expenditures increased each year based upon the long term growth rate per the Court's Opinion.    5.32%
(c) Calculated based upon above expenditures, noted asset life, and assumes 1/2 year of depreciation in year of purchase.
(d) Assumed that 50% of the ER Relocation Capital Expenditures relate to the building, and therefore its asset life is 39 years.
(e) Assumed that 50% of the ER Relocation Capital Expenditures relate to the equipment, and therefore its asset life is 5 years.
(f) Other Depreciation & Amortization was added to equal the October projections used by the Court.

Prepared by Invotex Group

Proposed Adjustment for Depreciation and Amortization Expense - Reconsideration

|  | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Terminal |
|---|---|---|---|---|---|---|---|---|---|
| Depreciation and Amortization Expense per Opinion | $ 3,194,800.00 (a) | $ 9,083,000.00 (a) | $ 10,652,000.00 (a) | $ 11,120,000.00 (a) | $ 11,586,000.00 (a) | $ 12,202,375.20 (b) | $ 12,851,541.56 (b) | $ 13,535,243.57 (b) | |
| Revised Depreciation and Amortization Expense (c) | 3,194,800.00 | 9,083,000.00 | 10,652,000.00 | 11,120,000.00 | 11,586,000.00 | 9,395,785.98 (c) | 8,625,237.19 (c) | 7,692,234.70 (c) | |
| Reduced Depreciation and Amortization Expense | $ - | $ (0.00) | $ (0.00) | $ (0.00) | $ (0.00) | $ 2,806,589.22 | $ 4,226,304.37 | $ 5,843,008.87 | |
| Increased EBIT | $ - | $ (0.00) | $ (0.00) | $ (0.00) | $ (0.00) | $ 2,806,589.22 | $ 4,226,304.37 | $ 5,843,008.87 | |
| Cash Flow Adjustments: | | | | | | | | | |
| Less Increased Income Taxes (d) | - | 0.00 | 0.00 | 0.00 | 0.00 | (1,091,201.89) | (1,643,187.14) | (2,271,761.85) | |
| Reduced Depreciation and Amortization Expense | | | | | | (2,806,589.22) | (4,226,304.37) | (5,843,008.87) | |
| Reduced Net Cash Flow | - | (0.00) | (0.00) | (0.00) | (0.00) | (1,091,201.89) | (1,643,187.14) | (2,271,761.85) | (2,469,228.53) (e) |
| Capitalization Rate for Terminal Year | | | | | | | | | 12.82% (f) |
| Reduced Terminal Value | | | | | | | | | (19,260,753) |
| Reduced Terminal Net Cash Flow | | | | | | | | | |
| Discount Factor (g) | (1+19.36%)^0.07 98.77% | (1+19.36%)^0.64 89.29% | (1+19.36%)^1.64 74.81% | (1+19.36%)^2.64 62.67% | (1+18.14%)^3.64 54.51% | (1+18.14%)^4.64 46.14% | (1+18.14%)^5.64 39.06% | (1+18.14%)^6.64 33.06% | (1+18.14%)^7.14 30.41% |
| Reduced Present Value | $ - | $ (0.00) | $ (0.00) | $ (0.00) | $ (0.00) | $ (503,481.11) | $ (641,753.34) | $ (751,012.12) | $ (5,858,128.84) |
| Reduced Net Present Value | $ (7,754,375.42) | | | | | | | | |

Notes:
(a) Source - October projection used in Court's opinion.
(b) Years 2003 through 2005 calculated as year 2002 increased by the long term growth rate used in the Court's opinion:     5.32%
(c) Source - Exhibit 3
(d) Income tax rate per Opinion, page 144     38.88%
(e) Terminal Year Reduced Net Cash Flow calculated as year 2005 Reduced Net Cash Flow times
    one plus the WACC raised to the 1/2 power.  (Opinion page 171)
(f) Source - Opinion page 171
(g) Source - Opinion page 172

**EXHIBIT 1 TO MEMORANDUM DECISION RE MOTION FOR RECONSIDERATION**

**[Only change to Motion For Reconsideration Exhibit O: This Exhibit 1 includes $3.14 million in omitted 2003 depreciation (and the effects of that change).]**

**DEPRECIATION AND AMORTIZATION EXPENSE CHANGES AND IMPACT ON PRESENT VALUE OF EACH YEAR'S NET CASH FLOW**

| Asset | Life | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|
| Building | 39 | | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 |
| Equipment | 5 | | 2,400,000.00 | 2,400,000.00 | 2,400,000.00 | 2,400,000.00 | 2,400,000.00 | | |
| Cardiac Cath | 5 | | 240,000.00 | 240,000.00 | 240,000.00 | 240,000.00 | 240,000.00 | | |
| Computer 2.5MM | 5 | | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | | |
| Computer 9 MM | 5 | | 900,000.00 | 1,800,000.00 | 1,800,000.00 | 1,800,000.00 | 1,800,000.00 | 900,000.00 | |
| ER $295,894 | 5 & 39 | | 33,382.88 | 33,382.88 | 33,382.88 | 33,382.88 | 33,382.88 | 3,793.51 | 3,793.51 |
| ER $2,204, 106 | 5 & 39 | | 124,334.20 | 248,668.40 | 248,668.40 | 248,668.40 | 248,668.40 | 138,463.08 | 28,257.77 |
| Cosmetic $236,715 | 5 | | 47,343.00 | 47,343.00 | 47,343.00 | 47,343.00 | 47,343.00 | | |
| Cosmetic $1763285 | 5 | | 176,328.50 | 352,657.00 | 352,657.00 | 352,657.00 | 352,657.00 | 176,328.50 | |
| Other 1998 | 5 | | 107,397.20 | 107,397.20 | 107,397.20 | 107,397.20 | 107,397.20 | | |
| Other 1999 | 5 | | 400,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 400,000.00 | |
| Other 2000 | 5 | | | 400,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 400,000.00 |
| Other 2001 | 5 | | | | 400,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 800,000.00 |
| Other 2002 | 5 | | | | | 400,000.00 | 800,000.00 | 800,000.00 | 800,000.00 |
| Other 2003 | 5 | | | | | | 421,280.00 | 842,560.00 | 842,560.00 |
| Other 2004 | 5 | | | | | | | 443,692.10 | 887,384.19 |
| Other 2005 | 5 | | | | | | | | 467,296.52 |
| Other | | 3,194,800.00 | 3,513,188.58 | 3,081,525.88 | 2,749,525.88 | 2,415,525.88 | 2,544,031.86 | 2,679,374.35 | 2,821,917.07 |
| TOTAL DEPRECIATION | | 3,194,800.00 | 9,083,000.00 | 10,652,000.00 | 11,120,000.00 | 11,586,000.00 | 12,535,785.98 | 8,625,237.18 | 7,692,234.70 |
| Depreciation and amortiz'n | | | | | | | | | |
| per Opinion | | 3,194,800.00 | 9,083,000.00 | 10,652,000.00 | 11,120,000.00 | 11,586,000.00 | 12,202,375.20 | 12,851,541.56 | 13,535,243.57 |
| Revised | | 3,194,800.00 | 9,083,000.00 | 10,652,000.00 | 11,120,000.00 | 11,586,000.00 | 12,535,785.98 | 8,625,237.18 | 7,692,234.70 |
| Change | | - | - | - | - | - | (333,410.78) | 4,226,304.38 | 5,843,008.87 |
| Increased EBIT | | - | - | - | - | - | (333,410.78) | 4,226,304.38 | 5,843,008.87 |
| Tax Rate | | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 |
| Change in net cash flow | | - | - | - | - | - | 129,630.11 | (1,643,187.14) | (2,271,761.85) |
| Discount factor | | 0.9877 | 0.8929 | 0.7481 | 0.6267 | 0.5451 | 0.461400515 | 0.390554017 | 0.33058576 |
| Change in present value | | - | - | - | - | - | 59,811.40 | (641,753.34) | (751,012.12) |

Exhibit 1 to Memorandum Decision re Motion for Reconsideration - Page 1 of 2
Only change to Motion For Reconsideration Exhibit O: Includes $3.14 million in omitted 2003 depreciation, and that change's effects.

**CALCULATION OF CHANGE IN TERMINAL VALUE AND THAT CHANGE'S PRESENT VALUE, AND CALCULATION OF TOTAL OF ALL CHANGES IN PRESENT VALUE**

**1. Terminal Year Reduced Net Cash Flow calculated as year 2005 Reduced Net Cash Flow times one plus the WACC of .1814 raised to the 1/2 power:**

| | | |
|---|---|---|
| (1 + WACC) | 1.1814 | |
| (1 + WACC) Raised to 1/2 power | | 1.08692226 |
| 2005 reduced cash flow | | (2,271,761.85) |
| *Terminal Year Reduced Net Cash Flow* | | *(2,469,228.52)* |

**2. Change in Terminal Value:**

| | |
|---|---|
| Terminal Year Reduced Net Cash Flow | (2,469,228.52) |
| Divide by Capitalization Rate for Terminal Yr. | 0.1282 |
| *Change in Terminal Value* | *(19,260,752.92)* |

**3. Present Value of Change in Terminal Value**

| | |
|---|---|
| Change | (19,260,752.92) |
| Discount rate | 0.304148486 |
| *Present Value of Change* | *(5,858,128.84)* |

**4. Total of Changes to Present Value**

| Year | Change in Present Value of Cash Flow |
|---|---|
| 1998 | - |
| 1999 | - |
| 2000 | - |
| 2001 | - |
| 2002 | - |
| 2003 | 59,811.40 |
| 2004 | (641,753.34) |
| 2005 | (751,012.12) |
| Terminal | (5,858,128.84) |
| **TOTAL** | **(7,191,082.90)** |

Exhibit 1 to Memorandum Decision re Motion for Reconsideration - Page 2 of 2
Only change to Motion For Reconsideration Exhibit O: Includes $3.14 million in omitted 2003 depreciation, and that change's effects.

**EXHIBIT 2 TO MEMORANDUM DECISION RE MOTION FOR RECONSIDERATION**

**[Same as Exhibit 1 except that this Exhibit 2 treats the ER relocation expenses as 100% for 39-year property (and reflects the effects of that change).]**

**DEPRECIATION AND AMORTIZATION EXPENSE CHANGES AND IMPACT ON PRESENT VALUE OF EACH YEAR'S NET CASH FLOW**

| Asset | Life | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|
| Building | 39 | | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 |
| Equipment | 5 | | 2,400,000.00 | 2,400,000.00 | 2,400,000.00 | 2,400,000.00 | 2,400,000.00 | | |
| Cardiac Cath | 5 | | 240,000.00 | 240,000.00 | 240,000.00 | 240,000.00 | 240,000.00 | | |
| Computer 2.5MM | 5 | | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | | |
| Computer 9 MM | 5 | | 900,000.00 | 1,800,000.00 | 1,800,000.00 | 1,800,000.00 | 1,800,000.00 | 900,000.00 | |
| ER $295,894 | 39 | | 7,587.03 | 7,587.03 | 7,587.03 | 7,587.03 | 7,587.03 | 7,587.03 | 7,587.03 |
| ER $2,204, 106 | 39 | | 28,257.77 | 56,515.54 | 56,515.54 | 56,515.54 | 56,515.54 | 56,515.54 | 56,515.54 |
| Cosmetic $236,715 | 5 | | 47,343.00 | 47,343.00 | 47,343.00 | 47,343.00 | 47,343.00 | | |
| Cosmetic $1763285 | 5 | | 176,328.50 | 352,657.00 | 352,657.00 | 352,657.00 | 352,657.00 | 176,328.50 | |
| Other 1998 | 5 | | 107,397.20 | 107,397.20 | 107,397.20 | 107,397.20 | 107,397.20 | | |
| Other 1999 | 5 | | 400,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 400,000.00 | |
| Other 2000 | 5 | | | 400,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 400,000.00 |
| Other 2001 | 5 | | | | 400,000.00 | 800,000.00 | 800,000.00 | 800,000.00 | 800,000.00 |
| Other 2002 | 5 | | | | | 400,000.00 | 800,000.00 | 800,000.00 | 800,000.00 |
| Other 2003 | 5 | | | | | | 421,280.00 | 842,560.00 | 842,560.00 |
| Other 2004 | 5 | | | | | | | 443,692.10 | 887,384.19 |
| Other 2005 | 5 | | | | | | | | 467,296.52 |
| Other | | 3,194,800.00 | 3,635,060.87 | 3,299,474.60 | 2,967,474.60 | 2,633,474.60 | 2,773,575.44 | 2,921,129.66 | 3,076,533.76 |
| TOTAL DEPRECIATION | | 3,194,800.00 | 9,083,000.00 | 10,652,000.00 | 11,120,000.00 | 11,586,000.00 | 12,547,380.85 | 8,788,838.46 | 7,978,902.67 |
| Depreciation and amortiz'n | | | | | | | | | |
| per Opinion | | 3,194,800.00 | 9,083,000.00 | 10,652,000.00 | 11,120,000.00 | 11,586,000.00 | 12,202,375.20 | 12,851,541.56 | 13,535,243.57 |
| Revised | | 3,194,800.00 | 9,083,000.00 | 10,652,000.00 | 11,120,000.00 | 11,586,000.00 | 12,547,380.85 | 8,788,838.46 | 7,978,902.67 |
| Change | | - | - | - | - | - | (345,005.65) | 4,062,703.10 | 5,556,340.90 |
| Increased EBIT | | - | - | - | - | - | (345,005.65) | 4,062,703.10 | 5,556,340.90 |
| Tax Rate | | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 |
| Change in net cash flow | | - | - | - | - | - | 134,138.20 | (1,579,578.96) | (2,160,305.34) |
| Discount factor | | 0.9877 | 0.8929 | 0.7481 | 0.6267 | 0.5451 | 0.461400515 | 0.390554017 | 0.33058576 |
| Change in present value | | - | - | - | - | - | 61,891.43 | (616,910.91) | (714,166.18) |

Exhibit 2 to Memorandum Decision re Motion for Reconsideration - Page 1 of 2
Same as Exhibit 1, but additionally assumes that ER relocation expense is 100% for 39-year property.

**CALCULATION OF CHANGE IN TERMINAL VALUE AND THAT CHANGE'S PRESENT VALUE, AND CALCULATION OF TOTAL OF
ALL CHANGES IN PRESENT VALUE**

**1.  Terminal Year Reduced Net Cash Flow calculated as year 2005 Reduced Net Cash Flow times
one plus the WACC of .1814 raised to the 1/2 power:**

| | | |
|---|---|---|
| (1 + WACC) | 1.1814 | |
| (1 + WACC) Raised to 1/2 power | | 1.08692226 |
| 2005 reduced cash flow | | (2,160,305.34) |
| *Terminal Year Reduced Net Cash Flow* | | *(2,348,083.97)* |

**2.  Change in Terminal Value:**

| | |
|---|---|
| Terminal Year Reduced Net Cash Flow | (2,348,083.97) |
| Divide by Capitalization Rate for Terminal Yr. | 0.1282 |
| *Change in Terminal Value* | *-18315787.56* |

**3.  Present Value of Change in Terminal Value**

| | |
|---|---|
| Change | (18,315,787.56) |
| Discount rate | 0.304148486 |
| *Present Value of Change* | *(5,570,719.06)* |

**4.  Total of Changes to Present Value**

| Year | Change in Present Value of Cash Flow |
|---|---|
| 1998 | - |
| 1999 | - |
| 2000 | - |
| 2001 | - |
| 2002 | - |
| 2003 | 61,891.43 |
| 2004 | (616,910.91) |
| 2005 | (714,166.18) |
| Terminal | (5,570,719.06) |
| **TOTAL** | **(6,839,904.72)** |

Exhibit 2 to Memorandum Decision re Motion for Reconsideration - Page 2 of 2
Same as Exhibit 1, but additionally assumes that ER relocation expense
 is 100% for 39-year property.

**EXHIBIT 3 TO MEMORANDUM DECISION RE MOTION FOR RECONSIDERATION**

**[Same as Exhibit 2, but additionally assumes that "Other 1998," "Other 1999," Other 2000," and "Other 2001" are 100% 39-year property (and reflects that change's effects).]**

**DEPRECIATION AND AMORTIZATION EXPENSE CHANGES AND IMPACT ON PRESENT VALUE OF EACH YEAR'S NET CASH FLOW**

| Asset | Life | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|
| Building | 39 | | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 |
| Equipment | 5 | | 2,400,000.00 | 2,400,000.00 | 2,400,000.00 | 2,400,000.00 | 2,400,000.00 | | |
| Cardiac Cath | 5 | | 240,000.00 | 240,000.00 | 240,000.00 | 240,000.00 | 240,000.00 | | |
| Computer 2.5MM | 5 | | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | | |
| Computer 9 MM | 5 | | 900,000.00 | 1,800,000.00 | 1,800,000.00 | 1,800,000.00 | 1,800,000.00 | 900,000.00 | |
| ER $295,894 | 39 | | 7,587.03 | 7,587.03 | 7,587.03 | 7,587.03 | 7,587.03 | 7,587.03 | 7,587.03 |
| ER $2,204, 106 | 39 | | 28,257.77 | 56,515.54 | 56,515.54 | 56,515.54 | 56,515.54 | 56,515.54 | 56,515.54 |
| Cosmetic $236,715 | 5 | | 47,343.00 | 47,343.00 | 47,343.00 | 47,343.00 | 47,343.00 | | |
| Cosmetic $1763285 | 5 | | 176,328.50 | 352,657.00 | 352,657.00 | 352,657.00 | 352,657.00 | 176,328.50 | |
| Other 1998 | 39 | | 13,768.87 | 13,768.87 | 13,768.87 | 13,768.87 | 13,768.87 | 13,768.87 | 13,768.87 |
| Other 1999 | 39 | | 51,282.05 | 102,564.10 | 102,564.10 | 102,564.10 | 102,564.10 | 102,564.10 | 102,564.10 |
| Other 2000 | 39 | | | 51,282.05 | 102,564.10 | 102,564.10 | 102,564.10 | 102,564.10 | 102,564.10 |
| Other 2001 | 39 | | | | 51,282.05 | 102,564.10 | 102,564.10 | 102,564.10 | 102,564.10 |
| Other 2002 | 5 | | | | | 400,000.00 | 800,000.00 | 800,000.00 | 800,000.00 |
| Other 2003 | 5 | | | | | | 421,280.00 | 842,560.00 | 842,560.00 |
| Other 2004 | 5 | | | | | | | 443,692.10 | 887,384.19 |
| Other 2005 | 5 | | | | | | | | 467,296.52 |
| Other | | 3,194,800.00 | 4,077,407.14 | 4,439,256.77 | 4,804,692.67 | 4,819,410.62 | 5,075,803.26 | 5,345,835.99 | 5,630,234.47 |
| TOTAL DEPRECIATION | | 3,194,800.00 | 9,083,000.00 | 10,652,000.00 | 11,120,000.00 | 11,586,000.00 | 12,663,672.64 | 9,535,005.98 | 9,654,064.56 |
| Depreciation and amortiz'n | | | | | | | | | |
| per Opinion | | 3,194,800.00 | 9,083,000.00 | 10,652,000.00 | 11,120,000.00 | 11,586,000.00 | 12,202,375.20 | 12,851,541.56 | 13,535,243.57 |
| Revised | | 3,194,800.00 | 9,083,000.00 | 10,652,000.00 | 11,120,000.00 | 11,586,000.00 | 12,663,672.64 | 9,535,005.98 | 9,654,064.56 |
| Change | | - | - | - | - | - | (461,297.44) | 3,316,535.58 | 3,881,179.01 |
| Increased EBIT | | - | - | - | - | - | (461,297.44) | 3,316,535.58 | 3,881,179.01 |
| Tax Rate | | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 |
| Change in net cash flow | | - | - | - | - | - | 179,352.45 | (1,289,469.03) | (1,509,002.40) |
| Discount factor | | 0.9877 | 0.8929 | 0.7481 | 0.6267 | 0.5451 | 0.461400515 | 0.390554017 | 0.33058576 |
| Change in present value | | - | - | - | - | - | 82,753.31 | (503,607.31) | (498,854.70) |

Exhibit 3 to Memorandum Decision re Motion for Reconsideration - Page 1 of 2
Same as Exhibit 2, but additionally assumes that "Other 1998," "Other 1999," Other 2000," and "Other 2001" are 100% 39-year property.

**CALCULATION OF CHANGE IN TERMINAL VALUE AND THAT CHANGE'S PRESENT VALUE, AND CALCULATION OF TOTAL OF
ALL CHANGES IN PRESENT VALUE**

**1. Terminal Year Reduced Net Cash Flow calculated as year 2005 Reduced Net Cash Flow times
one plus the WACC of .1814 raised to the 1/2 power:**

| | | |
|---|---|---|
| (1 + WACC) | 1.1814 | |
| (1 + WACC) Raised to 1/2 power | | 1.08692226 |
| 2005 reduced cash flow | | (1,509,002.40) |
| *Terminal Year Reduced Net Cash Flow* | | *(1,640,168.30)* |

**2. Change in Terminal Value:**

| | |
|---|---|
| Terminal Year Reduced Net Cash Flow | (1,640,168.30) |
| Divide by Capitalization Rate for Terminal Yr. | 0.1282 |
| *Change in Terminal Value* | *(12,793,824.47)* |

**3. Present Value of Change in Terminal Value**

| | |
|---|---|
| Change | (12,793,824.47) |
| Discount rate | 0.304148486 |
| *Present Value of Change* | *(3,891,222.34)* |

**4. Total of Changes to Present Value**

| Year | Change in Present Value of Cash Flow |
|---|---|
| 1998 | - |
| 1999 | - |
| 2000 | - |
| 2001 | - |
| 2002 | - |
| 2003 | 82,753.31 |
| 2004 | (503,607.31) |
| 2005 | (498,854.70) |
| Terminal | (3,891,222.34) |
| **TOTAL** | **(4,810,931.05)** |

Exhibit 3 to Memorandum Decision re Motion for Reconsideration - Page 2 of 2
Same as Exhibit 2, but additionally assumes that "Other 1998," "Other 1999," Other 2000,"
and "Other 2001" are 100% 39-year property.

**EXHIBIT 4 TO MEMORANDUM DECISION RE MOTION FOR RECONSIDERATION**

**[Same as Exhibit 3, but additionally assumes that "Equipment" and "Cardiac Cath" are treated as seven-year property.]**

**DEPRECIATION AND AMORTIZATION EXPENSE CHANGES AND IMPACT ON PRESENT VALUE OF EACH YEAR'S NET CASH FLOW**

| Asset | Life | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|
| Building | 39 | | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 | 641,025.64 |
| Equipment | 7 | | 1,714,285.70 | 1,714,285.70 | 1,714,285.70 | 1,714,285.70 | 1,714,285.70 | 1,714,285.70 | 1,714,285.70 |
| Cardiac Cath | 7 | | 1,714,285.70 | 1,714,285.70 | 1,714,285.70 | 1,714,285.70 | 1,714,285.70 | 1,714,285.70 | 1,714,285.70 |
| Computer 2.5MM | 5 | | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | | |
| Computer 9 MM | 5 | | 900,000.00 | 1,800,000.00 | 1,800,000.00 | 1,800,000.00 | 1,800,000.00 | 900,000.00 | |
| ER $295,894 | 39 | | 7,587.03 | 7,587.03 | 7,587.03 | 7,587.03 | 7,587.03 | 7,587.03 | 7,587.03 |
| ER $2,204, 106 | 39 | | 28,257.77 | 56,515.54 | 56,515.54 | 56,515.54 | 56,515.54 | 56,515.54 | 56,515.54 |
| Cosmetic $236,715 | 5 | | 47,343.00 | 47,343.00 | 47,343.00 | 47,343.00 | 47,343.00 | | |
| Cosmetic $1763285 | 5 | | 176,328.50 | 352,657.00 | 352,657.00 | 352,657.00 | 352,657.00 | 176,328.50 | |
| Other 1998 | 39 | | 13,768.87 | 13,768.87 | 13,768.87 | 13,768.87 | 13,768.87 | 13,768.87 | 13,768.87 |
| Other 1999 | 39 | | 51,282.05 | 102,564.10 | 102,564.10 | 102,564.10 | 102,564.10 | 102,564.10 | 102,564.10 |
| Other 2000 | 39 | | | 51,282.05 | 102,564.10 | 102,564.10 | 102,564.10 | 102,564.10 | 102,564.10 |
| Other 2001 | 39 | | | | 51,282.05 | 102,564.10 | 102,564.10 | 102,564.10 | 102,564.10 |
| Other 2002 | 5 | | | | | 400,000.00 | 800,000.00 | 800,000.00 | 800,000.00 |
| Other 2003 | 5 | | | | | | 421,280.00 | 842,560.00 | 842,560.00 |
| Other 2004 | 5 | | | | | | | 443,692.10 | 887,384.19 |
| Other 2005 | 5 | | | | | | | | 467,296.52 |
| Other | | 3,194,800.00 | 3,288,835.74 | 3,650,685.37 | 4,016,121.27 | 4,030,839.22 | 4,245,279.86 | 4,471,128.75 | 4,708,992.80 |
| TOTAL DEPRECIATION | | 3,194,800.00 | 9,083,000.00 | 10,652,000.00 | 11,120,000.00 | 11,586,000.00 | 12,621,720.65 | 12,088,870.14 | 12,161,394.29 |
| Depreciation and amortiz'n | | | | | | | | | |
| per Opinion | | 3,194,800.00 | 9,083,000.00 | 10,652,000.00 | 11,120,000.00 | 11,586,000.00 | 12,202,375.20 | 12,851,541.56 | 13,535,243.57 |
| Revised | | 3,194,800.00 | 9,083,000.00 | 10,652,000.00 | 11,120,000.00 | 11,586,000.00 | 12,621,720.65 | 12,088,870.14 | 12,161,394.29 |
| Change | | - | - | - | - | - | (419,345.45) | 762,671.42 | 1,373,849.28 |
| Increased EBIT | | - | - | - | - | - | (419,345.45) | 762,671.42 | 1,373,849.28 |
| Tax Rate | | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 | 0.3888 |
| Change in net cash flow | | - | - | - | - | - | 163,041.51 | (296,526.65) | (534,152.60) |
| Discount factor | | 0.9877 | 0.8929 | 0.7481 | 0.6267 | 0.5451 | 0.461400515 | 0.390554017 | 0.33058576 |
| Change in present value | | - | - | - | - | - | 75,227.44 | (115,809.67) | (176,583.24) |

Exhibit 4 to Memorandum Decision re Motion for Reconsideration - Page 1 of 2
Same as Exhibit 3, but additionally assumes that "Equipment" and "Cardiac Cath" are treated as seven-year property.

**CALCULATION OF CHANGE IN TERMINAL VALUE AND THAT CHANGE'S PRESENT VALUE, AND CALCULATION OF TOTAL OF**
**ALL CHANGES IN PRESENT VALUE**

**1.  Terminal Year Reduced Net Cash Flow calculated as year 2005 Reduced Net Cash Flow times**
**one plus the WACC of .1814 raised to the 1/2 power:**

| | | |
|---|---|---:|
| (1 + WACC) | 1.1814 | |
| (1 + WACC) Raised to 1/2 power | | 1.08692226 |
| 2005 reduced cash flow | | (534,152.60) |
| *Terminal Year Reduced Net Cash Flow* | | *(580,582.35)* |

**2.  Change in Terminal Value:**

| | |
|---|---:|
| Terminal Year Reduced Net Cash Flow | (580,582.35) |
| Divide by Capitalization Rate for Terminal Yr. | 0.1282 |
| *Change in Terminal Value* | *(4,528,723.48)* |

**3.  Present Value of Change in Terminal Value**

| | |
|---|---:|
| Change | (4,528,723.48) |
| Discount rate | 0.304148486 |
| *Present Value of Change* | *(1,377,404.39)* |

**4.  Total of Changes to Present Value**

| Year | Change in Present Value of Cash Flow |
|---|---:|
| 1998 | - |
| 1999 | - |
| 2000 | - |
| 2001 | - |
| 2002 | - |
| 2003 | 75,227.44 |
| 2004 | (115,809.67) |
| 2005 | (176,583.24) |
| Terminal | (1,377,404.39) |
| **TOTAL** | **(1,594,569.87)** |

Exhibit 4 to Memorandum Decision re Motion for Reconsideration - Page 2 of 2
Same as Exhibit 3, but additionally assumes that "Equipment" and "Cardiac Cath"
are treated as seven-year property.